FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

OCT 2 9 2026

TAMMY H. DOWNS, CLERK
By: DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ADP LITTLE ROCK DATA HUB, LLC** **PLAINTIFF**

**vs.** **Case No.** 4:26-cv-1196-LPR

**PULASKI COUNTY, ARKANSAS;**
**BARRY HYDE, in his official capacity as Pulaski County Judge;**
**JULIE BLACKWOOD, in her official capacity as Pulaski County Justice of the Peace** **DEFENDANTS**

This case assigned to District Judge Rudofsky
and to Magistrate Judge Ervin

**COMPLAINT**

Plaintiff ADP Little Rock Data Hub, LLC ("ADP") brings this complaint against Defendants Pulaski County, Arkansas, Barry Hyde, in his official capacity as Pulaski County Judge, and Julie Blackwood, in her official capacity as a Pulaski County Justice of the Peace. This complaint seeks a judicial declaration that Pulaski County Ordinance No. 26-OR-19 ("the Ordinance") is unlawful, unconstitutional, and without effect. ADP seeks a judicial declaration that Ordinance 26-OR-19 is invalid on its face and as applied to ADP and all those in privity with ADP. To obtain complete relief, ADP seeks preliminary and permanent prospective injunctive relief, damages, and the reimbursement of its attorneys' fees and costs.

**PARTIES, JURISDICTION, AND VENUE**

1. ADP is a limited liability company organized under Delaware law that is building a data center project in Pulaski County, Arkansas.

2. Defendant Pulaski County, Arkansas ("the County") is a subordinate political subdivision of the State of Arkansas. ADP brings claims against the County for monetary, declaratory, and injunctive relief based on Ordinance 26-OR-19, which was officially adopted and promulgated by the County's officers. 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs. of City of*

*New York*, 436 U.S. 658, 689-691 (1978). The Pulaski County Quorum Court ("Quorum Court") is the County's legislative body which enacted Ordinance 26-OR-19.

3. Defendant Pulaski County Judge Barry Hyde ("Judge Hyde") is a natural person and citizen of Arkansas who serves as the Pulaski County Judge. Judge Hyde vetoed Ordinance 26-OR-19, but the Quorum Court overrode Judge Hyde's veto. Judge Hyde is a public official charged with enforcing Ordinance 26-OR-19 and supervising officers, agents, servants, employees, and attorneys of the County, including all personnel charged with enforcing Ordinance 26-OR-19. ADP brings claims against Judge Hyde solely in his official capacity.

4. Defendant Pulaski County Justice of the Peace Julie Blackwood ("Justice Blackwood") is a natural person and citizen of Arkansas who serves as a member of the Pulaski County Quorum Court as a Pulaski County Justice of the Peace. Justice Blackwood is a public official and custodian of public records related to Ordinance 26-OR-19. ADP brings claims against Justice Blackwood solely in her official capacity as a custodian of unlawfully withheld public records.

5. Defendants have acted under color of state law for all purposes giving rise to this action. 42 U.S.C. § 1983.

6. This Court has original jurisdiction over this action which arises under the Constitution, laws, or treaties of the United States and seeks to redress the deprivation under color of law of rights, privileges, and immunities secured by the Constitution of the United States and any Act of Congress providing for equal rights of all persons within the jurisdiction of the United States. 28 U.S.C. §§ 1331, 1343.

7. This Court has supplemental jurisdiction over all claims that are so related to claims in this action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution. 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over all Defendants.

9. Venue is proper in this Court as it is a judicial district in which the defendants reside and where a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. §§ 1391(b)(1)-(2).

## SUMMARY OF CLAIMS

10. Over the course of 2026, candidate for Pulaski County Judge Wendell Griffen has exercised unlawful control over the Pulaski County Quorum Court despite holding no office authorizing the exercise of official governmental power.

11. During that period, working in active concert with members of the Quorum Court, Griffen developed, endorsed, deliberated, and sponsored Ordinance 26-OR-19.

12. But Ordinance 26-OR-19 is preempted under federal law, including the Federal Power Act, because the federal government holds exclusive jurisdiction over the operation, transmission, and sale of electric energy in interstate commerce through the Federal Energy Regulatory Commission ("FERC"). 16 U.S.C. § 824(b); *New York v. FERC*, 535 U.S. 1, 6-7 (2002).

13. And Ordinance 26-OR-19 is without effect because it is an obstacle to the full exercise of the federal government's authorities under the Federal Power Act to regulate the transmission of electricity. *Id.*

14. Enforcement of Ordinance 26-OR-19 will directly affect transmission rates, which are committed to FERC's exclusive authority to set and oversee. 16 U.S.C. § 824e; *e.g.*, 195 FERC ¶ 61,212 (June 18, 2026).

15. Ordinance 26-OR-19 regulates and discriminates against interstate commerce in violation of the Commerce Clause of the United States Constitution.

16. Ordinance 26-OR-19 is preempted under Arkansas law because the Arkansas Public Service Commission ("PSC") holds exclusive jurisdiction over the generation and retail sale of electricity. Ark. Code Ann. §§ 23-4-201(a)(1), *et seq.*

17. Ordinance 26-OR-19 is without effect because it is an obstacle to the full exercise of the PSC's authority to determine the rates to be charged for each kind of product or service to be furnished or rendered by electric, gas, telephone, or sewer public utilities in Arkansas. Ark. Code Ann. §§ 23-4-201(a)(1), *et seq.*

18. Enforcement of Ordinance 26-OR-19 will directly affect the PSC's retail electricity rates, which are committed to the PSC's exclusive authority. *Id.*

19. Ordinance 26-OR-19 was adopted to target ADP's data center for disparate treatment even though other industrial and commercial operations within Pulaski County trigger the threshold amounts of water and electricity consumption identified in Section 4.1 of the Ordinance.

20. Ordinance 26-OR-19 was adopted due to ill will against ADP and to deny ADP rights enjoyed by similarly situated businesses located in Pulaski County in violation of the Equal Protection Clause of the United States Constitution.

21. Ordinance 26-OR-19 interferes with ADP's vested contracts and contract rights, and it attempts to regulate ADP's data center retroactively—despite the County's existing site plan approval—in violation of the Due Process, Contracts, and Takings Clauses of the United States Constitution.

22. Members of the Quorum Court, working with Griffen, deliberated the adoption and veto override of Ordinance 26-OR-19 outside of public meetings in violation of the Freedom of Information Act, Ark. Code Ann. § 25-19-106. As a result, Ordinance 26-OR-19 is invalid and without effect.

23. In furtherance of their coordination, Defendants and other custodians of public records have unlawfully withheld materials from a duly submitted written request for examination and copying of public records relating to Ordinance 26-OR-19.

## FACTS

### ADP's Development and Site Plan Approval

24. ADP entered contracts to purchase undeveloped land in Pulaski County to build its data center.

25. Pursuant to the Pulaski County Planning Board rules and requirements in effect at the time, ADP obtained Final Site Plan Approval from the County to begin construction of its data center.

26. ADP has spent substantial sums towards developing the data center totaling tens of millions of dollars.

27. ADP has a binding Electricity Service Agreement ("ESA") with Entergy Arkansas to supply up to 150 megawatts ("MW") of electricity to the data center at an annual cost of tens of millions of dollars. The ESA has a required start date for construction and operation. To meet the start date, construction must begin immediately.

28. ADP has also secured rights to use water for the data center from Central Arkansas Water.

29. ADP submitted the AVAIO Data Center Site Plan ("Site Plan") for conditional approval by Pulaski County, Arkansas.

30. The Site Plan contains confidential, trade-secret, and financial information entitled to protections under federal law, including the Defend Trade Secrets Act, and exemptions to the Arkansas Freedom of Information Act, but ADP stands ready to submit the Site Plan for *in camera* review, under seal at a suitable proceeding, or pursuant to a confidentiality protective order under Fed. R. Civ. P. 26(c).

31. On or about August 10, 2026, ADP received verified 911 Address information for Parcel # 35R0240002300, 35R0241300100, 35R0240002304, & 35R0190006800 from Pulaski County Planning and Development. Ex. 1, 911 Address Verification.

32. On or about August 11, 2026, ADP received Final Site Plan Approval from the Pulaski County Planning and Development, approving without conditions the Site Plan which ADP had previously submitted for the County's review. Ex. 2, Site Plan Approval Letter of August 11, 2026.

33. ADP obtained Final Site Plan Approval, entered the ESA, and invested tens of millions of dollars in the planned development before the Quorum Court first voted on Ordinance 26-OR-19 (then known as Item 26-I-56) in August 2026.

34. Despite ADP's receipt of Site Plan approvals and 911 Address verification, Ordinance 26-OR-19 threatens ADP's data center development, investments, and agreements due to the targeted, unreasonable, undefined, unauthorized, ultra vires, and arbitrary additional reviews and approvals required by the Ordinance, all of which are designed to impair ADP's rights and investment.

Deliberation and Adoption of Ordinance 26-OR-19

35. Led by Griffen, several members of Pulaski County's Quorum Court opposed AVAIO's project and developed and deliberated on Ordinance 26-OR-19 in secret before Griffen presented it at a Quorum Court meeting on behalf of its nominal sponsor, Justice Blackwood.

36. Before Ordinance 26-OR-19 was presented at a public meeting, members of the Quorum Court, working with Griffen, had deliberated and decided to adopt it through private communications outside of public scrutiny and in violation of the Open Meetings requirements of the Arkansas Freedom of Information Act.

37. This group had been conducting secret conversations for several months to determine how to enact an ordinance that would frustrate ADP in building its data center.

38. For example, on April 28, 2026, Griffen emailed fourteen members of the Quorum Court a draft ordinance that would permit high-intensity digital infrastructure uses only by conditional use permit. He wrote: "After speaking with some of you individually in recent days I have revised the resolution that I submitted to you last week . . . ."

39. On May 4, 2026, Justin Blagg, a County employee who serves as the Quorum Court's Director and Parliamentarian, sent Griffen formatted drafts of his measures and asked Griffen to let him know if he had "some sponsors lined up."

40. On May 26, 2026, amid an ongoing meeting of the Quorum Court to consider a different data center ordinance, Griffen texted Justices Blackwood, Lewison, Capps, and Davis urging them, "Vote NO on the amendment! NO! Special treatment for AVAIO." They did so.

41. "Special treatment" for AVAIO, which is ADP's affiliate, is a consistent thread through the private communications in which this group of Justices of the Peace of Pulaski County

collaborated to target ADP, culminating in Ordinance 26-OR-19. As set forth in detail in Count VIII, all these communications violated the Freedom of Information Act.

42. On Friday, September 18, 2026, Griffen emailed Justice Blackwood: "We need an updated emergency clause for Item 26-I-56 . . . . I suggest that you submit the following Amendment to Item 26-I-56 on Monday."

43. In advance of the Quorum Court's meeting on September 22, 2026, persons acting in concert with Griffen and this group of Justices of the Peace coordinated impermissible private polling of Justices of the Peace to determine how they would vote on Ordinance 26-OR-19 at the public meeting.

44. On September 22, 2026, the Quorum Court voted to enact Ordinance 26-OR-19, which takes substantially the same form as the document submitted in support of this Complaint as Exhibit 3, when it was known as 26-I-56. *See* Ex. 3, Ordinance 26-OR-19.

45. During the ongoing September 22, 2026, public meeting, persons acting in concert with Griffen and this group of Justices of the Peace coordinated the reinstatement of an Emergency Clause, which had earlier been removed from the measure.

46. By reinstating the Emergency Clause, the Quorum Court ensured Ordinance 26-OR-19 would have taken effect "immediately upon passage by the quorum court and approval by the county judge." Ark. Code Ann. § 14-14-908(f).

47. But on September 25, 2026, Judge Hyde vetoed Ordinance 26-OR-19 due to well-founded concerns that it would violate ADP's rights with respect to its data center and that the Ordinance would overstep the County's legitimate authority by conflicting with federal and state regulation of the project. Ex. 4, Judge Hyde Veto of Ordinance 26-OR-19; Ark. Code Ann. § 14-14-911(a).

48. Yet on October 27, 2026, the Quorum Court voted to override Judge Hyde's veto to enact Ordinance 26-OR-19, including the Emergency Clause to give it immediate effect.

<u>What the Ordinance Does and Does Not Do</u>

49. A primary purpose of Ordinance 26-OR-19 is to "require project-specific disclosure and review of electrical demand, …transportation, … on-site generation, battery energy storage, and decommissioning before approval, permitting, construction, or material modification of High-Intensity Digital Infrastructure (HIDIU) land use project." Art. 2 (d).

50. Ordinance 26-OR-19 defines a "HIDIU" project to include a use involving "Continuous Electrical Demand [as opposed to consumption] of ten (10) megawatts or greater for a facility, project site, phased development, or integrated campus." Section 4.1(a).

51. Ordinance 26-OR-19 alternatively defines a "HIDIU" project to include a use involving one hundred thousand square feet or more of building area "primarily devoted to digital computing equipment, servers, networking, data processing, or related digital infrastructure." Section 4.1(b).

52. Ordinance 26-OR-19 alternatively defines a "HIDIU" project to include a use involving "projected or actual average water demand [as opposed to consumption] of one hundred thousand (100,000) gallons per day for cooling, processing, or operations." Section 4.1(c).

53. There are numerous industrial and commercial operations within Pulaski County that meet one of these definitions and therefore are a "HIDIU." But the Ordinance expressly exempts them from regulation as "Ordinary office buildings, hospitals, educational institutions, research laboratories, manufacturing facilities, distribution centers, telecommunications facilities, governmental facilities, public utility infrastructure, and other commercial or industrial uses […] when digital computing is merely incidental or accessory to their principal use." Section 4.1.

54. Ordinance 26-OR-19 intentionally targets only ADP's data center.

55. Under Ordinance 26-OR-19, a property owner and proposed operator must submit to the County an application that includes "electrical-load analysis, utility correspondence, proposed substations, transmission and distribution facilities, on-site generation, generators, fuel systems, and battery systems." Section 6.2.

56. Ordinance 26-OR-19 declares that an application "shall be approved only upon written findings, supported by substantial evidence in the County proceedings, that the Applicant has established each of the following: Infrastructure Capacity. Adequate electrical, water, wastewater, transportation, drainage, telecommunications, and other necessary infrastructure exists or will be provided before operations and the use will not materially impair safe, reliable, or efficient infrastructure usage service to surrounding properties." Article 7(a).

57. Even after issuing a conditional use permit to an applicant, Ordinance 26-OR-19 requires an additional proceeding before the County in the event of a "material modification," which could be "an increase in approved continuous electrical demand equal to or exceeding the lesser of ten percent (10%) of the approved demand or five (5) megawatts." Section 8.2(a).

58. Applications must be made to the County Planning Board with a right of appeal to the Quorum Court unless applicable Arkansas law requires an appeal to Circuit Court. Section 9.2.

59. That right of appeal extends not only to "the Applicant or Permit Holder" and "Affected Public-Service Entity," Section 9.2(a), (c), but also to "an owner or lawful occupant of property that *may* be materially affected by the Planning Board decision," Section 9.2(b) (emphasis added), and even to "a person who submitted evidence or comments before the Planning Board" who "demonstrates a concrete and particularized effect upon the person's property, use and enjoyment of property, health, safety, legal rights, or other legally protected interest" including

both those that are "actual" or "reasonably probable and different in kind or degree from the effect on the public generally." Section 9.2(d).

60. Ordinance 26-OR-19 directly regulates "Electrical Infrastructure." It provides: "Before operations, the Permit Holder shall provide competent evidence that required electrical infrastructure is complete or available. The County may consider on-site and adjacent utility infrastructure for land-use impacts to the extent permitted by law. This section does not regulate utility rates, tariffs, service contracts, or matters within the authority of the Arkansas Public Service Commission." Section 10.4.

61. Section 10.4 provides no standard by which the County will determine that "required" infrastructure is complete or available nor any standard for "competent evidence."

62. Ordinance 26-OR-19 monitors electrical usage and infrastructure on an annual basis by requiring a report containing "actual peak, average, and maximum coincident electrical demand during the reporting period, together with the approved Continuous Electrical Demand and any material change in electrical-load assumptions, equipment, or phased buildout." Section 12.4(b).

63. Ordinance 26-OR-19's annual report requires reporting of "generator operation, including testing, maintenance, emergency use, extended operation, fuel consumption" as well as "battery thermal events," "extended emergency generation," and "corrective measures," all of which affect the generation, transmission, and consumption of electricity. Section 12.4(d), (f). These regulations require reporting of "*material* operational, equipment, ownership, control, or site changes" and "*material* complaints received" without defining any standard of materiality that triggers a reporting requirement. Section 12.4(e), (g) (emphasis added).

64. Ordinance 26-OR-19 purports to authorize the County to "obtain judicial process or pursue another lawful remedy" "if lawful access is denied," without defining "lawful access" and without identifying any basis for County or County officials to enjoy indefinite "access" to ADP's private property. Section 12.6.

Federal Preemption

65. These provisions of Ordinance 26-OR-19, individually and in the aggregate, state that the Pulaski County Planning Board and, in certain circumstances, the Quorum Court, will have decision-making authority based on the County's assessment of electrical demand, usage, supply, transmission, and capacity, all of which directly interfere with the exclusive federal jurisdiction to regulate electrical transmission and wholesale rates under the Federal Power Act.

66. The Federal Power Act confers that exclusive authority on FERC, including the authority to institute proceedings to remedy unjust, unreasonable, and unduly discriminatory or preferential rates, charges, or classifications set by public utilities for the transmission or wholesale of electricity. 16 U.S.C. § 824e.

67. Exercising its authority conferred by 16 U.S.C. § 824e, FERC recently described its exclusive jurisdiction in matters concerning data centers in a proceeding FERC initiated to order Midcontinent Independent System Operator ("MISO") to show cause why MISO's existing tariffs do not impermissibly delay and deter large-load interconnections, such as ADP's data center project. 195 FERC ¶ 61,212, ¶ 45, p. 30 (June 18, 2026). FERC stated:

> As applied to large load additions to the transmission system, these principles mean that [FERC] has exclusive jurisdiction over the rates, terms, and conditions of interstate transmission service to Eligible Customers on behalf of large loads connecting to the transmission system, and the practices directly affecting the provision of such interstate transmission of electricity. An essential component of providing such transmission service is the process by which the transmission provider and/or transmission owner evaluates (1) whether it can provide the requested transmission service and (2) the impact that providing such transmission

> service will have on the jurisdictional transmission system, including determining whether any new or upgraded transmission facilities are needed to provide transmission service to Eligible Customers on behalf of large loads, the costs of which are included in transmission rates. As such, this study process directly affects Commission-jurisdictional transmission rates. The Commission has exclusive authority to ensure that the process to study the provision of transmission service to Eligible Customers is just and reasonable and not unduly discriminatory or preferential. We therefore find that we have authority to ensure that tariffs include provisions that clearly and consistently address the study process for the provision of transmission service to Eligible Customers on behalf of large loads, including the unique impacts that providing transmission service to Eligible Customers on behalf of large loads may have on the transmission system.

FERC explained at ¶ 43, page 29:

> [C]ertain aspects of the process for integrating large loads onto the transmission system fall squarely within the Commission's exclusive jurisdiction. Specifically, we find that it is within the Commission's exclusive authority to ensure that transmission provider and/or transmission owner tariffs include sufficiently clear and consistent provisions governing how transmission service to Eligible Customers on behalf of large loads interconnecting to the transmission system will be studied, including whether new or upgraded transmission facilities are necessary to provide the requested transmission service. The Commission has jurisdiction over the study process for transmission service to both Eligible Customers and on behalf of large loads and unbundled retail transmission service to end-use large load customers where, pursuant to state law or a public utility's voluntary offer of such service, the large load is an Eligible Customer under the transmission provider and/or transmission owner tariffs.

68. Pulaski County's attempt to regulate based on electrical usage, demand, transmission, or supply necessarily intrudes upon and is preempted by FERC's exclusive jurisdiction. Electrical inputs such as usage, demand, transmission, and supply necessarily affect wholesale rates charged by electrical service providers such as Entergy Arkansas and the terms and rates for interstate transmission of electricity through the power grid:

> [T]he Commission must ensure that the rates, charges, and classifications for such transmission of electricity—as well as the practices directly affecting such transmission of electricity—are just and reasonable and not unduly discriminatory or preferential." *Id.* §§ 824d, 824e; *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016) (*EPSA*) (approving "a common-sense construction of the FPA's language, limiting FERC's 'affecting' jurisdiction to rules or practices that 'directly affect the wholesale rate'") (cleaned up)). The Supreme Court has held that the Commission's authority over interstate transmission is not limited to wholesale

> transmission service and that the Commission has authority over unbundled retail transmission service. *New York v. FERC*, 535 U.S. 1, 17, 19-20 (2002) (upholding the Commission's exercise of jurisdiction over unbundled retail transmission service). As part of its transmission authority, the Commission has exercised jurisdiction over the terms of certain interconnections to the transmission system as an element of transmission service, including the interconnection of wholesale load to the transmission system. (citing *Tenn. Power Co.*, 90 FERC ¶ 61,238, at 61,761 (2000) (*Tennessee Power*), *order denying reh'g*, 91 FERC 61,271 (2000); *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103, at P 9 (2003); *see also Laguna Irrigation Dist.*, 91 FERC ¶ 61,340, at 62,152 (2000); *Pac. Gas & Elec. Co.*, 109 FERC ¶ 61,392, at P 37 (2004); *Pac. Gas & Elec. Co.*, 115 FERC ¶ 61,193, at PP 36-38 (2006)).

195 FERC ¶ 61,212, ¶ 42, at 29.

69. ADP's data center is a large load as defined under 195 FERC ¶ 61,212, because it is (1) a new commercial or industrial customer; (2) located at a single site behind one or more points of interconnection; (3) has a peak load of 50 MW or greater; (4) interconnects to the transmission system at a voltage level of greater than 69 kV; and (5) is not part of a co-location arrangement." 195 FERC ¶ 61,212, ¶ 58, at 37 (citing MISO, *Large Load Interconnection Reliability Requirements (LLWG)* 8 (May 14, 2026), https://cdn.misoenergy.org/20260514%20LLWG%20Item%2004%20Large%20Load%20Interconnection%20Reliability%20Requirements757718.pdf).

70. FERC's show-cause order to MISO initiating proceedings under 16 U.S.C. § 824e is attached and incorporated by reference herein. Ex. 5, 195 FERC ¶ 61,212, Docket No. EL26-70-000 (June 18, 2026).

<u>Regulation and Discrimination Against Interstate Commerce</u>

71. The electrical infrastructure to transmit and deliver electricity to a data center is interstate commerce.

72. Pulaski County cannot regulate or discriminate against interstate commerce.

73. Ordinance 26-OR-19 has a discriminatory purpose to restrict and curtail ADP's operations in interstate commerce as shown by express statements of its proponents' intent to target ADP and procedural irregularities throughout its promulgation, including violations of the Arkansas Freedom of Information Act by Pulaski County, Arkansas, Justice Blackwood, and other records custodians participating in the enactment of Ordinance 26-OR-19.

74. Ordinance 26-OR-19 discriminates arbitrarily against interstate commerce notwithstanding any local concerns it claims to address, which could be addressed by less-restrictive means, such as Item 26-I-71, as submitted by Pulaski County Justice of the Peace Doug House.

75. Ordinance 26-OR-19 exceeds the authority of Pulaski County and violates the Commerce Clause of the United States Constitution by regulating and discriminating against interstate commerce.

<u>Arkansas Public Service Commission Preemption</u>

76. By its text, Ordinance 26-OR-19 recognizes that actions of the Pulaski County Planning Board pursuant to the Ordinance may affect a Public-Service Entity.

77. Ordinance 26-OR-19 defines an "Affected Public-Service Entity" to include an "electric utility [...] or other governmental or public service entity whose facilities or services may be materially affected by an application." Article 4.

78. Affected Public-Service Entities must receive public notice of the Planning Board's hearing on an application. Section 6.5(d). An Affected Public-Service Entity also has a right to appeal the decision of the Planning Board to the Quorum Court. Section 9.2(c).

79. Entergy Arkansas is an electric utility whose retail contracts and rates are within the exclusive jurisdiction of the PSC.

80. The PSC is a governmental entity providing a service to the state and citizens of Arkansas by reviewing electrical rates and contracts of electric utilities such as Entergy Arkansas.

81. Both Entergy Arkansas and the PSC are Affected Public-Service Entities under the Ordinance.

82. ADP's binding ESA with Entergy Arkansas will be foreseeably "affected" by the Ordinance.

83. Ordinance 26-OR-19 would provide the Pulaski County Planning Board undefined power to determine whether "necessary" electrical infrastructure exists for ADP's data center and whether the data center's electricity "use will not materially impair safe, reliable, or efficient infrastructure service to surrounding properties." Article 7(a).

84. The PSC has exclusive jurisdiction over the service contracts and rates charged by Entergy Arkansas. *E.g., Centerpoint Energy, Inc. v. Miller County Circuit Court, Second Div.*, 370 Ark. 190, 197, 258 S.W.3d 336, 341 (2007) ("*Centerpoint I*") ("The General Assembly has endowed the APSC with sole and exclusive ratemaking authority"); Ark. Code Ann. § 23-3-117.

85. Further, the PSC has its own administrative processes that preempt the Ordinance's conflicting processes, *e.g.*, Ark. Code Ann. §§ 23-4-305, 306, 408. The "right of appeal" and "Judicial Review" prescribed by the Ordinance in Section 9.6 necessarily conflict with and are preempted by Arkansas statute, which confers exclusive jurisdiction over rate-regulation issues to the PSC without any review by a circuit court. *General Telephone Co. of Southwest v. Lowe*, 263 Ark. 727, 730, 569 S.W.2d 71, 73 (1978); *Centerpoint I*, 370 Ark. at 197, 258 S.W.3d at 345.

86. Ordinance 26-OR-19 directly interferes with and is preempted by the exclusive jurisdiction granted to the PSC over matters of electrical retail rates and service contracts, including but not limited to the existing service contract between ADP and Entergy Arkansas.

87. Neither the County nor its Quorum Court can "retain jurisdiction over a proceeding for which it does not have jurisdiction in the first place." *Centerpoint Energy, Inc. v. Miller County Circuit Court*, 372 Ark. 343, 350, 276 S.W.3d 231, 327 (2008) ("*Centerpoint II*").

Federal Equal Protection

88. Numerous industrial and commercial businesses, such as manufacturing facilities and big-box stores, have demands for electricity, digital infrastructure, and water triggering the threshold amounts of water and electricity consumption identified in Section 4.1 of the Ordinance.

89. There are businesses and facilities within Pulaski County that consume more than 10 MW of electrical power on an average annual basis, have 100,000 square feet devoted to digital infrastructure, or demand one hundred thousand (100,000) gallons per day for cooling, processing, or operations. Section 4.1(a)-(c).

90. Pulaski County acknowledged such uses exist and carved them out of the scope of the Ordinance because they are "ordinary" things like hospitals, distribution centers, and manufacturing plants where digital computing is "incidental" to their "principal" use.

91. Pulaski County does not attempt to regulate such other similarly situated industrial and commercial users of electricity, digital infrastructure, and water in the Ordinance.

92. There is no rational basis for Pulaski County to target data centers in the Ordinance but not regulate other businesses that also trigger the threshold amounts of water and electricity consumption identified in Section 4.1 of the Ordinance.

93. Industrial and commercial users of electricity that have high demands may and do enter service contracts with electric utilities such as Entergy Arkansas. ADP has done so through its binding ESA.

94. Some terms of these contracts contain provisions for demand response by which the user will agree to curtail or limit its use of electricity during periods of peak demand, so that more electricity supply remains in the grid, and prices remain lower. Demand response provisions can benefit consumers during periods of peak demand. *See* 195 FERC ¶ 61,212, ¶ 22, at 19 (noting Eligible Customers under the FERC-regulated MISO tariff may take "firm transmission service" which "may only be curtailed in limited circumstances for reliability purposes" or "non-firm service" which "may be curtailed or interrupted for *both* economic and reliability reasons") (emphasis added).

95. The balance of load during periods of peak demand is a critical consideration for MISO, Entergy Arkansas, and ultimately, large-load users like ADP, which can have both economic and system-wide reliability dimensions.

96. Without considering these complexities, the Ordinance authorizes the Pulaski County Planning Board to assess a data center's electrical service agreement while determining whether to permit the project. Pulaski County does not attempt to regulate other equally situated users of electricity in this manner.

97. The Ordinance authorizes the Pulaski County Planning Board to assess a data center's water usage while determining whether to permit the project. Pulaski County does not attempt to regulate other equally situated users of water in this manner.

98. The Ordinance's disparate treatment of equally situated users of electricity and water is intentional, irrational, and wholly arbitrary. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000).

99. Pulaski County was motivated by ill will against ADP's planned data center in adopting the Ordinance and intends to deny ADP rights enjoyed by other similarly situated users of electricity, digital infrastructure, and water within Pulaski County. *Id.*

100. On September 1, 2026, Justice of the Peace Rebekah Davis stated in a non-public group-text message about Ordinance 26-OR-19, "Judge Wendell… I think you could stop Avaio if you told them you wouldn't give them tax abatements they would leave."

101. Griffen replied, "I agree. I need to wait until January 1 for the message to stick. Until then, Judge Hyde has the power. Let's hope he hasn't made a secret deal!"

102. Non-public impermissible polling and deliberation surrounding Ordinance 26-OR-19 show that its purpose was to target ADP and its affiliate, AVAIO, for disparate treatment.

<u>Denial of Rights Under FOIA</u>

103. On October 19, 2026, Defendants received a written request under Ark. Code Ann. § 25-19-105(a)(2)(A) for examination and copying of public records about Ordinance 26-OR-19.

104. The written request complied in all respects with the requirements of the FOIA. Ark. Code Ann. § 25-19-105.

105. Pulaski County, Justice Blackwood, and other records custodians asserted no exception or objection to any component of the written request for examination and copying of public records submitted on October 19, 2026.

106. Pulaski County, Justice Blackwood, and other records custodians failed to respond in writing in compliance with Ark. Code Ann. § 25-19-105(a)(3), subjecting those persons to penalties under Ark. Code Ann. § 25-19-104.

107. Pulaski County, Justice Blackwood, and other records custodians failed to immediately provide responsive records not in active use or storage in violation of Ark. Code Ann. § 25-19-105(a)(6).

108. Pulaski County, Justice Blackwood, and other records custodians have failed to allow examination and provide copying of all public records responsive to the written request submitted on October 19, 2026.

109. Pulaski County, Justice Blackwood, and other records custodians failed to preserve public records required to be retained under Ark. Code Ann. § 13-4-302(3).

110. ADP is an interested party entitled to appeal immediately from the denial of rights granted under the FOIA. Ark. Code Ann. § 25-19-107(b).

Irreparable Harms to ADP

111. ADP has spent tens of millions of dollars and committed to future payments of tens of millions of dollars to Entergy Arkansas, Nabholz Construction, and other contractors and vendors to build and operate its data center in Pulaski County, Arkansas.

112. ADP's expenditures are evidenced by business records which ADP will submit to the Court under seal and for exchange with all parties upon entry of an appropriate protective order to protect the confidentiality of ADP's trade secrets and confidential commercial information.

113. If enforcement of Ordinance 26-OR-19 is not enjoined by this Court, then its enforcement or threatened enforcement by Defendants will cause ADP to sustain incalculable business injury, including the loss of goodwill to an incalculable, but substantial, degree.

114. Unforeseeable delays from duplicative suitability and feasibility studies beyond the County's lawful jurisdiction will threaten critical deadlines for ADP's project and will foreseeably cause loss of goodwill for ADP and its affiliates among its customers and vendors.

115. Threatened enforcement of Ordinance 26-OR-19 against ADP's already-approved Site Plan creates a cloud of uncertainty about the viability of ADP's existing project that threatens ADP's existing business, financial, and investment arrangements, which will foreseeably cause irreparable harm to ADP and its affiliates.

116. ADP will sustain irreparable harm during the pendency of this action which may itself be irremediable even if ADP ultimately prevails in this action; thus, absent preliminary injunctive relief, no remedy at law would be adequate to afford ADP complete relief.

**COUNT I**
**FEDERAL PREEMPTION**

117. ADP incorporates by reference all allegations of paragraphs 1 through 116.

118. ADP has the ESA with Entergy Arkansas for the purchase of electricity and construction of transmission facilities for ADP's data center.

119. The data center requires a large load of electrical supply and transmission, which is within the exclusive jurisdiction of FERC as explained in its Docket No. EL26-70-000. Ex. 5, 195 FERC ¶ 61,212 (June 18, 2026).

120. FERC has determined that "there is an urgent need for thoughtful reforms to ensure that large loads are 'able to connect to the transmission system in a timely, orderly, and non-discriminatory manner.'" 195 FERC ¶ 61,212, ¶ 7, at 9.

121. Ordinance 26-OR-19 directly interferes with FERC's exclusive jurisdiction over electrical supply and transmission to ADP's data center, which meets FERC's definition of "large load" to be connected "in a timely, orderly, and non-discriminatory manner." *Id.*

122. Pulaski County's Planning Board has no ability or authority to undertake the regional and national study and determination of best practices with respect to the electricity

supply to ADP's data center. Pulaski County's regulation of electrical supply to ADP's data center conflicts with FERC's national mandate and expertise.

123. There is an actual and concrete dispute between ADP and Defendants concerning Pulaski County's ability to assess or regulate the data center's electricity supply and usage.

124. The Court should determine and declare that Ordinance 26-OR-19 is preempted by the Federal Power Act to the extent the Ordinance seeks to review, control, or regulate ADP's data center based on electricity supply, usage, or infrastructure.

125. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

126. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

127. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

## COUNT II
## COMMERCE CLAUSE

128. ADP incorporates by reference all allegations of paragraphs 1 through 127.

129. ADP's data center is a "large load" as defined by FERC, and the large load of electrical supply and electrical infrastructure and transmission required for ADP's data center is interstate commerce.

130. Ordinance 26-OR-19 directly regulates and discriminates against ADP's data center by imposing local review and approval of the data center's electrical supply, infrastructure, and transmission.

131. Pulaski County has no authority to regulate these instrumentalities of interstate commerce.

132. Pulaski County may not discriminate against these instrumentalities of interstate commerce.

133. There is an actual and concrete dispute between ADP and Defendants concerning Pulaski County's ability to assess or regulate the data center's electricity supply and usage.

134. The Court should determine and declare that Ordinance 26-OR-19 violates the Commerce Clause to the extent the Ordinance seeks to review, control, or regulate ADP's data center based on electricity supply, transmission, usage, or infrastructure.

135. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

136. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

137. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

## COUNT III
## PUBLIC SERVICE COMMISSION PREEMPTION

138. ADP incorporates by reference all allegations of paragraphs 1 through 137.

139. ADP has the ESA with Entergy Arkansas for the purchase of electricity and construction of transmission facilities for ADP's data center.

140. The PSC has exclusive jurisdiction under Arkansas law to regulate ADP's contract with Entergy Arkansas.

141. Ordinance 26-OR-19 directly interferes with the PSC's exclusive jurisdiction over ADP's ESA for its data center.

142. Pulaski County's Planning Board has no expertise or authority to undertake the study and determination of best practices with respect to the ESA for ADP's data center. Pulaski County's regulation of electrical supply to ADP's data center would conflict with the PSC's statutory mandate, processes, and expertise.

143. There is an actual and concrete dispute between ADP and Defendants concerning Pulaski County's ability to assess or regulate the data center's electricity supply and usage.

144. The Court should determine and declare that Ordinance 26-OR-19 is preempted by Arkansas law to the extent the Ordinance seeks to review, control, or regulate the data center based on the ESA.

145. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

146. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

147. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

**COUNT IV**
**DEPRIVATION OF EQUAL PROTECTION**

148. ADP incorporates by reference all allegations of paragraphs 1 through 147.

149. Ordinance 26-OR-19 intentionally discriminates against ADP's data center.

150. There are no other data centers planned within territory subject to the County's jurisdiction.

151. There are, however, other businesses and operations within Pulaski County that meet the usage criteria for electricity, digital infrastructure, or water set forth in Ordinance 26-OR-19.

152. Pulaski County intentionally exempted all such similarly situated users from the scope of Ordinance 26-OR-19.

153. If the true intent was to address the usage levels for electricity, digital infrastructure, and water set forth in Ordinance 26-OR-19, the Ordinance would address them with other users.

154. The intentional targeting of ADP's data center alone among the other users reveals bias and ill will toward ADP.

155. There is no rational basis to single out ADP's data center in the Ordinance.

156. In the Ordinance, Pulaski County seeks to deprive ADP of the rights and benefits that the expressly exempted users in Pulaski County enjoy.

157. Ordinance 26-OR-19 intentionally deprives ADP of equal protection under the Fourteenth Amendment.

158. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

159. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

160. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

**COUNT V**
**DEPRIVATION OF DUE PROCESS**

161. ADP incorporates by reference all allegations of paragraphs 1 through 160.

162. ADP's binding contract with Entergy Arkansas is a property right.

163. ADP purchased its land in Pulaski County to build the data center at a time when there was no targeted regulation of data centers in Pulaski County.

164. Ordinance 26-OR-19 creates a regulatory process that enables defendants to apply new and standardless criteria and rules retroactively to impair or defeat ADP's rights to build its data center.

165. The standards by which the Pulaski County Planning Board would evaluate the application for this data center are undefined. For instance, there is no standard by which the Planning Board would determine what is "required" "Electrical Infrastructure" or whether it is "complete" or "available."

166. Ordinance 26-OR-19 does not define what amounts to "competent evidence" or what degree of impairment is "material." The Ordinance repeatedly confers overly broad discretion to officials acting at the pleasure of the Pulaski County Judge, including personnel of the Pulaski County Planning Board, and that overly broad discretion prevents ADP from predicting what standards or conduct will comport with the Ordinance's undefined and standardless provisions.

167. Ordinance 26-OR-19 seeks to deprive ADP of its pre-existing property rights in Pulaski County.

168. Proponents of the measure publicly proclaim that Ordinance 26-OR-19 will apply to ADP.

169. Key provisions of Ordinance 26-OR-19 are repeatedly undefined, vague, and ambiguous, resulting in a deprivation of procedural due process should the Ordinance be enforced against ADP.

170. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

171. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

172. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

## COUNT VI
## TAKINGS WITHOUT COMPENSATION

173. ADP incorporates by reference all allegations of paragraphs 1 through 172.

174. Ordinance 26-OR-19 is written in such a manner that no reasonable person can know what the Pulaski County Planning Board may deem to be "substantial evidence" that ADP "has established" each of the ten "approval criteria" set forth in Article 7.

175. Ordinance 26-OR-19 is an arbitrary and capricious process with no objective standards.

176. Ordinance 26-OR-19 was created after ADP bought its property and began development of its data center in Pulaski County.

177. Ordinance 26-OR-19 was adopted after ADP had received site plan approval to build its data center in Pulaski County.

178. Ordinance 26-OR-19 is designed to prevent ADP from building its data center in Pulaski County.

179. Ordinance 26-OR-19 claims the right to "lawful access" to ADP's physical property, which constitutes an actual physical taking, and the Ordinance threatens penalties for "[r]efusal to provide access" to the County, without defining what constitutes "refusal."

180. Ordinance 26-OR-19 claims the right to "handle trade secrets, security information, and confidential information under applicable Arkansas law" without regard to federal law governing the rights of owners of trade secrets, like ADP, including but not limited to the Defend Trade Secrets Act, 18 U.S.C. § 1836.

181. If enforced against ADP's data center project, Ordinance 26-OR-19 would amount to a regulatory taking of ADP's property, including ADP's intellectual property, by causing substantial interference with ADP's investment-backed expectations for the data center under the Fifth and Fourteenth Amendments to the United States Constitution.

182. If enforced against ADP's data center project, Ordinance 26-OR-19 would impose severe negative economic impacts on ADP by employing excessively restrictive means to achieve discriminatory purposes.

183. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

184. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

185. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

**COUNT VII**
**CONTRACT CLAUSE VIOLATION**

186. ADP incorporates by reference all allegations of paragraphs 1 through 185.

187. ADP has a binding ESA with Entergy Arkansas with payment obligations.

188. The ESA is valid and appropriate under the state and federal jurisdiction of the PSC and FERC.

189. ADP has vested rights under the ESA.

190. Defendants have no legitimate basis to interfere with the ESA.

191. Defendants have no lawful authority to attempt to regulate the areas within the PSC's and FERC's exclusive (and separate) jurisdictions.

192. The Contract Clause of the United States Constitution prohibits state legislation that interferes with existing agreements.

193. Under 42 U.S.C. § 1983 the Court should award preliminary and permanent injunctive relief against Defendants prohibiting the enforcement of Ordinance 26-OR-19 against ADP.

194. In the alternative, if injunctive relief is not warranted, under 42 U.S.C. § 1983 the Court should award compensatory damages against Pulaski County and in favor of ADP.

195. Under 42 U.S.C. § 1988(b) the Court should award attorneys' fees and litigation costs against Defendants in favor of ADP.

**COUNT VIII**
**INVALIDITY UNDER FOIA**

196. ADP incorporates by reference all allegations of paragraphs 1 through 195.

197. As amended in 2025, the Arkansas Freedom of Information Act ("FOIA") makes clear that all deliberation about a matter on which official action may be taken by the Pulaski County Quorum Court must take place in a public meeting. Ark. Code Ann. § 25-19-106(f)(2)(C).

198. It is also a violation of the FOIA for a member of the Quorum Court to participate in a communication, whether oral, written, or electronic, that occurs outside of a public meeting with another member of the Quorum Court "about a matter in which official action will foreseeably be taken." Ark. Code Ann. § 25-19-106(f)(2)(A).

199. Contrary to the FOIA Open Meeting statute, at least four or five members of the Quorum Court repeatedly considered and deliberated about ways to regulate ADP's data center by ordinance outside of a public meeting. These communications took place by private text messages, phone calls, and emails orchestrated by and including Griffen.

200. On May 26, 2026, amid an ongoing meeting of the Quorum Court to consider a different data center ordinance, Griffen texted Justices Blackwood, Lewison, Capps, and Davis urging them, "Vote NO on the amendment! NO! Special treatment for AVAIO." They did so.

201. On June 2, 2026, Griffen sent a text message to Justices Blackwood, Lewison, Capps, Massey, and Davis, but none of the other members of the Quorum Court. Griffen stated, "I am drafting a clear and legally defensible ordinance with a companion resolution of legislative findings for a twelve (12) month countywide moratorium on permitting high-intensity digital development in unincorporated areas of Pulaski County."

202. Griffen added, incorrectly, "Pulaski County is legally immune from liability for monetary damages, again on statutory and constitutional grounds." He invited "any suggestions for the measures I am drafting." Justice Blackwood replied, "Great! Can't wait to see it [] :-)". Griffen stated, "Check your email inboxes. Kathy, I sent yours to your Pulaski.net email address. Let me know if you need me to send it to another email address."

203. There was no public meeting of the Quorum Court on June 2, 2026.

204. Between June 8, 2026, and June 9, 2026, Griffen engaged members of the Quorum Court in non-public deliberations about data center measures via email correspondence outside any formal public meeting.

205. On July 20, 2026, Griffen texted Justice Blackwood plus at least four other members of the Pulaski County Quorum Court in secret polling and deliberations about Items 26-

I-45A and 26-I-52, which dealt with ADP's data center. Griffen invited specific legislative maneuvering: "[i]f the five of you vote against 26-I-52 we can mount another effort to pass a revised version of 26-I-45A," continuing, "[i]f any of you object to my idea please let me know." Justice Blackwood replied, "I'm with you Judge!"

206. On August 11, 2026, the day of an Agenda Committee meeting of the Quorum Court, Griffen wrote "CONGRATULATIONS!" to a subset of members of the Quorum Court including Justice Blackwood, as well as numerous non-members of the Quorum Court. Presumably this was a private celebration of placing Item 26-I-56 on the Meeting Agenda for August 25, 2026. Referring to the presence of non-members of the Quorum Court on Griffen's text, Justice Curry asked, "Why are other people included in this text? Much disrespect has already been [g]iven over the last 3 months."

207. Before consideration of Item 26-I-56, now Ordinance 26-OR-19, persons in active concert with proponents of Item 26-I-56, including Griffen and a subset of members of the Quorum Court, contacted members of the Quorum Court to conduct impermissible polling outside of public meetings about how members of the Quorum Court would vote on the measure.

208. Before final consideration of Item 26-I-56, Griffen and a subset of members of the Quorum Court knew or should have known their impermissible polling and deliberations were violations of FOIA, yet they continued to engage in impermissible polling and deliberations.

209. On August 25, 2026, Item 26-I-56A came before the full Quorum Court at its 6:00 p.m. meeting with an emergency clause. That afternoon, Justice Blackwood texted Pulaski County Parliamentarian Justin Blagg: "Justin I need to talk to you." Blagg replied, "Yeah come on back."

210. On information and belief, between 4:29 p.m. and 5:41 p.m. on August 25, 2026, Justice Blackwood called Justices Massey, Capps, Luke McCoy, Davis, Medlock, Ward, and Keith, and twice called Justice Robinson. She also spoke with Griffen.

211. At the meeting, the emergency clause was removed, and Item 26-I-56A was placed on first reading. Later, Blagg texted Justice Blackwood: "Why'd you pull it?" She answered: "I pulled it because I was losing Luke and that left me with 9 votes." She spoke with Griffen later that night. At that same meeting, Item 26-I-64A (the moratorium measure) was withdrawn.

212. On August 29, 2026, Griffen posted an Arkansas Times story about AVAIO's plans to a group text thread and wrote: "This news makes the case for 26-I-56 and its emergency clause unmistakably clear!" Justice Blackwood later replied to the group: "As we have thought! We must pass I-56!"

213. On September 1, 2026, Blagg texted Justice Blackwood: "Give me a call when you have a chance please. Talked with Davis and she's cool with holding off on moratorium and getting the regulations passed."

214. On September 1, 2026, Pulaski County Justice of the Peace Natalie Capps rejected the impermissible polling and deliberations, stating, "I appreciate being included in this conversation but think it violates open meeting laws. I am going to kindly excuse myself. See you all next Tuesday—have a great rest of the week."

215. Justice Capps then removed herself from the polling-and-deliberation text-message thread.

216. But Griffen and the remaining subset of members of the Quorum Court continued to engage in impermissible polling and deliberations on the very same text-message thread which

Justice Capps had left, in communications which remain withheld unlawfully from Defendants' FOIA production.

217. The Quorum Court passed Item 26-I-56, now Ordinance 26-OR-19, on September 22, 2026.

218. At 10:08 p.m. on September 22, 2026, Griffen returned Justice Capps to the earlier polling-and-deliberation text-message thread which Justice Capps had left on September 1, 2026, stating, "Good evening, I cannot end today without thanking each of you for co-sponsoring Item 26-I-56a. Thank you for the long tedious hours you spent studying this subject over the past months. Thank you for all you've done."

219. Upon information and belief, that text-message thread included the co-sponsors of Item 26-I-56, which was ultimately enacted as Ordinance 26-OR-19: Justices Blackwood, Capps, Davis, and Donna Massey. *See* Ex. 3 at 1.

220. Despite lawful request under FOIA, Justice Blackwood produce no call or text log for the billing cycle of September 4 through October 3, 2026, which includes the Quorum Court's vote on September 22, 2026. Yet she produced logs for the billing cycles of May 4 through June 3, June 4 through July 3, July 4 through August 3, August 4 through September 3, and October 4 through November 3, 2026.

221. The logs Justice Blackwood did produce 130 calls with Griffen, totaling 860 minutes, between May 4 and September 3, 2026.

222. Justice Blackwood transmitted her FOIA response to Blagg from a personal Yahoo account and produced no emails. Yet she used her personal Gmail account to send and forward communications about Item 26-I-56, including Griffen's September 18 emergency clause.

223. On information and belief, Justice Blackwood's September call logs would show evidence of her communications with other Justices of the Quorum Court to poll and deliberate about the Ordinance before the Quorum Court's vote at its public meeting on September 22, 2026.

224. Despite lawful request under FOIA, Justice Blackwood failed to produce text messages, email correspondence, and other written communications constituting records of the performance or lack of performance of her official functions.

225. All these secret communications and deliberations violated Ark. Code Ann. §§ 25-19-106(f)(2)(A), 25-19-106(f)(2)(C), and 25-19-106(g) ("An informal meeting that includes deliberation or is for the purpose of exercising an authorized responsibility, authority, power, or duty of a governing body is strictly prohibited.").

226. The Court may invalidate any action the governing body took that is the direct or indirect result of the prohibited communication or informal meeting. Ark. Code Ann. § 25-19-106(i)(2).

227. The requirement of the Open Meeting Law of the FOIA is to require members of the Quorum Court to deliberate in public, before their constituents and stakeholders, so that the public servants may be accountable for their votes.

228. The secret communications concerning targeting ADP for "special treatment" deprived the public of its right to know how its representatives were addressing the issues.

229. The Court should invalidate Ordinance 26-OR-19 because it is the direct result of unlawful secret communications and deliberations about Quorum Court matters. Ark. Code Ann. § 25-19-106(i)(1).

230. The Court should award ADP its reasonable attorneys' fees and litigation expenses against all Defendants pursuant to Ark. Code Ann. § 25-19-107(d)(1).

## COUNT IX
## APPEAL FROM DENIAL OF RIGHTS UNDER FOIA

231. ADP incorporates by reference all allegations of paragraphs 1 through 230.

232. Under Ark. Code Ann. § 25-19-107, an interested party denied rights under the FOIA may make written application to be heard and for the case to be determined by the Court.

233. On October 19, 2026, Defendants received a written request for production of public records initiated by ADP. Ex. 6, FOIA Request of Oct. 19, 2026.

234. ADP is an interested party concerning the FOIA Request which Defendants received on October 19, 2026.

235. Pulaski County, Justice Blackwood, persons in active concert with them, and other records custodians have failed to respond as required by Ark. Code Ann. § 25-19-105(a)(3).

236. Pulaski County, Justice Blackwood, persons in active concert with them, and other records custodians have unlawfully withheld public records in violation of FOIA. Ark. Code Ann. § 25-19-104.

237. The withholding and concealment of those public records has been unlawful.

238. Defendants have failed to respond to a demand initiated by ADP seeking FOIA compliance; Defendants' non-production of public records is unjustified. Ex. 7, Demand Letter of Oct. 27, 2026.

239. The Court should order Defendants to produce all materials unlawfully withheld by Defendants in violation of Ark. Code Ann. § 25-19-105.

240. The Court should fix and assess a day for the petition to be heard within seven (7) days of the date of this complaint to hear and determine the case. Ark. Code Ann. § 25-19-107(b).

241. The Court should award ADP its reasonable attorneys' fees and litigation expenses against all Defendants pursuant to Ark. Code Ann. § 25-19-107(d)(1).

242. ADP reserves the right to plead further and amend this complaint as discovery and investigation proceed. Fed. R. Civ. P. 15.

## REQUESTS FOR RELIEF:

ADP requests that the Court:

A. Grant judgment in favor of ADP on all claims brought in this Complaint.

B. Declare that Ordinance 26-OR-19 is unlawful and unenforceable as applied to ADP. 28 U.S.C. § 2201; Fed. R. Civ. P. 57.

C. Preliminarily and permanently enjoin Defendants, all persons in active concert with them, and all their successors, from taking any act to enforce Ordinance 26-OR-19 against ADP Little Rock Data Hub, LLC, its privies, affiliates, or related persons. Fed. R. Civ. P. 65(a).

D. Award ADP compensatory damages at the maximum extent available under law. 42 U.S.C. § 1983.

E. Order Defendants and all persons in active concert with them to produce all public records wrongfully withheld from the written request submitted October 19, 2026, within three business days of the order compelling production. Ark. Code Ann. § 25-19-105(a)(2)(A).

F. Invalidate Ordinance 26-OR-19 under Ark. Code Ann. § 25-19-106(i)(1).

G. Award ADP its reasonable attorneys' fees and costs incurred in bringing this action. 42 U.S.C. § 1988(b); Ark. Code Ann. § 25-19-107(d)(1).

H. Grant all other relief to which ADP is entitled at law and equity.

Dated: October 29, 2026.

**KUTAK ROCK LLP**

Jess Askew III, Ark. Bar No. 86005
Alexander T. Jones, Ark. Bar No. 2015246
Shayla I. Dawson, Ark. Bar No. 2023283
Adam P. Hagler, Ark. Bar No. 2026161
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
jess.askew@kutakrock.com
alex.jones@kutakrock.com
shayla.dawson@kutakrock.com
adam.hagler@kutakrock.com

*Attorneys for ADP Little Rock Data Hub, LLC*

PULASKI COUNTY
Planning & Development

**PULASKI COUNTY**
**PLANNING AND DEVELOPMENT**
**3200 BROWN STREET**
**LITTLE ROCK, AR 72204**
**Request for confirmation of address.**

August 10, 2026

ADP Little Rock Data Hub LLC
4000 & 4003 Avaio Way
Little Rock, Ar 72206

Parcel # 35R0240002300, 35R0241300100, 35R0240002304, & 35R0190006800 911 Addresses structure 1; 4000 Avaio Way & structure 2; 4003 Avaio Way, Little Rock, Ar 72206. These are verified 911 Address. If you have any questions, please feel free to call.

Sincerely,

Vicki LaSpina
911 Address Coordinator,
501-340-8271

cc: Reading File

EXHIBIT
1

PULASKI COUNTY
Planning & Development

# PULASKI COUNTY
**PLANNING AND DEVELOPMENT**
**3200 BROWN STREET**
**LITTLE ROCK, AR 72204**
**Request for confirmation of address.**

August 11,2026

Mr. Nate Bachelor
Kimberly-Horn Engineers
ADP Little Rock Data Hub, LLC
Little Rock, AR 72206

Mr. Bachelor,

This letter confirms that all five conditions identified in the conditionally approved Avaio Data Center Site Plan dated December 19, 2024, have been satisfied and properly addressed.

Tab Townsell,
Public Works Director
Pulaski County Arkansas

EXHIBIT
2

**Ordinance No.**

File stamp

Pulaski County Quorum Court
State of Arkansas
August 2026

Item: 26-I-56

By: Justices Blackwood, *Capps, Davis, Massey*

**EMERGENCY ORDINANCE**

**BE IT ENACTED BY THE QUORUM COURT OF PULASKI COUNTY, STATE OF ARKANSAS, AN ORDINANCE TO BE ENTITLED:**

**AN ORDINANCE REGULATING HIGH-INTENSITY DIGITAL INFRASTRUCTURE USES IN THE UNINCORPORATED AREAS OF PULASKI COUNTY; CLASSIFYING SUCH USES AS HEAVY INDUSTRIAL; ESTABLISHING A CONDITIONAL USE PERMIT PROCESS; PROVIDING PERFORMANCE STANDARDS, COST RECOVERY, INSPECTION, MONITORING, ENFORCEMENT, DECOMMISSIONING, AND OTHER SAFEGUARDS; AND FOR OTHER PURPOSES.**

**ARTICLE 1. AUTHORITY**. This Ordinance is adopted pursuant to Arkansas Constitution Amendment 55; Arkansas Code Annotated §§ 14-14-801 and 14-14-802; Arkansas Code Annotated Title 14, Chapter 17; and all other applicable authority. This Ordinance is intended to operate consistently with the Arkansas Data Centers Act of 2023, as amended, and other applicable state and federal law.

**ARTICLE 2. PURPOSE**. The purposes of this Ordinance are to:

(a) protect the capacity, safety, reliability, and useful life of public infrastructure and public-service systems;

(b) ensure compatibility between High-Intensity Digital Infrastructure Uses (HIDIU) and existing and reasonably foreseeable surrounding land uses;

(c) protect public health, safety, welfare, property, and the environment;

(d) require project-specific disclosure and review of electrical demand, water and wastewater demand, transportation, drainage, noise, lighting, fire protection, emergency response, hazardous materials, on-site generation, battery energy storage, and decommissioning before approval, permitting, construction, or material modification of High-Intensity Digital Infrastructure (HIDI) land use projects;

(e) prevent the imposition of unreasonable or uncompensated project specific costs upon Pulaski County, public-service providers, and taxpayers;

EXHIBIT

3

(f) provide predictable, fair, and evidence-based procedures for HIDIU applicants and other persons who may be affected by their location, construction, and operations; and

(g) promote orderly and fiscally responsible land use development in the unincorporated areas of Pulaski County.

**ARTICLE 3. LEGISLATIVE FINDINGS.**

(a) Scale and intensity. High-Intensity Digital Infrastructure Uses may operate continuously and may require electrical loads, water supplies, cooling systems, substations, generators, battery systems, telecommunications systems, roads, drainage facilities, and emergency response resources of a scale materially greater than residential, agricultural, commercial, and other industrial land uses in unincorporated areas of Pulaski County.

(b) Location-dependent infrastructure impacts. Available electrical, water, wastewater, road, drainage, and emergency-service capacity vary substantially by location, existing commitments, system configuration, load profile, facility design, cooling technology, and project scale. Site-specific review is therefore necessary.

(c) Water and wastewater. Certain cooling and operational designs may require substantial potable or non-potable water use and may generate wastewater, cooling-tower blowdown, or other discharges requiring verification of capacity, treatment, conservation, and drought-response measures.

(d) Fire and emergency response. High-voltage equipment, transformers, fuel storage, emergency generators, battery energy storage systems, refrigerants, cooling chemicals, and large enclosed equipment areas may create specialized fire, hazardous-material, and emergency-response needs in unincorporated areas of Pulaski County.

(e) Noise and compatibility. Cooling equipment, transformers, substations, generators, ventilation systems, and other operational equipment of HIDI facilities may produce continuous, tonal, low-frequency, impulsive, or intermittent noise that may affect residential, agricultural, commercial, institutional, and recreational land uses, wildlife, and the long-cherished enjoyment of nature in unincorporated areas of Pulaski County.

(f) Construction and transportation. Construction and operation may generate heavy-vehicle traffic, oversized loads, road wear, dust, vibration, congestion, and intersection or access impacts on roads not designed for sustained industrial use.

(g) Drainage and environmental conditions. Large buildings, paved areas, utility yards, fuel systems, batteries, cooling systems, and land disturbance may affect stormwater, floodplains, erosion, heat rejection, spill risk, waste handling, and site restoration.

(h) Public cost. Review and continuing oversight may require specialized engineering, acoustical, transportation, environmental, fire-safety, legal, financial, and other

professional services beyond existing or ordinarily foreseeable County staffing. Requiring applicants and permit holders to pay reasonable, documented, project-specific regulatory costs will be necessary to protect taxpayers from bearing the costs of those additional services.

(i) Heavy-industrial classification. Because of their potential scale, continuous operation, infrastructure demand, and off-site impacts, covered High-Intensity Digital Infrastructure Uses are appropriately classified as Heavy Industrial Uses requiring Conditional Use Permit review.

(j) Neutral regulation. This Ordinance regulates land use and site impacts according to objective thresholds and project-specific evidence. It does not regulate utility rates, tariffs, or electric-service contracts and shall not be administered to discriminate unlawfully against digital-asset mining or any other protected activity.

**ARTICLE 4. DEFINITIONS**. Affected Public-Service Entity. A fire department or district, emergency medical provider, law-enforcement agency, road authority, drainage authority, water or wastewater provider, electric utility, telecommunications provider, school district, municipality, or other governmental or public service entity whose facilities or services may be materially affected by an application.

Applicant. A person or entity applying for a Conditional Use Permit, amendment, extension, or other approval under this Ordinance, including the property owner and any proposed operator where different.

Battery Energy Storage System. One or more devices, facilities, containers, or structures that receive, store, and discharge electrical energy through batteries or substantially similar electrochemical technology.

Binding Utility Agreement. A final written agreement executed by the applicant and applicable utility that obligates the parties to specified construction or service commitments and is not merely a study agreement, application, expression of interest, preliminary estimate, nonbinding service indication, or agreement subject to unresolved material feasibility review. A Binding Utility Agreement does not constitute a County land-use approval or establish a right to a Conditional Use Permit under this Ordinance.

Commencement of Operations. The first regular use of a HIDIU for its approved primary purpose, excluding testing, commissioning, and temporary construction activities.

Complete Application. An Application containing the information required by this Ordinance, the applicable application form, and any additional information identified in a written completeness notice as reasonably necessary to determine whether the Application is ready for substantive review. A completeness determination is procedural, does not establish entitlement to approval, and does not preclude later requests for material information reasonably necessary to evaluate newly identified issues.

Conditional Use Permit or CUP. A site-specific authorization issued by Pulaski County under this Ordinance following required public notice, hearing, findings, and conditions.

Continuous Electrical Demand. The projected or actual maximum coincident electrical demand reasonably expected during normal operations, including reasonably foreseeable phased buildout, measured or estimated based on competent utility, engineering, equipment, and operational evidence. Brief commissioning or emergency events may be excluded where adequately documented.

County. Pulaski County, Arkansas, acting through the official, board, court, department, employee, agent, or consultant assigned authority under this Ordinance.

County Final Administrative Decision. The Planning Board's written decision after expiration of the administrative appeal period if no timely administrative appeal is filed, or the Quorum Court's final written decision following a timely administrative appeal.

Decommissioning. The permanent cessation of the approved use and the removal, stabilization, disposal, recycling, restoration, and other work required by the approved decommissioning plan.

Existing Residential Dwelling. A lawful dwelling existing or under active lawful construction on the date a Complete Application is filed.

Final County Approval. Final approval of every discretionary County land use authorization required under County law applicable at the relevant time to authorize commencement of the specific project, after expiration or resolution of any administrative appeal. Preliminary reviews, staff comments, conceptual approvals, utility approvals, grading permits, ministerial permits, and approvals subject to unresolved material discretionary conditions are not Final County Approvals.

High-Intensity Digital Infrastructure Use or HIDIU. A principal land use, facility, campus, or integrated group of facilities whose primary purpose is digital computing, artificial-intelligence processing, cloud computing, digital data storage or hosting, hyperscale computing, blockchain validation, digital-asset mining, machine learning, high-performance computing, colocation services, or substantially similar digital information processing or computational activity, and that meets one or more of the thresholds specified in Section 4.1 of this Article.

Material Modification. A change described in Article 8 that is reasonably expected to increase or substantially alter the scale, intensity, operation, or land-use impacts of an approved HIDIU.

Permit Holder. The current owner, lessee, operator, or other person exercising operational control over a HIDIU authorized by a CUP granted pursuant to this Ordinance.

Planning Board. The Pulaski County Planning Board or its lawful successor.

Planning Director. The Pulaski County official assigned by law or County administrative action to administer County planning and development review, or the official's authorized designee.

Project Site. All parcels, easements, buildings, utility yards, substations, generators, batteries, cooling systems, access roads, and related areas included in or functionally serving the proposed HIDIU under common ownership, control, operation, or development plan.

Quorum Court. Pulaski County Quorum Court.

Residential Lot. A lawfully created lot shown on a recorded subdivision plat for residential use that had not been lawfully vacated, returned to acreage, combined into a nonresidential development, or devoted to a lawful nonresidential principal use before the Complete Application was filed.

Responsible Official. A corporate officer, managing member, partner, owner, or site executive authorized to certify information on behalf of the Applicant or Permit Holder.

Substantial Construction. Lawful, good-faith construction of permanent improvements authorized by the CUP and required permits that is substantial in relation to the approved project. Surveying, testing, temporary fencing, minor clearing, speculative grading, or nominal work undertaken primarily to preserve permit status is not Substantial Construction.

SECTION 4.1 HIDIU Thresholds.

A land-use meeting the primary-purpose test in the definition of HIDIU is covered by this Ordinance when one or more of the following apply:

(a) Continuous Electrical Demand of ten (10) megawatts or greater for a facility, Project Site, phased development, or integrated campus;

(b) one hundred thousand (100,000) square feet or more of building area primarily devoted to digital computing equipment, servers, networking, data processing, or related digital infrastructure;

(c) projected or actual average water demand of one hundred thousand (100,000) gallons per day or greater for cooling, processing, or operations; or

(d) three (3) megawatts or more of aggregate dedicated on-site generation or Battery Energy Storage System capacity intended primarily to support the digital infrastructure use.

Separate buildings, parcels, phases, entities, and equipment shall be aggregated when they are under common ownership or control, form part of a common development plan, share material infrastructure, or serve substantially the same operational purpose. No person shall divide, phase, sequence, lease, convey, or otherwise structure a project to avoid regulation by this Ordinance.

Ordinary office buildings, hospitals, educational institutions, research laboratories, manufacturing facilities, distribution centers, telecommunications facilities, governmental facilities, public utility infrastructure, and other commercial or industrial uses are not HIDIUs when digital computing is merely incidental or accessory to their principal use.

## ARTICLE 5. APPLICABILITY AND LAND-USE CLASSIFICATION.

(a) A HIDIU is classified as a Heavy Industrial Use for purposes of this Ordinance. No HIDIU may be located, constructed, expanded, materially modified, or operated in the unincorporated areas of Pulaski County unless a Conditional Use Permit has been approved and become effective under this Ordinance and all other applicable County approvals have been obtained. Classification as a Heavy Industrial Use does not create an entitlement to approval at any location.

(b) Compliance with a numerical or other minimum performance standard does not create an entitlement to approval. The Applicant must establish every applicable approval criterion under Article 7 of this Ordinance.

(c) A federal, state, or other governmental or regulatory approval may constitute relevant or controlling evidence concerning matters within the issuing entity's jurisdiction, as provided by applicable law. A utility approval, agreement, study, or determination may constitute relevant evidence concerning matters within the utility's responsibility or expertise. No such approval, agreement, study, or determination, standing alone, compels approval of a CUP or establishes compliance with the County land-use compatibility, infrastructure, public-safety, or other criteria governed by this Ordinance.

(d) More protective lawful conditions contained in a CUP shall control over the minimum standards of this Ordinance when supported by the record, related to identified project impacts, and roughly proportional to those impacts.

(e) A HIDIU located wholly or partly within the area governed by the Pulaski County Lake Maumelle Watershed Zoning Code and its implementing regulations shall comply with this Ordinance and all applicable Lake Maumelle Watershed procedures, standards, restrictions, and approval requirements. A CUP issued under this Ordinance does not substitute for or eliminate any approval required under the Lake Maumelle Watershed Zoning Code.

The requirements of this Ordinance and the Lake Maumelle Watershed Zoning Code are cumulative and shall each be given effect to the fullest extent permitted by law. All applicable substantive standards shall be satisfied. Where two substantive standards regulate the same subject and cannot both be applied as written, the more protective lawful standard shall govern.

The County may coordinate review and hearing schedules, but each required approval shall be separately decided by the body having jurisdiction, in accordance with the procedures and appeal provisions governing that approval. Nothing in this subsection authorizes modification of a mandatory procedure, jurisdictional requirement, substantive standard, or appeal right established by ordinance or applicable law.

**ARTICLE 6. ADMINISTRATION, APPLICATION, AND PUBLIC HEARING PROCEDURES.**

SECTION 6.1 Preapplication Conference.
Before filing, an Applicant shall complete a preapplication conference with the Planning Director. The conference is advisory and does not bind the County or establish project entitlement.

SECTION 6.2 Application Contents.
An application shall be signed by the property owner and proposed operator and shall include, at minimum:

(a) legal description, ownership, site control, parcel map, and identification of all owners, operators, affiliates, and controlling entities;

(b) site, grading, drainage, landscape, lighting, access, security, utility, building, equipment-yard, and phasing plans showing maximum reasonably foreseeable buildout as of the date of the application;

(c) electrical-load analysis, utility correspondence, proposed substations, transmission and distribution facilities, on-site generation, generators, fuel systems, and battery systems;

(d) a water and wastewater plan identifying average-day, maximum-day, annual, potable, non-potable, reuse, cooling, discharge, drought, and curtailment conditions, together with written evidence from each applicable water or wastewater provider demonstrating that the proposed demand can reasonably be served, subject to any identified infrastructure improvements, capacity limitations, conditions, or final agreements. If provider confirmation is not yet reasonably available, the Applicant shall submit an analysis prepared by a qualified independent professional demonstrating that the proposed demand can reasonably be served and identifying all assumptions, required improvements, unresolved capacity issues, and conditions that must be satisfied before final provider verification;

(e) baseline and predictive acoustical study prepared by a qualified acoustical professional;

(f) fire-protection, hazardous-material, battery-safety, generator, fuel storage, emergency-access, incident-command, and emergency-response plan prepared in consultation with affected responders;

(g) traffic-impact study, construction haul routes, road-condition survey, access plan, and proposed road-use or restoration measures;

(h) stormwater, floodplain, erosion, heat-rejection, air-permit, spill prevention, waste, electronic-waste, refrigerant, cooling-chemical, transformer-oil, and environmental-management information applicable to the project;

(i) community and land-use compatibility analysis addressing nearby residences, farms, schools, institutions, businesses, recreation, natural resources, and reasonably foreseeable development;

(j) construction schedule, construction-management plan, complaint response protocol, and identification of a twenty-four-hour project contact;

(k) decommissioning plan and proposed financial assurance;

(l) evidence of financial and operational capacity to construct, operate, mitigate, maintain, and decommission the project;

(m) identification of all federal, state, local, utility, and other approvals required or obtained; and

(n) other information reasonably requested in writing by the Planning Director or County consultants to apply this Ordinance.

SECTION 6.3 Completeness Determination.

Within thirty (30) calendar days after filing, the Planning Director shall determine in writing whether the application is complete or identify missing information. The review period is suspended while requested information remains outstanding. If no response is received for one hundred eighty (180) days, the application may be deemed withdrawn after written notice. A completeness determination does not prevent later requests for material information reasonably necessary to evaluate newly identified issues.

SECTION 6.4. Independent Review And Affected Entities.

The County may retain qualified independent consultants and may transmit relevant application materials to Affected Public-Service Entities for review. Consultants shall be selected and directed by the County. The Applicant shall reimburse the County for reasonable project-specific costs under Article 11.

SECTION 6.5 Public Notice.

After the application is complete, the County shall provide public notice of a Planning Board hearing on the application at least twenty-one (21) calendar days before the hearing by:

(a) publication in a newspaper of general circulation in Pulaski County;

(b) posting on the County website and at the Project Site in a location visible from a public road;

(c) first-class mail to owners of real property within two thousand five hundred (2,500) feet of the projected Project Site, as shown by the most recent County assessment records; and

(d) electronic or written notice to Affected Public-Service Entities and municipalities within five (5) miles of the proposed Project Site. The notice shall identify the Applicant,

location, proposed maximum buildout, hearing date and place, means for reviewing materials, deadline for written comments, and a statement that conditions, approval, or denial may result.

SECTION 6.6 Staff Report and Response.
The Planning Director shall make the Planning Department staff report, and all material consultant reports publicly available, when practicable, at least seven (7) calendar days before the hearing. The Applicant and interested persons may submit written responses to those reports subject to reasonable deadlines established by the Planning Director.

SECTION 6.7 Hearing Procedure.
The Planning Board shall conduct a public quasi-judicial hearing. The Chair may administer oaths, regulate presentation time, receive relevant evidence, continue the hearing for good cause, and exclude unduly repetitive, irrelevant, or disruptive material. Formal rules of evidence do not apply, but findings shall rest on reliable and probative evidence.

SECTION 6.8 Conflicts, Ex Parte Communications, and Record.
Any decision-maker shall disclose each financial interest, prejudgment, ex parte communication, or site visit concerning the application, and shall recuse when required by law or when impartial adjudication is reasonably questioned. Disclosure of any ex parte information shall be placed on the record with a reasonable opportunity for response. The County shall preserve the application, notices, reports, comments, exhibits, recordings or transcripts if available, correspondence relied upon, findings, decisions, and permit conditions as the administrative record.

SECTION 6.9 Decision Deadline.
The Planning Board shall issue a written decision within forty-five (45) calendar days after the hearing record closes unless the Applicant agrees to an extension or extraordinary complexity requires additional time stated in a written order identifying the reasons and establishing a definite extended decision date. Failure to act within a deadline does not constitute approval.

**ARTICLE 7. APPROVAL CRITERIA AND CONDITIONS.** A CUP shall be approved only upon written findings, supported by substantial evidence in the County proceedings, that the Applicant has established each of the following:

(a) Infrastructure capacity. Adequate electrical, water, wastewater, transportation, drainage, telecommunications, and other necessary infrastructure exists or will be provided before operations, and the use will not materially impair safe, reliable, or efficient infrastructure service to surrounding properties.

(b) Land-use compatibility. The use is compatible with existing and reasonably foreseeable surrounding uses considering area character, development patterns, setbacks, buffering, screening, lighting, noise, vibration, traffic, visual effects, heat, security, and other relevant factors.

(c) Public health and safety. The development provides adequate emergency access, fire protection, battery and generator safety, hazardous-material controls, incident response, responder coordination, and compliance with applicable safety requirements.

(d) Water and wastewater. Sufficient supply and treatment capacity will be available without materially impairing existing obligations, and the project includes reasonable conservation, drought, reuse, discharge, and contingency measures.

(e) Transportation. Roads and access can safely accommodate construction and operations and identified impacts will be avoided, repaired, or mitigated.

(f) Environmental protection. The project complies with applicable environmental requirements and includes appropriate stormwater, floodplain, erosion, spill, waste, heat-rejection, fuel, chemical, electronic waste, and restoration measures.

(g) Performance standards. The project complies with Article 10 and all proposed permit conditions.

(h) Mitigation and proportionality. Reasonably foreseeable adverse impacts have been avoided or mitigated through conditions related and roughly proportional to project impacts.

(i) Cumulative impacts. The project, together with existing and reasonably foreseeable approved uses relying on the same roads, utilities, drainage systems, emergency services, or surrounding area, will not materially impair infrastructure capacity, public safety, environmental conditions, surrounding land-use compatibility, or the ability of affected public-service entities to provide safe and reliable service.

(j) Applicant capability. The Applicant has demonstrated legal, financial, technical, and operational capacity to construct, operate, maintain, mitigate, respond to emergencies, satisfy permit obligations, and decommission the project.

Failure to establish any required finding is sufficient grounds for denial.

The Planning Board may impose reasonable conditions related and proportional to identified impacts, including limits on scale, phasing, operating practices, construction, testing, noise, water use, generator use, traffic, access, lighting, buffering, reporting, monitoring, financial assurance, mitigation, and decommissioning.

## ARTICLE 8. MATERIAL MODIFICATIONS.

SECTION 8.1 Approval Required.

No Permit Holder shall undertake Material Modification without approval of an amended CUP. Routine maintenance, repair, software changes, and replacement with substantially equivalent equipment that does not materially increase land-use or infrastructure impacts are not Material Modifications.

SECTION 8.2 Material Modification Triggers.

A Material Modification includes:

(a) an increase in approved Continuous Electrical Demand equal to or exceeding the lesser of ten percent (10%) of the approved demand or five (5) megawatts;

(b) additional buildings, server halls, substations, cooling systems, batteries, generators, fuel systems, or principal operational infrastructure materially increasing scale or impact;

(c) an increase in approved digital-computing floor area equal to or exceeding the lesser of twenty percent (20%) of the approved floor area or twenty-five thousand (25,000) square feet;

(d) an increase in approved average water demand equal to or exceeding the lesser of twenty percent (20%) of the approved average demand or twenty thousand (20,000) gallons per day;

(e) expansion of the approved Project Site;

(f) addition of a phase or structure that, when aggregated, increases operational intensity;

(g) a change in primary operational purpose that materially alters land-use or infrastructure impacts;

(h) a material change in cooling technology, fuel type, battery chemistry or capacity, generator capacity, discharge method, or emergency-response demand; or

(i) any other change demonstrated by competent evidence and written findings to materially increase or alter an impact governed by Article 7 or Article 10 when compared with the approved project baseline.

SECTION 8.3 Determination and Appeal.

Before undertaking a proposed change that may constitute a Material Modification or whose status under this Article is uncertain, the Permit Holder shall submit plans, calculations, descriptions, and other information reasonably sufficient for a materiality determination. The Planning Director may request additional information reasonably necessary to evaluate the proposed change, and the decision period shall be suspended while requested material information remains outstanding.

Within thirty (30) calendar days after receiving all information reasonably necessary to evaluate the proposed change, the Planning Director shall issue a written determination stating whether the proposed change constitutes a Material Modification and identifying the approved project baseline, the proposed change, the applicable criteria or triggers, and the evidence relied upon. Extraordinary complexity may justify additional time stated in a written notice establishing a definite extended decision date. Failure to issue a determination within the applicable period does not constitute a determination that the proposed change is nonmaterial.

A person entitled to appeal under Section 9.2 may appeal the determination under Article 9. Work constituting or dependent upon the proposed change shall not begin while a timely appeal is pending, but independently authorized work within the scope of the existing CUP may continue unless otherwise ordered by the County or a court.

SECTION 8.4 Review.
An amended-CUP application shall follow the procedures and criteria applicable to an original CUP. The County may consider cumulative impacts, changed infrastructure capacity, compliance history, changed surrounding uses, and new technical or safety information.

SECTION 8.5 Anti-Avoidance.
Related changes shall be aggregated. No person shall divide, phase, sequence, convey, lease, or otherwise structure related changes to avoid a materiality determination, amended-CUP review, or enforcement under this Ordinance.

## ARTICLE 9. ADMINISTRATIVE APPEALS AND JUDICIAL REVIEW.

SECTION 9.1 Planning Board Decision.
The Planning Board shall approve, approve with conditions, or deny an application in written findings identifying the evidence relied upon and the basis for each required criterion.

The written decision shall be filed with the County Clerk and maintained as part of the County administrative record. The written decision shall be served by first-class mail and electronic mail, if available, upon the Applicant, Permit Holder, and each person who timely requested notice.

The administrative appeal period begins on the later of the filing date or the date of service. If no timely administrative appeal is filed, the Planning Board's written decision becomes the County Final Administrative Decision upon expiration of the administrative appeal period.

SECTION 9.2 Appeal to Quorum Court.
Within thirty (30) calendar days from the later of the filing date of the written decision or the date of service as stated in Section 9.1, an appeal may be filed by:

(a) the Applicant or Permit Holder;

(b) an owner or lawful occupant of property that may be materially affected by the Planning Board decision;

(c) an Affected Public-Service Entity; or

(d) a person who submitted evidence or comments before the Planning Board and demonstrates a concrete and particularized effect upon the person's property, use and enjoyment of property, health, safety, legal rights, or other legally protected interest that is actual or reasonably probable and different in kind or degree from the effect on the public generally.

The notice shall identify the decision, alleged errors, requested relief, and relevant record portions.

SECTION 9.3 Scope and Supplemental Evidence.
The Quorum Court shall conduct a public administrative appeal based primarily on the record. Supplemental evidence may be admitted only upon written findings that it is material, was unavailable despite reasonable diligence, admission will not unfairly prejudice another party, and affected parties receive a reasonable opportunity to respond. The conflict-of interest, recusal, ex parte-communication, disclosure, and administrative record requirements of Section 6.8 apply to each Quorum Court member participating in an administrative appeal.

SECTION 9.4 Decision.
In an appeal concerning an Application, the Applicant retains the burden of establishing compliance with the applicable approval criteria. In an enforcement appeal, the County bears the burden of proving the violation by a preponderance of the evidence, and the Permit Holder bears the burden of proving correction or an affirmative defense.

The Quorum Court may affirm, reverse, remand, or modify conditions authorized by this Ordinance and shall issue written findings within thirty (30) calendar days after the appeal record closes. The written decision is the County Final Administrative Decision.

SECTION 9.5 Stay.
A timely appeal stays issuance and exercise of the CUP. No construction, grading, land disturbance, or operation authorized solely by the appealed CUP shall occur while the appeal is pending unless ordered by a court. Work independently authorized by an undisputed and otherwise valid County approval is not stayed solely by an appeal under this Article unless the County or a court determines that the work depends upon the appealed decision.

SECTION 9.6 Judicial Review.
Notwithstanding any other provision of this Article, a decision or issue that applicable Arkansas law requires to be appealed directly to circuit court shall not be subject to administrative appeal to the Quorum Court. A person or entity entitled to appeal under Arkansas law may seek judicial review in the manner, within the time, and under the standard provided by Arkansas Code Annotated § 14-17-211 and other applicable law. Nothing in this Ordinance restricts, enlarges, alters, or prescribes the scope of judicial review or the evidence a court may receive.

**ARTICLE 10. PERFORMANCE STANDARDS.**

SECTION 10.1 Noise.

(a) A baseline ambient-noise study and predictive study shall be prepared by a qualified acoustical professional using recognized ANSI, ASTM, ISO, or other County-approved methods.

(b) Operational noise attributable to the HIDIU shall not exceed sixty-five (65) dBA daytime Leq from 7:00 a.m. to 10:00 p.m. or fifty-five (55) dBA nighttime Leq from

10:00 p.m. to 7:00 a.m., measured at the nearest property line of a nonindustrial use, unless a more protective condition is imposed.

(c) The County may impose lower limits or tonal, low-frequency, impulsive, octave-band, or maximum-level criteria where necessary to protect unusually quiet or sensitive uses.

(d) Generator testing and planned maintenance shall occur during approved daytime hours except during emergencies or where required by law or utility direction.

(e) The Permit Holder shall conduct postconstruction and complaint-based testing when required and shall pay reasonable testing costs. A confirmed exceedance shall be corrected within a County-approved period.

(f) The approved measurement protocol shall specify the Leq averaging interval, instrument class and calibration, microphone location and height, permissible weather conditions, background-noise correction, and treatment of tonal, low-frequency, impulsive, and intermittent noise. Where documented ambient noise unrelated to the HIDIU exceeds a generally applicable numerical limit, the CUP shall establish an appropriate project attributable limit or incremental-noise standard supported by the acoustical record.

SECTION 10.2 Setbacks, Buffering, and Security.

(a) Each principal building, cooling unit, substation, transformer yard, Battery Energy Storage System, generator, fuel-storage area, and other major operational component shall be at least five hundred (500) feet from an Existing Residential Dwelling or Residential Lot, measured from the nearest edge of the component to the nearest dwelling wall or residential property line, whichever is more protective.

(b) Greater setbacks, berms, landscaping, fencing, screening, sound walls, equipment orientation, or other measures may be required based on scale, topography, fire risk, noise, lighting, visual exposure, and surrounding uses.

(c) Security measures shall not obstruct emergency access or create unreasonable lighting, drainage, or public-road hazards.

SECTION 10.3 Water and Wastewater.
Before building-permit issuance, the Applicant shall provide final written verification of capacity from applicable providers and shall comply with the approved water and wastewater plan, including maximum-day demand, source, cooling method, conservation, drought curtailment, reuse, wastewater quantity and characteristics, blowdown, chemical management, and contingency measures. Unauthorized groundwater withdrawal is prohibited. At the CUP stage, the Applicant shall provide competent evidence demonstrating that the proposed water and wastewater demands can reasonably be served, subject to identified improvements, conditions, or final agreements.

SECTION 10.4 Electrical Infrastructure.
Before operations, the Permit Holder shall provide competent evidence that required electrical infrastructure is complete or available. The County may consider on-site and adjacent utility infrastructure for land-use impacts to the extent permitted by law. This section does not regulate utility rates, tariffs, service contracts, or matters within the authority of the Arkansas Public Service Commission (APSC).

SECTION 10.5 Generators, Fuel, and Air-Related Land-Use Impacts.
The approved plan shall identify generator count, capacity, fuel, testing, expected emergency use, air permits, stacks, noise controls, fuel volume, secondary containment, spill prevention, fire separation, and waste-oil handling. Extended generator operation exceeding permit assumptions shall be promptly reported. County regulation under this section is limited to lawful land-use, safety, access, noise, fuel, and emergency impacts.

SECTION 10.6 Battery Energy Storage Systems.
Battery systems shall comply with applicable fire and electrical codes and the approved plan addressing chemistry, capacity, separation, ventilation, thermal-runaway detection, gas monitoring, fire suppression, emergency isolation, runoff containment, responder information and training, post incident monitoring, and disposal.

SECTION 10.7 Fire Protection and Emergency Response.
The Applicant shall prepare the plan in consultation with the fire department or district having primary authority. The County may require on-site suppression, dedicated water supply, emergency access, responder equipment, training, communications, hazardous-material controls, incident-command procedures, and reimbursement of reasonable project specific preparedness costs where authorized by law.

SECTION 10.8 Traffic, Roads, and Construction.
The Applicant shall provide safe ingress and egress to the Project Site and comply with an approved construction and traffic plan. The County may require haul routes, hours, flagging, intersection or roadway improvements, dust and vibration controls, preconstruction and postconstruction road surveys, road-use and repair agreements, weight compliance, and financial security related to project impacts.

SECTION 10.9 Lighting.
Exterior lighting shall use fully shielded fixtures, minimum necessary illumination, dimming or controls where feasible, and design that minimizes glare, sky glow, and trespass. Aviation or security lighting required by law is permitted but shall be mitigated where practicable.

SECTION 10.10 Stormwater, Floodplain, Heat, Materials, and Waste.
The project shall comply with approved plans for stormwater, detention, floodplain protection, erosion, sediment, heat rejection, visible plumes, refrigerants, cooling chemicals, transformer oils,

hazardous materials, spill prevention and response, electronic waste, recycling, and lawful disposal.

SECTION 10.11 Incident and Complaint Response.

The Permit Holder shall maintain a twenty-four-hour contact, investigate material complaints, preserve complaint and response records, and promptly report fires, explosions, battery thermal events, significant spills or releases, evacuations, extended emergency generation, major utility failures, and incidents requiring outside emergency response.

SECTION 10.12 Decommissioning and Financial Assurance.

Before Commencement of Operations, the Permit Holder shall obtain County approval of a decommissioning plan addressing removal and lawful disposition of equipment, batteries, generators, fuels, chemicals, structures as required by the approved plan, utilities, waste, contamination, site stabilization, and restoration of the Project Site to a condition compatible with surrounding land uses.

The Permit Holder shall provide and continuously maintain financial assurance in an amount equal to one hundred percent (100%) of the reasonable estimated cost for Pulaski County or a qualified third party to complete all required decommissioning, stabilization, disposal, remediation, and restoration work. The estimate shall be prepared by a qualified independent professional acceptable to the County, shall assume third-party performance, and shall include reasonable professional, administrative, inflation, and contingency costs. Credit for salvage value may be allowed only to the extent approved by the County based on reliable and conservative evidence.

Financial assurance may consist of a surety bond, irrevocable standby letter of credit, cash escrow, or other instrument approved by the County Attorney and designated County fiscal official. The instrument shall be issued or held for the benefit of Pulaski County, remain effective until written County release, and provide at least ninety (90) calendar days' advance written notice of cancellation, expiration, or nonrenewal.

The decommissioning estimate and financial assurance shall be reviewed and updated at least once every three (3) years, upon approval of a Material Modification affecting decommissioning cost, upon transfer of ownership or operational control, after a material incident affecting restoration cost, and whenever the County reasonably determines that the existing amount may be inadequate. Any deficiency shall be corrected within thirty (30) calendar days after written notice, unless the County approves another period for good cause.

The County may draw upon the financial assurance, after notice and a reasonable opportunity to cure except in an emergency, upon abandonment, expiration or revocation of the CUP, failure to commence or complete required decommissioning, failure to renew, replace, or replenish the security, failure to comply with a lawful restoration or decommissioning order, or performance by the County of emergency stabilization, abatement, decommissioning, or restoration work. Any amount drawn while operations continue shall be replenished within thirty (30) calendar days.

Decommissioning shall begin within ninety (90) calendar days after a final abandonment determination, expiration, revocation, or other permanent termination of authority to operate and shall be completed within the period established by the approved decommissioning plan, unless the County grants a written extension for good cause. The approved decommissioning plan shall establish a completion deadline based on project scale and site conditions and shall include interim milestones when appropriate.

The Permit Holder shall provide replacement financial assurance accepted by the County not later than thirty (30) calendar days before the existing instrument's cancellation, expiration, or nonrenewal. Failure to do so constitutes a violation and authorizes the County to draw upon the existing instrument to the extent permitted by its terms and applicable law.

Financial assurance shall be released only after the County determines in writing that all decommissioning, restoration, remediation, cost-payment, and other secured obligations have been completed. Existing financial assurance shall remain in effect until replacement assurance furnished by the successor has been approved and accepted in writing by the County.

## ARTICLE 11. FEES, ESCROW, MONITORING, AND COST RECOVERY.

SECTION 11.1 Regulatory Nature and Limitations.

Fees, escrow deposits, monitoring charges, and cost-recovery amounts imposed under this Article are regulatory charges intended solely to recover reasonable, documented, nonduplicative, project-specific costs incurred in administering and enforcing this Ordinance. They are not imposed to raise general revenue.

Funds collected under this Article shall be used only for regulatory purposes authorized by this Article, shall be separately identifiable in County accounting records, and shall not be used to recover general County overhead or costs unrelated to the applicable Application, HIDIU, Permit Holder, or enforcement matter.

No cost included in the base application fee, annual monitoring fee, monitoring escrow, or another charge shall also be recovered through application-review escrow or another fee.

SECTION 11.2 Base Application Fee.

An Applicant shall pay a non-refundable base application fee of twenty-five thousand dollars ($25,000) when filing an Application.

The base application fee shall cover ordinary application intake, initial completeness review, routine staff administration, standard public-notice administration, record creation, hearing preparation, and other ordinary County services identified in the County's supporting fee analysis or adopted fee schedule.

Costs covered by the base application fee shall not also be charged against application-review escrow.

SECTION 11.3 Initial Application-Review Escrow and Preliminary Budget.
In addition to the base application fee, the Applicant shall deposit an initial application-review escrow of one hundred thousand dollars ($100,000), or a greater amount established in accordance with this Section based on project scale, complexity, and anticipated review needs.
Before requiring an initial application-review escrow, the County shall provide the Applicant with a written preliminary budget identifying:

(a) the anticipated review disciplines;

(b) the material tasks to be performed;

(c) the applicable hourly rates, contract rates, or other compensation terms; and

(d) the estimated costs.

If the required initial application-review escrow exceeds one hundred thousand dollars ($100,000), the preliminary budget shall also identify the reasons the increased amount is reasonably necessary based on project scale, complexity, or anticipated review needs.

The preliminary budget is an estimate and does not limit recovery of reasonable, documented, nonduplicative, project-specific costs actually incurred or reasonably committed in accordance with this Article.

For purposes of this Article, "reasonably committed costs" means contractual or other payment obligations authorized by the County for project-specific work within the scope of the most recent written budget but not yet invoiced or paid.

SECTION 11.4. Allowable Application-Review Costs.
Application-review escrow may be used only for reasonable, documented, nonduplicative, project-specific costs associated with reviewing and deciding an Application, amendment, extension, materiality determination, or other approval under this Ordinance.

Allowable application-review costs may include:

(a) planning and land-use review;

(b) engineering and infrastructure review;

(c) acoustical review and testing;

(d) transportation, access, road, and traffic analysis;

(e) drainage, stormwater, floodplain, and environmental review;

(f) fire-protection, hazardous-material, generator, battery, and emergency response review;

(g) legal and financial review;

(h) public-notice, hearing, record, and transcription costs;

(i) review of decommissioning plans and financial assurance; and

(j) other professional or technical services reasonably necessary to apply this Ordinance to the project.

Consultants shall be selected, retained, and directed by the County. General County overhead, unrelated work, costs already included in another fee, and costs not reasonably attributable to the project are not allowable application-review escrow costs.

SECTION 11.5 Revised Budgets.
For purposes of this Article, "most recent written budget" means the preliminary budget issued under Section 11.3 or the latest revised budget issued under this Section.

Before authorizing or incurring costs that are reasonably expected to cause the combined total of application-review expenditures and reasonably committed costs to exceed the total amount of the most recent written budget by more than twenty percent (20%), the County shall provide the Applicant a revised written budget identifying:

(a) the additional tasks;

(b) the additional or expanded review disciplines;

(c) the applicable rates or contract terms;

(d) the estimated additional costs; and

(e) the reasons the additional work is reasonably necessary.

The County may authorize or incur costs before issuing a revised budget only when the work is required by:

(a) an emergency;

(b) an unforeseen material issue;

(c) a judicial, administrative, contractual, or statutory deadline; or

(d) another time-sensitive circumstance reasonably necessary to protect public health, safety, property, the environment, or the County's legal interests.

When costs are authorized or incurred under this exception, the County shall provide the Applicant a written explanation and revised budget as soon as practicable.

Failure to provide a revised budget does not eliminate the Applicant's responsibility for reasonable, documented, nonduplicative, project-specific costs actually and necessarily incurred. The failure shall be considered in determining whether excess charges were reasonably foreseeable, reasonably necessary, adequately documented, and recoverable.

SECTION 11.6 Statements and Accounting.
The County shall provide itemized escrow statements to the Applicant at least quarterly and whenever the County issues a revised budget or replenishment demand.

During periods of active consultant review or substantial escrow activity, the County may provide statements more frequently. Each statement shall identify:

(a) the current escrow balance;

(b) each person, department, consultant, or entity performing the work; (c) the date and nature of each service;

(d) the time expended;

(e) the applicable rate or contract term;

(f) each reimbursable expense;

(g) the amount charged;

(h) amounts previously paid;

(i) outstanding invoices and reasonably committed costs;

(j) the application-review purpose to which each charge relates;

(k) the remaining anticipated work and estimated costs; and

(l) whether each charge falls within the most recent written budget.

Project-specific receipts, deposits, expenditures, reserves, refunds, and outstanding obligations shall be separately identifiable and maintained in accordance with applicable County fiscal and audit procedures.

SECTION 11.7 Replenishment.
The Applicant shall replenish the application-review escrow within thirty (30) calendar days after written notice that the balance has fallen below the amount reasonably necessary to cover outstanding charges, reasonably committed costs, and anticipated remaining costs identified in the most recent written budget.

The replenishment notice shall state:

(a) the current escrow balance;

(b) outstanding charges;

(c) reasonably committed costs;

(d) anticipated remaining work and costs; and

(e) the amount required to restore the escrow to the documented level is reasonably necessary to complete review.

The required replenishment shall not exceed the amount reasonably necessary to cover documented outstanding charges, reasonably committed costs, and anticipated remaining costs.

An Applicant may dispute a replenishment demand under Section 11.10 to the extent the Applicant challenges the calculation, documentation, necessity, or amount of outstanding charges, reasonably committed costs, or anticipated remaining costs. Undisputed amounts remain due within the thirty-day period prescribed by this Section.

If the Applicant fails to replenish an undisputed amount within that thirty-day period, the County shall provide a final written notice allowing not less than ten (10) additional calendar days to cure. The County may suspend further project review if the undisputed amount is not replenished within the additional cure period.

SECTION 11.8 Annual Monitoring Fee and Monitoring Escrow.
Beginning when the CUP becomes effective, or at another time stated in the CUP based on commencement of applicable monitoring obligations, the Permit Holder shall pay an annual monitoring fee established by a schedule adopted by Quorum Court ordinance.

The schedule shall bear a reasonable relationship to documented anticipated monitoring costs and may consider:

(a) approved Continuous Electrical Demand;

(b) Project Site acreage;

(c) digital-computing floor area;

(d) water and wastewater demand;

(e) generator and fuel-storage capacity;

(f) Battery Energy Storage System capacity and chemistry;

(g) required inspection and testing frequency;

(h) required acoustical, environmental, fire-safety, or infrastructure monitoring;

(i) project complexity; and

(j) compliance history.

Compliance history may affect the amount of the annual monitoring fee only to the extent that documented compliance conditions reasonably increase the anticipated frequency, scope, complexity, or cost of monitoring. Compliance history shall not be used to impose a penalty through the monitoring fee schedule.

No annual monitoring fee shall become due until the applicable schedule has been adopted by Quorum Court ordinance and made publicly available.

The adopted schedule shall specify the applicable fee year, payment date, and method for prorating the initial fee when monitoring obligations begin during a partial fee year. The schedule may also provide for equitable proration when monitoring obligations permanently cease during a fee year.

The County may require a separate monitoring escrow when the CUP requires specialized or unusually intensive monitoring not reasonably covered by the annual monitoring fee. Before establishing or increasing a monitoring escrow, the County shall provide a written budget and administer the escrow under standards comparable to Sections 11.3 through 11.7, 11.10, and 11.11.

Routine post-approval inspection and monitoring costs shall be recovered through the annual monitoring fee or a separately established monitoring escrow and shall not be charged against application-review escrow.

SECTION 11.9 Extraordinary Investigation and Enforcement Costs.
Extraordinary investigation and enforcement costs may be recovered from the Permit Holder only when:

(a) the County establishes a violation under Article 13;

(b) the costs resulted from a knowing, reckless, or materially negligent misstatement, misrepresentation, or omission of a material fact by the Applicant or Permit Holder;

(c) the costs resulted from the Permit Holder's failure to conduct required testing, monitoring, reporting, mitigation, corrective work, or another required compliance activity; or

(d) immediate investigation or action was reasonably necessary because of a credible threat to health, safety, property, infrastructure, or the environment.

Recoverable enforcement costs shall be reasonable, documented, nonduplicative, and directly related to the applicable violation, omission, investigation, emergency, corrective action, or enforcement proceeding.

Routine monitoring costs and costs of an investigation that does not establish a violation shall not be treated as extraordinary enforcement costs unless recovery is independently authorized by a CUP condition or applicable law.

Costs under subsection (d) may be recovered without a final violation finding only when recovery is authorized by a CUP condition or applicable law and the County establishes that the investigation or action was objectively reasonable, project-specific, extraordinary rather than routine, and necessary in response to a credible imminent or substantial threat.

Recovery of extraordinary investigation and enforcement costs shall be subject to the notice, hearing, and appeal protections of Article 13 where applicable.

SECTION 11.10 Charge and Replenishment Disputes.

An Applicant or Permit Holder may dispute a charge or replenishment demand by submitting a written objection within thirty (30) calendar days after the applicable itemized statement or replenishment notice.

The objection shall identify:

(a) the disputed charge or replenishment demand;

(b) the disputed amount;

(c) the grounds for the objection; and

(d) any supporting information.

Grounds for dispute may include:

(a) mathematical error;

(b) duplication;

(c) lack of relationship to the project;

(d) an unreasonable rate;

(e) unnecessary or excessive work;

(f) inadequate documentation;

(g) inclusion of general County overhead;

(h) inclusion of a cost covered by another fee;

(i) inconsistency with this Article or the most recent written budget; or

(j) an unsupported or unreasonable estimate of outstanding, committed, or anticipated remaining costs.

The County shall provide documentation demonstrating that the disputed charge or replenishment amount was actually incurred, reasonably committed, or reasonably anticipated; reasonably necessary; project specific; nonduplicative; and calculated or billed at a reasonable rate or amount. The County Comptroller or another designated fiscal official who did not direct, approve, or materially participate in the disputed work shall issue a written determination within thirty (30) calendar days after the dispute record is complete.

The dispute record is complete when the fiscal official has received the written objection, supporting information submitted by the Applicant or Permit Holder, the County's billing and budget documentation, and any supplemental information reasonably requested by the fiscal official. The fiscal official shall notify the parties in writing of the date the dispute record is complete.

The written determination shall identify the evidence considered, resolve each material objection, and state the amount, if any, determined to be payable or required for replenishment.

A person aggrieved by the fiscal official's determination may appeal within fifteen (15) calendar days to a neutral hearing officer appointed by the County Judge and confirmed by the Quorum Court, or to another neutral reviewing body established by Quorum Court ordinance.

The Quorum Court may confirm one or more neutral hearing officers in advance to hear appeals under this Section. If no previously confirmed hearing officer is available, the County Judge shall submit an appointment for confirmation at the next regular or specially called meeting of the Quorum Court. If no neutral hearing officer is confirmed or available within thirty (30) calendar days after the appeal is filed, the appeal shall be assigned to another neutral reviewing body previously designated by Quorum Court ordinance.

A person who directed, approved, or materially participated in the disputed expenditure, work, budget, or replenishment demand shall not decide the dispute or appeal.

The appeal shall be based on the dispute record. Supplemental evidence may be admitted for good cause. The reviewing officer or body shall determine whether the disputed charge or replenishment demand is authorized by this Article, adequately documented, reasonably necessary, nonduplicative, project-specific, and reasonable in amount.

The appeal record is complete upon receipt of the dispute record, the notice of appeal, any written appellate submissions, and any supplemental evidence admitted for good cause. The reviewing officer or body shall notify the parties in writing when the appeal record is complete.

The reviewing officer or body shall issue a written decision within thirty (30) calendar days after the appeal record is complete or any hearing is concluded, whichever occurs later. The decision shall state the findings, conclusions, and amount, if any, determined to be payable or required.

The written appellate decision constitutes the final administrative decision of the County concerning the disputed charge or replenishment demand.

Judicial review may be sought only as provided by applicable Arkansas law. Nothing in this Section creates, enlarges, or restricts a right to judicial review.

Undisputed amounts remain payable. A disputed amount may be paid under protest or temporarily withheld pending resolution. A timely good faith dispute does not, standing alone, authorize suspension of project review or constitute noncompliance, provided that all undisputed amounts and the required undisputed escrow balance remain funded.

SECTION 11.11 Final Accounting and Refund.
Within sixty (60) calendar days after completion of the Application-review, monitoring, investigation, or enforcement matter for which an escrow was established, the County shall provide a final accounting.

For application-review escrow, the review matter is complete upon final administrative disposition of the Application, expiration or completion of any timely administrative appeal, and receipt of reasonably anticipated final invoices.

The County shall refund all unused funds not reasonably reserved for identified outstanding invoices, contractual commitments, unresolved obligations, or charges subject to a pending dispute or appeal under Section 11.10.

Any reserved amount shall be separately identified in the final accounting and shall state the invoice, commitment, obligation, dispute, or appeal for which the amount is reserved.

A reserved amount shall be reconciled and refunded promptly, and in no event later than thirty (30) calendar days after the applicable invoice, commitment, obligation, dispute, or appeal is resolved. No refund is required until all final, undisputed charges and all charges finally determined to be payable under Section 11.10 have been satisfied.

SECTION 11.12 Fixed-Fee and Schedule Adjustment.
Fixed fees and adopted fee schedules under this Article may be revised only by Quorum Court ordinance based on:

(a) documented changes in actual or reasonably anticipated regulatory costs;

(b) a supporting cost analysis;

(c) an identified inflation index; or

(d) another reasonable and documented regulatory cost basis.

Any ordinance making an inflation-based adjustment shall identify:

(a) the applicable inflation index;

(b) the index base period;

(c) the adjustment period and frequency;

(d) the method for calculating the adjustment;
(e) the method for rounding the adjusted amount; and

(f) whether and how decreases in the applicable index will be recognized.

An inflation adjustment shall not be applied more frequently than once during any twelve-month period unless otherwise required by applicable law.

Any revised fee or schedule shall bear a reasonable relationship to the anticipated cost of the regulatory services funded by the fee.

Project-specific costs shall remain limited to reasonable, documented, nonduplicative expenses actually incurred or reasonably committed for purposes authorized by this Article.

**ARTICLE 12. INSPECTION, MONITORING, REPORTING, AND CONFIDENTIALITY.**

SECTION 12.1 Inspection.
As a CUP condition, the Permit Holder shall allow reasonable County inspections of areas, records, equipment, and conditions relevant to land use compliance during normal business hours or other reasonable times, upon reasonable advance notice when practicable, and in a manner minimizing unnecessary interference. Authorized inspectors may include County employees and County-directed professionals.

SECTION 12.2 Emergency Access And Action.
When the County reasonably believes that an imminent threat exists, it may request immediate consensual access or take other action authorized by law. The County shall obtain an administrative inspection warrant or other judicial authorization where legally required.

SECTION 12.3 Limits.
Inspection authority shall not require access to customer data, personal data, proprietary algorithms, cybersecurity credentials, computing content, or secure systems unrelated to land-use compliance.

SECTION 12.4 Annual Report.
The Permit Holder shall submit an annual report certified by a Responsible Official and supported by documentation reasonably sufficient to verify compliance with this Ordinance and the CUP. The report shall include:

(a) the approved project phase, the project phase actually constructed or operating, and a description of any material difference between the approved and actual phase;

(b) actual peak, average, and maximum coincident electrical demand during the reporting period, together with the approved Continuous Electrical Demand and any material change in electrical-load assumptions, equipment, or phased buildout;

(c) total annual, average-day, and maximum-day water demand, including potable, non-potable, reused, and other material water sources, together with wastewater discharge quantities where applicable;

(d) generator operation, including testing, maintenance, emergency use, extended operation, fuel consumption, and any operation exceeding approved assumptions;

(e) material operational, equipment, ownership, control, or site changes, including any change evaluated or required to be evaluated under Article 8;

(f) fires, explosions, battery thermal events, spills, releases, evacuations, major utility failures, extended emergency generation, and other material incidents, including corrective measures taken;

(g) material complaints received, the subject and disposition of each complaint, investigations conducted, testing performed, and corrective or mitigation measures implemented;

(h) required compliance testing, monitoring results, permit-condition status, and any actual or potential exceedance or noncompliance identified during the reporting period;

(i) the current amount and form of financial assurance, the name of the issuer or holder, the instrument number if applicable, the expiration or renewal date, renewal status, and whether the assurance remains in the amount required by Section 10.12;

(j) the date and status of the most recent decommissioning-cost estimate review, the amount of the current estimate, any identified deficiency, and the status of any required update, increase, replacement, or replenishment;

(k) the status of all annual monitoring fees, monitoring escrow, and other required regulatory deposits, including amounts paid, current escrow balances, outstanding replenishment demands, and unresolved charge disputes;

(l) all governmental notices of violation, enforcement actions, administrative orders, consent orders, permit modifications, or other material compliance actions relating to the Project Site;

(m) each outstanding corrective action, compliance schedule, mitigation measure, or restoration obligation, including the responsible party, required completion date, and current status;

(n) each corrective action, mitigation measure, or restoration obligation completed during the reporting period, including the completion date and supporting verification; and

(o) other information reasonably requested in writing by the Planning Director that is materially related to compliance with this Ordinance or the CUP.

The annual report shall distinguish between approved, actual, and projected conditions and shall identify any information based upon estimates rather than measured data. The Permit Holder shall promptly supplement the report upon discovering a material error, omission, or change affecting the accuracy of the report.

SECTION 12.5 Records.
Compliance records shall be retained for at least five (5) years and made available upon reasonable request. The County shall handle trade secrets, security information, and confidential information under applicable Arkansas law, including the Arkansas Freedom of Information Act.

SECTION 12.6 Denial of Access.
If lawful access is denied, the County may obtain judicial process or pursue another lawful remedy. Refusal to provide access required by a CUP or lawful judicial authorization, after proper notice, may constitute a violation.

## ARTICLE 13. ENFORCEMENT, SUSPENSION, AND REVOCATION.

SECTION 13.1 Enforcement Official.
The Planning Director, or another official designated by County ordinance or administrative order, may investigate compliance and issue notices and orders authorized by this Article.

SECTION 13.2 Violations.
Violations include unpermitted construction or operation of a High-Intensity Digital Infrastructure facility; violation of this Ordinance or a CUP condition; unauthorized Material Modification; failure to report or maintain required security; refusal of lawful inspection; a knowing, reckless, or materially negligent false statement, material misrepresentation, or material omission in information required by this Ordinance or a CUP; and failure to comply with a lawful order.

SECTION 13.3 Notice and Cure.
Except for emergency action, the Enforcement Official shall issue a written Notice of Violation stating the facts, provisions violated, corrective action, compliance deadline, service method, and hearing right. A reasonable cure period shall be provided based on seriousness, complexity, and risk.

SECTION 13.4 Service.

Notice may be served personally, by certified mail, by a recognized delivery service, by electronic mail to a designated contact, or by any combination of those methods reasonably calculated to provide notice. If those methods fail, notice may be posted at the Project Site and mailed to the owner of record.

SECTION 13.5 Hearing.
A Permit Holder may request a Planning Board hearing within fifteen (15) calendar days after service of a violation notice. The County bears the burden of proving a violation by a preponderance of the evidence. The Permit Holder bears the burden of proving correction or an affirmative defense. The Planning Board may dismiss, affirm, establish a compliance schedule, or suspend specified activities or the CUP until compliance. It may not materially rewrite CUP conditions outside the amended-CUP process.

Any suspension shall be limited to activities reasonably related to the violation and shall be supported by written findings that the suspension is necessary and proportionate to the seriousness, duration, risk, and compliance history of the violation.

SECTION 13.6 Emergency Orders.
When construction or operation presents an imminent threat, the Enforcement Official may issue an immediate stop-work, partial-shutdown, evacuation, or emergency-compliance order limited to the scope that is reasonably necessary. An expedited hearing shall be offered as soon as practicable.

SECTION 13.7 Revocation.
The Planning Board may recommend revocation of a Conditional Use Permit issued pursuant to this Ordinance for repeated or material violations, fraud or material misrepresentation, unauthorized Material Modification, refusal of inspection, failure to maintain financial assurance, abandonment finally determined under Article 14, or failure to correct an imminent or substantial hazard. The Quorum Court shall conduct a noticed public hearing, consider the enforcement record and additional evidence admitted under standards comparable to Article 9, and issue written findings. Revocation of a Conditional Use Permit shall not eliminate restoration, decommissioning, cost, or enforcement obligations.

Revocation may be ordered only upon written findings that the violation, conduct, or condition is sufficiently serious to warrant revocation and that lesser remedies would be inadequate to secure compliance or protect health, safety, property, infrastructure, or the environment.

SECTION 13.8 Remedies.
To the extent authorized by Arkansas law, remedies include stop-work orders, suspension, revocation, injunction, abatement, restoration, recovery against financial security, recovery of reasonable enforcement and professional costs, lawful civil or criminal penalties, and other available relief. Attorney's fees may be recovered only where authorized by law. Remedies are cumulative.

SECTION 13.9 Continuing Violations and No Waiver. Each day a violation continues after the compliance period may constitute a separate violation where authorized by law. Failure to enforce on one occasion is not a waiver.

SECTION 13.10 Appeal.

A final Planning Board enforcement decision, other than a revocation recommendation, may be appealed to the Quorum Court within thirty (30) calendar days under Article 9. Emergency orders remain effective unless modified by the County or a court.

**ARTICLE 14. PERMIT DURATION, COMMENCEMENT, EXTENSION, CESSATION, AND ABANDONMENT.**

SECTION 14.1 Expiration.

A Conditional Use Permit granted pursuant to this Ordinance shall automatically expire unless Substantial Construction begins within twenty-four (24) months after the County Final Administrative Decision. Time is tolled during judicial proceedings challenging the CUP, a governmental moratorium or injunction preventing construction, or a documented force majeure event.

SECTION 14.2 Continued Construction Diligence.

After Substantial Construction begins, construction shall proceed with reasonable continuity and diligence. A continuous cessation of material construction activity for twelve (12) months may constitute grounds for expiration after notice and hearing, excluding documented force majeure, governmental restraint, utility delay beyond the Permit Holder's reasonable control, or another temporary cause accepted in writing by the Planning Director.

SECTION 14.3 Extension.

Before expiration, the Planning Board may grant one extension not exceeding twelve (12) months upon written findings of good-faith progress, circumstances beyond reasonable control or other good cause, and no material increase in adverse impacts. Further extensions require a new public hearing and extraordinary-circumstances findings.

SECTION 14.4 Cessation And Abandonment.

If operations cease continuously for twenty-four (24) months, the Planning Board may determine abandonment after notice and hearing. Temporary shutdowns for maintenance, repair, modernization, utility interruption, market conditions, force majeure, or other documented temporary causes are not abandonment when the Permit Holder maintains the site, security, fire protection, financial assurance, and an intent and capacity to resume lawful operations.

SECTION 14.5 Effect.

Expiration or abandonment terminates authority for the HIDIU and activates applicable decommissioning and restoration obligations. This Article does not impair vested rights established under Arkansas law.

## ARTICLE 15. TRANSFER OF OWNERSHIP OR OPERATION.

SECTION 15.1 Permit Runs with Land.
A CUP runs with the land for the approved use and binds every successor owner, lessee, operator, and tenant on the Facility site.

SECTION 15.2 Advance Notice and Acknowledgment.
At least thirty (30) days before a transfer of ownership or operational control when practicable, and no later than ten (10) days after an unanticipated transfer, the current and successor parties shall notify the Planning Director, identify responsible contacts, acknowledge all permit obligations, update emergency plans, and demonstrate continuation or replacement of insurance and financial assurance.

Before the County recognizes a transfer, the successor shall execute a written assumption, in a form acceptable to the County, agreeing to perform all CUP, monitoring, reporting, financial-assurance, decommissioning, restoration, and enforcement obligations. Before the County recognizes a transfer, the successor shall execute a written assumption, in a form acceptable to the County, agreeing to perform all CUP, monitoring, reporting, financial-assurance, decommissioning, restoration, and enforcement obligations.

SECTION 15.3 No Automatic Modification or Cure.
A transfer alone is not a Material Modification. Physical or operational changes remain subject to Article 8. Transfer does not extinguish a violation, enforcement action, compliance schedule, restoration duty, decommissioning duty, or liability to the extent provided by law.

## ARTICLE 16. NON-PREEMPTION AND CONSTRUCTION.

(a) This Ordinance regulates land use, development, site operation, and project-specific impacts. It does not regulate utility rates, tariffs, electric service contracts, or matters within the exclusive authority of the Arkansas Public Service Commission or another state or federal agency.

(b) Nothing in this Ordinance authorizes unlawful discrimination against a digital-asset mining business or other protected activity. Substantially similar impacts shall be evaluated under substantially similar standards.

(c) If another applicable law or valid permit imposes a more protective requirement within lawful County authority, the more protective requirement controls unless preempted.

(d) References to technical codes and standards mean the version adopted or recognized by applicable law or expressly incorporated as a CUP condition.

## ARTICLE 17. EXISTING PROJECTS, PENDING PROJECTS, MATERIAL MODIFICATIONS, AND VESTED RIGHTS.

SECTION 17.1 General Rule.
This Ordinance applies to every proposed High-Intensity Digital Infrastructure Use that, before the effective date of this Ordinance, had not obtained all Final County Approvals required for the specific project under County law then in effect. Article 8 applies to every Material Modification proposed or undertaken after the effective date, including a Material Modification of a project qualifying under Section 17.2, to the extent permitted by law.

SECTION 17.2 Projects With Final County Approvals.
A High-Intensity Digital Infrastructure Use shall not be required to obtain a new Conditional Use Permit solely by reason of the adoption of this Ordinance if, before the effective date of this Ordinance, the project obtained all Final County Approvals required under County law then in effect to authorize the specific use, location, scale, capacity, structures, facilities, phases, and development shown in the approved plans.

A project qualifying under this Section:

(a) may proceed only within the scope of its Final County Approvals and the approved plans, conditions, limitations, development parameters, and material representations expressly incorporated into or relied upon in those approvals;

(b) remains subject to all conditions of its existing approvals and to generally applicable federal, state, and local laws concerning public health, safety, fire protection, emergency response, building construction, environmental protection, roads, drainage, nuisances, and other matters lawfully applicable to the project;

(c) does not acquire any right to an expansion, alteration, additional phase, increase in capacity, change in operational purpose, or other development not authorized by its Final County Approvals; and

(d) remains subject to Article 8 concerning any post-effective-date Material Modification, to the extent permitted by law.

SECTION 17.3 Projects Without All Final County Approvals.
This Ordinance applies to every proposed High-Intensity Digital Infrastructure Use that, before the effective date of this Ordinance, had not obtained all Final County Approvals required for the specific project under County law then in effect.

A project is subject to this Ordinance notwithstanding that, before the effective date, the Applicant or another person:

(a) filed or submitted an application, preliminary plan, site plan, plat, permit request, or other request for governmental approval;

(b) obtained an interim or preliminary approval, or an approval contingent upon unresolved discretionary review, further discretionary approval, or satisfaction of a material condition precedent to final approval;

(c) participated in a preapplication conference, consultation, technical review, utility study, public meeting, or other preliminary process;

(d) incurred costs, acquired or leased property, entered into contracts, ordered equipment, conducted studies, or performed clearing, grading, construction, or other site work before obtaining all Final County Approvals required to authorize the HIDIU as a whole; or

(e) obtained a utility application, study agreement, facilities study, service indication, service commitment, construction authorization, Binding Utility Agreement, interconnection agreement, or other utility-related approval or milestone.
No act or circumstance listed in this Section, standing alone, constitutes Final County Approval, County authorization of the proposed land use, or a vested right to construct or operate a High-Intensity Digital Infrastructure Use, except to the extent a vested right is independently established under applicable Arkansas law.

SECTION 17.4 Post-Effective-Date Material Modifications.
A project described in Section 17.2 shall obtain approval under Article 8 before undertaking any post-effective-date expansion, alteration, addition, change, or other activity that constitutes a Material Modification.

Completion, operation, maintenance, repair, or replacement within the scope of an existing Final County Approval shall not constitute a Material Modification solely because the activity occurs after the effective date of this Ordinance, provided that the activity does not materially increase or alter the approved scale, capacity, intensity, operational purpose, or land use or infrastructure impacts of the project.

Materiality shall be determined by comparing the proposed activity with the use, plans, capacity, equipment, phases, conditions, and development parameters authorized by the project's Final County Approvals.

SECTION 17.5 Utility Milestones.
A utility application, feasibility review, system-impact study, facilities study, study agreement, service commitment, Binding Utility Agreement, interconnection agreement, construction authorization, expenditure, or other utility milestone, standing alone, does not constitute:

(a) Final County Approval;

(b) approval of land-use compatibility by Pulaski County;

(c) entitlement to issuance of a Conditional Use Permit;

(d) authorization to construct or operate a High-Intensity Digital Infrastructure Use; or

(e) a vested land-use right or development entitlement under applicable law except to the extent independently established under applicable Arkansas law.

SECTION 17.6 Determination of Status. A person claiming that a project is exempt from obtaining a new Conditional Use Permit under Section 17.2 shall submit to the Planning Director copies of the approvals, plans, conditions, permits, and other evidence upon which the claim is based.

The Planning Director shall issue a written determination stating:

(a) whether all required Final County Approvals were obtained before the effective date;

(b) the specific use, location, scale, capacity, structures, facilities, phases, and development authorized by those approvals;
(c) any conditions or limitations applicable to the project; and
(d) whether any proposed post-effective-date activity requires review under Article 8.

The Planning Director's determination shall address the existence and scope of County approvals and the applicability of this Ordinance. The Planning Director shall not adjudicate any constitutional claim or determine whether a vested right exists under Arkansas law but may consider whether the claimant has established an exemption under this Article.

Before issuing a determination, the Planning Director may request additional information reasonably necessary to determine the existence or scope of the claimed Final County Approvals. If the determination may materially affect an approved project or surrounding property, the Planning Director shall provide reasonable notice and an opportunity for the claimant and other persons entitled to notice under County law to submit relevant written information.

The Planning Director shall issue the written determination within thirty (30) calendar days after receiving all information reasonably required to evaluate the claim, unless extraordinary complexity requires additional time stated in a written notice. Unless otherwise ordered by a court, no construction or activity dependent upon the claimed exemption shall begin or continue while a timely administrative appeal is pending, except work independently authorized by an undisputed Final County Approval.

The person claiming the exemption bears the burden of establishing it by competent evidence. A determination under this Section may be appealed under Article 9, except where applicable Arkansas law requires a direct appeal to circuit court.

SECTION 17.7 No Impairment or Creation of Vested Rights. Nothing in this Article shall be construed to impair a vested right established under Arkansas law.

Neither the filing of an application, the expenditure of funds, the acquisition or lease of property, the execution of a private or utility agreement, the receipt of a preliminary or incomplete approval, a ministerial approval, nor an approval contingent upon unresolved discretionary action shall create a vested right except to the extent independently established under applicable Arkansas law.

This Article does not enlarge any project approval, create any entitlement to future development, or prevent the County from regulating a new use, expansion, alteration, or Material Modification to the extent permitted by law.

**ARTICLE 18. SEVERABILITY.** If any provision or application of this Ordinance is held invalid, the invalidity shall not affect other provisions or applications that can be given effect without the invalid portion.

**ARTICLE 19 REPEALER**. All ordinances and parts of ordinances in conflict with this Ordinance are repealed to the extent of the conflict.

**ARTICLE 20. EMERGENCY CLAUSE.** The Quorum Court finds that development project applications for unusually intensive digital infrastructure development may be submitted or advanced before the County has a comprehensive site-specific regulatory framework addressing infrastructure, roads, drainage, fire and emergency response, water, noise, and land-use compatibility, continuing compliance, and public cost impacts associated with High-Intensity Digital Infrastructure Uses. The Quorum Court further finds that large-scale digital infrastructure development is presently proposed, under consideration, or reasonably foreseeable within Pulaski County and that delay in establishing uniform review standards could permit applications or construction activity to advance without adequate site-specific safeguards. Immediate effectiveness of this Ordinance is necessary to prevent a regulatory gap and protect public health, safety, welfare, property, and County resources. An emergency is therefore declared, and this Ordinance shall take effect immediately upon passage.

APPROVED AS TO FORM: ______________________________ DATE: __________
County Attorney's Office

APPROVED: ______________________ DATE: __________
County Judge - Barry Hyde

ATTEST: ______________________________ DATE: __________
Circuit County Clerk - Terri Hollingsworth

PULASKI COUNTY

BARRY HYDE
County Judge / Chief Executive Officer

September 25, 2026

The Honorable Terri Hollingsworth
Pulaski County Clerk
401 West Markham Street
Little Rock, Arkansas 72201

Filed: 09/25/2026 16:30
Pulaski County/Circuit Cle

**RE: Veto of Ordinance No. 26-OR-19**

Dear Madam Clerk:

Pursuant to Amendment 55 of the Arkansas Constitution and Arkansas Code Annotated § 14-14-911, I am vetoing Ordinance No. 26-I-56B.

This decision is not based on opposition to reasonable regulation of high-intensity digital infrastructure. Pulaski County has both the authority and the responsibility to protect its residents, property, roads, emergency services, and other public infrastructure. Arkansas law expressly gives counties broad authority over county affairs and the power to protect the public from dangerous or noxious activities. Ark. Code Ann. § 14-14-801.

The question is whether this particular ordinance, in its present form, can be lawfully, fairly, and effectively administered without exposing Pulaski County to unnecessary legal and financial risk.

After reviewing the ordinance, the applicable statutes and case law, the Attorney General's guidance, and the resources that would be required to administer it, I do not believe that it can.

**1. Significant questions remain concerning state law and existing property rights.**

Pulaski County's regulatory authority is broad, but it is not unlimited. County legislation must remain consistent with state law and constitutional protections.

That principle is particularly important in the area of digital-asset mining. In Arkansas Attorney General Opinion No. 2023-060, Attorney General Tim Griffin concluded that a city or county could not use an ordinance to ban a new digital-asset-mining operation where state law protected the activity. The same opinion recognized legitimate local authority over matters such as operations, safety, and generally applicable noise regulation.

The General Assembly amended the statutory framework in 2024. Current Arkansas Code § 23-119-105(f) preserves local regulatory authority, but only in areas not otherwise addressed by federal law, state law, or Arkansas Oil and Gas Commission rules, and only when local regulation is consistent with those authorities.



EXHIBIT
4

201 South Broadway, Suite 400 | Little Rock, AR 72201
Phone: 501.340.8305 | Cell: 501.351.6616 | Fax: 501.340.8282
pulaskicounty.net

The issue, therefore, is not whether Pulaski County may regulate these facilities. It may. The issue is whether each provision of this ordinance remains within the County's authority and whether its application could interfere with rights already established under Arkansas law.

Article 17 presents the most immediate concern.

The ordinance applies its new regulatory framework to certain projects that have not obtained all defined "Final County Approvals," even where a developer may already have acquired or leased property, entered contracts, ordered equipment, incurred substantial expenses, completed utility work or studies, or undertaken clearing, grading, construction, or other development activity.

The ordinance appropriately states that it does not impair vested rights established under Arkansas law. But that language does not determine whether a project has already acquired such rights.

Arkansas law makes that determination fact-specific. In *Blundell v. City of West Helena*, the Arkansas Supreme Court recognized vested rights where a property owner, acting in good faith, had substantially entered upon performance of the project. *Potter v. City of Tontitown* later emphasized both good faith and substantial use or performance. Significant expenditures alone may not be enough, but neither does Arkansas law make vested rights depend exclusively upon obtaining every final governmental approval.

Article 17 itself recognizes the difficulty: the Planning Director is permitted to determine the existence and scope of County approvals but is specifically prohibited from deciding whether a constitutional vested right exists.

That leaves the County in a difficult position. A substantially advanced project could become subject to new restrictions while the central question—whether the owner already possesses legally protected rights—remains unresolved.

With projects involving extraordinary levels of private investment, that is not a minor drafting concern. It is an invitation to costly litigation over vested rights, due process, contractual interests, and constitutional property protections.

Those issues should be addressed before enforcement begins, not after the County and a developer are standing in court.

**2. The appeal provisions should be brought squarely into compliance with Arkansas law.**

Article 9 provides for appeals from Planning Board decisions to the Quorum Court and directs the Quorum Court to conduct those administrative appeals.

Arkansas Code § 14-17-203(g), however, specifically addresses that process. When a quorum court elects to act as a board of administrative appeal from the county planning board, the statute provides that the County Judge shall chair the appellate board and vote only in the event of a tie, with the Quorum Court determining how many members sit on the board.

This is particularly important after the Arkansas Supreme Court's March 2026 decision in *MMSC, LLC v. Washington County*. The Court held that deciding an individual conditional-use application by applying existing standards to the facts is a quasi-judicial act, not a legislative act.

When government is making quasi-judicial decisions affecting valuable property rights, procedure matters. The ordinance should clearly conform to state law governing the appellate body, the County Judge's role, the record, hearing procedures, and judicial review before those proceedings begin.

**3. 26-OR-19 creates a regulatory system the County is not presently equipped to administer.**

This ordinance is not simply a zoning classification.

It creates an ongoing regulatory program requiring technical application review, inspections, monitoring, annual reporting, accounting, noise and environmental evaluation, complaint investigation, enforcement proceedings, administrative hearings, emergency orders, decommissioning oversight, and continuing compliance review.

The ordinance itself acknowledges that administration may require specialized engineering, acoustical, transportation, environmental, fire-safety, legal, financial, and other professional expertise beyond existing County staffing.

It authorizes County employees and outside professionals to conduct inspections and requires detailed annual compliance reporting covering electrical demand, water use, generator operation, equipment changes, incidents, and other technical information.

That work requires people, equipment, expertise, contracts, recordkeeping systems, legal support, and appropriated funds.

Applicant fees and escrows may offset some project-specific expenses, but they do not eliminate that problem. The ordinance itself limits cost recovery to reasonable, documented, nonduplicative, project-specific expenses and prohibits recovery of unrelated general County overhead.

The annual monitoring fee cannot even be imposed until the Quorum Court adopts a separate fee schedule by ordinance.

The County Judge is responsible for administering County ordinances and may approve expenditures only within lawful appropriations and available funds. Ark. Code Ann. § 14-14-1102.

Before Pulaski County creates a regulatory program of this magnitude, we should know who will administer it, what qualifications are necessary, what equipment must be acquired, what outside professionals will be required, and what the program will actually cost.

We do not yet have those answers.

The County should not create obligations today and determine tomorrow whether it has the people and money to fulfill them.

**4. The cost of getting this wrong will not fall only on a developer. It may fall on our children and our communities.**

There is another consequence that cannot be reduced to legal citations or balance sheets.

Projects of this size can produce substantial additions to the local property tax base. Those revenues can directly affect the resources available to our schools, libraries, and other public institutions. The project also carries the potential for community-enhancement funding that could be directed toward neighborhoods and families that have historically received far too little investment.

Those benefits do not buy immunity from regulation, but neither should we pretend they do not matter.

Pulaski County contains communities where the opportunities available to a child can still depend far too much on the neighborhood in which that child is born and the school he or she attends. Deep and persistent inequalities in educational resources have consequences that last for generations.

For a child attending an under-resourced school, the loss of future revenue is not an abstract line on a tax statement. It can mean a teacher who is never hired, a reading or tutoring program that never begins, technology that cannot be replaced, a counselor who must serve too many children, an extracurricular opportunity that disappears, or a facility improvement that is postponed yet again.

When opportunities are already unequal, voluntarily losing a significant source of new revenue can make those inequalities harder—not easier—to overcome.

Libraries, youth programs, workforce initiatives, parks, neighborhood improvements, and community organizations can likewise benefit when new investment expands the local tax base or provides dedicated community-enhancement resources.

If a major project is lost because Pulaski County deliberately imposed requirements later determined to exceed its lawful authority, those dollars do not simply reappear elsewhere in our budget. The investment, tax base, community commitments, employment opportunities, and secondary economic activity can leave with the project.

That weighs heavily in my decision.

We should regulate responsibly. But we should be equally responsible about the consequences of regulation. The County should not jeopardize meaningful opportunities for schoolchildren and underserved communities because of legal and administrative defects that can be corrected with careful drafting.

A sound ordinance can protect neighborhoods and preserve responsible investment. We should insist on both.

**5. The litigation risk is real, and official immunity should not be misunderstood**.

Recent litigation in *RCM Hill, LLC v. Hill County, Texas* provides a useful warning.

In May 2026, a data-center developer sued Hill County and individual county officials under 42 U.S.C. § 1983 over a county moratorium. The case was dismissed with prejudice on July 9, 2026, without a judicial determination that the officials were personally liable. It therefore is not precedent establishing personal liability.

It does demonstrate, however, that officials can be named individually and that significant legal expense can arise before questions of immunity or liability are ever resolved.

Arkansas law provides meaningful protections to public officials. Legislative acts—including ordinarily debating and voting on an ordinance—receive broad legislative immunity. The Arkansas Supreme Court has recognized that principle for quorum-court members. *Massongill v. County of Scott*, 337 Ark. 281, 991 S.W.2d 105 (1999).

A member does not lose legislative immunity merely because he or she disagrees with legal counsel or votes for an ordinance later found invalid.

That point should be clear.

But the ordinance does not end with a vote. It contemplates inspections, enforcement, administrative decisions, financial demands, suspensions, revocations, and quasi-judicial appeals. Those subsequent acts may present different immunity questions.

Arkansas Code § 21-9-301 provides broad immunity to counties and political subdivisions from damages, subject to the statute's insurance exception. The Arkansas Supreme Court has also made clear that this state-law immunity does not control a federal claim brought under 42 U.S.C. § 1983; federal immunity principles govern those claims. *Benton School District v. Greer*, 2023 Ark. 160.

The Arkansas Civil Rights Act likewise authorizes claims for deprivation of rights secured by the Arkansas Constitution, although applicable immunity defenses remain available. Ark. Code Ann. § 16-123-105.

Accordingly, I am not suggesting that passage of this ordinance automatically exposes any Justice of the Peace to personal financial liability.

I am saying something narrower and more important:

Once elected officials have been specifically placed on notice by the County Attorney's Office, the Arkansas Attorney General, and other experienced governmental attorneys that a contemplated exercise of governmental power may exceed authority granted by Arkansas law, those warnings should not simply be disregarded.

Such opinions are not court orders, and they do not themselves establish liability or defeat immunity. But they are notice that legitimate legal questions exist.

No official should assume that every later act taken to implement or enforce a disputed ordinance will be protected simply because it was undertaken in an official capacity.

I am unwilling to place members of this Court, County employees who would be required to administer this ordinance, or the taxpayers of Pulaski County in the position of defending avoidable official-capacity or individual-capacity litigation when these legal questions can be addressed beforehand.

Pulaski County does not have to choose between protecting its citizens and encouraging responsible economic development.

We can do both.

But we should do it through an ordinance that is clearly within Arkansas law, protects established rights, follows the procedures required for quasi-judicial land-use decisions, and is supported by a realistic staffing and funding plan.

The consequences of getting this wrong are substantial: expensive litigation, administrative obligations the County may not be prepared to meet, uncertainty for property owners and residents, the possible loss of major investment, and potentially millions of dollars in future public and community benefits that could otherwise support schools, libraries, children, and neighborhoods that need those resources most.

Filed: 09/25/2026 16:3C
Pulaski County/Circuit Cle

Those risks are avoidable.

The better course is to correct the ordinance before those consequences occur.

For these reasons, I veto Ordinance No. 26-OR-19.

Respectfully,

Barry Hyde
Pulaski County Judge

195 FERC ¶ 61,212
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Laura V. Swett, Chairman;
David Rosner, Lindsay S. See,
Judy W. Chang, and David LaCerte.

Midcontinent Independent System Operator, Inc. Docket No. EL26-70-000

AEP Indiana Michigan Transmission Company, Inc.
ALLETE, Inc.
Ameren Illinois Company
Ameren Transmission Company of Illinois
American Transmission Company, LLC
Cleco Power LLC
Duke Energy Indiana, LLC
Entergy Arkansas, LLC
Entergy Louisiana, LLC
Entergy Mississippi, LLC
Entergy New Orleans, LLC
Entergy Texas, Inc.
GridLiance Heartland LLC
Indianapolis Power & Light Company
International Transmission Company
ITC Midwest LLC
Michigan Electric Transmission Company, LLC
MidAmerican Energy Company
Montana-Dakota Utilities Company
Northern Indiana Public Service Company LLC
Northern States Power Company, a Minnesota Corporation
Northern States Power Company, a Wisconsin Corporation
Northwestern Wisconsin Electric Company
Otter Tail Power Company
Pioneer Transmission, LLC
Republic Transmission, LLC
Southern Indiana Gas & Electric Company
Union Electric Company
Wabash Valley Power Association, Inc.
Wolverine Power Supply Cooperative, Inc.

EXHIBIT 5

ORDER INSTITUTING PROCEEDING
UNDER SECTION 206 OF THE FEDERAL POWER ACT

(Issued June 18, 2026)

Paragraph Numbers

I. Background ... 6.
A. Growth of Large and Co-Located Loads and ANOPR ... 6.
B. Recent Proceedings Addressing Large and Co-Located Loads ... 13.
1. PJM Co-Location Proceedings ... 14.
2. SPP High Impact Large Load and High Impact Large Load Generation Assessment Processes ... 17.
3. SPP Conditional High Impact Large Load Service ... 19.

II. MISO's Existing Processes ... 21.
A. Existing Tariff Processes ... 21.
B. Recent Stakeholder Proceedings in MISO ... 29.

III. Discussion ... 33.
A. Transmission Service to Eligible Customers on Behalf of Large Loads ... 39.
1. Jurisdiction ... 42.
2. Tariff Provisions ... 48.
B. Cost Shifting Risk Among Transmission Customers ... 66.
1. Jurisdiction ... 68.
2. Additional Cost Transparency ... 71.
3. Cost Recovery Agreements ... 78.
C. Co-Location Arrangements and Load with Behind the Meter Generation ... 86.
1. Definition ... 88.
2. Jurisdiction ... 92.
3. Tariff Provisions ... 94.
D. Extending New Transmission Services to Eligible Customers Taking Service on Behalf of Flexible Large Loads ... 103.
E. Interconnection Customers Serving Electrically Proximate Large Load and Co-Located Load ... 106.
1. Jurisdiction ... 110.
2. Definitions ... 112.
3. Tariff Provisions ... 113.
F. Informational Report ... 120.

IV. Briefing Questions ... 123.

1. Over the past year, the Commission has taken action in numerous dockets[1] to address issues related to (a) unprecedented increases in requests for transmission service to serve large loads[2] and (b) growing interest in the co-location of loads with generating facilities (co-location arrangements[3]). Separately, the Secretary of Energy (Secretary) released an advance notice of proposed rulemaking (ANOPR) in October 2025. The ANOPR, issued pursuant to section 403 of the Department of Energy Organization Act,[4] directed the Commission to consider taking additional actions to address the addition of large and co-located loads to the transmission system.[5] The records in these proceedings illustrate a host of urgent challenges associated with providing the transmission service needed to serve the ongoing influx of large loads while maintaining reliability and affordability. In particular, stakeholders have expressed concerns that large loads are not efficiently and appropriately integrated onto the transmission system; have identified a

---

[1] *See, e.g.*, *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,115 (2025) (PJM Show Cause Order); *PJM Interconnection, L.L.C.*, 193 FERC ¶ 61,217 (2025) (PJM Co-Location Order); *Sw. Power Pool, Inc.*, 194 FERC ¶ 61,031 (2026) (SPP HILL Order); *Sw. Power Pool, Inc.*, 195 FERC ¶ 61,196 (2026) (SPP CHILLS Order); *see also, e.g.*, *Duke Energy Carolinas, LLC*, 193 FERC ¶ 61,237 (2025); *Commonwealth Edison Co.*, 194 FERC ¶ 61,181 (2026).

[2] As explained below, it appears that it would be reasonable to define a large load as (1) a new commercial or industrial customer, (2) located at a single site behind one or more points of interconnection, (3) that has a peak load of 50 MW or greater, (4) interconnects to the transmission system at a voltage level of greater than 69 kV, and (5) is not part of a co-location arrangement. *See infra* P 58.

[3] As explained below, it appears that it would be reasonable to define co-located load as a configuration that refers to end-use customer load that is physically connected to the facilities of an existing or planned generating facility on the interconnection customer's side of the point of interconnection to the RTO/ISO's transmission system. In this order, we will use the term co-location arrangement when referring to both the co-located load and the associated generating facility. *See infra* P 89.

[4] 42 U.S.C. § 7173.

[5] *See Interconnection of Large Loads to the Interstate Transmission System*, Advance Notice of Proposed Rulemaking, Docket No. RM26-4-000 (Oct. 23, 2025) (ANOPR); *see also* Letter from Chris Wright, Sec'y, U.S. Dep't of Energy, Docket No. RM26-4-000 (Oct. 23, 2025). The ANOPR uses the term "hybrid facilities," which it explains are large loads that "share a point of interconnection with new or existing generation facilities." ANOPR at P 12. In this order, as explained below, we use the term co-located load.

number of unique challenges that large load integration poses for the reliable operation of that system; and have debated how best to ensure that the rates, terms, and conditions of transmission service remain just and reasonable as more and more large loads are onboarded onto that system.[6] The records in these proceedings likewise present serious concerns about the lack of clarity and consistency in Regional Transmission Organization or Independent System Operator (RTO/ISO) tariffs—including with respect to the rates, terms, and conditions of service that apply to flexible large loads, co-location arrangements, load with behind the meter generation, and generating facilities with electrically proximate large load[7] or co-located load.

2. The findings in several recent Commission proceedings establish the foundations of a just and reasonable framework for addressing these concerns and ensuring the timely, efficient, and reliable integration of large and co-located loads onto the transmission system. For example, Southwest Power Pool, Inc. (SPP) has recently taken a number of innovative and proactive steps to address the challenges of integrating large loads, co-located loads, and/or generation and electrically proximate large load onto the transmission system while ensuring that its tariff remains just and reasonable, and PJM Interconnection, L.L.C. (PJM) has likewise taken steps toward that goal in response to this Commission's directives.[8] By contrast, Midcontinent Independent System Operator, Inc. (MISO) has not yet proposed tariff revisions to address the challenges

---

[6] Throughout this order we rely on comments and answers filed in response to the ANOPR in Docket No. RM26-4-000 and all referenced comments in this order were filed in that docket, unless otherwise noted. A full list of commenter names and abbreviations is attached to this order as an Appendix. Additionally, we have relied on the discussions held in the Federal and State Current Issues Collaborative in Docket No. AD24-7-000 (NARUC Collaborative). All entities who wish to participate in this docket, regardless of participation in the ANOPR proceeding or NARUC Collaborative, should file to intervene in Docket No. EL26-70-000.

[7] As explained below, for purposes of this order, an "electrically proximate large load" is a large load, as defined in this order, that is sufficiently electrically close to the interconnection customer's requested point of interconnection, such that the impact on the transmission system of the combination of the generating facility and the load, with the exception of the transmission facilities between the two, will be effectively the same as if they were located at the same substation (e.g., large load that is located no more than two substations away from the generating facility). *See infra* P 112.

[8] PJM Show Cause Order, 190 FERC ¶ 61,115; PJM Co-Location Order, 193 FERC ¶ 61,217, *order on reh'g*, 195 FERC ¶ 61,209 (2026) (PJM Co-Location Rehearing Order); SPP HILL Order, 194 FERC ¶ 61,031; SPP CHILLS Order, 195 FERC ¶ 61,196.

associated with the integration of large and co-located loads, despite the facts that large and co-located loads are increasingly common in the MISO region and MISO itself has recognized that its tariff currently does not "provide a consistent or transparent framework to evaluate" such large loads.[9]

3. As discussed below, we find that MISO's existing Open Access Transmission, Energy, and Operating Reserve Markets Tariff (Tariff) appears to be unjust, unreasonable, or unduly discriminatory or preferential. We thus institute a show cause proceeding pursuant to section 206 of the Federal Power Act (FPA),[10] and we direct MISO and the Transmission Owners,[11] within 60 days of the date of this order, to either:

---

[9] MISO, *Issue Submission Report* (Apr. 15, 2026), https://cdn.misoenergy.org/New%20Issue%20-%20Large%20Load%20Interconnection%20Reliability%20Requirements748710.pdf (MISO Issue Submission Report).

[10] 16 U.S.C. § 824e.

[11] Transmission Owners refers to the entities listed in the caption of this order. We recognize that MISO's transmission owners include entities that are not subject to the Commission's jurisdiction because they are not public utilities pursuant to section 201(f) of the FPA. *See* 16 U.S.C. § 824(f); *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,022, at PP 44-45 (2022). Accordingly, the Commission has not included 1803 Electric Cooperative, Inc.; Ames Municipal Electric System; Arkansas Electric Cooperative Corporation; Big Rivers Electric Corporation; Board of Water, Electric and Communications Trustees of the City of Muscatine, Iowa; Central Minnesota Municipal Power Agency; Citizens Electric Corporation; City of Alexandria, Louisiana; City of Columbia, Missouri, Water & Light Department; City of Henderson, Kentucky, Utility Commission; City Water, Light and Power - City of Springfield, Illinois City Water and Light Plant of the City of Jonesboro; Cooperative Energy; Dairyland Power Cooperative; East Texas Electric Cooperative, Inc.; Great River Energy; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Lafayette City-Parish Consolidated Government; Michigan Public Power Agency; Michigan South Central Power Agency; Minnesota Municipal Power Agency; Missouri Joint Municipal Electric Utility Commission; Missouri River Energy Services; Municipal Electric Utility of the City of Cedar Falls, Iowa; Municipal Energy Agency of Nebraska; Prairie Power, Inc.; Rochester Public Utilities; Sam Houston Electric Cooperative, Inc.; Southern Illinois Power Cooperative; Southern Minnesota Municipal Power Agency; Willmar Municipal Utilities; and WPPI Energy here as Transmission Owners that must respond to this order to show cause. Nonetheless, the Commission retains the authority to review each entity's formula rates as a component of MISO's Tariff in an order to show cause directed towards MISO, and MISO must respond to this order

(1) show cause as to why the Tariff remains just and reasonable and not unduly discriminatory or preferential without provisions addressing:

(a) the application process, study procedures, and ongoing operational requirements that apply to Eligible Customers[12] seeking transmission service on behalf of large loads;

(b) additional transparency concerning the Network Upgrade[13] costs to provide transmission service to Eligible Customers on behalf of large loads, a *pro forma* cost recovery agreement between MISO, the relevant transmission owner, and Eligible Customer taking transmission service on behalf of the large load to mitigate the risk of cost shifting among transmission customers, and a mechanism to ensure such payments are appropriately credited toward transmission owners' transmission revenue requirements consistent with the Commission's cost-of-service regulations;

(c) the rates, terms, and conditions of service that apply to co-location arrangements;

---

regarding the non-public utilities' MISO Tariff provisions on file with the Commission. *See Sw. Power Pool, Inc.*, 180 FERC ¶ 61,022 at P 40.

[12] MISO defines an Eligible Customer, in relevant part, as:

> (i) Any electric utility (including the Transmission Owner(s), ITC Participants(s), and any power marketer), Market Participant, Federal Power Marketing Agency, or any person generating electric Energy for sale or for resale is an Eligible Customer . . . ; or (ii) Any retail customer taking unbundled transmission service pursuant to a state requirement that a Transmission Owner or ITC Participant offer the transmission service, or pursuant to a voluntary offer of such service by a Transmission Owner or ITC Participant, that is an Eligible Customer under this Tariff. Unbundled retail customers that seek to take local distribution service cannot be Eligible Customers under this Tariff with respect to that service.

MISO, FERC Elec. Tariff, Module A, § 1.E (Definitions E) (93.0.0), Eligible Customer (MISO Tariff).

[13] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Tariff.

(d) transmission services that reflect Eligible Customers taking transmission service on behalf of co-located loads, load with behind the meter generation, and flexible large loads that are willing and able to limit their use of the transmission system under certain conditions;[14] and

(e) the rates, terms, and conditions of service applicable to interconnection customers serving electrically proximate large load or co-located load; or

(2) explain what changes to the Tariff would remedy the identified concerns if the Commission were to determine that the Tariff has in fact become unjust and unreasonable or unduly discriminatory or preferential and, therefore, proceeds to establish a replacement Tariff.

4. We are also concerned with MISO's need to ensure adequate generation to serve new large loads.[15] We therefore direct MISO to submit, within 30 days of the date of issuance of this order, an informational report on how MISO intends to ensure that adequate generation will be available to serve existing and new large loads, as detailed later in this order.

5. We recognize that large loads, including data centers, are actively working with transmission owners and other relevant entities to interconnect to, and to take service from, the transmission system. We appreciate that different large loads are currently at different stages of that process. We also understand that large loads and Eligible Customers taking transmission service on behalf of large loads are negotiating, entering into, and/or have executed various agreements related to interconnecting to the transmission system and/or the provision of transmission service. This proceeding is not intended to disrupt existing commercial arrangements, but rather to establish prospective reforms. Accordingly, any Tariff revisions offered by MISO and/or the Transmission Owners in response to this proceeding should (a) propose a reasonable implementation period to ensure minimal disruption to such existing commercial arrangements, and (b) allow a reasonable amount of time to finalize ongoing agreements that are nearing completion as of the date such Tariff provisions are filed with the Commission. Such

---

[14] As explained below, for purpose of this order, "flexible" large loads are a subset of large loads, as used in this order, that are not co-located with generation, but are willing and able to limit their energy withdrawals from the transmission system under certain conditions. *See infra* note 217.

[15] *Cf.* PJM Co-Location Order, 193 FERC ¶ 61,217 at PP 237-239 (highlighting PJM's ongoing Critical Issue Fast Path stakeholder process to consider proposals to help integrate large load additions without causing resource inadequacy and directing an informational report on the status of those proposals).

proposed Tariff revisions should include a reasonable effective date that accommodates such considerations regarding these existing commercial arrangements.

# I. Background

## A. Growth of Large and Co-Located Loads and ANOPR

6. As the Secretary explained in the ANOPR, electricity demand in the United States is expected to grow at an extraordinary pace in the near term, largely due to the rapid growth of large loads.[16] The Secretary highlighted findings from the North American Electric Reliability Corporation (NERC) that show that demand growth is now higher than at any point in the past two decades, driven in part by increasing quantities of large commercial and industrial load, most notably data centers, connecting rapidly to the transmission system.[17] The Secretary also highlighted NERC's conclusion that the size and speed with which data centers can be connected to the grid present unique challenges for demand forecasting and system planning. The ANOPR proposed that, in light of the unprecedented current and expected growth of large loads seeking to interconnect to the transmission system, the Commission should standardize interconnection procedures and agreements for large loads, including those that seek to share a point of interconnection with new or existing generation facilities.[18]

7. On April 16, 2026, the Commission issued an order regarding its intent to act with respect to the ANOPR docket.[19] In that order, the Commission explained that it agreed with the Secretary "that, '[i]n light of the unprecedented current and expected growth of

---

[16] ANOPR at 2 (citing U.S. Dep't of Energy, *Resource Adequacy Report: Evaluating the Reliability & Security of the United States Electric Grid* (July 2025), www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf).

[17] *Id.* (citing NERC, *2024 Long- Term Reliability Assessment* 8 (Dec. 2024, updated July 2025), https://www.nerc.com/pa/RAPA/ra/Reliability%20Assessments%20DL/NERC_Long%20Term%20Reliability%20Assessment_2024.pdf).

[18] *Id.* P 12. For example, the ANOPR proposed that load and hybrid facilities should be studied together with generating facilities, observing that "siting a large load near or at the same point of interconnection as a new generating facility could reduce the network upgrades needed to interconnect only the load or only the generating facility." ANOPR at P 20.

[19] *Interconnection of Large Loads to the Interstate Transmission Sys.*, 195 FERC ¶ 61,045 (2026) (Order Regarding Intent to Act).

large loads' such as data centers, there is an urgent need for thoughtful reforms to ensure that large loads are 'able to connect to the transmission system in a timely, orderly, and non-discriminatory manner.'"[20] After recognizing the Commission's recent actions in proceedings involving issues associated with large loads,[21] the Commission concluded that it was clear that additional "action is warranted to support further progress where it is needed."[22]

8. MISO's comments in response to the ANOPR recognize the growth of large loads[23] and highlight the challenges that the integration of large loads poses to transmission system operations given those loads' size, operational behavior, and unique potential to impact the transmission system.[24] Other comments on the ANOPR identify a number of large load projects that are underway across the MISO footprint.[25] The Commission's 2025 State of the Market Report found that MISO had the fastest data center growth of any region in the country, with data center capacity increasing at a 43% compound annual growth rate since 2020.[26]

9. The MISO TOs stated in their ANOPR comments that, to date, MISO has approved transmission enhancements to support approximately 14.4 gigawatts (GW) of

---

[20] *Id.* P 2.

[21] *Id.* (citing PJM Co-Location Order, 193 FERC ¶ 61,217; SPP HILL Order, 194 FERC ¶ 61,031; *Commonwealth Edison Co.*, 194 FERC ¶ 61,181; *Tri-State Generation & Transmission Ass'n*, 193 FERC ¶ 61,070 (2025); *Duke Energy Carolinas, LLC*, 193 FERC ¶ 61,237).

[22] *Id.* PP 3-4.

[23] MISO November 21 ANOPR Comments at 10-11 (noting that MISO has approved approximately 17 GW of large load additions since the 2022 MISO Transmission Expansion Plan cycle and that data centers are, in part, materially increasing the outlook for load growth over coming years).

[24] *See id.* at 30-33 (describing NERC's findings related to large loads); *see also* MISO, *Large Load Additions Workshop* 7-8 (Jan. 30, 2026), https://cdn.misoenergy.org/20260130%20Large%20Load%20Workshop%20Presentation738349.pdf (MISO Large Load Workshop Presentation).

[25] EEI March 12 ANOPR Comments, attach. 1 at 1-8 (listing publicly announced large load projects, including in the MISO footprint).

[26] Commission Staff, *2025 State of the Market Report* 7 (Mar. 2026) (FERC 2025 State of the Market Report).

large load additions.[27] AES states that they are experiencing unprecedented load growth driven by data center additions in their respective territories and that AES Indiana forecasted to MISO nearly 1.9 GW of new load by 2029, which represents a 75% increase to its existing peak.[28] Alliant states that the Alliant Energy Operating Companies are coordinating with their respective transmission owners and MISO to interconnect four large loads totaling approximately 3 GW.[29] Wisconsin Electric highlights that Microsoft committed to invest over $7 billion to construct a data center in Wisconsin Electric's service territory and that Vantage Data Centers is also investing in a $15 billion data center that will be powered by Wisconsin Electric.[30] Entergy states that it plans to construct more than 8 GW of additional dispatchable generation over the next five years to meet the needs of customers, including 7 to 12 GW of data centers.[31]

10. While some commenters in the ANOPR proceeding assert that MISO's existing processes effectively facilitate the interconnection of large loads,[32] the MISO TOs argue that more can and should be done to address the growth of large loads,[33] and a number of entities in the MISO footprint generally agree there is a need for clear rules in MISO's Tariff governing how large loads are added to the transmission system.[34] The Illinois AG

---

[27] MISO TOs November 21 ANOPR Comments at 3.

[28] AES November 21 ANOPR Comments at 4.

[29] Alliant November 21 ANOPR Comments at 2.

[30] Wisconsin Electric November 21 ANOPR Comments at 4-5.

[31] Entergy November 21 ANOPR Comments at 3.

[32] *See, e.g.*, Arkansas Commission November 21 ANOPR Comments at 3; DTE November 21 ANOPR Comments at 13; Entergy November 21 ANOPR Comments at 18; Louisiana and Mississippi Commissions November 21 ANOPR Comments at 6; MISO November 21 ANOPR Comments at 2; MISO TOs November 21 ANOPR Comments at 4; North Dakota Commission November 21 ANOPR Comments at 5; OMS November 21 ANOPR Comments at 2-3; South Dakota Commission November 13 ANOPR Comments at 5-6; Wisconsin Electric November 21 ANOPR Comments at 7-8.

[33] MISO TOs April 3 ANOPR Comments at 2-3.

[34] AES November 21 ANOPR Comments at 4-5 ("AES shares the view that transparency and regulatory certainty are necessary elements for effective market participation and investment, whether such investment involves generation, transmission and distribution, or load."); Alliant November 21 ANOPR Comments at 3 ("Establishing clear, transparent, and fair rules will enable straightforward compliance and reduce administrative burdens, fostering a more efficient regulatory environment.");

states that the MISO market monitor has identified large increases in "federal energy market prices and transmission charges" and argues that adopting clear rules in MISO's Tariff for the interconnection of large loads to the transmission system is necessary both to address the effect that these outsized loads have on the wholesale electricity markets and the transmission system, and to prevent practices that will lead to unjust and unreasonable cost shifts and prices.[35] Commenters also support reforms that capture the efficiencies of generation paired with electrically proximate large load.[36]

11. In addition, various entities in the MISO footprint recognize that large loads present unique operational and reliability challenges. For example, ATC states that large loads require detailed study to understand how grid providers can best serve them and that their operating characteristics, such as large and rapid ramping, make them even more challenging to analyze and serve.[37] Similarly, DTE asserts that, operationally, the largest loads pose distinct planning and reliability challenges, including abrupt ramps, concentrated nodal demand, and sensitivity to upstream contingencies.[38] AES states that each new large load interconnection is unique depending on the site, cost of facilities necessary to provide transmission service, and load type.[39]

12. Moreover, many commenters in the ANOPR proceeding filed persuasive comments documenting, generally, the need for clear and consistent tariff provisions to ensure regulatory and process certainty, fairness and consistency, and efficiency as large

---

ITC November 21 ANOPR Comments at 2 ("ITC is committed to working with FERC and stakeholders to achieve a regulatory framework that is efficient, transparent, and equitable for the interconnection of large loads."); Industrial Customers November 21 ANOPR Comments at 6 ("Require transparency improvements and clear standards for load studies and system impact studies pertaining to the FERC-jurisdictional transmission system.").

[35] Illinois AG November 21 ANOPR Comments at 5-6 (citing Potomac Economics, *IMM Quarterly Report: Spring 2025*, at 2 (July 10, 2025), https://www.potomaceconomics.com/wp-content/uploads/2025/06/IMM-Quarterly-Report_Spring-2025-MSC.pdf).

[36] *E.g.*, Alliant November 21 ANOPR Comments at 6; ENGIE November 21 ANOPR Comments at 14; MISO November 21 ANOPR Comments at 13; OMS November 21 ANOPR Comments at 13.

[37] ATC November 21 ANOPR Comments at 3.

[38] DTE November 21 ANOPR Comments at 18.

[39] AES November 21 ANOPR Comments at 9.

and co-located loads are added to the transmission system in increasing numbers.[40] There is also broad support for rules that help to ensure that other transmission customers are not unfairly burdened with additional costs or reliability impacts as large and co-located loads interconnect to the transmission system.[41] In addition, many ANOPR commenters highlighted the need to efficiently integrate large loads, particularly data centers, to support national security priorities and economic development.[42]

### B. Recent Proceedings Addressing Large and Co-Located Loads

13. Over the past year, the Commission has begun to address, both *sua sponte* and in response to complaints and FPA section 205[43] filings, the growing use of co-location

[40] *See, e.g.*, AI Supply Chain Alliance November 21 ANOPR Comments at 2; Calibrant November 21 ANOPR Comments at 1-3; CEBA November 21 ANOPR Comments at 9-11; Constellation November 21 ANOPR Comments at 6; DCC November 21 ANOPR Comments at 3-4; ECA November 21 ANOPR Comments at 7-11; EPSA November 21 ANOPR Comments at 4-6; Infrastructure Masons December 5 ANOPR Comments at 4-7; Microsoft November 21 ANOPR Comments at 9-10; National Grid November 21 ANOPR Comments at 7; ODEC December 5 ANOPR Comments at 2-4; R Street November 21 ANOPR Comments at 3; Switch December 5 ANOPR Comments at 3; Tract November 21 ANOPR Comments at 5; Vantage November 21 ANOPR Comments at 5-6; Vistra December 5 ANOPR Comments at 1-2.

[41] *See, e.g.*, APPA November 21 ANOPR Comments at 6; Buckeye November 21 ANOPR Comments at 17; Exelon November 21 ANOPR Comments at 10; Kansas Commission November 21 ANOPR Comments at 12; NCSL November 21 ANOPR Comments at 1; NRECA November 21 ANOPR Comments at 8-9; NY UIU November 21 ANOPR Comments at 3; OCC November 21 ANOPR Comments at 9; Oklo December 5 ANOPR Comments at 3; Southeast PIOs December 5 ANOPR Comments 11-15; State Entities November 21 ANOPR Comments at 7-8; Tri-State November 21 ANOPR Comments at 8; UCS November 21 ANOPR Comments at 9-11; U.S. Representatives November 21 ANOPR Comments at 1.

[42] *See, e.g.*, AI Supply Chain Alliance November 21 ANOPR Comments at 2; DCC November 21 ANOPR Comments at 3; ECA November 21 ANOPR Comments at 6; Geronimo November 21 ANOPR Comments at 1-2; Google November 21 ANOPR Comments at 2-3; Verrus December 5 ANOPR Comments at 2.

[43] 16 U.S.C. § 824d.

arrangements.[44] The Commission's orders in those proceedings have addressed the need for clear and consistent tariff provisions regarding the rates, terms, and conditions of service that apply to co-location arrangements and for transmission services that reflect Eligible Customers taking transmission service on behalf of co-located loads and load with behind the meter generation that are willing and able to limit their energy withdrawals from the transmission system under certain conditions. Several other Commission proceedings have addressed the challenges of integrating large loads onto the transmission system, including the need for clear and consistent tariff provisions regarding the provision of transmission service to Eligible Customers on behalf of large loads and for interconnection customers serving electrically proximate large load. As explained below, these proceedings provide examples that will help to ensure that jurisdictional transmission service is provided in a manner that is just and reasonable and maintains reliability as large loads are integrated onto the transmission system and co-location arrangements become more common. It is in this context that the Commission now considers whether MISO's Tariff remains just and reasonable without similar provisions.

### 1. <u>PJM Co-Location Proceedings</u>

14. On February 20, 2025, the Commission initiated a show cause proceeding against PJM and the PJM transmission owners regarding the lack of tariff provisions addressing with sufficient clarity or consistency the rates, terms, and conditions of service that apply to co-location arrangements.[45] The Commission explained when initiating that proceeding that the absence of such provisions may leave entities unable to determine what steps they can or must take to effectuate co-location arrangements of various configurations and how to do so in a manner that is just and reasonable.[46] On December 18, 2025, the Commission found that PJM's tariff was indeed unjust and unreasonable because it does not contain provisions addressing with sufficient clarity or consistency the rates, terms, and conditions of service that apply to interconnection

---

[44] *See* PJM Show Cause Order, 190 FERC ¶ 61,115; PJM Co-Location Order, 193 FERC ¶ 61,217, PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209; SPP HILL Order, 194 FERC ¶ 61,031; SPP CHILLS Order, 195 FERC ¶ 61,196.

[45] *See* PJM Show Cause Order, 190 FERC ¶ 61,115.

[46] *Id.* P 74. The PJM Show Cause Order defined co-located load as a "configuration [that] refers to end-use customer load that is physically connected to the facilities of an existing or planned Customer Facility on the Interconnection Customer's side of the Point of Interconnection ('POI') to the PJM Transmission System." *Id.* P 3 n.4.

customers serving co-located load and Eligible Customers taking transmission service on behalf of co-located load.[47]

15. Specifically, the Commission found that the PJM tariff was unjust and unreasonable because there is a lack of sufficient clarity or consistency as to the rates, terms, and conditions of service that apply to interconnection customers serving co-located load.[48] The Commission also found that PJM's tariff was unjust and unreasonable because it does not include transmission services that reflect Eligible Customers taking transmission service on behalf of co-located loads that are willing and able to limit their energy withdrawals from the transmission system under certain conditions.[49] Additionally, the Commission found that PJM's behind the meter generation rules were no longer just and reasonable.[50] The Commission directed PJM to file a compliance filing to revise its tariff: (1) to set forth specific terms and conditions that an interconnection customer in PJM seeking to serve co-located load must follow in order to effectuate a co-location arrangement;[51] (2) to require that the Eligible Customer taking transmission service on behalf of co-located load takes one of three transmission services: (a) network integration transmission service (NITS) or a new interim, non-firm transmission service while Network Upgrades to provide full NITS service are constructed (interim NITS); (b) a new firm contract demand transmission service; or (c) a new non-firm contract demand transmission service;[52] (3) to revise the behind the meter generation rules and implement a transition process for existing behind the meter generation participants;[53] and (4) to make several clarifications on how certain aspects of PJM's generator interconnection process apply to interconnection customers seeking to serve co-located load.[54]

---

[47] PJM Co-Location Order, 193 FERC ¶ 61,217.

[48] *Id.* P 176.

[49] *Id.* P 177.

[50] *Id.* P 179.

[51] *Id.* PP 187-192, 225-230.

[52] *Id.* PP 193-218. The Commission also established a paper hearing to determine the just and reasonable rates, terms, and conditions for the new transmission services. *Id.* PP 219-220.

[53] *Id.* PP 221-224.

[54] *Id.* PP 161, 231-236.

16. On June 18, 2026, concurrently with the instant order, the Commission issued an order modifying the discussion in the PJM Co-Location Order and setting aside the order in part; accepting in part and rejecting in part PJM's compliance filing, and directing a further compliance filing; and establishing as just and reasonable certain rates, terms, and conditions for the new transmission services (i.e., interim NITS, firm contract demand transmission service, and non-firm contract demand transmission service).[55]

### 2. SPP High Impact Large Load and High Impact Large Load Generation Assessment Processes

17. On January 14, 2026, the Commission accepted revisions to SPP's tariff to add a high impact large load (HILL) study process and High Impact Large Load Generation Assessment (HILLGA) process.[56] SPP's tariff revisions established HILLs as a new category of load;[57] imposed enhanced study requirements to enable SPP to assess the HILL's reliability impacts on the transmission system;[58] and created additional, ongoing

---

[55] PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at PP 7-9. PJM's compliance filing proposing revisions in response to the Commission's directives regarding clarification that certain aspects of PJM's generator interconnection process apply to interconnection customers seeking to serve co-located load was accepted in part on April 16, 2026. *PJM Interconnection, L.L.C.*, 195 FERC ¶ 61,030 (2026).

[56] SPP HILL Order, 194 FERC ¶ 61,031 at PP 61, 64.

[57] SPP defines a HILL as:

> A new commercial or industrial load, or increase in commercial or industrial load, at a single site connected through one or more shared Points of Interconnection (POIs) or delivery points, where such load is either (1) 10 MW or more if connected to the Transmission System at a voltage level less than or equal to 69 [kilovolts (kV)]; or (2) 50 MW or more if connected to the Transmission System at a voltage level greater than 69 kV. An Electric Storage Resource is not considered a HILL.

SPP, Open Access Transmission Tariff, Sixth Revised Vol. No. 1, pt. I, § 1 (Definitions H) (1.0.0).

[58] SPP HILL Order, 194 FERC ¶ 61,031 at PP 13-17 (explaining that the HILL process requires up to three additional studies beyond those required of all transmission service requests for transmission customers requesting to add or modify a delivery point associated with a HILL, including a HILL delivery point study, HILL supplemental load connection study, and potential supplemental Electromagnetic Transient study).

operational requirements for transmission customers serving HILLs to ensure continued reliability of the transmission system.[59] The tariff revisions also established the HILLGA process, a new generator interconnection service and related interconnection process to facilitate the prompt interconnection of generating facilities that are specifically identified for, and limited to, serving a HILL and are located no more than two substations away from the HILL.[60]

18. The Commission stated that SPP demonstrated that the "unprecedented growth in large loads in the SPP region presents significant and unique operational and planning challenges."[61] The Commission found that SPP demonstrated that its proposed HILL process was a just and reasonable approach for integrating transmission customers' new large loads onto SPP's transmission system in a reliable manner.[62] The Commission found that it was reasonable to impose additional study requirements and other proposed requirements given the unique operating characteristics of HILLs. The Commission further found that the proposed study requirements would ensure the reliable integration of the transmission customer's HILLs onto SPP's transmission system and would provide SPP with information about their impact on SPP's transmission system, including the transmission system's ability to withstand and control disturbances by the HILL at the

---

[59] *Id.* P 18 (explaining that market participants registering a HILL must (1) follow all nonconforming load requirements (e.g., additional load forecast requirements); (2) provide load data via telemetry in real time; (3) have remote capability to disconnect the load from the transmission system made available to the transmission operator; (4) have an up/down ramp rate not exceeding 20 MW per minute unless otherwise directed; (5) include additional information with registration; and (6) not have withdrawals from the transmission system without appropriate transmission service); *id.* P 19 (explaining that the transmission owner, at the transmission customer's expense, must install a phasor measurement unit or similar equipment); *id.* PP 20-21 (explaining that the transmission customer will be required to comply with ride-through requirement guidelines).

[60] *Id.* P 27 (explaining that, under the HILLGA process, SPP proposes to study HILLGA requests to determine whether any network upgrades are needed to accommodate the generating facility's injection to the local area); *id.* P 32 (explaining that SPP will grant HILLGA customers a new type of interconnection service, load limited resource interconnection service, which grants limited interconnection service solely to serve the associated HILL).

[61] *Id.* P 60.

[62] *Id.* P 61.

point of interconnection.[63] In addition, the Commission found that the proposed study deposits would discourage speculative HILL study requests.[64] Finally, the Commission concluded that the proposed ongoing reliability requirements would allow SPP to maintain reliable operation of its transmission system by increasing SPP's visibility, providing necessary data, and imposing real-time operational safeguards for HILLs.[65] In accepting HILLGA, the Commission found that "SPP's HILLGA process reasonably provides a flexible, expedited, and separate serial interconnection process that will facilitate the prompt interconnection of generating facilities that are limited to serving a HILL in the same local area."[66]

### 3. <u>SPP Conditional High Impact Large Load Service</u>

19. On June 5, 2026, the Commission accepted revisions to SPP's tariff to add a new type of non-firm transmission service, conditional high impact large load service (CHILLS).[67] CHILLS allows transmission customers serving HILLs to reliably receive transfers of energy until sufficient designated resources and/or network upgrades are in place to support long-term, firm transmission service.[68] CHILLS is an as-available transmission service that will transfer energy to designated points of delivery to serve the portion of a HILL eligible to receive CHILLS, subject to curtailment and interruption.[69] CHILLS has a maximum term of seven years, which is intended to incentivize transmission customers seeking CHILLS to obtain the designated resources and/or

---

[63] *Id.* P 62.

[64] For the HILL delivery point study, SPP required a $10,000 non-refundable application fee and a $100,000 study deposit, with an additional $200,000 study deposit if an Electromagnetic Transient study was also required. *Id.* P 15. For the HILL supplemental load connection study, SPP allows the host transmission owner to require a $25,000 study deposit. *Id.* P 16.

[65] *Id.* P 63.

[66] *Id.* P 64.

[67] SPP CHILLS Order, 195 FERC ¶ 61,196 at P 1.

[68] *Id.* P 7.

[69] *Id.* PP 9-10.

complete the network upgrades needed to procure long-term firm transmission service through existing tariff processes.[70]

20. The Commission found that SPP had shown that unprecedented growth in large loads presents significant and unique operational and planning challenges.[71] The Commission also found that SPP's ability to add HILLs to its transmission system in a timely manner may be limited due to delays in obtaining sufficient designated resources and completing network upgrades needed to provide long-term firm transmission service to such load.[72] The Commission concluded that CHILLS is a just and reasonable and not unduly discriminatory or preferential approach to addressing the need to expeditiously interconnect and provide transmission service to new HILLs, while maintaining the reliable operation of SPP's transmission system.[73]

## II. MISO's Existing Processes

### A. Existing Tariff Processes

21. In MISO, transmission owners play the lead role in managing and connecting load and have their own study processes and requirements, and MISO plays a supporting role by conducting its own studies.[74] With the exception of ATC's local planning procedures,[75] transmission owners' processes with respect to planning for and studying load additions within the MISO territory are not detailed in the MISO Tariff.[76] Some

---

[70] *Id.* P 9.

[71] *Id.* P 84.

[72] *Id.*

[73] *Id.*

[74] *See, e.g.*, MISO TOs November 21 ANOPR Comments at 5-7; ATC November 21 ANOPR Comments at 7-8; Wisconsin Electric November 21 ANOPR Comments at 6-7.

[75] MISO Tariff, attach. FF-ATCLLC (31.0.0). Although Attachment FF-ATCLLC includes ATC's distribution-to-transmission interconnection request process and load interconnection procedure, Attachment FF-ATCLLC does not include provisions specific to large loads.

[76] As a result, two of Xcel Energy Services Inc.'s affiliate transmission owners have, for example, filed with the Commission numerous stand-alone system impact study agreements for requests by load to interconnect to their transmission assets within MISO, but such agreements are not standard practice among transmission owners within MISO. *See, e.g.*, *N. States Power Co., a Minn. Corp.*, Docket No. ER26-1174-000 (Mar. 17, 2026)

transmission owners have established specific procedures and requirements outside of Commission-jurisdictional tariffs for interconnecting large loads.[77] MISO performs a supplemental role in this process by evaluating transmission system enhancements necessary to accommodate load additions once the transmission owner has already followed its own study procedures.[78] Specifically, MISO's role primarily consists of studying new Network Load—i.e., load designated by an Eligible Customer to receive NITS—to identify upgrades to its transmission system necessary to accommodate the new load and maintain reliability. MISO's processes for new Network Load additions are set out in Module B of the Tariff, through which MISO may conduct system impact studies and facilities studies to determine what transmission facilities are required for the requested transmission service.[79] MISO's Tariff does not distinguish based on the size of load seeking to be added to the transmission system,[80] and the process for studying new load additions is separate from MISO's process for studying generator interconnection.[81]

22. Eligible Customers in MISO may take either NITS or Point-to-Point Transmission Service.[82] Point-to-Point Transmission Service may be firm transmission service (which may only be curtailed in limited circumstances for reliability purposes) or non-firm service (which may be curtailed or interrupted for both economic and reliability reasons to accommodate firm Point-to-Point Transmission Service and NITS customers).[83] These transmission services require the Eligible Customer to request transmission service to

---

(delegated order); *N. States Power Co., a Wis. Corp.*, Docket No. ER25-863-000 (Feb. 12, 2025) (delegated order).

[77] Wisconsin Electric November 21 ANOPR Comments at 6 (citing ATC, *Transmission System Planning Criteria* (Aug. 28, 2025), https://www.atc10yearplan.com/wp-content/uploads/2025/09/PLG-CR-0001-4.pdf).

[78] MISO TOs November 21 ANOPR Comments at 6-7.

[79] *See* MISO Tariff, Module B, §§ 32.3 (31.0.0), 32.4 (30.0.0).

[80] MISO, *Load Interconnection Whitepaper* 4-5 (July 2023), https://cdn.misoenergy.org/MISO%20Load%20Interconnection%20Whitepaper629693.pdf.

[81] *See, e.g.*, MISO November 21 ANOPR Comments at 23; MISO TOs November 21 ANOPR Comments at 22; ATC November 21 ANOPR Comments at 10.

[82] MISO Tariff, Module B, § I (Introduction) (30.0.0); *see also id.* Module A, § 1.T (Definitions T) (43.0.0), Transmission Service.

[83] *Id.* Module B, §§ 13.6 (Curtailment of Firm Transmission Service) (31.0.0), 14.7 (Curtailment or Interruption of Service) (31.0.0).

meet the load's maximum demand, regardless of the load's operational capabilities or willingness to be curtailed.

23. Costs for Network Upgrades needed to provide transmission service to Eligible Customers to serve new load are allocated in several ways. As noted, MISO may conduct a facilities study, in coordination with the affected transmission owner(s), to estimate the costs of Direct Assignment Facilities and Network Upgrades needed to supply an Eligible Customer's request for new NITS, new long-term firm Point-to-Point Transmission Service, or designation of new Network Load(s).[84] Direct Assignment Facilities are facilities constructed by a transmission owner for the sole use and benefit of a transmission customer,[85] and their costs are directly assigned to the Eligible Customer.[86] Network Upgrades, on the other hand, are included in the MISO Transmission Expansion Plan (MTEP) as Transmission Delivery Service Projects, the costs of which may be rolled into the relevant transmission owner's base zonal rates in accordance with Attachment N of the Tariff.[87] As such, these costs are shared among the transmission owner's wholesale transmission customers based on usage.[88]

24. Network Upgrades needed to provide requested transmission service to Eligible Customers may also be planned for and constructed under local transmission planning processes within MISO. Under Attachment FF to the Tariff, the Transmission Expansion Planning Protocol, transmission owners may propose Network Upgrades for inclusion in the MTEP that qualify as Other Projects, which address local reliability issues and/or provide local economic benefit and do not otherwise qualify as another type of project.[89] Other Projects may include transmission projects needed to connect new loads, among other purposes, and costs for approved Other Projects are assigned to the applicable transmission owner and may be recovered under the transmission owner's

---

[84] *Id.* Module B, §§ 19.4 (Facilities Study Procedures) (30.0.0), 32.4 (Facilities Study Procedures) (30.0.0).

[85] *Id.* Module A, § 1.D (Definitions D) (71.0.0), Direct Assignment Facilities.

[86] *Id.* attach. N (Recovery of Costs Associated with New Facilities) (30.0.0), § A.

[87] *Id.* attach. FF (Transmission Expansion Planning Protocol) (93.0.0), §§ II.A.2.b, III.A.2.e; MISO, Transmission Planning Business Practice Manual (BPM-020), § 2.3.2.6; *see also* MISO Tariff, attach. N, § B.

[88] MISO Tariff, attach. N, § B; *see also id.* Schedule 7 (Long-Term and Short-Term Firm Point-To-Point Service) (93.0.0); *id.* Schedule 9 (Network Integration Transmission Service) (98.0.0).

[89] *Id.* attach. FF, § III.A.2.k.

formula rate in Attachment O of the Tariff through base zonal rates.[90] As such, the costs of the Network Upgrades needed to provide the requested transmission service are shared among the transmission owner's wholesale transmission customers based on usage within the transmission pricing zone(s) in which the facilities are located.

25. MISO also uses its Expedited Project Review (EPR) process[91] to perform streamlined consideration and approval of local transmission projects, including some projects that are associated with large load additions.[92] The details governing the study process and cost allocation for EPR requests are included in MISO's Transmission Planning Business Practices Manual.[93] While not all EPR projects are associated with large loads, MISO explains that it has seen an increase in EPR applications, which reflects the increased proliferation of data centers and large loads.[94] According to MISO and MISO TOs, the EPR process allows for an expedited review for transmission owners who need to start construction on transmission projects to support large load additions more quickly than would be enabled under normal MTEP timelines.[95]

26. Finally, in addition to the local transmission projects described above, MISO plans regional transmission projects through its Long Range Transmission Planning (LRTP) process that focuses on a long-term (i.e., 20 to 40 years) planning horizon and results in projects that are "regional backbone facilities needed to move bulk power between

---

[90] *Id.*; MISO, BPM-020, § 2.3.2.1.

[91] Attachment FF of MISO's Tariff provides the basis for the EPR process by allowing MISO to perform a streamlined review outside of the MTEP cycle of a transmission owner's transmission project in the event that a transmission owner determines that system conditions warrant the urgent development of system enhancements that would be jeopardized unless MISO performs an expedited review of the impacts of the project. MISO Tariff, attach. FF, § I.D.1.c.

[92] MISO November 21 ANOPR Comments at 9-10; MISO, *MTEP25 Report* 36 (2025), https://cdn.misoenergy.org/MTEP25%20Report731648.pdf (MISO MTEP 25 Report); MISO Tariff, attach. FF, § I.D.1.c; MISO, BPM-020, § 4.1.4.

[93] MISO, BPM-020, § 4.1.4.

[94] MISO November 21 ANOPR Comments at 9-10.

[95] *Id.*; Alliant November 21 ANOPR Comments at 10; Entergy November 21 ANOPR Comments at 18-19; MISO TOs November 21 ANOPR Comments at 8; OMS November 21 ANOPR Comments at 9; Wisconsin Electric November 21 ANOPR Comments at 7.

geographically dispersed areas within MISO."[96] The costs of LRTP projects are allocated on a regional or sub-regional basis. Anticipated load growth is one of several factors MISO considers when developing LRTP portfolios.[97]

27. MISO processes generator interconnection requests under Attachment X (Generator Interconnection Procedures) of its Tariff.[98] MISO administers a three-phase Definitive Planning Phase (DPP) process that facilitates the structured study and restudy, in clusters, of interconnection requests for proposed generating facilities.[99] MISO conducts one system impact study in each of the three DPP phases that will evaluate the impact of an interconnection request on the reliability of the transmission system (i.e., a preliminary system impact study in DPP Phase I, a revised system impact study in DPP Phase II, and a final system impact study in DPP Phase III) and account for withdrawn interconnection requests in the same study cluster to refine the analysis.[100] During DPP Phases II and III, MISO also conducts a two-part facilities study to estimate the cost and time required to construct necessary interconnection facilities and Network Upgrades to facilitate the interconnection of a proposed generating facility.[101]

28. Pursuant to the Tariff, an interconnection customer may request, and MISO may provide, provisional interconnection service for limited operation of a proposed generating facility at MISO's discretion based on the results of available studies that indicate that there is a level of interconnection that can occur without any additional Network Upgrades.[102] The scope of the provisional interconnection study "will consist of stability, short circuit, and voltage analysis to identify issues that would result if the

---

[96] *See* MISO, *MTEP2024 Report* 11, 21 (Dec. 12, 2024), https://www.misoenergy.org/planning/transmission-planning/mtep/ (scroll down to and click "MTEP Reports"; then download "MTEP24.zip" to access "MTEP24 Chapter 1 – Transmission Planning Overview" PDF) (MISO MTEP 2024 Report).

[97] *See id.* at 28-29, 88.

[98] MISO Tariff, attach. X (Generator Interconnection Procedures) (185.0.0).

[99] An interconnection request for a proposed generating facility to be studied through the Expedited Resource Addition Study process is subject to separate rules and study procedures pursuant to section 3.9.2 of Attachment X. *Id.* § 2 (Scope and Application).

[100] *Id.* §§ 7.3.1 (Definitive Planning Phase I), 7.3.2 (Definitive Planning Phase II), 7.3.3 (Definitive Planning Phase III).

[101] *Id.* §§ 7.3.2.5, 7.3.3.4.

[102] *Id.* § 7.9 (Provisional Generator Interconnection Agreement).

Generating Facility were interconnected without project modifications or system modifications."[103] Under the Tariff, an interconnection customer may also request surplus interconnection service to increase the gross generating capability at the same point of interconnection of an existing generating facility without increasing the total amount of interconnection service at the point of interconnection.[104] The surplus interconnection study for surplus interconnection service consists of reactive power, short circuit/fault duty, stability analyses, and any other appropriate studies, and steady-state (thermal/voltage) analyses may be performed as necessary to ensure that all required reliability conditions are studied.[105]

### B. Recent Stakeholder Proceedings in MISO

29. The Commission is aware that MISO has begun considering potential revisions and enhancements to its Tariff that may help address the recent growth of large and co-located loads. MISO explained in its ANOPR comments that it engages in regular outreach to its members and that it is working to enhance its processes related to large load additions, including by launching a survey to obtain more granular information on large loads and anticipated future buildouts.[106] MISO incorporated the results of that survey into its 2026 Long Term Load Forecast, which MISO will use to inform its long-term transmission planning efforts.[107] MISO also recently convened a stakeholder workshop to address the integration of large loads, including consideration of a set of guidelines and requirements needed to support reliability as a result of large load integration.[108] Moreover, MISO established the Large Load Working Group, a new stakeholder group that will provide input and policy guidance on processes and policies

---

[103] *Id.* § 10.2 (Provisional Interconnection Study Procedures).

[104] *Id.* §§ 3.2.3 (Surplus Interconnection Service), 3.2.3.1.

[105] *Id.* § 3.2.3.2.

[106] MISO November 21 ANOPR Comments at 12.

[107] *See* MISO, *2026 Long-Term Load Forecasting (LTLF) Results Summary* (Apr. 13, 2026), https://cdn.misoenergy.org/20260413%20LTLF%20Workshop%202026%20Long%20Term%20Load%20Forecast%20Summary_UPDATED750524.pdf (MISO Long-Term Load Forecasting Results Presentation).

[108] MISO Large Load Workshop Presentation at 18-25.

that facilitate the integration and enablement of large loads in the MISO footprint.[109] MISO recently recognized that its existing Tariff provisions "do not provide a consistent or transparent framework to evaluate" large loads and that interested parties "face uncertainty regarding applicable criteria, study assumptions, data requirements, and post-interconnection obligations."[110] MISO TOs also explain that MISO is developing a definition of large load and reliability requirements for large load additions.[111]

30. MISO notes that it is working with stakeholders on issues related to co-location arrangements,[112] including developing a zero-injection generator interconnection agreement process for generation that is co-located with load.[113] That process would allow a generating facility to serve load directly, but would not grant interconnection service, and would prevent the generating facility from injecting onto the transmission system.[114] MISO explains that, under this proposal, it would process a zero-injection generator interconnection request outside the standard generator interconnection queue process.[115] In the context of its stakeholder process, MISO has also explained that this proposal will create a path for generating facilities that are co-located with load to interconnect more quickly, with potentially reduced Network Upgrade costs.[116]

---

[109] MISO, *Large Load Working Group (LLWG)*, https://www.misoenergy.org/engage/committees/large-load-working-group/ (last visited Apr. 27, 2026).

[110] MISO Issue Submission Report.

[111] MISO TOs April 3 ANOPR Comments at 13.

[112] We note that we have defined the terms co-location arrangement and co-located load for purposes of this order, and we recognize that MISO's usage of this term in its proposal or any planned Tariff revisions may not necessarily or ultimately match the usage of those terms here. However, we continue to use these defined terms here and throughout this order.

[113] MISO November 21 ANOPR Comments at 13.

[114] *Id.*; *see also* MISO TOs April 3 ANOPR Comments at 13-14.

[115] MISO November 21 ANOPR Comments at 13.

[116] MISO, *Consideration of Zero-Injection GIA* 2 (Jan. 21, 2026), https://cdn.misoenergy.org/20260121%20PAC%20Item%2009%20Market%20Participation%20and%20Registration%20of%20Co-Located%20Load%20and%20Generation%20(PAC-2024-4)736238.pdf.

31. Finally, MISO is also considering through the stakeholder process the potential need for new transmission services as part of its efforts to address large load additions, such as incremental service until Network Upgrades are completed and other interim or non-firm service options.[117]

32. While we are encouraged by MISO's stakeholder efforts, and by its initial attention to the pressing concerns associated with large and co-located loads[118] and to the Secretary's interest in these issues,[119] we are initiating this FPA section 206 proceeding in order to ensure that MISO's ongoing processes generate reforms that are sufficiently timely and comprehensive to address the concerns we today identify. As such, and as the Commission explained in the April Order Regarding Intent to Act, we find that the Commission must now take further action to ensure that MISO promptly proposes revisions to ensure that its Tariff remains just and reasonable.

## III. <u>Discussion</u>

33. Based on the discussion below, pursuant section 206 of the FPA, we direct MISO and the Transmission Owners, within 60 days of the date of this order, to either:

> (1) show cause as to why the Tariff remains just and reasonable and not unduly discriminatory or preferential without provisions addressing:
>
> > (a) the application process, study procedures, and ongoing operational requirements that apply to Eligible Customers seeking transmission service on behalf of large loads;
> >
> > (b) additional transparency concerning the Network Upgrade costs to provide transmission service to Eligible Customers on behalf of large loads,

---

[117] *See* MISO, *Large Load Additions* (Apr. 8, 2026), https://www.misoenergy.org/planning/large-loads---container-page/large-load-additions/; MISO, *Response to Feedback: Large Load Workshop*19 (Jan. 30, 2026), https://cdn.misoenergy.org/MISO%20Response%20to%20Large%20Load%20Workshop%20Considerations%20and%20Outcomes%20of%20Large%20Load%20Additions746069.pdf.

[118] *See generally* MISO November 21 ANOPR Comments; *see also* Post-Technical Conference Remarks of Aubrey Johnson on behalf of MISO, Docket No. AD24-11-000, at 1, 5-6 (filed Dec. 9, 2024) (noting need to consider the impacts of co-location from a reliability, system operations, resource adequacy, planning, and cost-equity standpoint; and potential reforms related to co-location arrangements).

[119] *See supra* PP 6-7.

a *pro forma* cost recovery agreement between MISO, the relevant transmission owner and Eligible Customer taking transmission service on behalf of the large load to mitigate the risk of cost shifting among transmission customers, and a mechanism to ensure such payments are appropriately credited towards transmission owners' transmission revenue requirements consistent with the Commission's cost-of-service regulations;

(c) the rates, terms, and conditions of service that apply to co-location arrangements;

(d) transmission services that reflect Eligible Customers taking transmission service on behalf of co-located loads, load with behind the meter generation, and flexible large loads that are willing and able to limit their use of the transmission system under certain conditions; and

(e) the rates, terms, and conditions of service applicable to interconnection customers serving electrically proximate large load or co-located load; or

(2) explain what changes to the Tariff would remedy the identified concerns if the Commission were to determine that the Tariff has in fact become unjust and unreasonable or unduly discriminatory or preferential and, therefore, proceeds to establish a replacement Tariff.

34. We also direct MISO to submit, within 30 days of the date of issuance of this order, an informational report on how MISO intends to ensure that adequate generation will be available to serve existing and new large loads.

35. Interested entities may respond within 30 days of MISO's and the Transmission Owners' filings, addressing either or both of: (1) whether the existing Tariff remains just and reasonable and not unduly discriminatory or preferential; and (2) if not, what changes to the Tariff should be implemented as replacement rates.

36. We recognize that MISO and/or the Transmission Owners (to the extent the matters addressed herein implicate aspects of the Tariff over which they have the filing rights) may elect to address some or all of the issues discussed in this order by proposing revisions to the Tariff pursuant to their applicable FPA section 205 filing rights. We strongly encourage this. Although both the Secretary's ANOPR and our own Order Regarding Intent to Act expressly recognized (and indeed encouraged) that possibility,[120] no such filings were received from MISO by the Commission prior to the issuance of this order. Should MISO and/or the Transmission Owners elect to make such filings in response to this order, those filings should state explicitly that the proposals are being

---

[120] *See* ANOPR at P 32; Order Regarding Intent to Act, 195 FERC ¶ 61,045 at P 5.

submitted under FPA section 205. Should MISO and/or the Transmission Owners submit a filing under FPA section 205, they should also explain which of the Commission's above directives their filing addresses and how it resolves them. Additionally, any such filing should provide a reasoned explanation for how the proposal will avoid disrupting existing commercial arrangements and clearly identify a reasonable effective date that accommodates such existing commercial arrangements.

37. The Commission will consider requests from MISO and/or the Transmission Owners to hold, for up to 90 days, all or certain aspects of this FPA section 206 proceeding in abeyance, including the deadline to respond to this order. Any such abeyance, which will begin as of the deadline to respond to this order, would be considered to provide MISO and the Transmission Owners time while they work through the stakeholder processes to develop FPA section 205 filings to revise the Tariff to address the issues raised in this order. Requests for a full or partial abeyance[121] should be submitted prior to the deadline to respond to this order, specifically within 45 days of issuance of this order, to allow time for the Commission to act on the abeyance request. We emphasize that we will not grant such abeyances reflexively, that any abeyance will be limited to 90 days, and that we will look with great disfavor toward requests to extend the abeyance period. We anticipate that successful abeyance requests, if any, will include both (1) a robust description of the content of a potential future filing under FPA section 205 and (2) a reasoned and specific explanation of when such a filing is expected to be made.

38. In cases where, as here, the Commission institutes a section 206 investigation on its own motion, section 206(b) of the FPA requires that the Commission establish a refund effective date that is no earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than five months after the publication date. In such cases, in order to give maximum protection to customers, and consistent with our precedent, we have historically tended to establish the section 206 refund effective date at the earliest date allowed by section 206, and we do so here as well.[122] That date is the date of publication of notice of initiation of this proceeding in the *Federal Register*.

---

[121] A partial abeyance may be appropriate to the extent MISO is developing FPA section 205 filings in response to only a subset of the directives in this order. For any remaining directives, we expect a response to this order within the 60-day deadline set forth herein.

[122] *See, e.g.*, *Idaho Power Co.*, 145 FERC ¶ 61,122 (2013); *Canal Elec. Co.*, 46 FERC ¶ 61,153, *order on reh'g*, 47 FERC ¶ 61,275 (1989).

### A. Transmission Service to Eligible Customers on Behalf of Large Loads

39. We today make a preliminary finding that MISO's Tariff appears to be unjust and unreasonable because it lacks provisions that address, with sufficient clarity and consistency, how MISO and/or the Transmission Owners will timely study (i.e., within 60-90 days of receiving the request) the provision of transmission service to Eligible Customers on behalf of large loads.[123]

40. Throughout this order, we use the phrase "the provision of transmission service to Eligible Customers on behalf of large loads" to encompass the provision of new, modified, or additional jurisdictional transmission service to Eligible Customers on behalf of large loads. We note that this phrase is not limited to instances where an Eligible Customer submits an application to request new transmission service. It also includes instances where an Eligible Customer requests a new or modified point of delivery to serve a large load, where a large load seeks a new or modified delivery point as an unbundled retail transmission service customer, or where large loads are otherwise included in an Eligible Customer's reported load growth and that Eligible Customer is taking NITS.

41. We direct MISO and the Transmission Owners to the extent the matters addressed herein implicate aspects of the Tariff over which they have the filing rights, to explain whether the Tariff remains just and reasonable without an application process, study procedures, and ongoing operational requirements that address the unique characteristics and challenges of providing transmission service to Eligible Customers on behalf of large loads, or to propose appropriate Tariff revisions. We recognize that MISO is currently considering potential reforms to enhance its processes related to large load additions in its stakeholder process and we encourage MISO to consider whether these efforts would, either fully or in part, address the Commission's concerns that the Tariff appears to be unjust and unreasonable.

#### 1. Jurisdiction

42. At the outset, we clarify the principles relating to the Commission's jurisdiction over the matters relevant to the integration of large loads onto the transmission system and the impacts of large loads on the transmission system. We recognize that rates, terms, and conditions associated with the addition of and service to large loads implicate both federal and state interests. We also recognize that resolution of issues related to large load additions will require the involvement of both federal and state actors, including the Commission, state public utility commissions, and other state and local

---

[123] As discussed below, our findings here also apply to the study process for unbundled retail transmission service requests by end-use large load customers, as allowed by state law or voluntary utility rules.

entities. We are encouraged by efforts made at the state level to address issues related to large load additions that fall within state jurisdiction.[124]

43. As discussed below, however, certain aspects of the process for integrating large loads onto the transmission system fall squarely within the Commission's exclusive jurisdiction. Specifically, we find that it is within the Commission's exclusive authority to ensure that transmission provider and/or transmission owner tariffs include sufficiently clear and consistent provisions governing how transmission service to Eligible Customers on behalf of large loads interconnecting to the transmission system will be studied, including whether new or upgraded transmission facilities are necessary to provide the requested transmission service. The Commission has jurisdiction over the study process for transmission service to both Eligible Customers on behalf of large loads and unbundled retail transmission service to end-use large load customers where, pursuant to state law or a public utility's voluntary offer of such service, the large load is an Eligible Customer under the transmission provider and/or transmission owner tariffs.[125]

44. The Commission is a creature of statute and has jurisdiction over only those matters that Congress has given it the authority to regulate.[126] That authority includes jurisdiction over the wholesale sale and transmission of electricity in interstate commerce, including all facilities used for such sale and transmission.[127] As relevant here, the Commission must ensure that the rates, charges, and classifications for such transmission of electricity—as well as the practices directly affecting such transmission of electricity—are just and reasonable and not unduly discriminatory or preferential.[128] The Supreme Court has held that the Commission's authority over interstate transmission is not limited to wholesale transmission service and that the Commission has authority

---

[124] *See generally* NARUC April 14 ANOPR Comments (highlighting action taken by state public utility commissions related to large loads).

[125] Under the *pro forma* OATT, Eligible Customers include end-use customers seeking unbundled retail transmission service, pursuant to state law or public utility's voluntary offer of such service. *Pro forma* OATT, § 1.12 (Definitions – Eligible Customer); *see also* MISO Tariff, Module A, § 1.E, Eligible Customer.

[126] *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002).

[127] 16 U.S.C. § 824(b)(1).

[128] *Id.* §§ 824d, 824e; *see FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016) (*EPSA*) (approving "a common-sense construction of the FPA's language, limiting FERC's 'affecting' jurisdiction to rules or practices that 'directly affect the wholesale rate'" (cleaned up)).

over unbundled retail transmission service.[129] As part of its transmission authority, the Commission has exercised jurisdiction over the terms of certain interconnections to the transmission system as an element of transmission service,[130] including the interconnection of wholesale load to the transmission system.[131]

45. As applied to large load additions to the transmission system, these principles mean that the Commission has exclusive jurisdiction over the rates, terms, and conditions of interstate transmission service to Eligible Customers on behalf of large loads connecting to the transmission system, and the practices directly affecting the provision of such interstate transmission of electricity. An essential component of providing such transmission service is the process by which the transmission provider and/or transmission owner evaluates (1) whether it can provide the requested transmission service and (2) the impact that providing such transmission service will have on the jurisdictional transmission system, including determining whether any new or upgraded transmission facilities are needed to provide transmission service while maintaining reliable operation of the transmission system. This transmission service study process determines what Network Upgrades are needed to provide transmission service to Eligible Customers on behalf of large loads, the costs of which are included in transmission rates. As such, this study process directly affects Commission-jurisdictional transmission rates.[132] The Commission has exclusive authority to ensure that the process to study the provision of transmission service to Eligible Customers is just and reasonable and not unduly discriminatory or preferential. We therefore find that we have authority to ensure that tariffs include provisions that clearly and consistently address the study process for the provision of transmission service to Eligible Customers on behalf of large

---

[129] *New York v. FERC*, 535 U.S. 1, 17, 19-20 (2002) (upholding the Commission's exercise of jurisdiction over unbundled retail transmission service).

[130] *Tenn. Power Co.*, 90 FERC ¶ 61,238, at 61,761 (2000) (*Tennessee Power*), *order denying reh'g*, 91 FERC ¶ 61,271 (2000); *Standardization of Generator Interconnection Agreements & Procs.*, Order No. 2003, 104 FERC ¶ 61,103, at P 9 (2003); *see also Laguna Irrigation Dist.*, 91 FERC ¶ 61,340, at 62,152 (2000).

[131] *Pac. Gas & Elec. Co.*, 109 FERC ¶ 61,392, at P 37 (2004); *Pac. Gas & Elec. Co.*, 115 FERC ¶ 61,193, at PP 36-38 (2006).

[132] *Cf. Transmission Plan. & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶ 61,051, at P 112 (2011) ("It is through the transmission planning process that public utility transmission providers determine which transmission facilities will more efficiently or cost-effectively meet the needs of the region, the development of which directly impacts the rates, terms and conditions of jurisdictional service.").

loads, including the unique impacts that providing transmission service to Eligible Customers on behalf of large loads may have on the transmission system.

46. At the same time, we continue to recognize that the FPA expressly reserves to states the authority over any other sale of electric energy, including retail sales and wholesale sales not in interstate commerce (such as wholesale sales within the Electric Reliability Council of Texas region), as well as facilities used for the generation and distribution of electricity.[133] As such, we recognize that states will continue to regulate: (1) the specific terms of retail sales to large load;[134] (2) which entities may make retail sales within their borders, including which entities are legally permitted to provide electricity to retail large load customers;[135] and (3) any siting decisions and construction associated with the large load project.[136] Nothing in this order is intended to intrude upon state authority over retail service to large loads.

47. In sum, we today exercise our authority to ensure that the process by which jurisdictional transmission providers and/or transmission owners will study the provision of jurisdictional transmission service to Eligible Customers on behalf of large loads interconnecting to the transmission system, including where, as allowed by state law or a public utility's voluntary offer of such service, an end-use large load seeks unbundled retail transmission service, is just and reasonable and not unduly discriminatory or preferential. Pursuant to that authority, we find that MISO's Tariff appears to be unjust and unreasonable or unduly discriminatory or preferential because it lacks sufficiently clear and consistent provisions regarding the study process related to the provision of transmission service to Eligible Customers on behalf of large loads. We need not comprehensively address the Commission's jurisdiction over other aspects of the addition of large loads to the transmission system at this time.

---

[133] 16 U.S.C. § 824(b)(1); *see Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025).

[134] *See EPSA*, 577 U.S. at 279-80 (recognizing state authority over retail electricity sales); *New York v. FERC*, 535 U.S. at 28 (same).

[135] PJM Show Cause Order, 190 FERC ¶ 61,115 at PP 68-69.

[136] *See, e.g.*, *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th 229, 238 (D.C. Cir. 2025) (citing 16 U.S.C. § 824(b)(1)) (recognizing state authority over generation resource mix, including through their siting authority); Order No. 1000, 136 FERC ¶ 61,051 at P 107 (acknowledging state authority over siting, permitting, and construction of transmission facilities).

### 2. Tariff Provisions

48. In the following section, we begin by considering MISO's Tariff as it relates to how MISO and/or the Transmission Owners will study the provision of transmission service to Eligible Customers on behalf of large loads and explain our concerns that the lack of sufficiently clear and consistent provisions regarding the study process for the provision of transmission service to Eligible Customers on behalf of large loads is unjust and unreasonable or unduly discriminatory or preferential. We then consider whether the Tariff is unjust and unreasonable without certain elements. First, we consider whether the Tariff lacks sufficiently clear and consistent Tariff provisions establishing an appropriate definition of large load, as a separate category of load. Second, we consider whether the Tariff lacks sufficiently clear and consistent Tariff provisions establishing an application process and requirements for Eligible Customers requesting transmission service on behalf of large loads and a study process that considers the unique operational challenges of providing transmission service to Eligible Customers on behalf of large loads. Third, we consider whether the Tariff lacks sufficiently clear and consistent Tariff provisions establishing ongoing operational requirements necessary to ensure that MISO can reliably provide transmission service given the unique operational impacts on the transmission system of providing transmission service to Eligible Customers on behalf of large loads. Finally, we consider whether the Tariff requires such ongoing operational requirements for Eligible Customers taking transmission service on behalf of large loads to be memorialized in service agreements.

49. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable or unduly discriminatory or preferential because it does not contain provisions addressing with sufficient clarity and consistency how MISO and/or the Transmission Owners will study the provision of transmission service to Eligible Customers on behalf of large loads. We recognize that MISO and/or the Transmission Owners may have existing load integration processes, including studies that are performed in evaluating the provision of transmission service to Eligible Customers on behalf of large loads.[137] However, we are concerned that those processes and any required studies with regard to the provision of transmission service are not described in the Tariff with the degree of clarity and specificity necessary to ensure that the transmission provider can mitigate operational risks of providing transmission service to Eligible Customers on behalf of large loads, given their impact on the transmission system, avoid disputes regarding how studies are conducted, deter speculative or duplicative requests for transmission service by Eligible Customers on behalf of large loads, and help avoid excessive and unnecessary Network Upgrades.

---

[137] *See supra* P 21.

50. As noted above, Xcel Energy, Inc., on behalf of Northern States Power Company (NSPC), a transmission owner in MISO, has submitted to the Commission numerous system impact study agreements to evaluate the interconnection of new loads on NSPC's transmission system. Those submissions adapt Xcel Energy's grandfathered *pro forma* system impact study agreement contained in its Open Access Transmission Tariff, which is used to evaluate the provision of NITS or firm Point-to-Point Transmission Service when an Xcel Energy subsidiary is the transmission provider (i.e., not in the MISO footprint), to the study of large load additions.[138] These agreements underscore our concern that MISO's Tariff lacks provisions that address with sufficient clarity and consistency how MISO and/or Transmission Owners study the interconnection of large loads to the transmission system because they demonstrate that Xcel Energy is using an *ad hoc* study process that is not reflected in MISO's Tariff to study the addition of large loads.

51. Moreover, we are concerned that the existing Tariff does not contain other elements akin to those described below, which we preliminarily find may be necessary to ensure that the rates, terms, and conditions of jurisdictional transmission service are just and reasonable.

52. At the outset, we recognize that the Transmission Owners may be primarily responsible for conducting the studies that (1) evaluate whether a large load may be interconnected to the transmission system and served by the Eligible Customer, and (2) determine whether Network Upgrades are necessary to provide transmission service.[139] We appreciate that this role may stem from how MISO and the Transmission Owners allocated rights and responsibilities in the governing documents establishing MISO. We do not seek to alter that allocation of rights and responsibilities.

53. We are nonetheless concerned that MISO's Tariff lacks a study process that addresses the unique operational and reliability challenges that providing transmission service to Eligible Customers on behalf of large loads presents to the transmission system. Large loads can be more energy intensive and geographically concentrated than traditional load, and exhibit different load profiles and operational characteristics.[140] MISO itself has recognized in presentations to stakeholders that large loads can have a

---

[138] *See supra* note 76.

[139] *See supra* P 21.

[140] *See, e.g.*, SPP HILL Order, 194 FERC ¶ 61,031 at PP 7-8; NERC, *Characteristics and Risks of Emerging Large Loads* (July 2025), https://www.nerc.com/globalassets/who-we-are/standing-committees/rstc/whitepaper-characteristics-and-risks-of-emerging-large-loads.pdf (NERC Characteristics and Risks of Large Loads).

disproportionate impact on system reliability due to their size and unique characteristics, and so too has MISO acknowledged that the scale, pace, and characteristics of large load growth present significant operational and planning challenges.[141] As a result, providing transmission service to Eligible Customers on behalf of large loads may be more complex and could raise greater reliability concerns for the transmission system, relative to a situation where Eligible Customers seek transmission service on behalf of traditional load.

54. Without a clear and consistent process to study the provision of transmission service to Eligible Customers on behalf of large loads, MISO and/or the Transmission Owners may not fully capture the transmission system impacts of providing such transmission service, which could result in significant operational risks for the transmission system. Furthermore, we are concerned that, without sufficiently clear and consistent Tariff provisions, MISO will not have the ongoing visibility and operational control necessary to provide reliable transmission service.

55. We are also concerned that the absence of sufficiently clear and consistent Tariff provisions for how MISO and/or the Transmission Owners will study the provision of transmission service to Eligible Customers on behalf of large loads will lead to disputes over a variety of issues—e.g., study timelines and delays,[142] how the transmission service needed on behalf of the large load is studied,[143] what types of Network Upgrades are considered, and how required Network Upgrades to provide the requested transmission service are determined.[144] Such disputes may arise from the lack of transparency in how

---

[141] MISO Large Load Workshop Presentation at 7-8; *see also* MISO November 21 ANOPR Comments at 30-33.

[142] *See, e.g.*, CEBA November 21 ANOPR Comments at 12-13; Eolian November 21 ANOPR Comments at 14-16; Institute for Progress November 21 ANOPR Comments at 7-8; Microsoft November 21 ANOPR Comments at 9; ODEC December 5 ANOPR Comments at 4.

[143] Commenters raised concern that large loads are not studied with consideration of their known operating characteristics, including their willingness to be flexible or curtailable. *See, e.g.*, ClearPath November 21 ANOPR Comments at 5-6; Constellation November 21 ANOPR Comments at 23-24; Critical Loop November 21 ANOPR Comments at 3; GridCare December 5 ANOPR Comments at 1-2; L. Lynne Kiesling November 21 ANOPR Comments at 10.

[144] Specifically, commenters raised concern that transmission providers/owners may only consider traditional transmission infrastructure or that there is a lack of consideration of alternative transmission solutions. *See, e.g.*, ACORE November 21 ANOPR Comments at 3-4, 6-7; American Terawatt November 21 ANOPR Comments

studies are performed and how decisions will be made.[145] We are thus concerned that the lack of clear and consistent provisions in MISO's Tariff related to the study process for the provision of transmission service to Eligible Customers on behalf of large loads appears to be unjust and unreasonable or unduly discriminatory or preferential.

56. Lastly, we are concerned that MISO's existing Tariff fails to deter speculative or duplicative requests for transmission service by Eligible Customers on behalf of large loads. Many ANOPR comments assert that clear and consistent provisions establishing study timelines and costs, readiness requirements, and/or penalties will deter speculative or duplicative requests related to large load additions.[146] Commenters explain that speculative requests may bog down and delay the study process, wasting time and resources for transmission providers;[147] result in inaccurate study results or delays for

---

at 4-5; Calibrant November 21 ANOPR Comments at 1-2, 3; CEBA November 21 ANOPR Comments at 9-10; Chamber of Commerce November 21 ANOPR Comments at 3; CTC Global Corporation November 21 ANOPR Comments at 1-3; DCC November 21 ANOPR Comments at 10-11; GridCARE December 5 ANOPR Comments at 4; Industrial Customers November 21 ANOPR Comments at 27-28; Infrastructure Masons December 5 ANOPR Comments at 18; Iron Mountain Data Centers, LLC November 21 ANOPR Comments at 3-4; Land Trust Alliance November 21 ANOPR Comments at 5-6; PIOs November 21 ANOPR Comments at 22; Southeast PIOs November 21 ANOPR Comments at 44-45; WATT and Advancing Modern Powerlines November 21 ANOPR Comments at 5-8.

[145] *See, e.g.*, CEBA November 21 ANOPR Comments at 12; ECA December 5 ANOPR Comments at 1-2; Eolian November 21 ANOPR Comments at 17-18; EPSA November 21 ANOPR Comments at 6; Infrastructure Masons December 5 ANOPR Comments at 4, 6-7; Southeast PIOs November 21 ANOPR Comments at 39-40; Switch December 5 ANOPR Comments at 3; Tract November 21 ANOPR Comments at 5; Vantage November 21 ANOPR Comments at 5-6; Verrus November 21 ANOPR Comments at 6, 12; Vistra December 5 ANOPR Comments at 27.

[146] *See, e.g.*, ACORE November 21 ANOPR Comments at 6; AEU November 21 ANOPR Comments at 17-18; Amazon November 21 ANOPR Comments at 6; Crusoe December 5 ANOPR Comments at 5-6; EDF Power November 21 ANOPR Comments at 12-13; EEI November 21 ANOPR Comments at 20; Fervo November 21 ANOPR Comments at 3; GridCare December 5 ANOPR Comments at 5; Invenergy November 21 ANOPR Comments at 6; Microsoft November 21 ANOPR Comments at 9; Ohio FEA November 21 ANOPR Comments at 4.

[147] *See, e.g.*, ATC November 21 ANOPR Comments at 12; Eolian November 21 ANOPR Comments at 17-18; GridCare December 5 ANOPR Comments at 5; Illinois AG November 21 ANOPR Comments at 9-10; Institute for Progress November 21 ANOPR

other Eligible Customers seeking transmission service on behalf of load;[148] create a substantial risk of cost shifts if the large load additions do not materialize as planned;[149] and distort load forecasts.[150] Clear and consistent study procedures that include readiness requirements (i.e., meaningful milestones and/or financial commitments) can help ensure that Eligible Customers' requests for transmission service on behalf of large loads are more viable and more likely to materialize as planned, given that they must meet specific milestones and/or pay costs to proceed.

57. More specifically, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks sufficiently clear and consistent Tariff provisions that address certain aspects of the process to provide transmission service to Eligible Customers on behalf of large loads, including:

(1) a definition of large load sufficient to capture loads that present the unique challenges described herein;

(2) the application process for requesting transmission service to Eligible Customers on behalf of large loads and the study procedures, including readiness requirements, for studying the provision of transmission service to Eligible Customers on behalf of large loads;

---

Comments at 9; Ohio FEA November 21 ANOPR Comments at 4; Vistra November 21 ANOPR Comments at 23.

[148] *See, e.g.*, Amazon November 21 ANOPR Comments at 6; CEBA November 21 ANOPR Comments at 8; ClearPath November 21 ANOPR Comments at 4; Geronimo November 21 ANOPR Comments at 12; TAPS November 21 ANOPR Comments at 14-15.

[149] *See, e.g.*, Buckeye November 21 ANOPR Comments at 1-2; Exelon November 21 ANOPR Comments at 3; Kansas Commission November 21 ANOPR Comments at 12; NRECA November 21 ANOPR Comments at 9; OCC November 21 ANOPR Comments at 9; Southeast PIOs November 21 ANOPR Comments at 20; State Entities November 21 ANOPR Comments at 7-8; TAPS November 21 ANOPR Comments at 15, 22-24; Tri-State November 21 ANOPR Comments at 6, 8; Vistra November 21 ANOPR Comments at 23.

[150] *See, e.g.*, CEBA November 21 ANOPR Comments at 8; EEI November 21 ANOPR Comments at 20; ELCON November 21 ANOPR Comments at 7; Invenergy November 21 ANOPR Comments at 6; GridCare December 5 ANOPR Comments at 5; OCC November 21 ANOPR Comments at 9; PIOs November 21 ANOPR Comments at 5; Southeast PIOs November 21 ANOPR Comments at 41; Talen November 21 ANOPR Comments at 9.

(3) ongoing operational requirements for transmission customers[151] serving large loads necessary to ensure reliable operation of the transmission system; and

(4) *pro forma* provisions in transmission service agreements to memorialize these terms.

58. First, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks a definition of large load, as a new category of load. As MISO acknowledges, integrating large loads poses specific challenges to transmission system operation given their size, operational behavior, and unique potential to impact the transmission system.[152] An appropriate definition, including a load size and interconnection voltage threshold, should be based on the characteristics of MISO's transmission system. That said, based on the record in the ANOPR proceeding,[153] it appears that it would be reasonable to define a large load as a new, commercial or industrial customer, located at a single site behind one or more points of interconnection, and that has a peak load of 50 MW or greater, interconnects to the transmission system at a voltage level of greater than 69 kV, and is not part of a co-location arrangement. We note that this threshold also aligns with the definition of large load that MISO has proposed in its Large Load Working Group.[154] In its response to this order, MISO should

---

[151] We note that such ongoing operational requirements should apply to transmission customers, rather than Eligible Customers, as these requirements apply after the Eligible Customer has an executed (or a filed unexecuted) service agreement for transmission service and have become transmission customers under the Tariff.

[152] MISO Large Load Workshop Presentation at 7-8; *see also* MISO November 21 ANOPR Comments at 30-33.

[153] *See, e.g.*, Constellation November 21 ANOPR Comments at 13 (supporting a voltage threshold); DTE November 21 ANOPR Comments at 3, 17-19 (recommending a threshold of an amount between 50 MW to 100 MW); Eolian November 21 ANOPR Comments at 8-9 (recommending a voltage threshold greater than or equal to an amount between 60 kV to 100 kV); Illinois AG November 21 ANOPR Comments at 7 (supporting a 20 MW or 50 MW threshold and consideration of other factors, such as voltage level); ITC November 21 ANOPR Comments at 3 (recommending a threshold of between 50 MW to 100 MW); Nebraska Board November 21 ANOPR Comments at 4 (proposing a 50 MW threshold); New Mexico Commission November 21 ANOPR Comments at 5 (proposing a 50 MW threshold).

[154] *See* MISO, *Large Load Interconnection Reliability Requirements (LLWG)* 8 (May 14, 2026), https://cdn.misoenergy.org/20260514%20LLWG%20Item%2004%20Large%20Load%20Interconnection%20Reliability%20Requirements757718.pdf.

explain whether the Tariff remains just and reasonable without such a definition, or propose Tariff revisions establishing its own definition of large load.

59. Second, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks sufficiently clear and consistent Tariff provisions establishing the application process and study procedures that will be used when MISO and/or the Transmission Owners evaluate the provision of transmission service to Eligible Customers on behalf of large loads. MISO should explain whether the Tariff remains just and reasonable, for example, without: (1) an application process that accepts Eligible Customers' applications for transmission service on behalf of large loads on a rolling basis; (2) a non-refundable application fee and sufficient readiness requirements that escalate at distinct phases of the study process to deter duplicative or speculative requests for transmission service (e.g., meaningful milestones and/or financial commitments); and (3) information and data requirements that Eligible Customers must submit to MISO and/or the Transmission Owners regarding the characteristics of the large load on behalf of which the Eligible Customer is taking transmission service, including disclosure to MISO of any substantially similar pending transmission service requests on behalf of the same large load customer.[155] MISO may also elect to propose Tariff revisions establishing such an application process, fee, and requirements.

60. Further, MISO's Tariff appears to lack sufficiently clear and consistent provisions establishing a study process for evaluating the provision of transmission service to Eligible Customers on behalf of large loads that considers the unique characteristics and impacts of large loads on the transmission system. For example, we are concerned that MISO's Tariff may not clearly and consistently require MISO or the Transmission Owners to conduct studies that evaluate the transmission system's ability to withstand risks observed from analyzed large load behavior created by the large load at the point of interconnection, or any other necessary supplemental studies to evaluate the impact of providing transmission service to Eligible Customers on behalf of large loads.[156] Additionally, we preliminarily find that MISO's Tariff appears unjust and unreasonable because it lacks appropriate provisions recognizing within the transmission service request study process the unique operational characteristics of large loads that are willing

---

[155] The Electric Reliability Council of Texas (ERCOT) has proposed a similar disclosure requirement in its Batch Zero process for large load interconnections. ERCOT Planning Guide, § 9.7.1(1)(b) (proposed Mar. 4, 2026).

[156] *See generally* NERC, *Industry Recommendation: Large Load Interconnection, Study, Commissioning, and Operations* (Sep. 2025), https://www.nerc.com/globalassets/programs/bpsa/alerts/2025/nerc-alert-level-2--large-loads.pdf (finding that unique operational characteristics of large loads necessitate enhancements to studies).

and able to limit their energy withdrawals under certain conditions, which may thereby lessen or potentially avoid the need for certain Network Upgrades. While flexible large loads can reduce the demand on the transmission system, and therefore potentially reduce the need for additional transmission capacity, additional informational and study requirements may be necessary to account for the dynamic nature of these types of loads while maintaining reliability.[157] Additionally, we note that accurate models using Electromagnetic Transient studies may help to ensure that transmission service needed on behalf of large loads can be provided without compromising reliability.[158]

61. Additionally, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks clear and consistent provisions requiring the evaluation of alternative transmission technologies[159] as potential solutions to accommodate an Eligible Customer's request for transmission service on behalf of a large load. Alternative transmission technologies can add more capacity on existing transmission lines quickly, often within one to three years.[160] Unlike with traditional load growth,[161]

---

[157] *See, e.g.*, AEMA November 21 ANOPR Comments at 6; Thermal Battery Alliance November 21 ANOPR Comments at 7; Verrus November 21 ANOPR Comments at 10.

[158] *See, e.g.*, NERC, *Draft Reliability Guideline: Risk Mitigation for Emerging Large Loads* 6-7 (May 2026), https://www.nerc.com/globalassets/who-we-are/standing-committees/rstc/reliabilityguideline_riskmitigationforemerginglargeloads.pdf; NERC, *Assessment of Gaps in Existing Practices, Requirements, and Reliability Standards for Emerging Large Loads* 31 (Mar. 2026), https://www.nerc.com/globalassets/our-work/guidelines/reliability/white-paper---assessment-of-gaps.pdf; *see also* SPP HILL Order, 194 FERC ¶ 61,031 at P 62.

[159] For purposes of this order, alternative transmission technologies include static synchronous compensators, static VAR compensators, advanced power flow control devices, transmission switching, synchronous condensers, voltage source converters, advanced conductors, tower lifting, and dynamic line ratings. We note that the Commission has also referred to these types of technologies as Grid Enhancing Technologies (GET).

[160] WATT and Advancing Modern Powerlines November 21 ANOPR Comments at 5-6.

[161] *See, e.g.*, SPP HILL Order, 194 FERC ¶ 61,031 at P 7 (explaining that the HILL proposal was needed in part due to large load customers frequently requesting transmission service within months rather than years of their intended commercial operation, straining legacy regulatory frameworks and planning processes originally

large load customers often have development timelines requiring interconnection to the transmission system faster than traditional Network Upgrades can be built, necessitating a sufficient evaluation of alternative transmission technologies that can more quickly accommodate transmission service requests from Eligible Customers on behalf of large loads.[162] The Commission has previously recognized that alternative transmission technologies have the potential to mitigate or defer the need for traditional Network Upgrades and often can be deployed both more quickly and at lower cost than traditional Network Upgrades, and therefore failing to consider whether alternative transmission technologies can meet transmission needs more efficiently or cost-effectively than traditional Network Upgrades has the potential to render Commission-jurisdictional rates unjust and unreasonable.[163] Further, to the extent Network Upgrade costs to accommodate an Eligible Customer's request for transmission service on behalf of a large

---

designed for slow, incremental, and predictable load growth); *see also* FERC 2025 State of the Markets Report at 8 ("[D]ata centers have characteristics unlike more traditional loads [including] size, strong desire for faster interconnection, and potential flexibility.").

[162] Exec. Off. of the President, *Winning the Race: America's AI Action Plan* 1-2, 15 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf (explaining that accelerated deployment of AI data centers is a critical matter of national security and international economic competitiveness, and recommending federal policy action to optimize the existing grid through advanced grid technologies); WATT and Advancing Modern Powerlines November 21 ANOPR Comments at 5-8 ("[Alternative transmission technologies'] deployment timelines are more aligned with the interconnection needs of new large loads, which may only take 1-2 years to construct."); Industrial Customers November 21 ANOPR Comments at 28 ("Achieving speed-to-power in the near-term, while also protecting customers, will require the use of GETs, advanced reconductoring, and unlocking all available system capacity."); Energy Systems Integration Group, *Historical and Modern Large Loads: Characteristics, Context, and Industry Action to Meet Grid and Customer Needs* 4 (Mar. 2026), https://www.esig.energy/wp-content/uploads/2026/03/ESIG-Historical-vs-Modern-Large-Loads-white-paper-2026.pdf (describing the timing mismatch between how long it takes to build a new data center and how long it takes to plan, permit, and build transmission).

[163] *Improvements to Generator Interconnection Procs. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054 at P 1583, *order on reh'g*, 185 FERC ¶ 61,063 (2023), *order on reh'g*, Order No. 2023-A, 186 FERC ¶ 61,199, *errata notice*, 188 FERC ¶ 61,134 (2024); *see also Bldg. for the Future Through Elec. Reg'l Transmission Plan. & Cost Allocation*, Order No. 1920, 187 FERC ¶ 61,068 at P 1201, *order on reh'g*, Order No. 1920-A, 189 FERC ¶ 61,126 (2024), *order on reh'g*, Order No. 1920-B, 191 FERC ¶ 61,026 (2025).

load are rolled into a transmission owner's transmission revenue requirement, transmission customers other than the Eligible Customer may bear a portion of those Network Upgrade costs, highlighting the need for clear and consistent provisions requiring the evaluation of least-cost options like alternative transmission technologies to mitigate the rate impact on all transmission customers.

62. MISO should explain whether the Tariff remains just and reasonable without provisions that (1) require the evaluation of alternative transmission technologies in transmission service request studies, using models that are capable of evaluating the transmission system to accurately account for advanced transmission technologies, in all instances, without the need for a request from the Eligible Customer seeking transmission service on behalf of a large load; and (2) if traditional Network Upgrades are selected instead of alternative transmission technologies, inclusion in the study report to the Eligible Customer seeking transmission service on behalf of a large load of a sufficiently clear demonstration of why alternative transmission technologies are not feasible (i.e., would not resolve reliability violations identified or meet the relevant planning criteria) or would not result in lower costs or a faster timeline for accommodating the transmission service request; or propose Tariff revisions establishing such provisions. This transparency and informational requirement is warranted for the regulatory scheme we are establishing for transmission service requests by Eligible Customers on behalf of large loads given demand from and the expedited development timelines for large load customers. We underscore that we are not mandating the use of alternative transmission technologies. To the extent stakeholders believe that specific characteristics of providing transmission service to Eligible Customers on behalf of large loads warrant requirements beyond those contemplated here, we seek further briefing.

63. Finally, based on the record, it appears reasonable that such study processes, culminating in a report to the Eligible Customer with the results of the studies, including any Direct Assignment Facilities and Network Upgrades necessary to accommodate the transmission service request as well as a non-binding good-faith estimate of the cost and the time to construct such facilities, should take no more than 60-90 days calendar days to complete.[164] To the extent MISO or the Transmission Owners already have such procedures and conduct such studies, but those processes are not included in the Tariff,

---

[164] Several commenters support a 60-day timeline. *See, e.g.*, Constellation November 21 ANOPR Comments at 26; Critical Loop December 5 ANOPR Comments at 8; EDF Power November 21 ANOPR Comments at 16; Tract November 21 ANOPR Comments at 9. Other commenters note that SPP's HILL process has a 90-day timeline, or otherwise support a 90-day timeline. *See, e.g.*, AEMA November 21 ANOPR Comments at 3; Eolian December 5 ANOPR Comments at 27; Industrial Customers November 21 ANOPR Comments at 20; PJM November 21 ANOPR Comments at 7; SPP November 21 ANOPR Comments at 16-17.

MISO and the Transmission Owners should explain their existing processes and consider whether amendments are necessary to the Tariff to memorialize those processes and also address the concerns expressed herein. Otherwise, MISO should explain whether the Tariff remains just and reasonable without: (1) sufficiently clear and consistent provisions to evaluate the impact of providing the requested transmission service to Eligible Customers on behalf of large loads, including identifying the Direct Assignment Facilities and Network Upgrades necessary to provide such service reliably; (2) provisions to appropriately recognize within the transmission service study process the unique operational characteristics of large loads; (3) a study deadline of no more than 60-90 calendar days; or propose Tariff revisions establishing them.

64. Third, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks provisions addressing ongoing operational requirements for transmission customers taking transmission service on behalf of large loads. We are concerned that without such requirements the rates, terms, and conditions of transmission service may be unjust and unreasonable. The unique nature of these large loads creates challenges for operation of the transmission system and necessitates greater visibility and operational control when providing transmission service to transmission customers on behalf of large loads, without which the reliability of the transmission system could be at risk.[165] For example, we are concerned that MISO's Tariff does not require transmission customers to provide MISO hourly forecasts, telemetry data, and other data to ensure sufficient visibility or specify requirements for maintaining communication channels between MISO and the transmission customer on behalf of the large load. Additionally, we are concerned that the Tariff does not require transmission owners to install, and transmission customers to pay for, equipment to enable MISO to monitor large loads for impacts of, for example, fast-ramping load that may impact the transmission system too quickly to be captured by conventional data acquisition systems (e.g., the need for phasor measurement units or similar equipment). We are also concerned that the Tariff does not require the transmission customer to enable MISO to remotely disconnect large loads when necessary to maintain reliability of the transmission system, with the costs of such equipment directly assigned to the transmission customer, as well as the terms and conditions under which MISO may remotely disconnect the large load (e.g., emergency conditions, so that transmission equipment is not harmed). Further, we are concerned that the Tariff does not specify ramp rate or ride-through requirements with which the transmission customer taking transmission service on behalf of the large load must comply. Lastly, we are concerned that the Tariff does not specify requirements for necessary control technologies and/or protection systems that may be necessary to limit a

---

[165] *E.g.*, ATC November 21 ANOPR Comments at 14; CAISO November 21 ANOPR Comments at 10 (citing NERC Characteristics and Risks of Large Loads); Herb Schrayshuen November 21 ANOPR Comments at 2-5.

transmission customer's withdrawals from the transmission system as appropriate.[166] MISO should explain whether the Tariff remains just and reasonable without these or other ongoing operational requirements as part of the rates, terms, and conditions of transmission service or propose Tariff revisions establishing necessary ongoing operational requirements.

65. Fourth, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks *pro forma* provisions in a transmission service agreement between MISO and the transmission customer taking transmission service on behalf of a large load to memorialize the above terms (e.g., equipment requirements, data requirements, remote disconnect capability). We are concerned that, without such *pro forma* provisions in a transmission service agreement between MISO and the transmission customer, MISO may be unable to enforce ongoing operational requirements for transmission customers taking transmission service on behalf of large loads. MISO should explain whether the Tariff remains just and reasonable without such *pro forma* provisions in a transmission service agreement, or propose revisions to include *pro forma* provisions memorializing the ongoing operational requirements in a transmission service agreement between MISO and the transmission customer.

### B. <u>Cost Shifting Risk Among Transmission Customers</u>

66. We next preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks adequate mechanisms to mitigate the risk of cost shifting among transmission customers, which may result in unjust and unreasonable rates for transmission service. In particular, we are concerned about the apparent lack of (1) transparency regarding the assignment of Network Upgrades, and their associated costs, that are needed to provide transmission service to Eligible Customers on behalf of large loads; and (2) a *pro forma* cost recovery agreement between MISO, the relevant transmission owner, and the Eligible Customer taking transmission service on behalf of large loads that help ensure that Eligible Customers bear the risk and are ultimately responsible for costs incurred to provide transmission service, including the cost of Network Upgrades.

67. We direct MISO and the Transmission Owners, to the extent the matters addressed herein implicate aspects of the Tariff over which they have the filing rights, to explain whether the Tariff remains just and reasonable without (1) robust, accurate, and systematic provision of data on MISO's website in a single location, and in an easily

---

[166] Specifically, as discussed below, the Commission has found that such necessary control technologies and/or protection schemes may be appropriate where Eligible Customers are taking one of the new transmission services. *See infra* PP102,105.

accessible format that is searchable and allows users to filter the data, regarding the cost for Network Upgrades needed to provide transmission service to Eligible Customers on behalf of large loads; and (2) a *pro forma* cost recovery agreement between MISO, the relevant transmission owner, and the Eligible Customer taking transmission service on behalf of a large load, or to propose Tariff revisions to provide additional transparency and establish such a *pro forma* cost recovery agreement. We encourage state regulators responsible for setting retail rates to provide input to MISO regarding their transparency needs.

### 1. Jurisdiction

68. The Commission has a duty to address the risk of cost shifting among transmission customers that may result in unjust and unreasonable transmission rates. As explained above, the Commission is obligated to ensure that the rates charged for jurisdictional transmission service—as well as any practice directly affecting such rates—are just and reasonable and not unduly discriminatory or preferential. With respect to the addition of large loads to the transmission system, the Commission has exclusive authority to ensure that transmission rates are just and reasonable. The costs of those upgrades to the transmission system (i.e., Network Upgrades) necessary to provide transmission service to Eligible Customers on behalf of large loads are inputs to jurisdictional transmission rates, and thus directly affect the Commission-jurisdictional rates paid by transmission customers. To fulfill its responsibility to ensure that transmission rates are just and reasonable, the Commission must act to address the risk of cost shifting among transmission customers due to (1) the process transmission providers and/or transmission owners use to evaluate the facilities needed, and the associated costs, for the provision of transmission service to Eligible Customers on behalf of large loads and (2) speculative transmission service requests by Eligible Customers on behalf of large loads that could result in unjust and unreasonable transmission rates.

69. In response to the ANOPR, many commenters raise concerns about the impact that large load additions can have on retail ratepayers, particularly the concern that other retail ratepayers may be forced to subsidize Network Upgrades needed to add large loads to the transmission system.[167] While we appreciate and are similarly concerned about this issue, the Commission is limited to addressing jurisdictional transmission rates and as such, we do so herein. As the Commission has explained, states determine how Commission-approved rates are collected among the relevant retail consumers along

---

[167] *See, e.g.*, Illinois AG November 21 ANOPR Comments at 11-12; Missouri Commission November 21 ANOPR Comments at 11; OMS November 21 ANOPR Comments at 4.

with the rates for state-jurisdictional matters.[168] Specifically, states have authority over how the wholesale costs of providing electricity, including transmission of such electricity, to those retail customers are recovered through retail rates.[169] We are encouraged by efforts taken by states to reform retail tariffs to address the potential for retail cost shifting as large loads come online,[170] as well as voluntary efforts by transmission owners to protect retail ratepayers through cost recovery agreements with large loads.[171] We are also encouraged by the execution of the President's Ratepayer Protection Pledge, through which data center developers have committed to shield retail ratepayers from increased electricity prices.[172]

70. We expect that the additional cost transparency measures proposed in the following section will give state public utility commissions and other state regulators the information necessary to allow them to understand which transmission costs are caused by which transmission customers, so that they can sub-allocate these costs to the appropriate retail customers. Indeed, the Commission's objective in this proceeding is to respect the cooperative federalism approach established under the FPA. Specifically, one of the benefits of providing transparency on the costs of Network Upgrades necessary to provide transmission service to Eligible Customers on behalf of large loads is so that state regulators can use that information to protect residential and small commercial customers by incorporating those costs into the retail rates as they see fit given their authority to set rates for different classes of retail customers. We encourage state public utility commissions, state regulators, and state consumer advocates to submit comments explaining whether this information is sufficient and granular enough or to submit comments explaining precisely which additional information on transmission cost allocation may be needed to inform proper state-jurisdictional cost allocation.

---

[168] PJM Show Cause Order, 190 FERC ¶ 61,115 at P 167.

[169] *Id.* P 68.

[170] *See, e.g.*, Arkansas Commission November 21 ANOPR Comments at 2; Louisiana and Mississippi Commissions November 21 ANOPR Comments at 6-8; Wisconsin Electric November 21 ANOPR Comments at 5-6.

[171] *See, e.g.*, *Commonwealth Edison Co.* 194 FERC ¶ 61,106 (2026); *Commonwealth Edison Co.*, 194 FERC ¶ 61,109 (2026); *Commonwealth Edison Co.*, 194 FERC ¶ 61,110 (2026); *Commonwealth Edison Co.*, 194 FERC ¶ 61,113 (2026); *PECO Energy Co.*, 193 FERC ¶ 61,148 (2025); *Dayton Power & Light Co.*, 192 FERC ¶ 61,103 (2025); *Dayton Power & Light Co.*, 189 FERC ¶ 61,220 (2024).

[172] Proclamation No. 11014, 91 Fed. Reg. 11439 (Mar. 4, 2026).

## 2. Additional Cost Transparency

71. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable or unduly discriminatory or preferential because it does not contain provisions requiring the provision of data on MISO's website in a single location, and in an easily accessible format that is searchable and allows users to filter the data, on transmission service requested by Eligible Customers on behalf of large loads, for Network Upgrades evaluated in the local transmission planning process that are needed to provide transmission service to Eligible Customers on behalf of those large loads, and the costs for those Network Upgrades. We preliminarily find that cost transparency measures are needed to provide stakeholders with sufficient information and visibility regarding the Network Upgrades, and their associated costs, needed to provide transmission service to Eligible Customers on behalf of large loads.

72. As an initial matter, we note that the MISO Tariff contains several methods for identifying Network Upgrades needed to provide transmission service to Eligible Customers, including for Eligible Customers requesting transmission service on behalf of large loads. As discussed above, Network Upgrades triggered by a new NITS request or designation of new Network Load, such as to serve a large load, may be designated as Transmission Delivery Service Projects within the MTEP or included in local transmission planning processes. Moreover, in its comments, MISO asserts that its load forecasting approach accounts for data centers and manufacturing as two key drivers of load growth.[173] We also acknowledge that MISO recently conducted a survey to gather more granular data on large loads to improve its load forecasting.[174]

73. However, MISO's Tariff does not appear to require that information identifying the Network Upgrades needed to provide transmission service to Eligible Customers on behalf of large loads and the costs of those Network Upgrades determined through local transmission planning processes be readily available on MISO's website in a single location, and in an easily accessible format that is searchable and allows users to filter the data. The speed and scale with which Eligible Customers are seeking transmission service on behalf of large loads makes it difficult for interested parties, including transmission customers and state regulators, to accurately assess which transmission costs are driven by requests for transmission service by Eligible Customers to serve large loads. Further, MISO itself projects load growth to be three times higher than previously forecasted.[175] We are concerned that the potentially speculative nature of requests for

---

[173] MISO November 21 ANOPR Comments at 11.

[174] *Id.* at 12; *see* MISO, MISO Long-Term Load Forecasting Results Presentation.

[175] MISO November 21 ANOPR Comments at 10-11.

transmission service by Eligible Customers on behalf of large loads,[176] the speed and scale with which large loads are seeking to be added to the transmission system, the projected need for significant Network Upgrades to provide transmission service to Eligible Customers on behalf of large loads, and the lack of centralized information on the associated transmission costs in MISO hamper the ability of the Commission and stakeholders (including transmission customers and state regulators[177]) to understand and accurately assess the relationship between the addition of large loads to the transmission system and wholesale transmission costs.

74. For local transmission planning processes, we note that, for example, MISO's EPR Technical Study Task Force presents high-level study results and cost estimates for EPR projects that have been recently approved or are currently being studied at publicly noticed, monthly regional stakeholder meetings.[178] However, MISO's Tariff does not contain provisions that require MISO to publicly post cost estimates of EPR requests necessary to provide transmission service to Eligible Customers on behalf of large loads. Similarly, while MISO regularly updates a list of locally planned transmission projects that will be included in Appendix A of the next MTEP as Other Projects,[179] the Tariff

---

[176] *See supra* P 56.

[177] *See* Transcript, NARUC Collaborative, Docket No. AD24-7-000, at 16-17 (Feb. 11, 2026) (Chair Bagot, Virginia) (asserting that additional transparency at the RTO level would help the states get the information they need to "identify . . . that bucket of costs" related to large load-driven transmission costs), 19 (Commissioner Chattopadhyay, New Hampshire) (noting the need for "all parties to be able to see things transparently" with respect to wholesale transmission costs), 35-37 (Chair Martz, Iowa) (raising concern that currently RTOs/ISOs do not have to clearly explain when a "bucket of costs is specifically for this large load" and noting that "if we, at the state level, can't see the driver [of transmission costs], we can't assign the cost to the causer[,] [a]nd so we need that clarity"), 69-70 (Chair Myers, Arizona) ("[B]eing able to allocate the large load costs to the correct bucket when it gets to the states is kind of a top priority.").

[178] MISO, BPM-020, § 4.1.4.2; *see also, e.g.*, MISO, *Expedited Project Review Technical Study Taskforce (EPR-TSTF)* (Jan. 6, 2026), https://www.misoenergy.org/events/2026/expedited-project-review-technical-study-taskforce-epr-tstf---january-6-2026/; MISO, *Expedited Project Review Results and Recommendation* 4 (Jan. 6, 2026), https://cdn.misoenergy.org/20260106%20EPR-TSTF%20Item%2002%20EPR%20Results%20and%20MISO%20Recommendation734123.pdf (estimating the Network Upgrades to serve a 620 MW load addition will cost $11.26 million).

[179] MISO, *MTEP Appendix A Status Report*, https://www.misoenergy.org/planning/transmission-planning/mtep/ (scroll down and

does not require public posting of cost estimates for Other Projects necessary to provide transmission service to Eligible Customers on behalf of large loads.

75. We are concerned that without sufficient transparency regarding the Network Upgrades, and their associated costs, needed to provide transmission service to Eligible Customers on behalf of large loads, stakeholders may lack information and visibility regarding the costs driven by large load additions. We preliminarily find that, for Network Upgrades evaluated in the local transmission planning process[180] that are needed to provide transmission service to Eligible Customers on behalf of large loads, MISO must provide clear, timely, and detailed information regarding the extent to which requests for transmission service by Eligible Customers on behalf of large loads necessitate Network Upgrades to accommodate the transmission service to Eligible Customers on behalf of large loads, as well as the costs of those Network Upgrades.

76. We note that centralized information regarding Network Upgrades needed to accommodate requests for transmission service by Eligible Customers on behalf of large loads would also help inform stakeholders at the state and local level to address affordability and other challenges posed by the integration of large loads. Indeed, commenters state that the opaque nature of requests for transmission service by Eligible Customers on behalf of large loads, and the associated Network Upgrades required to provide that transmission service, prevent wholesale and retail customers, states, and other stakeholders from understanding such costs.[181]

---

click "Project Tracking and Monitoring," then click the link to "MTEP Appendix A Status Report") (last visited Apr. 30, 2026).

[180] Our concern with transparency regarding Network Upgrades needed to provide transmission service to Eligible Customers on behalf of large loads, as well as the costs of such upgrades, is limited to Network Upgrades planned through the local transmission planning process. While we acknowledge that in Order No. 890, the Commission adopted requirements for RTOs/ISOs, as well as for transmission owners to the extent that they perform transmission planning within an RTO/ISO, to have open and transparent transmission planning processes, there are additional requirements that apply to regional transmission planning processes (that do not apply to local transmission facilities) and thus is relevant to the distinction here. Specifically, under Order No. 1000, public utility transmission providers, including RTOs/ISOs, must evaluate as part of their regional transmission planning process whether there are transmission facilities that more efficiently or cost-effectively meet the transmission planning region's identified transmission needs. *See* Order No. 1000, 136 FERC ¶ 61,051 at P 11.

[181] *See* OCC November 21 ANOPR Comments at 3 ("Consumers, state advocates and state regulatory commissions have a right to know which entities are seeking large-

77. Accordingly, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not require the provision of data on MISO's website in a single location, and in an easily accessible format that is searchable and allows users to filter the data, that identifies the Network Upgrades that are needed to accommodate requests for transmission service by Eligible Customers on behalf of large loads, and the costs of those Network Upgrades. MISO should explain whether the Tariff remains just and reasonable without provisions that would require MISO and the Transmission Owners to publicly post and regularly update data that details: (1) the aggregate amounts of proposed large load additions in MISO's footprint, including the aggregate amounts in each transmission pricing zone; (2) the planned Network Upgrades needed to provide transmission service to Eligible Customers on behalf of large loads, identified by type of equipment and Network Upgrade (e.g., new substation, reconductoring, a new high-voltage transmission line) for each transmission service request; and (3) cost estimates for those Network Upgrades; or propose such Tariff revisions. MISO and the Transmission Owners should also consider what other data related to transmission costs resulting from the provision of transmission service to Eligible Customers on behalf of large loads would be useful to include on MISO's website. To the extent there are concerns about data confidentiality, MISO and the Transmission Owners should consider whether there are ways to mitigate those concerns while still providing the necessary transparency.

### 3. Cost Recovery Agreements

78. We next preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks adequate mechanisms to mitigate the risk of cost shifting among transmission customers, which may result in unjust and unreasonable rates for transmission service. In particular, we are concerned about the apparent lack of a *pro forma* cost recovery agreement between MISO, the relevant transmission owner, and the Eligible Customer taking transmission service on behalf of large loads that help ensure that Eligible Customers bear the risk and are ultimately responsible for costs incurred to provide transmission service, including the cost of Network Upgrades.

---

load interconnections, the nature of the requested service, and how related costs could flow through to transmission and distribution rates."); U.S. House of Representatives Committee on Energy and Commerce Ranking Members November 21 ANOPR Comments at 2 (urging the Commission to "require sufficient transparency from grid operators so it can determine which specific large load facilities are responsible for grid upgrade needs"); *see also* CPUC November 21 ANOPR Reply Comments at 16-17 (asserting that the public posting of large load cost responsibility determinations would improve transparency, to the benefit of businesses and ratepayers).

79. Several commenters discuss the risk of cost shifting among transmission customers that could result from transmission service requests by Eligible Customers on behalf of large loads.[182] Commenters also argue that retail-level large load tariffs do not protect wholesale transmission customers from cost shifting.[183] Specifically, commenters in the record contend that, while a retail-level large load tariff protects the load serving entity taking wholesale transmission service and its retail customers, it fails "to provide any mechanism to protect *other wholesale transmission customers*" from stranded transmission costs.[184] The Kansas Commission states that while its Large Load Power Services rate plan that requires large loads to make minimum payments toward transmission costs protects retail ratepayers from large-load driven transmission costs, it cannot protect against cost shifting associated with regional transmission buildout where "the large loads that formed the basis for the [regional] transmission plans do not materialize, leaving only existing customers to pay for generational expansions of the transmission grid."[185] TAPS contends, moreover, that it is not sufficient for the Commission to rely on transmission owners to voluntarily file cost recovery agreements to protect transmission customers from cost shifting for Network Upgrades.[186]

80. We are likewise concerned that there may be speculative transmission service requests by Eligible Customers on behalf of large loads that could result in cost shifting

---

[182] *See, e.g.*, Buckeye November 21 ANOPR Comments at 8-13; APPA November 21 ANOPR Comments at 6 ("Wholesale transmission customers in particular could be left shouldering massive costs if new large loads do not ultimately attain or maintain the level of electricity demand that is being forecasted."); NRECA November 21 ANOPR Comments at 21 (noting the risk that other transmission customers could bear stranded upgrade costs caused by large loads that they cannot absorb); TAPS November 21 ANOPR Comments at 22-24; California DWR November 21 ANOPR Comments at 8.

[183] TAPS November 21 ANOPR Comments at 26 ("[A] number of state commissions are moving forward with retail large load tariffs, which provide for varying protections, but may not require the revenues and minimum demand levels to be included in wholesale transmission rates."); Buckeye November 21 ANOPR Comments at 14-16; Kansas Commission November 21 ANOPR Comments at 15-16.

[184] Buckeye November 21 ANOPR Comments at 14-15; *see* TAPS November 21 ANOPR Comments at 26-27 & nn.50-51.

[185] Kansas Commission November 21 ANOPR Comments at 11-12.

[186] TAPS November 21 ANOPR Comments at 25-26 (noting that AES Ohio "committed to reflecting the payments it received from the data center in its Commission-jurisdictional transmission revenue requirement so that other customers are protected," in a Construction Service Agreement with Amazon).

among transmission customers, which may lead to unjust and unreasonable increases in jurisdictional transmission rates. When a transmission owner constructs Network Upgrades to accommodate an Eligible Customer's request for transmission service on behalf of a large load, those transmission costs will be included in the transmission owner's transmission revenue requirement. If, however, the Eligible Customer takes less transmission service than anticipated because the large load operates at a lower demand than anticipated or fails to materialize at all, other transmission customers may see an increase in transmission rates. In such a situation, those other transmission customers may have to pay for potentially unnecessary Network Upgrades that they neither caused the need for nor benefit commensurately from. In other words, this introduces the risk that costs may be unfairly shifted to other transmission customers, which may result in those costs then being passed through to residential customers, among others.

81. MISO's Tariff does not require cost recovery agreements between MISO, the relevant transmission owner, and the Eligible Customer taking transmission service on behalf of a large load. Such agreements would help ensure that the Eligible Customer makes a minimum contribution to the transmission owner's transmission revenue requirement commensurate with the costs incurred to provide the requested transmission service, including the costs of any needed Network Upgrades. Absent such cost recovery agreements, we are concerned that there is no mechanism to help ensure that Eligible Customers taking transmission service on behalf of large loads (as opposed to other transmission customers) bear the risk of, and are ultimately responsible for, the costs incurred to provide them with the requested transmission service, including the costs of any needed Network Upgrades.

82. Accordingly, we preliminarily find that, in order to prevent unjust and unreasonable cost shifting among transmission customers, it appears necessary for MISO, the relevant transmission owner, and the Eligible Customer taking transmission service on behalf of a large load to enter into a cost recovery agreement that requires the Eligible Customer to make a minimum contribution toward the transmission owner's transmission revenue requirement, if the Eligible Customer ultimately takes less transmission service than anticipated because the large load does not materialize as planned or is not developed at all. We preliminarily find that such cost recovery agreements are necessary to help ensure that the Eligible Customer is responsible for timely paying the costs of large load-driven transmission (i.e., the costs incurred to provide them with the requested transmission service, including the costs of any needed Network Upgrades), rather than having those costs paid by other transmission customers that neither caused the need for nor benefit commensurately from those Network Upgrades.[187] Our preliminary finding is not intended to alter or call into question existing regional cost allocation methods for

---

[187] *See, e.g.*, *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004); *Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009).

Network Upgrades, but instead is focused on helping to prevent cost shifting among transmission customers.

83. We note that several transmission owners and large load customers have filed cost recovery agreements (Transmission Security Agreements or Construction Service Agreements) with the Commission that guarantee minimum contributions from a large load customer (rather than from the Eligible Customer taking transmission service on behalf of the large load customer) to the transmission owner's transmission revenue requirement.[188] Although we decline to preliminarily find that cost recovery agreements between the transmission owner and the large load customer (rather than the Eligible Customer) are necessary to ensure just and reasonable transmission rates, we continue to find that such agreements directly affect Commission-jurisdictional transmission rates. Therefore, to the extent a transmission owner and a large load customer enter into a cost recovery agreement (whether voluntarily or pursuant to state law) through which the large load customer guarantees contributions to the transmission owner's Commission-jurisdictional transmission revenue requirement, we find that such an agreement should be filed with the Commission.[189] To reduce duplicative credit requirements and transaction costs, we direct further briefing on whether it would be appropriate for such an agreement to substitute for the requirement on the Eligible Customer to enter into a cost recovery agreement with the transmission owner, if the agreement with the large load customer provided comparable or greater protection against cost shifting among transmission customers than an agreement between the transmission owner and the Eligible Customer would.

84. In addition to our preliminary finding that MISO's Tariff is unjust and unreasonable because it lacks a *pro forma* cost recovery agreement of this type, we also preliminarily find that the minimum contribution required pursuant to such an agreement should be based on the level of jurisdictional transmission service (in MW) requested by the Eligible Customer on behalf of the large load. That figure is in turn tied to how MISO and/or Transmission Owners will study the requested transmission service and determine any necessary Network Upgrades that must be developed to provide the requested transmission service. We note, however, that there may be other just and reasonable methods for determining this minimum contribution, including methods that account for potential timing differences between when costs are incurred to develop needed Network Upgrades and the pace at which the large load ramps toward energizing

[188] *See supra* note 171.

[189] We emphasize that this finding is in no way intended to preempt or interfere with the ability of states to implement ratepayer protection measures designed to mitigate cost shifting among retail customers, such as through state-jurisdictional large load tariffs.

at its full level of requested service. We further preliminarily find that the cost recovery agreement should include a credit support (or other financial security) requirement sufficient to secure the obligations of the Eligible Customer taking transmission service on behalf of a large load to pay the amounts owed pursuant to the cost recovery agreement. We find that a cost recovery agreement with a specified minimum financial contribution and financial security sufficient to secure such contribution is necessary to mitigate cost shifting if the Eligible Customer ultimately takes less transmission service than anticipated because the large load does not materialize as planned or is not developed at all. We preliminarily find that an Eligible Customer may include a credit support or other financial security posted by a large load as part of a retail agreement to avoid creating duplicative credit support requirements. MISO should explain why such a *pro forma* cost recovery agreement is not necessary to ensure just and reasonable rates, or propose such a *pro forma* cost recovery agreement. To the extent that stakeholders believe that other mechanisms could address our cost shifting concerns, we seek further briefing as discussed below.[190]

85. Lastly, we expect that any payments made by an Eligible Customer to a transmission owner pursuant to such a cost recovery agreement (or by a large load to a transmission owner pursuant to other voluntary agreement) will be appropriately credited toward transmission owners' transmission revenue requirements consistent with the Commission's cost-of-service regulations.[191] We preliminarily find that it appears reasonable for filers of formula rates to provide a separate workpaper in the annual informational filing describing how any payments made pursuant to a cost recovery agreement are reflected in the transmission owner's transmission formula rate.

## C. Co-Location Arrangements and Load with Behind the Meter Generation

86. The Commission recently addressed in the PJM region the need for sufficiently clear and consistent tariff provisions addressing the rates, terms, and conditions that apply to co-location arrangements and for transmission services that reflect an Eligible Customer taking transmission service on behalf of Eligible Load[192] that is willing and able to limit its energy withdrawals from the transmission system under certain conditions.[193] As

---

[190] *See infra* P 125.

[191] *See* 18 C.F.R. pt. 101 (2025).

[192] As discussed below, for purposes of this order, we will use the term Eligible Load to refer to co-located load and/or load with behind the meter generation. *See infra* P 91.

[193] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 2; PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at PP 91, 102.

discussed below, MISO's Tariff appears to be unjust and unreasonable because it lacks such provisions.[194]

87. We direct MISO and the Transmission Owners, to the extent the matters addressed herein implicate aspects of the Tariff over which they have the filing rights, to explain whether the Tariff remains just and reasonable without provisions addressing the rates, terms and conditions that apply to interconnection customers serving co-located load and for Eligible Customers taking transmission service on behalf of Eligible Load, or propose Tariff revisions establishing the rates, terms, and conditions that apply to co-location arrangements. We recognize that MISO is currently considering reforms related to co-location arrangements in its stakeholder process, and we again encourage MISO to consider whether these efforts would, either fully or in part, address the Commission's concerns that the Tariff appears to be unjust and unreasonable.

### 1. Definition

88. The PJM Co-Location Order adopted the following definition of co-located load: a "configuration [that] refers to end-use customer load that is physically connected to the facilities of an existing or planned Customer Facility on the Interconnection Customer's side of the Point of Interconnection to the PJM Transmission System."[195] The PJM Co-Location Order used the term co-location arrangement when referring to both the co-located load and the associated generator.[196]

89. For purposes of this order, it appears that it would be reasonable to define co-located load as a configuration that refers to end-use customer load that is physically connected to the facilities of an existing or planned generating facility on the generator interconnection customer's side of the point of interconnection to the RTO/ISO's transmission system. In this order, we will also use the term co-location arrangement when referring to both the co-located load and the associated generating facility.

90. MISO's Tariff defines Behind the Meter Generation (BTMG) as:

---

[194] We note that MISO does not allow Eligible Customers taking transmission service on behalf of loads with behind the meter generation to reduce their transmission service charges by netting output from the behind the meter generation in determining NITS charges. We therefore need not address behind the meter generation netting rules in this order.

[195] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 164 (alterations in original).

[196] *Id.* P 3.

> Generation resources used to serve wholesale or retail load located behind a CPNode that are not included in the Transmission Provider's Setpoint Instructions and in some cases can also be deliverable to Load located within the Transmission Provider Region using either Network Integration, Point-To-Point Transmission Service or transmission service pursuant to a Grandfathered Agreement.[197]

91. For purposes of this order, we will use the term Eligible Load to refer to co-located load and/or load with BTMG.[198]

### 2. <u>Jurisdiction</u>

92. As explained in the PJM Co-Location Order, the Commission has exclusive jurisdiction to oversee the interconnection of generating facilities to the interstate transmission system, including where generators serve co-located load.[199] The Commission retains exclusive authority to regulate the procedures and agreements that apply to the interconnection of a generator that will make wholesale sales, both where the generator interconnects directly to the interstate transmission system and where a generator interconnects to dual-use distribution facilities.[200] Further, the Commission has exclusive jurisdiction over the provision of transmission service to an Eligible Customer on behalf of Eligible Load, provided that transmission of electricity is in interstate commerce.[201] As the Commission found in the PJM Co-Location Order, we continue to

---

[197] MISO Tariff, Module A, § 1.B (Definitions B) (3.0.0). While we believe this definition is sufficient for purposes of this order, responses may explain whether changes to the definition of BTMG may be needed in order to comply with any future directives, should the Commission find that the Tariff has in fact become unjust and unreasonable.

[198] PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 91.

[199] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 171 (citing 16 U.S.C. §§ 824d, 824e; *EPSA*, 577 U.S. at 278).

[200] *Id.* P 172 (citing *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1282 (D.C. Cir. 2007)).

[201] *Id.* P 173.

acknowledge that the application of these principles depends on the specific facts and circumstances presented in particular situations.[202]

93. Additionally, we reiterate that certain other aspects of co-location arrangements fall squarely within the jurisdiction of the states. As we explained in the PJM Co-Location Order, states retain exclusive authority over the specific terms of retail sales and retail rate design, including retail cost allocation to the co-located load; which entities are legally permitted to provide electricity to retail customers in co-location arrangements; and which generating facilities are sited and allowed to serve co-located load.[203]

### 3. <u>Tariff Provisions</u>

94. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable or unduly discriminatory or preferential because it does not contain provisions addressing with sufficient clarity and consistency the rates, terms, and conditions of service that apply to interconnection customers serving co-located load. We also preliminarily find that MISO's Tariff appears to be unjust and unreasonable or unduly discriminatory or preferential because it does not contain provisions addressing with sufficient clarity and consistency transmission services that reflect that an Eligible Customer taking transmission service on behalf of Eligible Load is willing and able to limit its energy withdrawals from the transmission system under certain conditions.

95. The absence of such provisions may leave entities unable to determine what steps they can or must take to effectuate co-location arrangements of various configurations. One step includes determining how interconnection customers serving co-located load may use generator interconnection processes in MISO's Tariff to facilitate their co-location arrangements. A further step includes requiring interconnection customers serving co-located load to specify the Eligible Customer taking transmission service on behalf of the co-located load under the Tariff for purposes of assessing charges, including the appropriate charges for wholesale services that should apply to such Eligible Customers. Without such a common and consistent understanding of entities' responsibilities relevant to co-location arrangements, many of which may significantly affect rates and are realistically susceptible of specification,[204] we are concerned that these arrangements may be developed in a manner that is itself unjust and unreasonable or that may result in unjust and unreasonable rates for other customers.

---

[202] *Id.* P 174.

[203] *Id.* PP 167-169.

[204] *Hecate Energy Greene Cnty. 3 LLC v. FERC*, 72 F.4th 1307, 1312 (D.C. Cir. 2023).

96. Moreover, as discussed further below, we are especially concerned that the absence of Tariff provisions addressing transmission and ancillary service rates for Eligible Customers taking transmission service on behalf of Eligible Load creates the potential that Eligible Customers, on behalf of Eligible Load, may not be required to pay for wholesale transmission services that they receive, as required by the cost causation principle. That principle provides that all Commission-jurisdictional rates and charges must "reflect to some degree the costs actually caused by the customer who must pay for them,"[205] and that costs must be allocated in a manner that is at least roughly commensurate with the benefits that entity receives.[206]

97. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks sufficient clarity and consistency as to the rates, terms, and conditions of service that apply to interconnection customers serving co-located load, including the scope of the analyses MISO performs as part of its existing study process to evaluate the impacts of co-location arrangements, which may need to account for any potential dynamic impacts of co-located load and any potential impacts of requests to modify an existing generating facility's interconnection service level to serve co-located load on transmission system reliability. Additionally, in the PJM Co-Location Order, the Commission found that it was necessary to clarify that interconnection customers seeking to use new generating facilities to serve co-located load may (1) request interconnection service at a level below the generating facility's maximum facility output; (2) use existing procedures to accelerate interconnection requests that satisfy certain tariff criteria; and (3) request provisional interconnection service and surplus interconnection service.[207] As such, interconnection customers seeking to use their generating facilities to serve co-located load have no means of knowing the appropriate mechanism for setting forth the terms and conditions of co-location arrangements. We recognize that MISO is developing a zero-injection generator interconnection agreement process for generation that is co-located with load in its stakeholder process.[208] However, MISO's Tariff currently does not include any standard interconnection procedures for these zero-injection arrangements, nor does the Tariff specify how MISO studies the reliability impacts that such arrangements may have on the transmission system. We are concerned

---

[205] *Midwest ISO Transmission Owners v. FERC*, 373 F.3d at 1368.

[206] *See, e.g.*, *Ill. Com. Comm'n v. FERC*, 576 F.3d at 476.

[207] PJM Co-Location Order, 193 FERC ¶ 61,217 at PP 231-235. PJM's compliance filing proposing revisions in response to these directives was accepted in part on April 16, 2026. *PJM Interconnection, L.L.C.*, 195 FERC ¶ 61,030.

[208] MISO November 21 ANOPR Comments at 13; *see also* MISO TOs April 3 ANOPR Comments at 13-14.

that the details of such a process—including the existing rules and studies applicable to such generator interconnection arrangements—are not sufficiently detailed in the Tariff to ensure clarity for how interconnection customers may seek to serve co-located load. Moreover, without an Eligible Customer designated to take transmission service on behalf of a co-located load, there is no mechanism for MISO to address situations in which a co-located load withdraws energy from the transmission system.

98. Therefore, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not contain provisions addressing with sufficient clarity and consistency the rates, terms, and conditions of service that apply to interconnection customers serving co-located load. MISO should explain whether the Tariff remains just and reasonable without such provisions, or propose Tariff revisions.

99. We have similar concerns regarding MISO's existing rate designs for transmission and ancillary services that are used by Eligible Customers taking transmission service on behalf of Eligible Load. The Commission has previously found that co-located loads that are synchronized with the transmission system use and benefit from at least some ancillary services and may be reasonably charged for such benefits.[209] Specifically, the Commission has found that, regardless of whether a co-located load withdraws energy from the transmission system, co-located load relies on and benefits from regulation service and black start service, and concluded that Eligible Customers taking one of the new transmission services (discussed below) on behalf of co-located load must pay for these ancillary services on a gross demand basis.[210] In the PJM Co-Location Rehearing Order, the Commission applied these findings to Eligible Customers taking transmission service on behalf of load with BTMG.[211] However, MISO's Tariff does not appear to include a mechanism by which an Eligible Customer, on behalf of Eligible Load, would be charged for ancillary services commensurate with its usage of such services, particularly if such customer did not withdraw energy from the transmission system.

100. Therefore, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not address whether and how Eligible Customers taking one of the new transmission services on behalf of Eligible Loads will be charged for their use of regulation and black start services, which introduces the risk that Eligible Load may benefit from regulation and black start services without contributing to cost recovery for such services. As noted in the PJM Co-Location Order, this introduces the risk that costs may be allocated entirely to other transmission customers and passed through to

[209] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 183.

[210] *Id.* PP 184-185.

[211] *See* PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 400.

residential customers, among others.[212] MISO should explain whether the Tariff remains just and reasonable without requiring Eligible Customers taking one of the new transmission services on behalf of Eligible Loads to pay for regulation and black start services on a gross demand basis, or propose Tariff revisions that require them to do so.

101. The Commission also found in the PJM Co-Location Order that Eligible Customers taking transmission service on behalf of co-located loads are willing and able to limit their energy withdrawals from the transmission system under certain conditions. As such, the Commission found that Eligible Customers taking transmission service on behalf of co-located loads should be allowed to choose a transmission service that aligns with their use of the transmission system and therefore aligns the charges for service with the benefits received.[213] On rehearing, the Commission found that it is just and reasonable for these services to be available to Eligible Customers taking transmission service on behalf of loads with BTMG.[214] We are concerned that MISO's Tariff lacks transmission services that would reflect the ability of Eligible Customers on behalf of Eligible Loads to take transmission services that align with their use of the transmission system, which may result in inefficient and costly transmission buildout and costs paid by transmission customers.[215]

102. Therefore, we also preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not include transmission services that reflect Eligible Customers taking transmission service on behalf of Eligible Load that are willing and able to limit their use of the transmission system under certain conditions. MISO should explain whether the Tariff remains just and reasonable without the transmission services described by the Commission in the PJM Co-Location Order, with regional variation as appropriate, being available to Eligible Customers taking transmission service on behalf of Eligible Load, or propose appropriate Tariff revisions. Specifically, MISO should explain whether the Tariff remains just and reasonable without (1) an interim non-firm network transmission service while Network Upgrades are being constructed (i.e., interim NITS) and (2) permanent firm and non-firm contract demand

---

[212] *See* PJM Co-Location Order, 193 FERC ¶ 61,217 at P 159.

[213] *Id.* P 199.

[214] PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at PP 101-103.

[215] *See, e.g.*, PSEG November 21 ANOPR Comments at 20 ("The Commission's long-standing policy is to encourage reduced use of the transmission system, which would in turn reduce upgrades to the transmission system, to the benefit of all transmission customers. For instance, if a co-located load's use of the transmission system is limited (or to a lesser degree) than other traditional in front of the meter loads, it should be responsible for costs based on its limited use.").

transmission services (transmission service up to a specified MW quantity, i.e., the contract level, on a firm or non-firm basis). Finally, we note that the Commission has found it just and reasonable that, in order for an Eligible Customer to take interim NITS, firm contract demand transmission service, and non-firm contract demand transmission service, an Eligible Customer must have necessary control technologies and/or protection systems, which may include a special protection scheme, to limit its energy withdrawals to its approved level.[216]

### D. Extending New Transmission Services to Eligible Customers Taking Service on Behalf of Flexible Large Loads

103. In response to the ANOPR, a number of commenters argue that certain large loads are able to limit their withdrawals from the transmission system under certain conditions. Namely, commenters observe that flexible large loads[217] can quickly and verifiably adjust their consumption in response to system conditions or price signals.[218] Commenters in the ANOPR also observe that, where load studies and system planning consider the flexible nature of large loads, flexible large loads can potentially defer or reduce the need for Network Upgrades, among other potential benefits.[219] In recognition of this flexibility, many commenters support new transmission services that reflect the

---

[216] PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 480.

[217] For purposes of this order, "flexible" large loads are a subset of large loads, as used in this order, that are not co-located with generation, but are willing and able to limit their energy withdrawals from the transmission system under certain conditions.

[218] *See, e.g.*, AEMA November 21 ANOPR Comments at 1-2; Land Trust Alliance November 21 ANOPR Comments at 10; California DWR November 21 ANOPR Comments at 5; CEBA November 21 ANOPR Comments at 14-15; ClearPath November 21 ANOPR Comments at 2-4; Digital Energy Council November 21 ANOPR Comments at 1; EDF Power November 21 ANOPR Comments at 4; Emerald November 21 ANOPR Comments at 2; Verrus November 21 ANOPR Comments at 4.

[219] *See, e.g.*, AEMA November 21 ANOPR Comments at 5; ELCON November 21 ANOPR Comments at 9; Emerald November 21 ANOPR Comments at 6-7; Institute for Progress November 21 ANOPR Comments at 11; Land Trust Alliance November 21 ANOPR Comments at 10; LS Power November 21 ANOPR Comments at 5; Microsoft November 21 ANOPR Comments at 10-11; National Grid November 21 ANOPR Comments at 19-20; OMS November 21 ANOPR Comments at 13-14; Southeast PIOs November 21 ANOPR Comments at 50.

operational capabilities of flexible large loads, including interim NITS while Network Upgrades are constructed, and non-firm transmission service.[220]

104. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not include transmission services that reflect Eligible Customers taking transmission service on behalf of flexible large loads that are willing and able to limit their use of the transmission system under certain conditions. The transmission services available to Eligible Customers, including on behalf of flexible large loads, in MISO are NITS and firm and non-firm Point-To-Point Transmission Service.[221] While these remain just and reasonable options for an Eligible Customer to take on behalf of a flexible large load, based on the record before us, we preliminarily find that new transmission services should be available to reflect the operational reality that large loads may use the transmission system to differing extents and certain large loads are willing and able to limit their use of the transmission system under certain conditions.[222] As explained above, the Commission found that Eligible Customers taking transmission service on behalf of Eligible Load should be allowed to choose a transmission service that aligns with their use of the transmission system and therefore aligns the charges for service with the benefits received.[223] As the record suggests, Eligible Customers taking transmission service on behalf of flexible large load also may be willing and able to limit their use of the transmission system under certain conditions. As recognized in the ANOPR record, load flexibility can avoid inefficient and costly transmission system build-out.[224] In addition, transmission services that reflect that flexible large loads are willing and able to limit their withdrawals from the transmission system under certain

---

[220] *See, e.g.*, Constellation November 21 ANOPR Comments at 24-25; Calibrant November 21 ANOPR Comments at 2-4; Critical Loop November 21 ANOPR Comments at 2; Digital Power Network November 21 ANOPR Comments at 3; PIOs November 21 ANOPR Comments at 27-28; Splight November 21 ANOPR Comments at 3-4.

[221] See *supra* P 22 (describing existing transmission services in MISO).

[222] *See supra* P 103.

[223] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 199; PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 103.

[224] *See supra* P 103; *see also* PJM Co-Location Order, 193 FERC ¶ 61,217 at PP 160, 177, 199 (finding that new transmission service options reflect a co-located load's ability to limit withdrawals from the transmission system and potentially avoid costly and inefficient transmission system buildout that may not be necessary).

conditions could help timely interconnect flexible large loads.[225] Entities in the MISO footprint acknowledge the importance of facilitating load flexibility.[226]

105. Therefore, we are concerned that MISO's Tariff does not include transmission services that reflect the use of the transmission system by Eligible Customers on behalf of flexible large load, on both an interim and permanent basis. MISO should explain whether the Tariff remains just and reasonable without the transmission services described by the Commission in the PJM Co-Location Order, with regional variation as appropriate, being available to Eligible Customers taking transmission service on behalf of flexible large loads, or propose appropriate Tariff revisions. Specifically, MISO should explain whether the Tariff remains just and reasonable without (1) an interim non-firm network transmission service while Network Upgrades are being constructed (i.e., interim NITS) and (2) permanent firm and non-firm contract demand transmission services (transmission service up to a specified MW quantity, i.e., the contract level, on a firm or non-firm basis). Finally, we note that the Commission has found it just and reasonable that, in order for an Eligible Customer to take interim NITS, firm contract demand transmission service, and non-firm contract demand transmission service, an Eligible Customer must have necessary control technologies and/or protection systems, which may include a special protection scheme, to limit its energy withdrawals to its approved level.[227]

### E. <u>Interconnection Customers Serving Electrically Proximate Large Load and Co-Located Load</u>

106. In response to the ANOPR, a number of commenters agree that the ability to study new load and new generation together, when physically or electrically proximate, presents system benefits and can help address the challenges posed by large load

---

[225] *See supra* P 103; *see also* PJM Co-Location Order, 193 FERC ¶ 61,217 at PP 201 (finding that the interim, non-firm transmission service will facilitate the "timely" provision of transmission service and that "[t]his willingness to curtail would potentially allow them to obtain service more quickly"), 205 (recognizing that parties argue that co-located loads may be able to receive transmission service faster with use of a new, limited transmission service product than they would if they selected NITS, to the extent that providing NITS would require Network Upgrades that the limited transmission service would not).

[226] *See, e.g.*, OMS November 21 ANOPR Comments at 13 ("[E]nabling load flexibility is critical to accelerating the interconnection of large loads while maintaining a reliable and affordable grid for existing customers.").

[227] PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 480.

additions.[228] Commenters argue that studies that consider large load and generation together present a more complete picture of the grid and can enable the identification of more accurate, efficient, and cost-effective transmission solutions by minimizing system impacts.[229] As a result, this can speed up the interconnection process for both large loads and generation, and shorten energization timelines,[230] which commenters contend reduces uncertainty for both parties[231] and "is necessary to match the pace of AI innovation in the United States."[232] CEBA also highlights that cost and timeline factors drive developers to submit multiple requests for price and timing discovery, which inflates queue volumes, distorts demand and supply forecasts, and causes significant delays when projects withdraw late after finding costs or energization timelines uneconomic.[233] Other benefits to a joint study identified by commenters include improving load forecasting and siting decisions[234] and reducing the need for critical supply chain components.[235]

---

[228] *See e.g.*, DCC November 21 ANOPR Comments at 5-6; DTE November 21 ANOPR Comments at 11; Google November 21 ANOPR Comments at 7; International Energy Credit Association November 21 ANOPR Comments at 10; Terraflux November 21 ANOPR Comments at 1.

[229] AEU November 21 ANOPR Comments at 13; ClearPath November 21 ANOPR Comments at 4; DCC November 21 ANOPR Comments at 5; DTE November 21 ANOPR Comments at 8-11; ENGIE November 21 ANOPR Comments at 6; Entergy November 21 ANOPR Comments at 5; Geronimo November 21 ANOPR Comments at 17-18; Information Technology Industry Council November 21 ANOPR Comments at 2.

[230] DCC November 21 ANOPR Comments at 5; DTE November 21 ANOPR Comments at 8-11; Information Technology Industry Council November 21 ANOPR Comments at 2; Microsoft November 21 ANOPR Comments at 8-9; Verrus December 5 ANOPR Comments at 9.

[231] ClearPath November 21 ANOPR Comments at 4; CEBA November 21 ANOPR Comments at 8.

[232] Microsoft November 21 ANOPR Comments at 8-9.

[233] CEBA November 21 ANOPR Comments at 8.

[234] ELCON November 21 ANOPR Comments at 5; Maryland Commission November 21 ANOPR Comments at 6-7.

[235] AEU November 21 ANOPR Comments at 13.

107. Commenters contend that current generator interconnection study processes may not adequately capture generation and load, including by failing to model known electrically proximate large load in base case assumptions, which may result in inaccurate studies and inefficient system build-out.[236] For example, Eolian states that in its experience developing a project in PJM, the failure of the generator interconnection study process to reflect reasonably expected load conditions on the grid models triggered overly costly Network Upgrades and caused the cancellation of generation project that could have reliably served adjacent load growth.[237]

108. Commenters in the ANOPR proceeding argue that the current state of the generator interconnection queue is not meeting the expeditious time frame needed to match the pace of large load additions and ensure the safe and reliable interconnection of these loads.[238] For example, Oracle states that one of the most significant and widespread delays it encounters when siting data centers in the U.S. is access to sufficient energy.[239] Similarly, Helion contends that more than half of U.S. developers now identify interconnection delays as the single biggest barrier to adding new generation capacity.[240] Commenters contend that if large load interconnection proceeds more quickly than new generation can come online, the result could be price increases for consumers.[241]

---

[236] Base Power November 21 ANOPR Comments at 7; Eolian November 21 ANOPR Comments at 18-19; Eolian May 19 ANOPR Comments at 2; Longroad November 21 ANOPR Comments at 8.

[237] Eolian May 19 ANOPR Comments at 10.

[238] *See, e.g.*, AEP December 5 ANOPR Comments at 1; DCC November 21 ANOPR Comments at 8; esVolta November 21 ANOPR Comments at 11-12; Oracle May 1 ANOPR Comments at 4.

[239] Oracle November 21 ANOPR Comments at 1.

[240] Helion November 21 ANOPR Comments at 1 (citing Third Way, *Picking Up the PACE: A Comprehensive Analysis of Available Pathways to Accelerating Clean Energy (PACE)* (Nov. 2025)).

[241] AEP December 5 ANOPR Comments at 1-2; OPSI November 21 ANOPR Comments at 6-7, 11.

109. A number of commenters support expedited interconnection studies for new generation paired with load.[242] Some commenters argue that one solution to generator interconnection delays may be the creation of time-limited or conditional interconnection service for generators serving large loads, which could require less time for initial generator interconnection studies and improve speed to power.[243] For example, several commenters express support for SPP's HILLGA proposal as a model and urge the Commission to establish nationwide rules similar to that approach.[244] Other commenters suggest reforms to expedite studies for new generation paired with large loads at existing points of interconnection that have already been studied, arguing it is unjust and unreasonable not to fully utilize existing infrastructure and proven reliability paths while new load waits for service.[245]

### 1. <u>Jurisdiction</u>

110. The Commission's statutory authority includes jurisdiction over the wholesale sale and transmission of electricity in interstate commerce, including the facilities used for such sale and transmission.[246] The Commission also has exclusive jurisdiction to regulate the procedures and agreements applicable to generating facilities seeking to interconnect to a Commission-jurisdictional distribution facility or transmission facility.[247] In the PJM Co-Location Order, the Commission observed that a generator's

---

[242] *See, e.g.*, DTE November 21 ANOPR Comments at 8; ENGIE November 21 ANOPR Comments at 4; International Energy Credit Association November 21 ANOPR Comments at 8; Meta November 21 ANOPR Comments at 5-6; Ohio FEA November 21 ANOPR Comments at 5.

[243] AEP December 5 ANOPR Comments at 12; AEU November 21 ANOPR Comments at 13; Google December 5 ANOPR Comments at 15; *see also* Duke November 21 ANOPR Comments at 21-22.

[244] AEP December 5 ANOPR Comments at 4; Crusoe December 5 ANOPR Comments at 7; Enchanted Rock November 21 ANOPR Comments at 4; Google November 21 ANOPR Comments at 7; GridStor November 21 ANOPR Comments at 5; Verrus November 21 ANOPR Comments at 9.

[245] Constellation June 5 ANOPR Comments at 8-9.

[246] 16 U.S.C. § 824(b)(1).

[247] *Id.*; *Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d at 1280-82 (affirming Order No. 2003 and observing that "interconnections appear to be relationships between parties with respect to electricity flowing over facilities. . . . By establishing standard agreements [the Commission] has exercised its jurisdiction over the *terms* of those relationships."); *see Pac. Gas & Elec. Co.*, 115 FERC ¶ 61,193 at P 36

interconnection to the interstate transmission system "does not fall outside of the Commission's jurisdiction merely because there is [c]o-[l]ocated [l]oad behind the generator's point of interconnection."[248] By the same token, the Commission retains jurisdiction over a generator's interconnection even where the generator plans to serve an electrically proximate large load.

111. We recognize that states have exclusive authority over resource planning and the generation mix within their boundaries.[249] Nothing about our preliminary finding here, however, intrudes or is intended to intrude on that exclusive authority. Rather, we preliminarily find that it is necessary and appropriate to exercise our exclusive jurisdiction over generator interconnection to ensure the availability of generator interconnection processes specifically tailored to the unique operational characteristics of generating facilities dedicated to serving electrically proximate large loads and co-located loads, as defined below. The Commission has exercised this jurisdiction previously in requiring generator interconnection services that allow certain generating facilities to interconnect more quickly through the use of provisional interconnection service and surplus interconnection service,[250] and has approved interconnection processes that allow certain generating facilities to interconnect more quickly by replacing a retiring existing generating facility.[251]

---

("[I]interconnection is part and parcel of transmission of electric energy in interstate commerce, and thus interconnection service is part and parcel of jurisdictional transmission service.").

[248] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 171.

[249] *See, e.g.*, *Citizens Action Coal. of Ind., Inc. v. FERC*, 125 F.4th at 238 (citing 16 U.S.C. § 824(b)(1)).

[250] *Reform of Generator Interconnection Procs. & Agreements*, Order No. 845, 163 FERC ¶ 61,043, at PP 438, 467 (2018), *order on reh'g & clarification*, Order No. 845-A, 166 FERC ¶ 61,137, *order on reh'g & clarification*, Order No. 845-B, 168 FERC ¶ 61,092 (2019); Order No. 2023, 184 FERC ¶ 61,054 at P 1436; *PJM Interconnection, L.L.C.*, 190 FERC ¶ 61,083 (2025).

[251] *See, e.g.*, *PJM Interconnection, L.L.C.*, 194 FERC ¶ 61,079 (2026); *Midcontinent Indep. Sys. Operator Inc.*, 167 FERC ¶ 61,146 (2019).

### 2. Definitions

112. For purposes of this order, it appears to be reasonable to use the term "electrically proximate large load" to mean a large load, as defined in this order,[252] that is sufficiently electrically close to the interconnection customer's requested point of interconnection, such that the impact on the transmission system of the combination of the generating facility and the load, with the exception of the transmission facilities between the two, will be effectively the same as if they were located at the same substation (e.g., large load that is located no more than two substations away from the generating facility). We will consider proposed revisions to this definition that ensure it is appropriately tailored to MISO's transmission system.

### 3. Tariff Provisions

113. We preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it does not contain provisions allowing an interconnection customer to seek the generator interconnection service(s) that reflects the operational dynamics of serving either: (1) an electrically proximate large load; or (2) a co-located load, as defined in this order,[253] that has a high peak load (i.e., large co-located loads that are 50 MW or greater).[254] Specifically, we preliminarily find that MISO's Tariff appears to be unjust and unreasonable because it lacks a generator interconnection study process and/or generator interconnection service to reflect an interconnection customer's commitment in an interconnection agreement to limit the generating facility's output to minimize the impact on the transmission system while serving an electrically proximate large load or large co-located load. We are concerned that MISO's Tariff lacks, for example, generator interconnection study procedures and generator interconnection services that reflect (a) an interconnection customer's commitment in an interconnection agreement to limit a generating facility's output to match the hourly forecast of an electrically proximate large load or large co-located load; and/or (b) a generating facility with necessary control technologies and/or protection systems, which may include a special protection scheme,[255] that ensure that the injection does not exceed the limit in the existing or new interconnection agreement. Where a generating facility's output is matched to the demand of the electrically proximate large load or large co-located load or if the generating facility's output is limited to ensure no new injection, the impacts to the

---

[252] *See supra* P 58.

[253] *See supra* P 89.

[254] We note that generator interconnection service in and of itself does not convey transmission service.

[255] *See* PJM Co-Location Rehearing Order, 195 FERC ¶ 61,209 at P 480.

transmission system of interconnecting the generating facility to serve that electrically proximate large load or large co-located load may be limited,[256] thereby potentially reducing the need for Network Upgrades, which can accelerate the generator interconnection process.[257] In the absence of Tariff provisions accounting for these operational dynamics when an interconnection customer's generating facility is serving electrically proximate large loads or large co-located loads, new shovel-ready generating facilities may face unnecessary delays in reaching commercial operation under current generator interconnection processes and will be unable to serve the immediate demand of new large loads or large co-located loads.[258]

114. As commenters in the ANOPR proceeding have recognized, the status quo may result in inefficient and unnecessary development of infrastructure, which leads to

---

[256] In other words, because the generating facility and load are located so closely on the transmission system, if the generating facility's output matches the load's demand, then the transmission provider would need to study only the local impacts because the impact on the transmission system of the combination of the generating facility and the load, with the exception of the transmission facilities between the two, will be effectively the same as if they were located at the same substation.

[257] *See, e.g.*, AEU November 21 ANOPR Comments at 13 ("To the extent that a new large load and new generation or storage resource are geographically and electrically proximate, studying them together would reduce network upgrades, lower costs, and reduce the need for critical supply chain components."); DTE November 21 ANOPR Comments at 10 (integrating the study of load and its supporting generation "reduces the need for network upgrades, optimizes the use of existing infrastructure, and accelerates the timeline for bringing both load and generation online"); Eolian November 21 ANOPR Comments at 18 ("It is obvious from basic engineering principles that generation located near load requires less transmission infrastructure to serve that load than generation located distant from load."); GridStor November 21 ANOPR Comments at 5 ("Siting a large load near or at the same point of interconnection as a new generating facility could reduce the network upgrades needed to interconnect only the load or only the generating facility.").

[258] *See* AEP December 5 ANOPR Comments at 1; Base Power November 21 ANOPR Comments at 7; CEBA November 21 ANOPR Comments at 8; DCC November 21 ANOPR Comments at 6 (asserting that a clear framework to study large loads paired with generation would resolve development bottlenecks); Eolian November 21 ANOPR Comments at 18-19; Eolian May 19 ANOPR Comments at 2; Google November 21 ANOPR Comments at 7 (calling for nationwide rules enabling proximate load-generation interconnection to "accelerate the pace at which new generation comes online"); Longroad November 21 ANOPR Comments at 8.

unnecessarily higher network upgrade costs that may result in unjust and unreasonable rates.[259] The Commission has already determined in the PJM Co-Location Order that without the new transmission services that reflect the operational dynamics of co-location arrangements, there could be unnecessary, costly, and inefficient Network Upgrades, increasing Network Upgrade costs.[260] The same result may occur in the absence of new generator interconnection study procedures and generator interconnection services tailored to a new generating facility coming online for the express purpose of serving an electrically proximate large load or large co-located load.[261]

115. SPP recognized this problem and submitted an FPA section 205 filing to implement a new, interim, generator interconnection service and related generator interconnection process, HILLGA, to facilitate the prompt interconnection of generating facilities that are specifically identified for and limited to serving a HILL, which the Commission accepted.[262] The Commission found that HILLGA "reasonably provides a flexible, expedited, and separate serial interconnection process that will facilitate the prompt interconnection of generating facilities that are limited to serving a HILL in the same local area."[263] We do not expect or propose that MISO adopt an identical process to SPP's HILLGA process, nor do we preliminarily find that the absence of Tariff provisions specifically mirroring SPP's Tariff renders MISO's Tariff unjust and unreasonable. Nevertheless, we remain concerned that the Tariff may be unjust and unreasonable without *any* uniquely tailored interconnection study process and/or generator interconnection service to recognize the reduced transmission system impacts

---

[259] *See, e.g.*, AEU November 21 ANOPR Comments at 13, AEP December 5 ANOPR Comments at 1-2; Longroad November 21 ANOPR Comments at 8; OPSI November 21 ANOPR Comments at 11.

[260] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 177 ("[F]or Eligible Customers taking service on behalf of Co-Located Loads that do not reserve transmission . . . requiring such Eligible Customers to take NITS on behalf of these Co-Located Loads may in some circumstances result in costly and inefficient transmission system buildout that may not be necessary if such Eligible Customers are willing and able to take a transmission service that requires fewer Network Upgrades to provide, and therefore may result in lower Network Upgrade costs, than would NITS.").

[261] *See* AEP December 5 ANOPR Comments at 1-2 (stating that current processes produce insufficient/inefficient infrastructure and "potentially unsustainable price increases"); Eolian May 19 ANOPR Comments at 2, 10 (contending that a lack of coordinated study leads to unjust and unreasonable outcomes).

[262] SPP HILL Order, 194 FERC ¶ 61,031.

[263] *Id.* P 64.

that may result from the interconnection of a generating facility where the interconnection customer has committed, in an interconnection agreement, to limit the generating facility's output to match the hourly forecast of an electrically proximate large load or large co-located load.[264] To the extent that the interconnection customer's generating facility is serving an electrically proximate large load, we believe that the generator interconnection service should be of an interim nature until the interconnection customer obtains Energy Resource Interconnection Service (ERIS) or Network Resource Interconnection Service (NRIS). To the extent that the interconnection customer's generating facility is serving a large co-located load, it may be reasonable for the generator interconnection service to be permanent because there will be no injections onto the transmission system and therefore it does not present operational or planning risks for reliability.

116. Another potentially reasonable approach to address our concerns could be to develop a generator interconnection study process that would allow the use of existing ERIS or NRIS of an existing generator to connect a new generating facility and a new large load behind the same point of interconnection of the existing generator with necessary control technologies and/or protection systems, which may include a special protection scheme, that ensure that the net injection does not exceed the amount in the existing generator interconnection agreement.[265] Such an approach could expedite the interconnection study process for a generator planning to serve an electrically proximate (in this case at the same point of interconnection) large load.[266] An additional potentially reasonable approach could be a new load-limited generator interconnection service that allows a new generating facility and new large co-located load seeking to interconnect behind the *same* new point of interconnection, with necessary control technologies and/or

---

[264] While, as discussed above, we view such a process that permits generation to serve electrically proximate loads no more than two substations away from the generators to be reasonable, we understand the unique features of MISO's transmission system may warrant consideration of a more limited definition of electrically proximate. *See* Duke November 21 ANOPR Comments at 21-22; DTE November 21 ANOPR Comments at 8-11 (asserting that studying large loads with electrically proximate generation streamlines interconnection and reduces upgrades); AEU November 21 ANOPR Comments at 13-15.

[265] *See* Constellation June 5 ANOPR Comments at 1-2, 10-13.

[266] *See id.* at 5 (explaining that when new generation load pairings "are sited at an existing generator's Point of Interconnection and fall within the same study parameters reflected by that existing generator's interconnection, they benefit from studies and upgrades already completed for that existing generator and can come on more rapidly without jeopardizing reliability").

protection systems, which may include a special protection scheme, to ensure that there is no injection to the transmission system.[267] It may be reasonable for such a load-limited generator interconnection service to be or not to be of an interim nature. We invite MISO and/or Transmission Owners, in responding to this order or in an FPA section 205 filing, to submit original proposals designed to address the concerns expressed herein and tailored to their unique circumstances.

117. We are concerned that the absence of generator interconnection study procedures and generator interconnection services facilitating the interconnection of a new generating facility that is being brought onto the transmission system in order to serve an electrically proximate large load or large co-located load will result in MISO's current generator interconnection process failing to keep pace with the new large loads seeking to be integrated onto MISO's transmission system.[268] We preliminarily find that this outcome may be unjust and unreasonable because reliance on MISO's current generator interconnection processes for generating facilities serving electrically proximate large loads or large co-located loads could result in unnecessary interconnection delays, unnecessary Network Upgrades, and an otherwise inefficient expansion of the transmission system, imposing unnecessary delays and costs on transmission customers.

118. MISO should explain whether the Tariff remains just and reasonable without, for example, provisions that establish: (1) a new generator interconnection study process and new interim generator interconnection service that reflect an interconnection customer's commitment, in a generator interconnection agreement, to limit a generating facility's output to match the hourly forecast of an electrically proximate large load or large co-located load; or (2) a generator interconnection study process that allows the use of the existing ERIS or NRIS of an existing generator to connect a new generating facility and a new large load behind the same point of interconnection of the existing generator with necessary control technologies and/or protection systems, which may include a special protection scheme, that ensures that the net injection does not exceed the amount in the existing generator interconnection agreement; or (3) a new generator interconnection service that allows a new generating facility and new large co-located load seeking to interconnect behind the same new point of interconnection with necessary

---

[267] *See* MISO November 21 ANOPR Comments at 13; *see also* MISO TOs April 3 ANOPR Comments at 13-14.

[268] *See* Helion November 21 ANOPR Comments at 1 (noting interconnection delays are the biggest barrier to adding new generation); Oracle November 21 ANOPR Comments at 1 (noting significant delays in access to sufficient energy for data centers); OPSI November 21 ANOPR Comments at 11 (explaining that expedited study encourages loads to bring their own generation); Enchanted Rock November 21 ANOPR Comments at 4; Microsoft November 21 ANOPR Comments at 8-9.

control technologies and/or protection systems, which may include a special protection scheme, to ensure that there is no injection to the transmission system. We note that, with respect to numbers (2) or (3), these approaches could be either interim or permanent. These approaches may not be mutually exclusive.

119. Given that generator interconnection service in and of itself does not convey transmission service, we encourage MISO to consider, in responding to these concerns, what type of transmission service an Eligible Customer will need to take on behalf of the electrically proximate large load or large co-located load.[269] We note that, in the PJM Co-Location Order, the Commission found that the Eligible Customer must take transmission service on behalf of co-located load that will not withdraw energy from the transmission system, even if it is 0 MW.[270]

### F. Informational Report

120. The rapid addition and proliferation of large loads without commensurate additions of supply or demand-side resources presents resource adequacy concerns. As discussed above and highlighted in the ANOPR, the growth of demand, and the speed of such growth, is driven in large part by the interconnection of large loads. While not expressly contemplated in the ANOPR, commenters highlight the strain rapid demand growth is putting on resource adequacy in many regions.[271] Indeed, the relative speed and concentration at which large loads are seeking to interconnect appears to be outpacing the addition of new generation, which in turn heightens reliability risks and drives up costs to ratepayers.[272] We are concerned that MISO and load serving entities are unable to plan adequate generation to serve all load at the pace such load seeks to connect.

---

[269] *See* SPP HILL Order, 194 FERC ¶ 61,031 at P 34.

[270] PJM Co-Location Order, 193 FERC ¶ 61,217 at P 206.

[271] *See, e.g.*, Entergy November 21 ANOPR Comments at 29-30; Eolian November 21 ANOPR Comments at 16-17; Industrial Customers November 21 ANOPR Comments at 24-26; R Street November 21 ANOPR Comments at 1; South Dakota Commission November 13 ANOPR Comments at 5; Talen December 5 ANOPR Reply Comments at 7.

[272] *See, e.g.*, Eolian November 21 ANOPR Comments at 16-17; David Gardiner & Associates November 21 ANOPR Comments at 1-2; Joint Consumer Advocates December 5 ANOPR Comments at 2; PSEG November 21 ANOPR Comments at 8; Southern California Edison December 5 ANOPR Comments at 3.

121. We recognize that RTOs/ISOs are engaging in efforts to more rapidly interconnect generation that is needed to serve this unprecedented growth in load. In particular, MISO's Expedited Resource Addition Study process and Joint Targeted Interconnection Queue with SPP have provided pathways for more efficient interconnection for generation.[273] While we are encouraged by the implementation of such processes to ensure resource adequacy and faster interconnection, we remain concerned that these efforts may fall short in light of generator retirements and tightening supply conditions.

122. Accordingly, we direct MISO to submit in Docket No. EL26-70-000, within 30 days of the date of issuance of this order, a detailed informational report on any proposals under consideration in its stakeholder process to address the issue of resource adequacy to serve new large loads. We also strongly encourage new proposals to the extent necessary to address these concerns. The informational report must include a detailed schedule of key milestones, such as stakeholder or MISO Board votes, that includes the estimated date on which MISO expects to file any such proposals with the Commission. Additionally, as part of this informational report, we direct MISO to identify any ongoing stakeholder processes that aim to increase the pace of adding generating capacity in the MISO region. The informational report must include a detailed schedule of such initiatives, including timing of the stakeholder process and dates of any anticipated filings with the Commission.

## IV. <u>Briefing Questions</u>

123. We note that large loads, including data centers, are actively working with transmission owners and other relevant entities to interconnect to, and to take interconnection and/or transmission service from, the transmission system and may be at varying stages of that process. We appreciate that different large loads are currently at different stages of that process. We also understand that large loads and Eligible Customers taking transmission service on behalf of large loads are negotiating, entering into, and/or have executed various agreements related to interconnecting to the transmission system and/or the provision of transmission service. We direct further briefing regarding how MISO and the Transmission Owners, in responding to the order to show cause, should protect existing commercial arrangements including: (1) what would be a reasonable implementation period to ensure minimal disruption to such existing commercial arrangements, and (2) how to allow a reasonable amount of time to finalize ongoing agreements that are nearing completion as of the date such Tariff provisions are filed with the Commission.

124. Today's order proposes, as part of a potential replacement rate, to establish new transmission services that recognize flexible large loads' ability and willingness to limit

---

[273] MISO November 21 ANOPR Comments at 6-7.

their use of the transmission system under certain conditions. As we assess this proposal, we also consider how these new transmission services might affect other parts of MISO's Tariff and/or processes. Specifically, what, if any, potential impacts on regional and local transmission planning would arise from the introduction of the new transmission services discussed herein? For example, when planning for load growth, how would transmission providers and planners account for flexible large loads' potential preference to take the new transmission services, including potential uncertainties around the type, location, and quantity of such expected loads?

125. Today's order preliminarily finds that MISO's Tariff appears to be unjust and unreasonable without the inclusion of cost shifting protections. We find that there may be a variety of possible approaches to protect customers from significant cost shifts associated with Network Upgrades triggered by large loads. To that end, we direct respondents to include information regarding potential structures for agreements between the transmission owner/provider and an Eligible Customer to prevent unjust and unreasonable cost shifts among transmission customers related to Network Upgrade costs required for large loads. Further, please include information on what an appropriate minimum level of cost recovery and financial security from an Eligible Customer would be under any such agreements.

126. Today's order preliminarily finds that MISO's Tariff appears to be unjust and unreasonable because it lacks clear and consistent provisions requiring the evaluation of alternative transmission technologies. The order directs MISO to explain whether the Tariff remains just and reasonable without provisions that (1) require the evaluation of alternative transmission technologies in transmission service request studies, using models that are capable of evaluating the transmission system to accurately account for advanced transmission technologies, in all instances, without the need for a request from the Eligible Customer seeking transmission service on behalf of large load; and (2) if traditional Network Upgrades are selected instead of alternative transmission technologies, inclusion in the study report to the Eligible Customer seeking transmission service on behalf of large load of a sufficiently clear demonstration of why alternative transmission technologies are not feasible (i.e., would not resolve reliability violations identified or meet the relevant planning criteria) or would not result in lower costs or a faster timeline for accommodating the transmission service request. As noted above, to the extent stakeholders believe that specific characteristics of providing transmission service to Eligible Customers on behalf of large loads warrant requirements beyond those contemplated here, we seek further briefing.

127. Today's order preliminarily finds that MISO's Tariff appears to be unjust and unreasonable because it does not contain provisions allowing an interconnection customer serving electrically proximate large load or large co-located load to seek generator interconnection service(s) that reflects the operational dynamics of serving such

loads. Any filings or tariff changes submitted in response to this order should address the following questions:

a. To what extent would MISO allow an interconnection customer's generating facility serving electrically proximate large load or large co-located load to participate in MISO's energy and ancillary services market, and if MISO were to allow them to participate, what restrictions or mitigation would MISO apply?

b. To the extent that MISO plans for the electrically proximate large load or large co-located load associated with an interconnection customer's generating facility for resource adequacy purposes, would MISO account for the generating facilities serving electrically proximate large load or large co-located load in the resource adequacy construct? If applicable, would MISO allow the generating facilities serving electrically proximate large load or large co-located load to participate in MISO's capacity market? If so, would MISO accredit these generating facilities using the same method as other MISO generating facilities?

The Commission orders:

(A) Pursuant to the authority contained in and subject to the jurisdiction conferred upon the Federal Energy Regulatory Commission by section 402(a) of the Department of Energy Organization Act and by the FPA, particularly section 206 thereof, and pursuant to the Commission's Rules of Practice and Procedure and the regulations under the FPA (18 C.F.R. Chapter I), the Commission hereby institutes a proceeding in Docket No. EL26-70-000 as discussed in the body of this order.

(B) MISO and the Transmission Owners are hereby directed, within 60 days of the date of the order, either: (1) to show cause as to why the Tariff remains just and reasonable and not unduly discriminatory or preferential; or (2) to explain what changes to the Tariff they believe would remedy the identified concerns if the Commission were to determine that the Tariff has in fact become unjust and unreasonable or unduly discriminatory or preferential and, therefore, proceeds to establish a replacement Tariff.

(C) MISO is directed to submit an informational report within 30 days of the date of issuance of this order, as discussed in the body of this order.

(D) Any interested person desiring to be heard in Docket No. EL26-70-000 must file a notice of intervention or motion to intervene, as appropriate, with the Federal Energy Regulatory Commission, 888 First Street, NE, Washington, DC 20426, in accordance with Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2025), within 21 days of the date of issuance of this order. The Commission encourages electronic submission of interventions in lieu of paper using the

"eFiling" link at http://www.ferc.gov. Persons unable to file electronically may file by U.S. mail addressed to Federal Energy Regulatory Commission, Secretary of the Commission, 888 First Street, N.E., Washington, DC 20426, or by hand (including courier) delivery to Federal Energy Regulatory Commission, 12225 Wilkins Avenue, Rockville, MD 20852.

(E) Interested entities may respond within 30 days of MISO's and the Transmission Owners' filing, addressing either or both of: (1) whether the Tariff remains just and reasonable and not unduly discriminatory or preferential; and (2) if not, what changes to the Tariff should be implemented as a replacement rate.

(F) The Secretary shall promptly publish in the Federal Register a notice of the Commission's initiation of the proceeding under section 206 of the FPA in Docket No. EL26-70-000.

(G) The refund effective date in Docket No. EL26-70-000 pursuant to section 206 of the FPA shall be the date of publication in the Federal Register of the notice discussed in Ordering Paragraph (F) above.

By the Commission. Chairman Swett is concurring with a separate statement attached.
Commissioner Rosner is concurring with a separate statement attached.
Commissioner See is concurring with a separate statement attached.
Commissioner Chang is concurring with a separate statement attached.
Commissioner LaCerte is concurring with a separate statement attached.

( S E A L )

Carlos D. Clay,
Deputy Secretary.

## Appendix - Commenters in Docket No. RM26-4-000

Advanced Energy Management Alliance (AEMA)
Advanced Energy United (AEU)
Advancing Modern Powerlines Coalition (together with Working for Advanced Transmission Technologies Coalition, WATT and Advancing Modern Powerlines)
Advocates for Consumer Regulated Electricity
AES Corporation (AES)
AI Supply Chain Alliance
Alexandre Figueras, on behalf of Monza Tech
Alliance for Tribal Clean Energy
Alliant Energy Corporate Services, Inc. (Alliant)
Amazon Energy LLC (Amazon)
America's Power
American Chemistry Council
American Clean Power Association
American Conservation Coalition
American Council on Renewable Energy (ACORE)
American Electric Power Service Corporation[274]
American Public Gas Association
American Public Power Association (APPA)
American Terawatt, Inc. (American Terawatt)
American Transmission Company LLC (ATC)[275]
Americans for a Clean Energy Grid
Antora Energy, Inc.
Arevia Power
Arizona Public Service Company
Arkansas Public Service Commission (Arkansas Commission)
Attorney General of the State of Oklahoma

---

[274] American Electric Power Service Corporation submitted comments on behalf of its affiliates Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, Public Service Company of Oklahoma, Southwestern Electric Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., AEP West Virginia Transmission Company, Inc., AEP Oklahoma Transmission Company, Inc., and AEP Southwestern Transmission Company, Inc.

[275] ATC submitted comments on behalf of itself and its corporate manager ATC Management Inc.

Base Power Company, Inc. (Base Power)
Bloom Energy Corporation
Buckeye Power, Inc. (Buckeye)
Calibrant Energy Holdings, LLC (Calibrant)
California Department of Water Resources State Water Project (California DWR)
California Independent System Operator Corporation
California Public Utilities Commission (CPUC)
Center for Biological Diversity
Chevron U.S.A., Inc.
Clean Energy Buyers Association (CEBA)
ClearPath, Inc. (ClearPath)
Confederated Tribes and Bands of the Yakama Nation
Constellation Energy Generation, LLC (Constellation)
Consumer Energy Alliance
Consumers Energy Company
Critical Loop, Inc. (Critical Loop)
Crusoe Energy Systems, Inc. (Crusoe)
CTC Global Corporation
Data Center Coalition (DCC)
David Gardiner & Associates
Delaware Division of the Public Advocate (together with Pennsylvania Office of Consumer Advocate, Joint Consumer Advocates)[276]
Digital Energy Council
Digital Power Network
Distributed Capacity Parties[277]
Dr. Elisa Nelson
DTE Electric Company (DTE)
Duke Energy Corporation (Duke)
EDF Power Solutions, Inc. (EDF Power)
Edison Electric Institute (EEI)
Electricity Consumers Resource Council (ELCON)
Electricity Customers Alliance (ECA)
Electric Power Supply Association (EPSA)
Emerald AI (Emerald)
Enchanted Rock, LLC
Energy New England, LLC

---

[276] The Illinois Attorney General joined the Joint Consumer Advocates in filing reply comments.

[277] Distributed Capacity Parties include: Clovereleaf Infrastructure; Spark Community Investment d/b/a Sparkfund; and Voltus, Inc.

Energy Trading Institute
ENGIE North America, Inc. (ENGIE)
Entergy Services, LLC (Entergy)[278]
Environmental Law & Policy Center
Eolian L.P. (Eolian)
Equinix, Inc.
esVolta, LP
ETX Upstream, LLC
Eversource Energy[279]
Exelon Corporation (Exelon)[280]
Fervo Energy Company (Fervo)
FirstEnergy Service Company[281]
Fluence
Front Door Technologies LLC
FuelCell Energy, Inc.
Georgia Public Service Commission
Geronimo Power, LLC (Geronimo)
Google LLC (Google)
Governors Josh Shapiro and Glenn Youngkin
GridCARE
GridStor LLC (GridStor)
Harvard Electricity Law Initiative

---

[278] Entergy submitted comments on behalf of the Entergy Operating Companies, which include Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, and Entergy Texas, Inc.

[279] Eversource Energy submitted comments on behalf of its affiliates The Connecticut Light and Power Company, NSTAR Electric Company, and Public Service Company of New Hampshire, and through its agent Eversource Energy Service Company.

[280] Exelon submitted comments on behalf of itself and its affiliates Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Commonwealth Edison Company of Indiana, Inc., Delmarva Power and Light Company, PECO Energy Company, and Potomac Electric Power Company.

[281] FirstEnergy Service Company submitted comments on behalf of itself and its affiliates American Transmission Systems, Inc., Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, Keystone Appalachian Transmission Company, The Potomac Edison Company, Monongahela Power Company, and Trans-Allegheny Interstate Line Company.

Helion Energy (Helion)
Herbert Schrayschuen
Heron Power Electronics Company
Indiana Energy Association
Indicated PJM Transmission Owners[282]
Industrial Customer Organizations (Industrial Customers)[283]
Information Technology Industry Council
Infrastructure Masons, Inc. (Infrastructure Masons)
Institute for Progress
International Energy Credit Association
Invenergy[284]

---

[282] Indicated PJM Transmission Owners include: AEP on behalf of Appalachian Power Company, Indiana Michigan Power Company, Kentucky Power Company, Kingsport Power Company, Ohio Power Company, Wheeling Power Company, AEP Appalachian Transmission Company, Inc., AEP Indiana Michigan Transmission Company, Inc., AEP Kentucky Transmission Company, Inc., AEP Ohio Transmission Company, Inc., and AEP West Virginia Transmission Company, Inc.; AMP Transmission, LLC; City of Cleveland, Department of Public Utilities, Division of Cleveland Public Power; City of Hamilton, OH; Dominion Energy Services, Inc. on behalf of Virginia Electric and Power Company d/b/a Dominion Energy Virginia; Duke Energy Corporation on behalf of its affiliates Duke Energy Ohio, Inc., Duke Energy Kentucky, Inc., and Duke Energy Business Services LLC; Duquesne Light Company; East Kentucky Power Cooperative; Exelon Corporation, on behalf of Atlantic City Electric Company, Baltimore Gas and Electric Company, Commonwealth Edison Company, Commonwealth Edison Company of Indiana, Inc., Delmarva Power & Light Company, PECO Energy Company, and Potomac Electric Power Company; FirstEnergy Service Company, as agent for its affiliates American Transmission Systems, Incorporated, Jersey Central Power & Light Company, Mid-Atlantic Interstate Transmission LLC, Keystone Appalachian Transmission Company, The Potomac Edison Company, Monongahela Power Company and Trans-Allegheny Interstate Line Company; Old Dominion Electric Cooperative; PPL Electric Utilities Corporation; Rockland Electric Company; Southern Maryland Electric Cooperative, Inc.; UGI Utilities Inc; and Wabash Valley Power Association, Inc.

[283] Industrial Customers include: The Industrial Energy Consumers of America, the American Forest & Paper Association, the PJM Industrial Customer Coalition, and the Coalition of MISO Transmission Customers

[284] Invenergy includes: Invenergy Wind Development North America LLC, Invenergy Solar Development North America LLC, and Invenergy Thermal Development Holdings LLC.

Iron Mountain Data Centers, LLC
ISO New England, Inc.
ITC Holdings Corp. (ITC)
Kansas Corporation Commission (Kansas Commission)
L. Lynne Kiesling
L.M. Marlowe
Land Trust Alliance
Large Public Power Council
Lauren Hopkins
LEAN Energy US
Load Flexibility Parties[285]
Long Island Power Authority
Longroad Energy Holdings, LLC (Longroad)
Louisiana Public Service Commission (together with the Mississippi Public Service Commission, Louisiana and Mississippi Commissions)
LS Power Development, LLC (LS Power)
Maine Office of the Public Advocate
Maryland Energy Administration
Maryland Public Service Commission
Maven Solutions
MCC Economics and Finance
Meta Platforms, Inc.
Michigan Attorney General Dana Nessel
Microsoft, Inc. (Microsoft)
Midcontinent Independent System Operator, Inc. (MISO)
MISO Transmission Owners (MISO TOs)[286]

---

[285] Load Flexibility Parties include: Enerwise Global Technologies, LLC d/b/a CPower, Enel North America, Inc., and Voltus, Inc.

[286] MISO TOs include: Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois; American Transmission Company LLC; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; Citizens Electric Corporation; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; East Texas Electric Cooperative; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Great River Energy; GridLiance Heartland LLC; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; Indianapolis Power & Light Company d/b/a AES Indiana; Lafayette Utilities System; MidAmerican Energy Company; Minnesota Power (and its subsidiary Superior Water, L&P); Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Northern States Power

Missouri Public Service Commission (Missouri Commission)
Monitoring Analytics, LLC, acting in its capacity as the Independent Market Monitor for PJM
Nathan Peterson
National Association of Regulatory Utility Commissioners
National Association of State Utility Consumer Advocates
National Conference of State Legislatures (NCSL)
National Congress of American Indians
National Grid PLC (National Grid)[287]
National Rural Electric Cooperative Association (NRECA)
Nebraska Power Review Board (Nebraska Board)
New England States Committee on Electricity
New England Conference of Public Utility Commissioners
New England Consumer-Owned Systems[288]
New England Public Systems[289]

---

Company, a Minnesota corporation, and Northern States Power Company, a Wisconsin corporation, subsidiaries of Xcel Energy Inc.; Northwestern Wisconsin Electric Company; Otter Tail Power Company; Prairie Power, Inc.; Republic Transmission, LLC; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc

[287] National Grid submitted comments behalf of its affiliates Niagara Mohawk Power Corporation; New England Power Company; New England Electric Transmission Corporation; New England Hydro-Transmission Corporation; New England Hydro-Transmission Electric Company, Inc.; and Massachusetts Electric Company.

[288] New England Consumer-Owned Systems include: Belmont Municipal Light Department, Block Island Utility District, Braintree Electric Light Department, Concord Municipal Light Plant, Danvers Electric Division, Georgetown Municipal Light Department, Groveland Electric Light Department, Hingham Municipal Lighting Plant, Hudson Light & Power Department, Littleton Electric Light & Water Department, Merrimac Municipal Light Department, Middleborough Gas & Electric Department, Middleton Electric Light Department, North Attleborough Electric Department, Norwood Municipal Light Department, Clear River Electric & Water District, Rowley Municipal Lighting Plant, Stowe Electric Department, Taunton Municipal Lighting Plant, Town of Wallingford, Connecticut Department of Public Utilities Electric Division, Westfield Gas and Electric Light Department, and Mid-Coast Regional Redevelopment Authority.

[289] New England Public Systems include: Connecticut Municipal Electric Cooperative, Massachusetts Municipal Wholesale Electric Company, and Vermont

New Mexico Public Regulation Commission (New Mexico Commission)
New York Independent System Operator, Inc.
New York State Department of State Utility Intervention Unit (NY UIU)
New York Public Service Commission
New York State Reliability Council
New York Transmission Owners[290]
North American Electric Reliability Corporation
North Carolina Utilities Commission
North Carolina Utilities Commission Public Staff
North Dakota Public Service Commission (North Dakota Commission)
Northeastern Rural Electric Membership Corporation
NRG Energy, Inc.
Office of the Illinois Attorney General (Illinois AG)
Office of the Ohio Consumers' Counsel (OCC)
Oklahoma Corporation Commission
Oklo Inc. (Oklo)
Old Dominion Electric Cooperative (ODEC)
Oncor Electric Delivery Company LLC
ON Energy Storage, Inc.
OpenAI Inc.
Oracle America, Inc. (Oracle)
Organization of MISO States, Inc. (OMS)
Organization of PJM States, Inc. (OPSI)
Paces AI Inc.
Pacific Gas & Electric Company
Paige Lambermont, on behalf of Competitive Enterprise Institute
Paul Statchen
Pennsylvania Office of Consumer Advocate
Pennsylvania Public Utility Commission
Pew Charitable Trusts Energy Modernization Project
PJM Interconnection, LLC
Power for Tomorrow
PPL Corporation[291]

---

Public Power Supply Authority.

[290] New York Transmission Owners include: Central Hudson Gas & Electric Corporation, Consolidated Edison Company of New York, Inc., New York Power Authority, New York State Electric & Gas Corporation, Niagara Mohawk Power Corp. (d/b/a National Grid), Orange and Rockland Utilities, Inc., Long Island Power Authority, and Rochester Gas and Electric Corporation.

[291] PPL Corporation submitted comments on behalf of the PPL Companies, which

Prime Mover Institute
PSEG Companies (PSEG)[292]
Public Citizen, Inc.
Public Interest Organizations (PIOs)[293]
Public Utilities Commission of Ohio's Office of the Federal Energy Advocate (Ohio FEA)
R Street Institute (R Street)
Rewiring America
MCC Economics Ltd.
RWE Clean Energy, LLC
Sarah McKinley
Shell Energy North America (US), L.P.
Sierra Club
SMA Solar Technology AG
Solar Energy Industries Association
South Carolina Office of Regulatory Staff
South Dakota Public Utilities Commission (South Dakota Commission)
Southeast Public Interest Organizations (Southeast PIOs)[294]
Southern California Edison Company (Southern California Edison)
Southern Companies[295]
Southern Maryland Electric Cooperative, Inc.
Southwest Power Pool, Inc.

---

include PPL Electric Utilities Corporation, Louisville Gas & Electric Company and Kentucky Utilities, and The Narragansett Electric Company d/b/a Rhode Island Energy.

[292] PSEG Companies include: Public Service and Gas Company, PSEG Power LLC, and PSEG Energy Resources & Trade LLC, which are each wholly-owned, direct or indirect subsidiaries of Public Service Enterprise Group Incorporated.

[293] PIOs include: Clean Air Task Force, Inc., Coalition for Affordable Utility Services and Energy Efficiency in Pennsylvania, Earthjustice, Environmental Defense Fund, Montana Environmental Information Center, Natural Resources Defense Council, Sustainable FERC Project, Sierra Club, and Southern Environmental Law Center.

[294] Southeast PIOs include: Southern Environmental Law Center, Appalachian Voices, North Carolina Sustainable Energy Association, South Carolina Coastal Conservation League, and Southern Alliance for Clean Energy.

[295] Southern Companies include: Georgia Power Company, Alabama Power Company, and Mississippi Power Company.

Southwest Power Pool Transmission Owner Group[296]
Splight Inc. (Splight)
State Entities[297]
Steel Manufacturers Association
Switch, Ltd. (Switch)
Talen Energy Corporation (Talen)
Terraflux LLC (Terraflux)
Tesla, Inc.
Texas Blockchain Council
Thermal Battery Alliance
Tract Holding Company I, LLC (Tract)
Transmission Access Policy Study Group (TAPS)
Tri-State Generation and Transmission Association, Inc. (Tri-State)
Travis Fisher, on behalf of Cato Institute
U.S. Chamber of Commerce (Chamber of Commerce)
U.S. Energy Storage Coalition
U.S. House of Representatives Committee on Energy and Commerce Ranking Members[298]
U.S. Representatives[299]
U.S. Senate Committee on Energy and Natural Resources
U.S. Senators[300]

---

[296] Southwest Power Pool Transmission Owner Group includes: American Electric Power Service Corporation, Evergy Kansas Central, Inc., Evergy Metro, Inc., Evergy Missouri West, Inc., Oklahoma Gas and Electric Company, and Xcel Energy Services Inc., on behalf of Southwestern Public Service Company.

[297] State Entities include: Massachusetts Attorney General's Office, the Arizona Attorney General's Office, the Colorado Attorney General's Office, the Connecticut Office of Consumer Counsel, the Maryland Office of People's Counsel, the Minnesota Attorney General's Office, the Office of the Nevada Attorney General, Bureau of Consumer Protection, the New Hampshire Office of the Consumer Advocate, the Oregon Attorney General, and the Rhode Island Division of Public Utilities and Carriers.

[298] Submitted by Frank Pallone, Jr. (Ranking Member) and Kathy Castor (Ranking Member, Subcommittee on Energy).

[299] The U.S. Representatives that submitted comments include: Suhas Subramanyam, John W. Mannion, Mike Quigley, and Donald S. Beyer Jr.

[300] The U.S. Senators that submitted comments include: Edward J. Markey, Chris Van Hollen, Elizabeth Warren, Peter Welch, Raphael Warnock, Richard Blumenthal, and Adam B. Schiff.

U.S. Senator Jon Ossoff
Union of Concerned Scientists (UCS)
Vantage Data Centers (Vantage)
Verrus
Virginia State Corporation Commission
Vistra Corp. (Vistra)
Washington Utilities and Transportation Commission
WIRES
Wisconsin Electric Company (together with Wisconsin Public Service Corporation, Wisconsin Electric)
Wisconsin Public Service Corporation

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Midcontinent Independent System Operator, Inc, AEP Indiana Michigan Transmission Company, Inc., ALLETE, Inc., Ameren Illinois Company, Ameren Transmission Company of Illinois, American Transmission Company, LLC, Cleco Power LLC, Duke Energy Indiana, LLC, Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, Entergy Texas, Inc., GridLiance Heartland LLC, Indianapolis Power & Light Company, International Transmission Company, ITC Midwest LLC, Michigan Electric Transmission Company, LLC, MidAmerican Energy Company, Montana-Dakota Utilities Company, Northern Indiana Public Service Company LLC, Northern States Power Company, a Minnesota Corporation, Northern States Power Company, a Wisconsin Corporation, Northwestern Wisconsin Electric Company, Otter Tail Power Company, Pioneer Transmission, LLC, Republic Transmission, LLC, Southern Indiana Gas & Electric Company, Union Electric Company, Wabash Valley Power Association, Inc., and Wolverine Power Supply Cooperative, Inc. | Docket No. | EL26-70-000 |

(Issued June 18, 2026)

SWETT, Chairman, *concurring*:

1. Today, we take historic action to push our country's electric markets and economy into the future—a future of fair cost allocation, unprecedented transparency for the American ratepayer, respect for states' rights, efficient markets and speed to power. Last October, Secretary Wright articulated the monumental, generational and "urgent" challenge FERC must solve for our country when he directed us to develop "reforms to ensure the timely and orderly interconnection of large loads to the transmission system."[1] I strongly agree. And now, through this suite of six orders, we deliver.

[1] Advance notice of proposed rulemaking (ANOPR) *Interconnection of Large Loads to the Interstate Transmission System*, Advance Notice of Proposed Rulemaking (Oct. 23, 2025) (ANOPR); *see* Letter from Chris Wright, Sec'y, U.S. Dep't of Energy (Oct. 23, 2025) (Secretary's Letter).

2. Simply put, the show cause orders the Commission issues today to each of the six electric markets subject to its jurisdiction find that the status quo across much of the country is not good enough.[2] Nowhere close. The record prompted by the Secretary's ANOPR leaves no doubt that most of the markets (and their existing rules) are inherently slow and prohibitive of the dexterity necessary to adapt to and power societal evolution—whether brought about by technological innovation or sustaining the great industrial economy that anchors America.

3. I wholeheartedly, fully concur with these orders, which we carefully crafted to execute upon the problems the Secretary identified in a manner that is quick, efficient, and legally durable. I write separately to highlight certain considerations underlying the Commission's procedural approach to delivering on the ANOPR and to today's orders.

4. Based on my analysis of the extensive record and numerous ongoing substantive stakeholder interactions, I have determined that the most productive way to "build upon the[] principles"[3] in the ANOPR and "work expeditiously"[4] towards a solution is to issue individualized orders to show cause to each market.[5] That is so for two main reasons.

5. First, the record the Commission collected in response to the challenges identified in the ANOPR and subsequent resulting developments indicate that an approach that honors the ANOPR principles but accounts for widening regional variation may now be more efficient than a one-size-fits-all rule.[6] The world has changed a great deal since last

---

[2] *Cal. Indep. Sys. Operator Corp.*, 195 FERC ¶ 61,214 (2026) (*CAISO*); *ISO New Eng. Inc.*, 195 FERC ¶ 61,215 (2026) (*ISO-NE*); *Midcontinent Indep. Sys. Operator, Inc.*, 195 FERC ¶ 61,212 (2026) (*MISO*); *N.Y. Indep. Sys. Operator, Inc.*, 195 FERC ¶ 61,216 (2026) (*NYISO*); *PJM Interconnection, L.L.C.*, 195 FERC ¶ 61,211 (2026) (*PJM*); *Sw. Power Pool, Inc.*, 195 FERC ¶ 61,213 (2026) (*SPP*) (collectively, Orders to Show Cause).

[3] Secretary's Letter at 2.

[4] *Id.*

[5] *See SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947) ("[A]n administrative agency must be equipped to act either by general rule or individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity. . . . [T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."); *Wis. Gas Co. v. FERC*, 770 F.2d 1144, 1166 (D.C. Cir. 1985) ("It is a well-settled principle of administrative law that the decision whether to proceed by rulemaking or adjudication lies within the broad discretion of the agency.").

[6] "[T]he Commission may rely on 'generic' or 'general' findings of a systemic

October. The ANOPR itself, including the articulated principles, appears to have shifted the playing field and prompted great progress across several electric markets. This change (and the Commission's alignment with the Secretary) is well illustrated by a number of landmark orders approving several market new constructs that we issued since October, which together operationalize the Secretary's principles and laid groundwork for meaningful reform and today's actions.[7] While working to develop those orders, the Commission has simultaneously devoted significant attention to evaluating the various procedural paths through which we might comprehensively deliver.

6. Individual show cause proceedings will allow the Commission to ensure that solutions to the problems the Secretary identified are tailored to the specific, varied circumstances and market constructs of each region. Indeed, a careful review of today's six orders reveals the many ways in which those orders are customized for each market's unique circumstances and progress (or lack thereof) towards serving large load. To name just a few examples, the orders recognize ongoing stakeholder processes in various regions and are adapted to existing tariff provisions concerning large and co-located loads; account for regional variances in allocating rights and responsibilities among RTOs/ISOs and the transmission owners; leave room for each market to tailor operational requirements for large loads that are particular to their region; and otherwise account for incumbent regional differences on topics such as cost allocation and cost transparency, study processes, and network upgrade procedures.

7. Proceeding via show cause proceedings will also allow the markets (and their respective transmission owners) to explain, in the first instance, how to address the Commission's concerns. These entities have the deepest understanding of their respective regions and are best positioned to implement solutions we identified, in the most expeditious manner. The Commission will promptly evaluate their responses to today's orders, and, with input from stakeholders, swiftly establish appropriate reforms.

8. Second, proceeding via individual show cause orders will allow the Commission to act more quickly than through traditional rulemaking. Notice-and-comment rulemaking may not capitalize upon individual market progress prompted since October

---

problem to support imposition of an industry-wide solution." *Interstate Nat. Gas Ass'n of Am. v. FERC*, 285 F.3d 18, 37 (D.C. Cir. 2002) (internal citations omitted). However, the Commission "has long allowed different regional transmission organizations to follow different rules, in recognition of regional variations including potential differences in 'geographic size and location.'" *Cent. Hudson Gas & Elec. Corp. v. FERC*, 138 F.4th 531, 539 (D.C. Cir. 2025) (internal citations omitted).

[7] *See id.* P 2 & nn.6-11.

and would be unduly time-consuming,[8] as it also inevitably would require the additional steps of accommodating the regional variations of the approach we take today. Rulemaking efforts can be particularly inefficient when, as here, they risk incubating uncertainty after progress has begun, and diverting scarce stakeholder resources away from other endeavors, such as the development of market-specific reforms submitted to the Commission under section 205 of the Federal Power Act (FPA). (To be clear, we very much encourage 205 submissions encapsulating the principles we articulate in the 206s, and with all due deliberate haste.)

9. Furthermore, rulemaking requires a lengthy series of steps before the proposed reforms would actually take effect—e.g., a NOPR, then a final rule, then potential orders on rehearing, and then a "compliance" process in which affected parties make filings (or, more likely, multiple rounds of filings) explaining how they intend to implement the rule. By their nature, these procedures take time. For example, the compliance process for the Commission's Order No. 2023[9] (which matured out of an ANOPR issued in July 2021 and a NOPR issued in June 2022) still is not fully complete as of June 2026. The compliance process for Order No. 2222[10] (NOPR issued in November 2016) could be considered completed in May 2026; however, even with that timing, not all of the RTOs/ISOs have yet fully implemented their Commission-accepted market rules. I provide these examples not to suggest that the completion of a rulemaking process on the interconnection of large loads would take this long,[11] but rather to make clear the scope of the years-long delays in implementation that might be expected if the Commission elected to proceed via a NOPR. By contrast, we expect that individual show cause

---

[8] *See, e.g.*, Comments of Talen Energy Corporation, Docket No. RM26-4, at 5-6 (filed Nov. 21, 2025).

[9] *Improvements to Generator Interconnection Procs. & Agreements*, Order No. 2023, 184 FERC ¶ 61,054, *order on reh'g*, 185 FERC ¶ 61,063 (2023), *order on reh'g*, Order No. 2023-A, 186 FERC ¶ 61,199, *errata notice*, 188 FERC ¶ 61,134 (2024).

[10] *Participation of Distributed Energy Res. Aggregations in Mkts. Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, Order No. 2222, 172 FERC ¶ 61,247 (2020), *order on reh'g*, Order No. 2222-A, 174 FERC ¶ 61,197, *order on reh'g*, Order No. 2222-B, 175 FERC ¶ 61,227 (2021).

[11] I do not mean to suggest that the public utilities subject to compliance under these rulemakings—or the Commission itself—have been derelict. The time-consuming nature of the compliance process is a natural consequence of complex, nuanced efforts toward tariff reform. As Chairman, I will continue to evaluate Commission directives to ensure that obligations on regulated entities are not unduly burdensome and to make certain that Commission action during the compliance process is as timely as possible.

proceedings for each of the RTO/ISOs will enable the Commission to spearhead lasting reform much more expeditiously.

10. The six markets together cover nearly two-thirds of load subject to Commission-jurisdictional rates, and therefore focusing initially on those regions is a prudent first step. But I am under no illusion that the challenges discussed in today's orders are somehow unique to the RTO/ISO regions. Our actions today do not foreclose the possibility of a future rulemaking, and nor do they prevent us from acting on filings made under sections 205 and 206 of the FPA. I encourage transmission providers and other stakeholders outside RTO/ISO regions to make individual filings to address the issues we discuss today.

11. FERC is no longer the sleepy, responsive agency of the past—our country cannot afford for it to be. This is a time for the best thinkers we have to collaborate on solving our biggest problems, and thus it is my great honor to deliver a solution that honors the Secretary's goals. For these reasons, I respectfully concur.

______________________________
Laura V. Swett
Chairman

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc, AEP Indiana Michigan Transmission Company, Inc., ALLETE, Inc., Ameren Illinois Company, Ameren Transmission Company of Illinois, American Transmission Company, LLC, Cleco Power LLC, Duke Energy Indiana, LLC, Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, Entergy Texas, Inc., GridLiance Heartland LLC, Indianapolis Power & Light Company, International Transmission Company, ITC Midwest LLC, Michigan Electric Transmission Company, LLC, MidAmerican Energy Company, Montana-Dakota Utilities Company, Northern Indiana Public Service Company LLC, Northern States Power Company, a Minnesota Corporation, Northern States Power Company, a Wisconsin Corporation, Northwestern Wisconsin Electric Company, Otter Tail Power Company, Pioneer Transmission, LLC, Republic Transmission, LLC, Southern Indiana Gas & Electric Company, Union Electric Company, Wabash Valley Power Association, Inc., and Wolverine Power Supply Cooperative, Inc.

Docket No. EL26-70-000

(Issued June 18, 2026)

ROSNER, Commissioner, *concurring*:

1. The electric industry is in the midst of changes not seen in a generation. Compared to more traditional load growth, the large loads seeking to connect to the grid today are larger, sometimes by orders of magnitude, and more concentrated. They also exhibit different operational characteristics, such as the ability to quickly change their energy consumption, sometimes in seconds. Often, these large loads seek to connect to the grid as quickly as possible. And because of these dynamics, large loads are rapidly driving the need for new transmission infrastructure and energy supply. This creates new challenges that, if unaddressed, could jeopardize the reliability and affordability of the grid on which we all depend.

2. Today, we are taking an important step toward addressing these challenges. We are opening a dialogue with each of the six RTO/ISOs on a series of reforms that are

tailored to address the unique reliability and affordability challenges posed by large load growth and the infrastructure buildout needed to serve dramatically growing demand. Informed by the record developed in response to the Secretary of Energy's October 2025 ANOPR,[1] and by innovative proposals that stakeholders have filed with the Commission under FPA section 205, today's orders are aimed at ensuring that the grid remains reliable and affordable for *all* customers, especially residential customers. It is also crucial that we unlock the immense economic opportunity that once-in-a-generation growth represents. While each order's specific focus varies according to the progress that each RTO/ISO has made, our actions today fit broadly into four key pillars that, taken together, provide a foundation for durable reform. Today, we are: (1) Protecting Consumers, (2) Safeguarding Reliability, (3) Enhancing Transparency, and (4) Fostering Innovation (*see* **Figure 1**). I write separately to explain how.

*****

3. **Protecting Consumers**: Today's orders include key protections that promote affordability. First, today's orders require "Cost Recovery Agreements", which are designed to ensure that large loads pay their fair share of the costs incurred to serve them, regardless of whether the large load comes online as planned. Thus, if new infrastructure is built to accommodate a data center, and that data center doesn't show up, residential customers are not left on the hook to pay the costs. Cost Recovery Agreements prevent those costs from being shifted to residential customers. Depending on how they are structured, Cost Recovery Agreements can also address the potentially uneven pacing of new infrastructure costs, where grid upgrade costs may hit customer bills *before* the large load is fully online and energized. Data centers have committed to paying their own way.[2] Today, with "Cost Recovery Agreements," we are taking steps to ensure that those commitments are honored. I note, however, that the door remains open to other creative, regionally-specific ideas to protect consumers. If there are other ways to accomplish that goal, I welcome those proposals.

4. Another win for consumers is requiring RTO/ISOs to consider grid enhancing technologies (GETs), including dynamic line ratings, when adding new large loads to the grid. GETs are technologies that squeeze more juice out of the existing grid, reducing the need for expensive upgrades and speeding up the time connect. Ensuring that RTO/ISOs consider GETs in the planning process—and if GETs are not used, explain why—not only helps new large loads get connected more quickly, but is also a commonsense step

---

[1] U.S. Dep't of Energy, Secretary of Energy Chris Wright, Direction that the Commission Initiate Rulemaking Procedures and Proposal Regarding the Interconnection of Large Loads Pursuant to the Secretary's Authority Under Section 403 of the Department of Energy Organization Act (Oct. 23, 2025).

[2] *See* Proclamation No. 11014, 91 Fed. Reg. 11439 (Mar. 4, 2026).

towards saving *all* consumers money. Put differently, today's orders will help us understand if we are leaving efficiencies on the table, an outcome we cannot afford.

5. **Safeguarding Reliability:** Today's orders safeguard reliability. They help ensure that RTO/ISOs use study procedures and operational requirements that reflect large loads' unique characteristics and the reliability impacts of connecting them to the grid. Those novel characteristics and reliability impacts are well-documented, and it is not clear if existing study procedures or operational requirements account for them. Clear, comprehensive, and specifically tailored study procedures and operational requirements are needed, such as enhanced data reporting and telemetry to increase visibility into how these loads interact with the grid, and today's orders represent progress towards this goal.

6. Finally, although not part of today's orders, I want to highlight NERC's ongoing efforts to establish registration criteria for large computational loads and to develop reliability standards.[3] NERC's goal is to finish the first phase of this critical work this year. It is essential that NERC meet this deadline. I encourage all stakeholders to participate in NERC's process.

7. **Enhancing Transparency:** Today's orders provide regulators—the Commission and, critically, our state partners—and customers with data on how connecting large loads to the grid affects bills. Today's orders embody a commonsense approach: if a Network Upgrade is built to connect a large load to the grid, consumers should know who that upgrade was built for and what it cost.

8. Transparency is important because "who pays?" has been and continues to be a fraught and contentious question for large load interconnection. Stakeholders, including state regulators and the ratepayers that they represent, must know the costs, for whom they are being incurred, and how they are being allocated, to know that everyone is paying their fair share. Today's orders ensure that this information is public, accessible, and clear. State regulators in more than half of the country have enacted large load tariffs.[4] Our action today helps them as they continue their critically important work.

9. The Commission's action today also addresses speculative load interconnection requests, which clog up load interconnection queues, divert resources, and distort forecasts. Under current rules, data centers can (and are incentivized to) "shop around"

---

[3] NERC, *Large Loads Action Plan Q1 2026 Update* (Apr. 2026), https://www.nerc.com/globalassets/initiatives/large-loads-action-plan/llap-quarterly-update-q1-2026.pdf.

[4] *See, e.g.*, National Association of Regulatory Utility Commissioners Supplemental Comments at 2-6; Edison Electric Institute Supplemental Comments at App. 9-13.

their prospective projects with different utilities to identify the fastest and cheapest location to connect. This wastes time and resources studying projects that are not real. Worse yet, it can inflate expected load growth by modeling projects that do not materialize, leading to double counting, inaccurate market signals, and unnecessarily high prices for consumers. Today, we target speculative projects by establishing escalating readiness requirements for distinct phases of the study process to deter duplicative or speculative requests for transmission service. I strongly encourage RTO/ISOs to pursue other improvements to load forecasts, such as using objective screening criteria like physical site control, to ensure that the data used to plan the grid is as accurate as possible.[5]

10. **Fostering Innovation:** As I have said, to meet the moment, "a business-as-usual approach . . . will not suffice."[6] Building new infrastructure is difficult and costly, which delays efforts to connect large loads to the grid quickly, reliably, and cost effectively. This is doubly true when generation and load are planned and studied separately. Today's orders push beyond this status quo.

11. First, today's orders promote flexible transmission services—that is, non-firm service to a co-located load that is willing and able to limit withdrawals from the grid—in every RTO/ISO (*see* **Figure 2**). As we explained when we first created these transmission services in PJM for co-located loads, customers willing to embrace flexibility can reduce the need for Network Upgrades and generating capacity to serve a co-located load, which speeds up connecting to the grid *and* reduces costs for the co-located load *as well as* other retail customers.

12. Second, today's orders recognize that extending these same transmission services to large loads that are *not* co-located but that may also be willing to limit their withdrawals from the grid can unlock even more efficiency. Just as for co-located loads, legalizing flexible transmission service options for more large load customers can speed interconnection, avoid constructing unnecessary transmission upgrades, reduce strain on the grid, and make power bills cheaper for everyone.

13. Finally, today's orders embrace yet another innovation. Load and generation need not be co-located to reduce the number of Network Upgrades; in other words, literal co-location is not the only way to facilitate faster, more efficient, and more cost-effective connections to the grid. Rather, where a large load and an associated generator are

---

[5] *See* Comm'r David Rosner, *Letter to the RTOs/ISOs on Large Load Forecasting* (Sept. 18, 2025), https://www.ferc.gov/news-events/news/chairman-rosners-letter-rtosisos-large-load-forecasting.

[6] *PJM Interconnection, L.L.C.*, 193 FERC ¶ 61,217 (2026), (Rosner, Comm'r, concurring) at P 3.

*electrically proximate* (i.e., close together) *and studied together*, the reliability impacts on the grid may be more limited than if the load and generator are studied separately. Just like with co-location, more limited impacts on the grid mean, all else equal, fewer Network Upgrades, which makes connecting to the grid faster, more efficient, and cheaper for both the large load *and the associated generator*. That last point is key. To add new supply to the grid, we must create incentives for "Bring Your Own *New* Generation." Today's orders make BYONG faster and more efficient.

14. SPP has been a leader in showing how to push beyond the status quo. With its innovative HILLGA proposal, approved by the Commission in January,[7] SPP leveraged the opportunity for speed and efficiency by studying load and generation together, and by creating a limited, expedited interconnection service to connect faster. By matching the generator's output to the electrically proximate large load's demand, the impacts to the grid are less than they otherwise would be, minimizing the need for time-consuming and costly Network Upgrades needed to connect. HILLGA is one solution that works for SPP, but today's orders direct other regions to follow SPP's lead in ways that work for them. Today's orders add a key tool by ensuring that all RTO/ISOs can study load and generation together.

*****

15. The Commission's action today is an important step forward, but the Commission cannot accomplish this work alone. States are essential partners in this work. The Commission's actions here respect the long-standing jurisdictional line between federal and state authority provided by Congress and repeatedly affirmed by the Supreme Court. States retain exclusive jurisdiction to allocate the costs of FERC-jurisdictional transmission charges among their retail ratepayers, including co-located loads. States also hold the keys to energy infrastructure permits, so we rely on their decisions to ensure that needed transmission and generation get built. At a time when some large loads are retail customers that can consume as much energy as a small city, it is imperative that we work within our respective jurisdictions, but that we collaborate. I look forward to continued collaboration.

16. Today's orders *begin* an important dialogue with RTO/ISOs. As a potential next step, today's orders invite RTO/ISOs to respond by submitting proposals under FPA section 205. I cannot encourage this enough. I also encourage public utilities outside of RTO/ISOs across the country to do the same. The electric industry is rapidly evolving with regions experiencing and addressing these challenges in different ways. Many of the examples on which the actions in today's orders are based on stakeholders thinking creatively to develop solutions, and I welcome other new, innovative, and regionally tailored proposals that build on the four key pillars set forth today: (1) Protecting

---

[7] *See Sw. Power Pool, Inc.*, 194 FERC ¶ 61,031 (2026).

Consumers, (2) Safeguarding Reliability, (3) Enhancing Transparency, and (4) Fostering Innovation. Only by working together can we rise to the occasion and meet this once-in-a-generation moment to deliver the reliable and affordable energy on which we all depend. It will not be easy, but I remain optimistic and look forward to the path ahead.

For these reasons, I respectfully concur.

__________________________
David Rosner
Commissioner

Figure 1


Four Pillars – FERC's Response to the Large Load /
Protect Consumers
• Prevent cost-shifting with mandatory contracts
• Reduce infrastructure costs with smarter studies
• Boost efficiency with Grid Enhancing Technologies
Enhance Transp
• Provide transparency in transn
• Improve load forecasting pract
• Increase disclosure of utility in
Safeguard Reliability
• Establish new large load impact studies
• Accelerate interconnection for system stability
• Continue NERC standards development process
Foster Innova
• Accelerate co-located and pro
• Leverage advanced load flexibi
• Complete studies faster (60 to
FEDERAL ENERGY REGULATORY COMMISSION
Office of Commissioner Rosner

**Figure 2**

*Large Load Interconnection: Transmission & Interconnection Service Innovation*



UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc, AEP Indiana Michigan Transmission Company, Inc., ALLETE, Inc., Ameren Illinois Company, Ameren Transmission Company of Illinois, American Transmission Company, LLC, Cleco Power LLC, Duke Energy Indiana, LLC, Entergy Arkansas, LLC, Entergy Louisiana, LLC, Entergy Mississippi, LLC, Entergy New Orleans, LLC, Entergy Texas, Inc., GridLiance Heartland LLC, Indianapolis Power & Light Company, International Transmission Company, ITC Midwest LLC, Michigan Electric Transmission Company, LLC, MidAmerican Energy Company, Montana-Dakota Utilities Company, Northern Indiana Public Service Company LLC, Northern States Power Company, a Minnesota Corporation, Northern States Power Company, a Wisconsin Corporation, Northwestern Wisconsin Electric Company, Otter Tail Power Company, Pioneer Transmission, LLC, Republic Transmission, LLC, Southern Indiana Gas & Electric Company, Union Electric Company, Wabash Valley Power Association, Inc., and Wolverine Power Supply Cooperative, Inc.

Docket No. EL26-70-000

(Issued June 18, 2026)

SEE, Commissioner, *concurring*:

1. Growing electricity demand underscores America's economic strength and the opportunities that come with it. And with new opportunities come new challenges. The pace and scale of emerging large loads create new circumstances that require us to adapt in how we build and manage the grid. Large and flexible loads can materially change system operations, for instance, as well as near-term planning needs, upgrade requirements, and how we allocate costs. Most existing systems were not designed to accommodate those changes—especially not at the pace needed to support AI growth and advanced manufacturing that are central to America's economic competitiveness. As a result, uncertainty over the operative rules and delays in interconnecting large loads can undermine reliability and investment and add unacceptable and avoidable costs.

2. Today, the Commission takes strong action within our jurisdictional sweep to address these and other challenges that large load growth poses to the interstate

transmission system. Today's orders support both just and reasonable rates and speed to (reliable) power. I'm deeply grateful for the many commenters who shared their insight and ideas in this action. They let us build a record that highlights the need for clearer processes, better information, and faster analysis while our country moves new large load additions online. As we press forward in these dockets, I will be looking to continue building on the momentum already underway across the country to craft more practical, region-specific solutions that support timely action while protecting consumers. Our continued ability to deliver reliable and affordable electricity requires nothing less.

3. Today's orders speak for themselves. I write separately to briefly highlight two principles baked throughout them and that I believe must remain central as the Commission evaluates further steps.

4. First, these issues extend beyond the Commission. Creating efficient, predictable large load interconnection processes is a joint and overlapping task for us, other federal agencies, the States, and the RTOs/ISOs and utilities. My animating principle here is that we must use FERC's statutory authority to bring clarity to the parts of this national issue we own, and to complement and aid others as they tackle theirs. The very procedure the Commission deploys today reflects that goal: Recognizing the value in region-specific approaches, we are directing individual action in each of the RTO/ISO regions and encouraging—strongly—proposals under section 205 of the Federal Power Act from transmission providers or other entities that are molded to their unique system needs.

5. Most critically, exercising our authority fully without hamstringing our regulatory and industry partners means respecting the States. States make many of the key decisions that affect how we manage large loads. States bring indispensable expertise over local conditions, siting needs, retail structures, and the resource decisions within their borders. And they have been hard at work pursuing the retail implications and other State-specific concerns that large load interconnection presents.[1] All this effort flows from the States' statutorily preserved role in regulating the power system. Today's order understands that limit—our power "extend[s] only to those matters which are not subject to regulation by the States."[2] It also embraces the value in a statutory lens that views large load issues as an area of shared federal-State responsibility. As we require clear study and operational parameters for large load interconnection, we should remember that the nation's energy landscape is not monolithic. State and regional diversity is a strength, and today's orders know that the best solutions reflect differing system characteristics. Our action today is

---

[1] *See* EEI Supplemental Comments at Appendix 9 – 13 (listing pending and approved State large load tariffs).

[2] 16 U.S.C. § 824(a).

designed to support further State efforts in this urgent and fast-moving space, not override them.

6. Second, affordability must be at the forefront as we protect consumers from unnecessary costs in a time of rising demand. True, the Commission lacks authority over all the factors that drive electricity costs at the retail level. Today's orders recognize that. In response, the orders strive to aid the States in their front-line affordability duties by getting into their hands all relevant information about Commission-jurisdictional costs. As these matters move forward, I am particularly interested in continued feedback from the States on what information they most need to assess cost implications as new loads come online. Are the cost transparency measures we identify today sufficient, or are additional or more granular data needed for States to appropriately suballocate transmission costs among retail customers? Tools like alternative cost allocation structures, greater clarity in transmission service agreements, accounting for States' large-load-specific tariffs, and direct assignment in appropriate cases may help States ensure that retail consumers do not bear costs incommensurate with the benefits they receive.

7. Moving to areas where the Commission has a more direct role in ensuring cost responsibility, we need to pull all the levers we have to keep rates fair and transparent. Today we reaffirm our responsibility to assign jurisdictional costs to the customers who drive or benefit from grid upgrades, not shift them onto families and small businesses. For instance, today's orders seek to reduce large-load driven network upgrade costs through alternative transmission technologies, or ATTs (also commonly called Grid Enhancing Technologies). In determining how best to meet the needs of this historic large load growth, technologies that can improve system capability faster than traditional upgrades and at lower costs deserve a hard look. ATTs may not be the best tool in every circumstance, but where they are they can support timely interconnections and avoid potentially tens or hundreds of millions of dollars in unnecessary network upgrade costs that would otherwise flow into transmission customers' bills.

8. So our approach today supports continuing the Commission's policy to roll most network upgrade costs—including those in the large load space—into the embedded-cost rate most transmission customers pay. But it includes an asterisk that this policy works for ratepayers only so long as we remain committed to pursuing technological innovations that keep those costs at a responsible and accountable level. Today's order thus calls for transmission providers to sufficiently evaluate ATTs to assess if and how they can meet large loads' interconnection needs. The answer may be yes or no in a given case. But if the transmission provider opts for traditional network upgrades, they must *demonstrate* why ATTs are not feasible or would not result in lower costs or a faster timeline for the large load interconnection customer. In short, the goal is to respect transmission providers' engineering judgments while protecting against upgrade costs when ATTs could solve transmission needs faster and with a lower bill.

9. I am also sensitive to novel questions about cost shifting that interconnecting large load may present. Today's findings on cost recovery agreements between transmission owners and Eligible Customers are an important step in mitigating the risks of stranded assets if large loads prove speculative. We are also reducing unnecessary redundancy by allowing an Eligible Customer to meet its financial security requirements by relying on credit support or other financial security a large load customer may have posted under a retail agreement. As we gain more experience studying transmission service requests on behalf of large loads, it may become appropriate to further streamline financial security arrangements. Perhaps, for instance, cost -recovery agreements between a transmission owner and a large load customer itself could satisfy an Eligible Customer's financial security requirements. As we move forward, I'll be looking to ensure cost-recovery agreements contain fair and transparent measures to ensure the right costs get on the right bills. (Relatedly, the discussion about the full nature of transmission-related charges in our concurrent PJM Order on Rehearing, Clarification, Compliance, and Paper Hearing[3] may prove relevant here: Real-world experience with new transmission services for co-located load may clarify if future action becomes needed to address potential cost shifts as Eligible Customers take new transmission services on behalf of large loads.[4])

10. More generally, as we gain more experience as an industry and a country in getting large loads connected to the grid, I welcome bold proposals to keep affordability central. Large load growth presents a real opportunity to build a stronger, more capable, and more reliable electric system that can benefit all ratepayers. Meeting that opportunity at the pace we need and at an acceptable cost requires innovative thinking and fast action. I commend the States in their continued work in these areas. I urge the RTOs and ISOs to continue their good work as they respond quickly to today's orders. I also remain committed to moving forward within the Commission's statutory zone with clarity and decisiveness. I am proud to support the Commission's important steps today. And we all have more work ahead.

For these reasons, I respectfully concur.

______________________________
Lindsay S. See
Commissioner

[3] *PJM Interconnection, L.L.C.*, 195 FERC ¶ 61,209 (2026).

[4] *See id.* P 456.

Document Accession #: 20260618-3047 Filed Date: 06/18/2026

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Midcontinent Independent System Operator, Inc. Docket Nos. EL26-70-000

AEP Indiana Michigan Transmission Company, Inc.
ALLETE, Inc.
Ameren Illinois Company
Ameren Transmission Company of Illinois
American Transmission Company, LLC
Cleco Power LLC
Duke Energy Indiana, LCC
Entergy Arkansas, LLC
Entergy Louisiana, LLC
Entergy Mississippi, LLC
Entergy New Orleans, LLC
Entergy Texas, Inc.
GridLiance Heartland LLC
Indianapolis Power & Light Company
International Transmission Company
ITC Midwest LLC
Michigan Electric Transmission Company, LLC
MidAmerican Energy Company
Montana-Dakota Utilities Company
Northern Indiana Public Service Company LLC
Northern States Power Company, a Minnesota Corporation
Northern States Power Company, a Wisconsin Corporation
Northwestern Wisconsin Electric Company
Otter Tail Power Company
Pioneer Transmission, LLC
Republic Transmission, LLC
Southern Indiana Gas & Electric Company
Union Electric Company
Wabash Valley Power Association, Inc.
Wolverine Power Supply Cooperative, Inc.

(Issued June 18, 2026)

CHANG, Commissioner, *concurring*:

1. In a series of orders today, the Commission initiates separate proceedings under Federal Power Act (FPA) section 206 to explore the impact of the increasing growth of large loads in Regional Transmission Organization (RTO) and Independent System Operator (ISO) regions. The preliminary findings in these orders, and the associated proposed reforms to RTO/ISO and transmission owner tariffs, could significantly change how loads procure, use, and pay for transmission service, with ramifications for RTO/ISO operations, planning, and markets. I write separately to emphasize the importance of building actionable records in these proceedings, particularly with respect to our consideration of customer protection, transmission service, and alternative transmission technology reforms.

## I. Overview of Today's Orders

2. In each of today's orders to show cause, the Commission identifies a series of issues raised by the ongoing growth of large loads, directs briefing on whether existing tariffs remain just and reasonable in light of those developments, and describes possible solutions to those issues if the Commission ultimately concludes that the relevant tariffs are unjust and unreasonable. Each order is directed to a specific RTO/ISO and relevant transmission owners that play a role in interconnecting large loads to the Commission-jurisdictional transmission system. The Commission does not pursue the broad assertion of jurisdictional authority contemplated in the Advanced Notice of Proposed Rulemaking, which I hope assuages concerns raised by our state colleagues that the Commission ought not encroach upon matters properly left to their jurisdiction.[1]

3. Broadly summarized, each order seeks regional input on a specific list of issues: (1) the clarity and consistency of existing rules governing how each RTO/ISO and its relevant transmission owners analyze the impact of providing transmission service to Eligible Customers on behalf of large loads; (2) whether each RTO/ISO tariff requires reforms to mitigate the risk of cost shifting among wholesale transmission customers; (3) whether each RTO/ISO tariff (other than PJM) requires additional clarity regarding the provisions addressing co-located generation and load arrangements; (4) the potential extension of new firm and non-firm transmission services to co-located load, load with behind the meter generation, and other flexible loads; and (5) the need for reforms, modeled on Southwest Power Pool, Inc.'s High Impact Large Load Generation

[1] I will do my part to ensure that the Commission continues to be a collaborative partner to our state counterparts, other federal agencies, and the industry as we seek to address this wide-ranging challenge. Accordingly, I welcome feedback from our state colleagues and others if they believe the Commission's preliminary findings raise jurisdictional concerns.

Assessment concept, to facilitate a process through which a generator may temporarily serve a co-located or electrically proximate load until interconnection and transmission service is available. The Commission also invites each region to submit FPA section 205 filings that can address each issue identified in the orders, thereby resolving the Commission's concerns.

## II. The Commission Needs Good Records to Ensure Reasoned Decision-Making

4. I first want to emphasize that the Commission needs active participation from interested stakeholders to develop thorough records in each region. The Commission cannot make reasoned decisions about whether reforms might be needed without an accurate understanding of the existing processes, which differ by region. Because the Commission is acting via FPA section 206 rather than generically through a rulemaking, the issues addressed by these orders will be subject to *ex parte* restrictions across the RTOs/ISO regions, including with our state colleagues whose regulation can and will directly affect the individual transmission owners that need to comply with the orders issued today. This will limit the Commission's ability to engage in informal fact-finding and discussions with regional stakeholders, and thus, it is even more essential that the record in each region fully reflects the views of all interested parties.

5. Second, I highlight three issues below that will be especially important to the success of this effort, and I hope that interested parties will take particular care in helping the Commission address those issues. Importantly, I recognize that the record established in each RTO/ISO region will (and should) differ, which will allow the Commission to ensure any required changes to an RTO/ISO's tariff are appropriately tailored to that region's needs.

## III. The Commission Needs to Pursue Meaningful Customer Protection

6. The FPA is fundamentally a customer protection statute,[2] and the Commission has an obligation to ensure that the rates that wholesale and transmission customers pay are just and reasonable. Rapid large load growth has strained planning and resource procurement processes around the country, as transmission owners, load serving entities, and generators accelerate the building of new infrastructure needed to serve these new loads. As we develop the new infrastructure, many have raised concerns about whether these costs are being fairly assigned to new and existing customers, whose benefits must be commensurate with the costs they pay. While individual states have been exploring or using various approaches to protect *retail* customers against unjustified cost shifts, the Commission to date has not initiated any proactive exploration of how to protect

[2] *See, e.g.*, *Mun. Light Bds. Of Reading and Wakefield v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971) (stating that the FPA's "primary aim is the protection of consumers from excessive rates and charges").

*wholesale* customers against unjustified cost shifts. I am laser-focused on this issue because we should not create unjustified costs for consumers in our efforts to connect and serve large loads.

7. In today's orders, the Commission launches an inquiry into whether existing RTO/ISO tariffs include adequate mechanisms to mitigate the risk of undue cost shifting among transmission customers. To address this risk, the Commission preliminarily identifies a two-part solution: (1) that each RTO/ISO post public information about the amount of new large loads seeking to connect to the RTO's/ISO's transmission system, any Network Upgrades identified in the local transmission planning process to serve those loads, and the costs of those Network Upgrades; and (2) that each RTO/ISO adopt a *pro forma* cost recovery agreement to help ensure that Eligible Customers serving large loads bear the risk and are ultimately responsible for costs incurred to provide transmission service. I strongly support this effort to provide additional transparency regarding jurisdictional transmission service requests and the costs associated with providing transmission service to the requesting parties, as the Commission cannot effectively execute its statutory responsibilities without sufficient understanding of the costs that feed into jurisdictional rates.

8. Exploring how agreements between transmission owners and Eligible Customers can protect *wholesale* customers against cost shifts is important. However, as I have previously explained, bilateral agreements that simply provide transmission revenue contributions untethered from any assessment of the actual cost of providing transmission service induced by individual large loads may be insufficient to adequately protect other customers against unjustified cost shifts.[3] It is therefore important that the resulting regulatory and rate design are not limited to a pre-defined solution set, and that parties provide the Commission with comprehensive records outlining various and innovative approaches to protect customers. I am encouraged by the continued development of the ANOPR record on this subject,[4] innovative solutions being developed at the state level,[5]

---

[3] *E.g.*, *PECO Energy Co.*, 193 FERC ¶ 61,148 (2025) (Comm'r Chang, *concurring*); *Commonwealth Edison Co.*, 194 FERC ¶ 61,109 (2026) (Comm'r Chang, *concurring*).

[4] *E.g.*, *Interconnection of Large Loads to the Interstate Trans. Sys.*, Supplemental Comments of FirstEnergy Svc. Co., Docket No. RM26-4-000 (filed June 5, 2026); *id.*, Comment of the Harvard Electricity Law Initiative, Docket No. RM26-4-000 (Apr. 15, 2026); *id.*, Supplemental Comments of WIRES, Docket No. RM26-4-000 (Mar. 30, 2026).

[5] *E.g.*, Utility Dive, *Microsoft seeks Nevada tariff to shield ratepayers from data center costs* (June 8, 2026), *available at* https://www.utilitydive.com/news/microsoft-

and a growing body of thoughtful analyses and proposed approaches to provide customer protection for costs driven by large load growth.[6] Without prejudging any particular proposed solution, the Commission needs a robust record in each docket and each region to ensure we establish the right cost shift protections for wholesale customers, including but not limited to the commitments outlined in the Ratepayer Protection Pledge.[7]

9. I support initiating our own review of customer protection approaches, rather than simply relying on voluntary commitments that may fall short of optimal protection, because the Commission has the opportunity and obligation to get this issue right. I therefore encourage interested parties to assist the Commission in that effort by clearly and comprehensively explaining the benefits and tradeoffs of alternative customer protection approaches. How power infrastructure costs will be assigned across Eligible Customers that serve large loads and other customers is at the core of the efforts we initiate today.

## IV. The Commission Needs to Understand the Implications of Extending New Transmission Services to Additional Loads and Regions

10. The orders also preliminarily find that the Commission should extend the transmission services developed in the PJM co-location proceeding – Interim NITS, Firm Contract Demand, and Non-Firm Contract Demand – to new types of load and new regions. These new transmission services represent a fundamental paradigm shift from the traditional network service and point-to-point transmission service models established in Order No. 888 that have been used across the country for the last three decades. While these services have the potential to facilitate more efficient use and build out of the transmission system, they also contemplate running the system "tighter" than we have done in the past, potentially with more loads on the system served by co-located or behind-the-meter generation, and potentially more use of batteries, load control systems, and backup resources to manage demand during system peaks or other stressed conditions. While it is important to identify innovative solutions that can adapt to the needs of the system, the Commission and grid operators must also be careful not to

---

seeks-nevada-tariff-to-shield-ratepayers-from-data-center-costs/822250/.

[6] *E.g.*, Travis Kavulla, *How Will Data Centers Pay for Power?*, American Affairs (may 2026), *available at* https://americanaffairsjournal.org/2026/05/how-will-data-centers-pay-for-power/ ; Electricity Customer Alliance, *A Customer-Centric Agenda for the Federal Energy Reg. Comm'n* (Jan. 2026), *available at* https://lnkd.in/em-apfuQ; Grid Strategies, *Federal Transmission Pricing Vol. 2, Options for Ensuring Affordability in an Era of High Load Growth* (June 2026), *available at* https://gridstrategiesllc.com/project/federal-transmission-pricing.

[7] Proclamation No. 11014, 91 Fed. Reg. 11439 (Mar. 4, 2026).

implement changes that create unforeseen reliability risks. Ultimately, we must find the proper balance (and I would argue we are exploring a *new* balance) between costs of investments versus reliability.

11. The Commission's experience in the PJM co-location proceeding highlights the complexities and challenges of introducing these new transmission services, which have significant ramifications for system operations, transmission planning, grid reliability, market dispatch, resource adequacy, and cost allocation. As the Commission considers whether to expand these transmission services to new types of load and new regions, I encourage commenters to address what impacts the introduction of new firm and non-firm transmission products would have in their regions, as well as any relevant characteristics that might distinguish their regions from the Commission's findings in the PJM co-location docket. Ultimately, this topic will have direct long-term impacts on how future transmission systems will be planned and configured, how efficiently future power markets will operate, and how customers will respond to prices and system needs. Therefore, I am specifically interested in understanding how extending the new transmission services might affect individual suppliers or customers, as well as how existing systems or processes might be affected by these new services. I am open to understanding how these services might be helpful to a region or that they may create problems not yet anticipated.

## V. The Orders Recognize the Importance of Evaluating Advanced Transmission Technologies

12. Lastly, today we preliminarily find that each RTO/ISO's tariff is unjust and unreasonable because the tariff lacks clear and consistent provisions requiring the evaluation of alternative transmission technologies as potential solutions to accommodate an Eligible Customer's request for transmission service on behalf of a large load. Specifically, it is important for RTO/ISOs and transmission owners to evaluate whether alternative transmission technologies are feasible in reducing the cost of transmission system upgrades or allow for a faster timeline for accommodating the transmission service request. As many transmission owners have explored various alternative technologies in pilot projects,[8] it is time to roll out all available technologies to reduce

---

[8] *See, e.g.*, *Increasing Mkt. and Planning Efficiency Through Improved Software*, Effective Congestion Mitigation with Transmission Topology Optimization at Alliant Energy and ATC, Docket No. AD10-12-016, *available at* https://www.ferc.gov/media/effective-congestion-mitigation-transmission-topology-optimization-alliant-energy-and-atc (Alliant and ATC were able to save customers approximately $24 million over a 12-month period through the use of topology optimization); Pablo Ruiz and Derek Brown, "Reliable and Efficient Congestion Mitigation Using Transmission Reconfigurations," NewGrid and Evergy presentation (Oct. 2022), *available at* https://www.spp.org/Documents/67968/SAG%20Meeting%20

risks and costs for customers, as well as help the industry continue to develop new technologies that can increase the robustness of our transmission system while protecting customers from higher costs.

## VI. Conclusion

13. Today's orders address some of the most consequential issues currently in the industry and before the Commission. I hope that these proceedings provide vehicles through which the Commission can provide much-needed clarity and direction, and it is imperative that we build strong and comprehensive records on each issue in each region to inform our decision-making. I therefore encourage all interested parties to fully engage and help the Commission navigate these complex, multi-faceted challenges. Our success will ultimately be measured by our shared ability to deliver reliable and affordable power to all customers, to ensure new loads can interconnect in a timely fashion while paying their fair share of system costs, and to protect existing customers against adverse reliability or economic impacts.

For these reasons, I respectfully concur.

Judy W. Chang
Commissioner

Materials%2020221007.zip (identifying reconfigurations, had they been implemented, which could eliminate 98% of overloads and reduce congestion costs by 85% for congestion patterns associated with 10 significant constraints on Evergy's system); Pacific Gas & Electric Press Release, *PG&E and Smart Wires Enhance Grid Reliability, Capacity for Data Centers in San Jose* (May 28, 2025), *available at* https://investor.pgecorp.com/news-events/press-releases/press-release-details/2025/PGE-and-Smart-Wires-Enhance-Grid-Reliability-Capacity-for-Data-Centers-in-San-Jose/default.aspx (describing PG&E's deployment of advanced power flow control devices were able to mitigate thermal overloads by up to 34%, enabling an additional 100 MW of firm power delivery over existing lines at a congested substation).

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

| | | |
|---|---|---|
| Midcontinent Independent System Operator, Inc.<br><br>AEP Indiana Michigan Transmission Company, Inc.<br>ALLETE, Inc.<br>Ameren Illinois Company<br>Ameren Transmission Company of Illinois<br>American Transmission Company, LLC<br>Cleco Power LLC<br>Duke Energy Indiana, LCC<br>Entergy Arkansas, LLC<br>Entergy Louisiana, LLC<br>Entergy Mississippi, LLC<br>Entergy New Orleans, LLC<br>Entergy Texas, Inc.<br>GridLiance Heartland LLC<br>Indianapolis Power & Light Company<br>International Transmission Company<br>ITC Midwest LLC<br>Michigan Electric Transmission Company, LLC<br>MidAmerican Energy Company<br>Montana-Dakota Utilities Company<br>Northern Indiana Public Service Company LLC<br>Northern States Power Company, a Minnesota Corporation<br>Northern States Power Company, a Wisconsin Corporation<br>Northwestern Wisconsin Electric Company<br>Otter Tail Power Company<br>Pioneer Transmission, LLC<br>Republic Transmission, LLC<br>Southern Indiana Gas & Electric Company<br>Union Electric Company<br>Wabash Valley Power Association, Inc.<br>Wolverine Power Supply Cooperative, Inc. | Docket No. | EL26-70-000 |

(Issued June 18, 2026)

LACERTE, Commissioner, *concurring*:

1. I support today's fleet of show cause orders. We are at an inflection point in the history of American energy infrastructure. The extraordinary and rapid growth of large loads in RTOs and ISOs is faster than the current system can handle. This order charts a course for addressing the potential gaps and shortcomings in MISO's Tariff that need to be resolved to appropriately respond to this growth, as informed by careful review of the thousands of pages of comments received in response to the advance notice of proposed rulemaking (ANOPR).[1] I write separately to underscore my expectation for RTOs and ISOs, including MISO, to timely submit their robust, thoughtful, and region-specific proposals to address the concerns that we have preliminarily identified in their respective tariffs and agreements. By harnessing your region-specific expertise and creativity to bring tailored solutions to the table, together we can efficiently, reliably, and affordably integrate large load, co-located load and generation and/or storage, as well as electrically proximate large load onto the transmission system. I also support the use of alternative transmission technologies to unlock every megawatt of existing capacity from our current transmission system. We have the technology. We should use it now to enable faster interconnection of large loads, lower costs to customers, and help prevent cost shifting.

2. To that end, and in light of our action in today's orders, I also ask the state public utility commissions—whether they have already approved large load retail tariffs, are in the process of crafting large load retail tariffs, or have yet to embark on this essential tariff design process—to take a hard look and ensure their large load retail tariff provisions insulate ratepayers from the negative impacts of data center growth. Additionally, I expect MISO to design proposals in response to this show cause order that dovetail with the efforts on the retail side to implement the Ratepayer Protection Pledge, protect customers, and ensure that large loads cover the costs they incur to integrate with the grid.

3. The stakes here could not be higher and every gambler knows that the secret to surviving is knowing what to throw away and knowing what to keep.[2] Today's orders do exactly that—adopting thoughtful proposals that position our nation for success, driving meaningful change, and rejecting the gridlock, half-measures, and failure to plan that have gone on for far too long. The data center odyssey that we embarked upon first with

---

[1] *Interconnection of Large Loads to the Interstate Transmission System*, Advance Notice of Proposed Rulemaking, Docket No. RM26-4-000, (Oct. 23, 2025) (ANOPR); *see also* Letter from Chris Wright, Sec'y, U.S. Dep't of Energy (Oct. 23, 2025) (Secretary's Letter).

[2] Kenny Rogers, *The Gambler* (United Artists Records 1978).

PJM, then SPP, we now aggressively extend to all the RTO/ISO regions.[3] Enabling the swift and efficient interconnection of large loads to the transmission system while maintaining affordability, reliability, commitment to open access, competitive principles and cooperative federalism, will only be achieved through consistent, coordinated action and persistence. But without that first step,[4] there is no direction, no forward momentum, no journey, and no way to arrive at our future destination. In the show cause orders we issue today, the Commission takes a series of long strides towards our ultimate large load interconnection destination: we make preliminary findings that the RTO/ISO tariffs, including MISO, may be unjust and unreasonable and/or unduly discriminatory or preferential because they lack features necessary to timely, reliably, and safely interconnect and serve new large loads in a way that produces just and reasonable rates.

4. I commend each commentor for their robust and ongoing responses to the concerns that Secretary Wright and the Commission raised in the ANOPR proceeding. The comments helped us identify the common issues, common solutions, and individual differences among the RTOs/ISOs. We heard a plea for broad flexibility and regionally tailored solutions. And we will strive to work towards those solutions, not through top-down, one-size-fits-all mandates, but through consideration of region-specific proposals. And we endeavor to support an appeal for federal policies that build upon rather than disrupt current and planned developments, reflecting state and local processes and stakeholder efforts. Through these individually tailored and region-specific show cause orders, we are delivering to ensure that our transmission system can accommodate new large loads in a timely, safe, and reliable manner. And, importantly, in a manner that ensures benefits and protection for all customers. Affordability remains a top concern as we proceed forward.

5. The collective voices in the ANOPR comments have shaped our decision to issue six separate individually tailored and region-specific show cause orders, rather than a proposed final rule *at this time*. But the success of the next phase of this journey rests with you, MISO, and your stakeholders. We are directing you to expeditiously bring forward for our consideration your novel, region-specific solution(s). Time is of the essence. By inviting you to proceed under FPA section 205, we are giving you significant perks: the benefits of first wielder of the pen and the relatively capacious

---

[3] *Interconnection of Large Loads to the Interstate Transmission System*, 195 FERC ¶ 61,045 at P 2 (2026) (Order Regarding Intent to Act) (citing PJM Co-Location Order, 193 FERC ¶ 61,217; SPP HILL Order, 194 FERC ¶ 61,031; *Commonwealth Edison Co.*, 194 FERC ¶ 61,181 (2026); *Tri-State Generation and Transmission Ass'n*, 193 FERC ¶ 61,070 (2025); *Duke Energy Carolinas, LLC*, 193 FERC ¶ 61,237 (2025)).

[4] Admittedly, we are further down the road in some regions as compared with others.

standard under FPA section 205 that allows us to accept a potentially broad range of proposals provided they are shown to be just and reasonable and not unduly discriminatory or preferential.[5] We are even giving you flexibility to propose the implementation date for your innovative proposals. But such freedom comes with great and concomitant responsibility.

6. This is not a time to be cavalier and dodge the urgent need to meet the moment. While this is a long journey, even so, we must continue to move at breakneck pace to win the AI race. So let me be direct. If you choose not to submit timely, reasonable, non-discriminatory or preferential, comprehensive, and substantiated proposal(s), as directed and as required under our applicable statutes, your deficient response will not go unnoticed. I am prepared to play jurisdictional hardball, if needed.[6] This Commission has appropriately exercised considerable restraint in asserting the full scope of our jurisdiction in these orders. However, the Commission has very broad jurisdiction over transmission that we will not hesitate to utilize as necessary to ensure that we meet our objectives in all show cause proceedings, including this MISO proceeding we initiate here. If we find your Tariff is in fact unjust and unreasonable and unduly discriminatory or preferential, any failure on your end to provide a sufficient FPA filing or filings to address the large-load-related concerns that we have identified will result in the Commission dictating the solutions for you. I say this not as a threat, but as a statement of duty. While you may not like our remedies—I have often said that the federal government generally does not come up with the best solutions—this is an outcome we are prepared to pursue given the gravity of the moment and our statutory obligation. Notwithstanding our readiness to step in, it greatly benefits everyone for you to come up with an approach tailored to your region.

---

[5] *See, e.g., NRG Power Mktg, LLC v. FERC*, 862 FERC 108, 105 (D.C. Cir. 2017) (FERC may not employ a rate design that follows "a completely different strategy" than, or is "methodologically distinct" from, a proposed rate) (internal quotations omitted); *Oxy USA, Inc. v. FERC*, 64 F.3d 679, 692 (D.C. Cir. 1995) (stating that a proposal under FPA section 205 "need not be the only reasonable methodology, or even the most accurate"); *City of Winnfield v. FERC*, 744 F.2d 871, at 874-875 (D.C. Cir. 1984) (comparing the respective authorities of the Commission and public utilities under sections 205 and 206).

[6] 16 U.S.C. § 824(b); *New York v. FERC*, 535 U.S. 17 (2002) ("There is no language in the statute limiting FERC's *transmission* jurisdiction to the wholesale market[.]")) (emphasis in original); *id.* at 20 (stating that "the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer[.]").

7. I will end my concurrence where I began: We have heard your concerns, and, let me underscore, now is the time for you to heed ours. This is an extraordinarily consequential proceeding. The stakes for reliability, for affordability, and for the American ratepayer could not be higher. We owe it to the public to get this right. I look forward to reviewing and acting as expeditiously as possible on your responses to this show cause order, which I expect will include an FPA section 205 proposal or proposals.

8. For these reasons, I respectfully concur.

______________________________
David LaCerte
Commissioner

Document Content(s)

EL26-70-000.docx........................................................1

KUTAKROCK

**Kutak Rock LLP**
124 West Capitol Avenue, Suite 2000, Little Rock, AR 72201
office 501.975.3000

**Alexander T. Jones**
501.975.3000
alex.jones@kutakrock.com

October 19, 2026

**VIA EMAIL**

The Hon. Barry Hyde
Pulaski County Judge
201 South Broadway, Suite 400
Little Rock, AR 72201
c/o County Attorney Dominique Lane
dlane@pulaskicounty.net

Re: Request under the Arkansas Freedom of Information Act

Dear Judge Hyde:

Pursuant to the Arkansas Freedom of Information Act ("FOIA"), Ark. Code Ann. §§ 25-19-101, *et seq.*, and as a citizen of Arkansas, I respectfully request copies of the following records maintained by Pulaski County, Arkansas, to include you, your office, and staff, as well as all members of the Pulaski County Quorum Court (collectively, "you"; "your"):

1. All communications involving each member of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to AVAIO, to include all email correspondence, text messages, SMS messages, social media posts, group-chat communications, hand-written notes, contemporaneous meeting notes, call logs, and all other written communications or records of oral and written communications.

2. All communications by each member of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to regulations of so-called "high-intensity digital infrastructure uses in the unincorporated areas of Pulaski County," including but not limited to Item 26-I-56B, as passed by the Pulaski County Quorum Court on September 22, 2026, to include all email correspondence, text messages, SMS messages, social media posts, group-chat communications, hand-written notes, contemporaneous meeting notes, call logs, and all other written communications or records of oral and written communications.

3. All communications by each member of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to County Judge Hyde's veto of Item 26-I-56B on September 25, 2026, to include all email correspondence, text messages, SMS messages, social

EXHIBIT
6

media posts, group-chat communications, hand-written notes, contemporaneous meeting notes, call logs, and all other written communications or records of communications.

4. All communications members of the Pulaski County Quorum Court, and Pulaski County Judge candidate Wendell Griffin and/or each of his agents, attorneys, consultants, designees, employees, and representatives identifying, regarding, referring to, or relating to AVAIO, to include all email correspondence, text messages, SMS messages, social media posts, group-chat communications, hand-written notes, contemporaneous meeting notes, call logs, and all other written communications or records of communications.

5. All communications members of the Pulaski County Quorum Court, and Pulaski County Judge candidate Wendell Griffin and/or each of his agents, attorneys, consultants, designees, employees, and representatives identifying, regarding, referring to, or relating to regulations of so-called "high-intensity digital infrastructure uses in the unincorporated areas of Pulaski County," including but not limited to Item 26-I-56B, as passed by the Pulaski County Quorum Court on September 22, 2026, to include all email correspondence, text messages, SMS messages, social media posts, group-chat communications, hand-written notes, contemporaneous meeting notes, call logs, and all other written communications or records of communications.

6. All call logs that show the date, time, and duration of all telephone calls between or among members of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to AVAIO.

7. All call logs that show the date, time, and duration of all telephone calls between or among members of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to Item 26-I-56B, as passed by the Pulaski County Quorum Court on September 22, 2026.

8. All call logs showing the date, time, and duration of all telephone calls between or among members of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to regulations of so-called "high-intensity digital infrastructure uses in the unincorporated areas of Pulaski County."

9. All call logs showing the date, time, and duration of all telephone calls between or among members of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to County Judge Hyde's veto of Item 26-I-56B on September 22, 2026.

10. All public records held by the County involving the drafting, deliberation, consideration, debate, or contents of Item 26-I-56B, to include all data, exemplar ordinances, alternative proposals, and all less-restrictive measures considered but rejected in favor of the provisions ultimately adopted in Item 26-I-56B.

11. All records showing all oral, written, electronic, or other communications between or among members of the Pulaski County Quorum Court outside of a public meeting identifying, regarding, referring to, or relating to AVAIO.

12. All records showing all oral, written, electronic, or other communications between or among members of the Pulaski County Quorum Court outside of a public meeting identifying, regarding, referring to, or relating to Item 26-I-56B.

13. All records showing all oral, written, electronic, or other communications between or among members of the Pulaski County Quorum Court outside of a public meeting identifying, regarding, referring to, or relating to so-called "high-intensity digital infrastructure uses in the unincorporated areas of Pulaski County."

14. All records showing all oral, written, electronic, or other communications between or among members of the Pulaski County Quorum Court outside of a public meeting identifying, regarding, referring to, or relating to County Judge Hyde's veto of Item 26-I-56B on September 25, 2026.

15. All records showing all oral, written, electronic, or other communications showing each informal meeting between or among members of the Pulaski County Quorum Court, including deliberation or for the purpose of exercising a responsibility, authority, power, or duty of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to AVAIO.

16. All records showing all oral, written, electronic, or other communications showing each informal meeting between or among members of the Pulaski County Quorum Court, including deliberation or for the purpose of exercising a responsibility, authority, power, or duty of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to Item 26-I-56B.

17. All records showing all oral, written, electronic, or other communications showing each informal meeting between or among members of the Pulaski County Quorum Court, including deliberation or for the purpose of exercising a responsibility, authority, power, or duty of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to so-called "high-intensity digital infrastructure uses in the unincorporated areas of Pulaski County."

18. All records showing all oral, written, electronic, or other communications showing each informal meeting between or among members of the Pulaski County Quorum Court, including deliberation or for the purpose of exercising a responsibility, authority, power, or duty of the Pulaski County Quorum Court identifying, regarding, referring to, or relating to County Judge Hyde's veto of Item 26-I-56B on September 25, 2026.

***

Please consider the time period of this request to span from January 1, 2025 to the date of full compliance.

This request encompasses all public records on all accounts and devices used by members of the Pulaski County Quorum Court to conduct the public's business, whether any email account, phone, or other communication method or device is publicly or privately maintained.

If you contend that any portion of these public records is exempt from disclosure, please provide all non-exempt portions and cite the specific statutory exception or other authority relied upon for any redaction or withheld materials.

Please provide all responsive documents in native format with metadata intact, to be transmitted to alex.jones@kutakrock.com. If there are any fees associated with fulfilling this request, please inform me in advance.

Please confirm receipt of this request and confirm your ability to comply with the three-day requirement under the Arkansas Freedom of Information Act. However, I would be willing to agree to a reasonable request for an extension of time for full compliance. If you need clarification regarding any part of this request, I am available to discuss it at your convenience.

Sincerely,

Alexander T. Jones

ATJ/clp

KUTAKROCK

**Kutak Rock LLP**
124 West Capitol Avenue, Suite 2000, Little Rock, AR 72201
office 501.975.3000

**Alexander T. Jones**
501.975.3000
alex.jones@kutakrock.com

October 27, 2026

**VIA EMAIL**

The Hon. Barry Hyde
Pulaski County Judge
201 S. Broadway, Suite 400
Little Rock, AR 72201
c/o dlane@pulaskicounty.net

Dominique Lane
Pulaski County Attorney
201 S. Broadway, Suite 400
Little Rock, AR 72201
dlane@pulaskicounty.net

Mr. Justin Blagg
Parliamentarian
Pulaski County Quorum Court
201 S. Broadway, Suite 400
Little Rock, AR 72201
jblagg@pulaskicounty.net

Re: Notice of Freedom of Information Act Violations re: Pulaski County Quorum Court Item 26-I-56; Demand for Immediate and Complete FOIA Compliance

Dear County Officials:

On October 19, 2026, our firm requested public records held by Pulaski County pertaining to Quorum Court Item 26-I-56. We agreed to extend the County's compliance deadline to October 26, 2026. That deadline has passed, but the County's response remains incomplete. The County is now violating the Arkansas Freedom of Information Act ("FOIA"). Ark. Code Ann. § 25-19-105(a).

The incomplete production shows the Pulaski County Quorum Court has repeatedly engaged in impermissible polling and deliberation outside the mandatory Open Meetings process. These are separate FOIA violations. Ark. Code Ann. § 25-19-106(f)-(g). And they independently threaten to invalidate Item 26-I-56, if Pulaski County Judge Barry Hyde's veto is overridden. Ark. Code Ann. § 25-19-106(i)(1).

Justice Blackwood's response repeatedly violates FOIA and conceals evidence of the Quorum Court's impermissible polling and deliberation. The Quorum Court passed Item 26-I-56 on September 22, 2026. Justice Blackwood failed to produce her call logs for September 22, 2026. Yet Justice Blackwood *did* provide call logs from May 4-June 3, June 3-July 4, July 4-August 3, August 3-September 3, and October 4-November 3, as shown below:

EXHIBIT
7

| | | |
|---|---|---|
| Aug. 4 to Sept 3 Call Logs | Microsoft Excel Worksheet | 65 KB |
| July 4 to Aug 3 Call logs | Microsoft Excel Worksheet | 56 KB |
| July 4 to June 3 Call Log | Microsoft Excel Worksheet | 57 KB |
| May 4 to June 3 Call logs | Microsoft Excel Worksheet | 51 KB |
| Oct 4 to Nov. 3 Call logs | Microsoft Excel Worksheet | 45 KB |

Justice Blackwood's May, June, July, August, and October call logs show (1) Justice Blackwood's September call logs are readily available, and (2) Justice Blackwood is violating FOIA by concealing her September call logs.

These concealed September call logs would show evidence of Justice Blackwood's contacts with other Members of the Quorum Court to engage in impermissible polling and deliberations before the Quorum Court's vote on September 22, 2026, supporting invalidation of Item 26-I-56 under Ark. Code Ann. § 25-19-106(i)(1).

Justice Blackwood failed to provide any email communications, despite having used email to conduct the public's business. Justice Blackwood also failed to provide any direct text message communications with Judge Wendell Griffen.

Justice Blackwood *has* produced group-text messages involving Justice Blackwood, Judge Griffen, and other members of the Pulaski County Quorum Court. But these messages reveal Justice Blackwood's concealment of other responsive communications—another FOIA violation. For example, one set begins with a "reaction" which Judge Griffen sent on August 13, 2026:

Text Message • SMS
Thu, Aug 13 at 7:10 AM

Wendell Griffen

WG Liked "I cannot make it, but will try to send a letter beforehand. Liz Fletcher"

That "reaction" message (*i.e.*, "liking" the earlier message) couldn't exist without the earlier message that triggered the reaction. Justice Blackwood has concealed that earlier message—and likely many others—from disclosure. Moreover, Justice Blackwood repeated that violation on the very next page, where another "reaction" message was produced without the earlier message that triggered the reaction:

KUTAKROCK






Back on May 26, 2026, amid an ongoing meeting of the Pulaski County Quorum Court to consider a data center ordinance, Judge Griffen texted Justices Blackwood, Lewison, Capps, and Davis urging them, "Vote NO on the amendment! NO! Special treatment for AVAIO[.]"




This polling and deliberation occurred outside the public meeting process, confined to four members of the Pulaski County Quorum Court, including Justice Blackwood, and Judge Griffen.

On June 2, 2026, Judge Griffen sent a text message to Justices Blackwood, Lewison, Capps, Massey, and Davis, stating "I am drafting a clear and legally defensible, ordinance with a companion resolution of legislative findings for a twelve (12) month countywide moratorium on permitting high-intensity digital development in unincorporated areas of Pulaski County."

Judge Griffen incorrectly stated, "Pulaski County is legally immune from liability for monetary damages, again on statutory and constitutional grounds." And invited "any suggestions for the measures I am drafting." Justice Blackwood replied, "Great! Can't wait to see it [] :-)". Judge Griffen stated, "Check your email inboxes. Kathy, I sent yours to your Pulaski.net email address. Let me know if you need me to send it to another email address." The County has failed to produce these email communications.

Between June 8, 2026, and June 9, 2026, Judge Griffen engaged members of the Pulaski County Quorum Court in impermissible deliberations about data center measures via email correspondence outside the formal public meeting process, violating FOIA. Ark. Code Ann. §§ 25-19-106(f)(2)(A), (C), (g).

On July 20, 2026, Judge Griffen engaged Justice Blackwood, plus four other Quorum Court members, in impermissible polling and deliberations about Item 26-I-45A and 26-I-52. Judge Griffen invited specific legislative maneuvering: "[i]f the five of you vote against 26-I-52 we can mount another effort to pass a revised version of 26-I-45A," continuing, "[i]f any of you object to my idea please let me know." Justice Blackwood replied, "I'm with you Judge!" These communications violated FOIA. Ark. Code Ann. §§ 25-19-106(f)(1)(A), (C)(ii); (f)(2)(A), (C); (g).

On August 11, 2026, Judge Griffen wrote "CONGRATULATIONS!" to a subset of members of the Quorum Court including Justice Blackwood, as well as numerous non-members of the Quorum Court. Referring to the presence of non-members of the Quorum Court, Justice Curry asked, "Why are other people included in this text? Much disrespect has already been [g]iven over the last 3 months. To go alone to go alone is not what I do. I had concerns."

***

We demand <u>immediate</u> and <u>complete</u> FOIA compliance. Our firm will take all steps needed to ensure public disclosure of these concealed public records.

These FOIA violations threaten to invalidate Item 26-I-56 and expose the County to attorneys' fees and other litigation expenses. Ark. Code Ann. §§ 25-19-106(i); 107(d)(1). Through this letter we seek to exhaust any applicable administrative remedy, while reserving the right to challenge the applicability or lawfulness of any such requirement.

Sincerely,

Alexander T. Jones

ATJ/atj
Enclosures

# ENCLOSURES INDEX

**ENCLOSURE A**: Call Logs from Justice Blackwood

**ENCLOSURE B**: Text Message Conversation, "jpdonna40@aol.com Kathy Steven Staci Patricia Natalie Eric Luke Blake Rebekah Tina Wendell Kristy Eans Kathy Liz +1 (479) 422-4826 +1 (501) 350-8371 +1 (501) 691-11" produced by Justice Blackwood

**ENCLOSURE C**: Text Message Conversation, "Kathy Natalie Rebekah Wendell" produced by Justice Blackwood

**ENCLOSURE D**: Text Message Conversation, "Kathy Natalie jpdonna40@aol.com Rebekah Wendell" produced by Justice Blackwood

**ENCLOSURE E**: Email Correspondence between W. Griffen and Quorum Court Members

**ENCLOSURE F**: Text Message Conversation, "jpdonna40@aol.com Patricia Rebekah Wendell Tina" produced by Justice Blackwood

**ENCLOSURE G**: Text Message Conversation, "jpdonna40@aol.com Kathy Steven Staci Patricia Natalie Dianne Curtis A. Kristina Rebekah Tina Wendell Kristy Eans +1 (501) 350-6948 +1 (919) 416-5097 +1 (501) 993-37" produced by Justice Blackwood

| | |
|---|---|
| **From:** | Justin Blagg <jblagg@pulaskicounty.net> |
| **Sent:** | Monday, October 26, 2026 4:25 PM UTC |
| **To:** | Jones, Alex T. <Alex.Jones@KutakRock.com> |
| **Subject:** | Fw: Julie Blackwood - FOIA response |
| **Attachments:** | Response to FOIA.pdf, May 4 to June 3 Call logs.numbers, July 4 to June 3 Call Log.numbers, July 4 to Aug 3 Call logs.numbers, Aug. 4 to Sept 3 Call Logs.numbers, Oct 4 to Nov. 3 Call logs.numbers |

**This Message Is From an External Sender**

This message came from outside your organization.

*Justin L. Blagg*
Quorum Court- Coordinator & Parliamentarian
201 South Broadway, Suite 411
Little Rock, Arkansas 72201
501-218-5757 Cell - 501-340-8802 Office
jblagg@pulaskicounty.net

PULASKI COUNTY

**From:** Julie Blackwood <bodyshapepro@yahoo.com>
**Sent:** Monday, October 26, 2026 11:11 AM
**To:** Justin Blagg <jblagg@pulaskicounty.net>
**Subject:** FOIA response

**⚠ EXTERNAL EMAIL**
This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and their email address.

Justin I am sending my texts from my phone in your messages

**ENCLOSURE A**

| | | |
|---|---|---|
| Aug. 4 to Sept 3 Call Logs | Microsoft Excel Worksheet | 65 KB |
| July 4 to Aug 3 Call logs | Microsoft Excel Worksheet | 56 KB |
| July 4 to June 3 Call Log | Microsoft Excel Worksheet | 57 KB |
| May 4 to June 3 Call logs | Microsoft Excel Worksheet | 51 KB |
| Oct 4 to Nov. 3 Call logs | Microsoft Excel Worksheet | 45 KB |

Text Message • SMS
Thu, Aug 13 at 7:10 AM

Wendell Griffen

WG

Liked "I cannot make it, but will try to send a letter beforehand. Liz Fletcher "

Thu, Aug 13 at 8:47 PM

Wendell Griffen

WG

Thanks to everyone for your presence and hopes tonight.

Fri, Aug 14 at 1:17 AM

Liz Fletcher

LF

They have had the document with only minor changes for a while, and I emailed it to them all again today.

LF

And the ordinance has an emergency clause, it needs to be enacted ASAP.

Fri, Aug 14 at 4:52 AM

Wendell Griffen



PUBLIC STATEMENT ON ITEM 26-I-56 A...
- Wendell Griffen
facebook.com

WG

**ENCLOSURE**

**B**

Liz Fletcher

LF

👍 to "Well it's safe for me to say,hmm, I'm not surprised,they allowed to burn because they couldn't extinguish it, NOONE can with a certified agent and count the number of agencies we're requested for assistance. It is also as a note of reference,Forest City has a paid department with 3 STAFFED fire stations. Imagine Wrightsville, Sweet Home, Quail Creek and East End, that unit would have burned in place."

Wendell Griffen

WG

FYI.

iMessage
Encrypted

Tue, May 26 at 9:28 PM

Wendell Griffen

WG Vote NO on the amendment!

WG NO! Special treatment for AVAIO

**ENCLOSURE**

**C**

iMessage
Encrypted

Tue, Jun 2 at 7:17 AM

Wendell Griffen

Good morning,

I am drafting a clear and legally defensible, ordinance with a companion resolution of legislative findings for a twelve (12) month countywide moratorium on permitting high-intensity digital development in unincorporated areas of Pulaski County. I hope to send my proposed measures to you by noon tomorrow.

In the meantime. I want you to know that a 12 month moratorium with appropriate legislative findings is not a ban, is highly defensible on constitutional and statutory grounds, and that Pulaski County is legally immune from liability for monetary damages, again on statutory and constitutional grounds.

Feel free to offer any suggestions for the measures I am drafting.

WG

Great! Can't wait to see it:-)

Tue, Jun 2 at 1:50 PM

Wendell Griffen

Check your email inboxes. Kathy, I sent yours to your Pulaski.net email address. Let me know if you need me to send it to another email address.

WG

ENCLOSURE

D

| | |
|---|---|
| **From:** | Natalie Capps <nataliecappsjp@gmail.com> |
| **Sent:** | Tuesday, June 9, 2026 4:47 PM UTC |
| **To:** | Patricia <patriciaforarkansas@gmail.com> |
| **CC:** | Wendell Griffen <wendell.griffen@gmail.com>; tinawardjustice9@gmail.com; stacimedlock1@yahoo.com; Steven Person <Sgperson@gmail.com>; Julie Blackwood <julieanneblackwood@gmail.com>; Justin Blagg <jblagg@pulaskicounty.net>; davisjop1@gmail.com; kathylewisonjp@pulaskicounty.net; Donna Massey <donnamassey64@gmail.com>; currydianne0405@yahoo.com; curtiskeith7817@yahoo.com; lmccoyjp@pulaskicounty.net; Phil Stowers <pstowers71@yahoo.com>; pdelliottmail@gmail.com; Jim Cranor <jcranor@pulaskicounty.net>; hkemp@pulaskicounty.net; Barry Hyde <bhyde@pulaskicounty.net> |
| **Subject:** | Re: added option to original question |

Thanks to you guys for these thoughtful revisions. I had and have expressed similar concerns to Judge Griffin regarding unintended consequences. I reached out to Jim Cranor to get a list of industries and use patterns that would be affected by these thresholds. They are included below for your information.

JP Capps,

Below are a few industrial uses beside data centers that use either more than 5 Megawatts/day or more than 100,000 gallons per day:
Electrical Usage
Metal ore processing. 50-200MW daily
Fertilizer production. 50MW+ daily
Petroleum refining 100MW+ daily
Semiconductor/chip manufacturing 50-100MW daily
Cement and Concrete Manufacturing 20-50MW daily
Forest/Paper Products 100-2400 MW daily
Food processing up to 24 MW daily
Plastic and Rubber manufacturing 10-30 MW daily

Water usage greater than 100K gallons per day
Chemical Processing
Forest Paper Products
Mining and Metal processing
Food and Beverage processing
Chip and semiconductor manufacturing
Automotive manufacturing
Textile manufacturing

https://www.energy.gov/cmei/ito/energy-intensive-industries

Jim Cranor RLA, CFM
Pulaski County Planning and Development
3200 Brown Street

**ENCLOSURE**
**E**

Little Rock, AR 72204
501-340-8265

On Jun 9, 2026, at 9:56 AM, Patricia <patriciaforarkansas@gmail.com> wrote:

Wendell,

Thank you for your thoughtful response and for taking the time to explain the legal and policy considerations behind the ordinance. I appreciate your willingness to consider amendments and your efforts to strengthen the ordinance's legal defensibility.

After reviewing your proposed revisions, I understand and appreciate the rationale for retaining the 5 MW threshold and utilizing an impact-based framework rather than limiting the moratorium solely to HIDI facilities. Your explanation regarding Act 851, equal protection concerns, and the potential challenges associated with a HIDI-only approach was helpful.

My remaining concern is ensuring that the moratorium does not unintentionally impede existing employers, essential public services, or projects already substantially underway. While I support providing the County time to develop a comprehensive regulatory framework, I also believe we should avoid discouraging investment from businesses and institutions that have already committed to Pulaski County.

With that in mind, I would like to suggest the addition of the following exemption language:

"Notwithstanding any provision of this Ordinance to the contrary, the temporary moratorium established herein shall not apply to:

(a) The expansion, modernization, replacement, redevelopment, upgrade, repair, or improvement of any lawful business, commercial facility, manufacturing facility, distribution facility, healthcare facility, agricultural operation, industrial operation, or other lawful enterprise operating within Pulaski County prior to the effective date of this Ordinance, provided such expansion or improvement remains substantially related to the facility's existing use;

(b) Any project for which a complete application for county approval, site plan approval, subdivision approval, utility service application, utility interconnection request, development permit, or other required governmental authorization has been submitted prior to the effective date of this Ordinance; and

(c) Public schools, colleges and universities, hospitals, medical facilities, public safety facilities, water and wastewater facilities, public utility infrastructure, electric generation facilities, renewable energy facilities, and agricultural operations providing essential public services."

I believe this amendment would preserve the core purpose of the moratorium while addressing concerns that existing employers, healthcare providers, educational institutions, utilities, and projects already in the development pipeline could be unintentionally impacted.

My goal is not to weaken the ordinance, but rather to ensure it remains focused on the types of new utility-intensive developments that prompted this discussion while protecting jobs, existing investment, essential services, and economic opportunities within Pulaski County.

I appreciate your willingness to work collaboratively on this issue and would welcome your thoughts regarding whether these exemptions could be incorporated into the ordinance as part of a compromise that addresses both the legal concerns you identified and the economic development concerns that have been raised.

Respectfully,

Patricia Young-Baker
Justice of the Peace, District 10
501-749-8535

On Tue, Jun 9, 2026 at 7:00 AM Wendell Griffen <wendell.griffen@gmail.com> wrote:
Good Morning, Patricia,

Thank you for your thoughtful message. You raise a good point. As crafted, the moratorium ordinance should avoid being "over-inclusive" by its application to "High-Impact Industrial Use" by not making the 5 MW electrical demand and 100,000 gallons of water usage threshold the sole objective criteria.

However, limiting the moratorium solely to High-Intensity Digital Infrastructure (HIDI) facilities creates additional legal and policy problems. The most obvious problem is that this approach would violate Act 851 of 2023 (The Arkansas Data Centers Act) - which prohibits governmental actions that discriminate against data centers, cryptocurrency mining operations, artificial intelligence computing campuses, and similar data asset mining operations - yet ignore other industrial projects that have electrical grid, water usage and wastewater, fire suppression and response, emergency services response, road, noise, light, air pollution, and other "impacts" comparable to those facilities. In addition to the Act 851 vulnerability, limiting the moratorium to HIDI facilities raises the prospect of claims that the ordinance constitutes special legislation in violation of the Arkansas Constitution, an arbitrary classification, or preferential treatment in violation of the equal protection provision in the Fourteenth Amendment to the U.S. Constitution. Those were the driving reasons for the additional category of "High-Impact Industrial Use."

To address your valid concern, I suggest that we replace the term "High-Impact Industrial Use" with the more descriptive term "High-Impact Utility-Intensive Industrial Use," defined as follows:

"High-Impact Utility-Intensive Industrial Use" means a facility that:

(1) is designed to require five (5) megawatts (MW) or more of continuous electrical demand;

(2) requires substantial new transmission, distribution, water, wastewater, or substation infrastructure;

(3) operates continuously or near-continuously; and

(4) is reasonably anticipated to create significant utility, public safety, environmental, emergency response, or other infrastructure impacts beyond the project site.

The Planning Board is authorized during the moratorium period to determine whether other proposed uses are substantially similar to this category so as to be governed by the moratorium."

This "impact-based" definition is stronger than a data-center-only or HIDI-only moratorium because it ties the moratorium to legitimate land use concerns rather than a single industry, and lowers the risk of legal challenges that the moratorium ordinance constitutes special legislation, is arbitrary, or violates the Fourteenth Amendment's guarantee of equal protection of the law.

The 5 MW threshold is not intended to regulate electricity consumption or stifle economic development. Instead, it is an objective industry-neutral method for identifying projects that may create extraordinary land-use, infrastructure, water, emergency response, and utility impacts during the temporary study period envisioned by the moratorium. From that perspective, the question is not whether a project is 'good" for economic development, but whether the project is large enough to justify review while Pulaski County develops a permanent regulatory framework.

Remember, the moratorium will not prevent projects from being designed. It will not prevent developers from submitting project applications to the Planning Department for review. And it will not prevent the Planning Department from performing the necessary reviews of those applications. *It will only postpone approving and permitting of projects that are of a scale that is likely to produce the land-use impacts we are concerned about beyond the boundaries of their sites, meaning on neighboring property-owners and their land uses.* A 5 MW threshold is used because projects at that scale typically require significant utility infrastructure planning (electrical substations, transmission lines, water mains, water lines, wastewater treatment adjustments, for example) **and** often involve impacts *that extend beyond the project site.*

The 10 MW threshold you suggest would allow a developer to design, get approval, permitting, and build two or more 5 MW facilities on its site, for example - and produce the same or greater permanent impacts *with each of those facilities beyond the project site* as a 10 MW threshold would produce - yet not be governed by the temporary moratorium for any

of them, let alone the entire site. Meanwhile other developers would be permanently governed by the 10 MW threshold. That situation would expose the County to legal challenge that the 10 MW threshold, although not facially discriminatory, is discriminatory "as applied" so as to be judged a violation of the Fourteenth Amendment to the U.S. Constitution.

To address the economic development concerns you mentioned, I propose that the following finding be added to Article 6 of the moratorium ordinance immediately after the word "Intent" and before the remaining wording in Article 6:

"The Quorum Court finds that an electrical demand of five (5) megawatts (MW) serves as a reasonable and objective indicator of projects that may create substantial impacts on utility infrastructure, water resources, transportation systems, emergency services, land use compatibility, and public finances. The threshold is not intended to regulate electrical consumption as such, nor is it intended to discourage economic development. Rather, it is intended to identify projects of a scale that may require significant public and private infrastructure commitments and whose impacts extend beyond the boundaries of the project site.

The Quorum Court further finds that the temporary moratorium established by this Ordinance is intended to provide the County sufficient time to evaluate the unique land use, infrastructure, environmental, emergency services, and fiscal impacts associated with High-Intensity Digital Infrastructure facilities and other similarly-situated utility-intensive land uses. The moratorium is temporary in duration, applies only during the period needed to develop a comprehensive regulatory framework, and is intended to promote long-term economic development by ensuring that future growth in the unincorporated areas of the County occurs in a way that is predictable, transparent, and sustainable, and protects the health, safety, and welfare of residents of Pulaski County."

To summarize, I think we can address your concerns by replacing "High-Impact Industrial Use" with the more descriptive term "High-Impact Utility-Intensive Industrial Use." We can address your concern about the economic development implications of the 5 MW electrical load threshold by the "impact-based" definition shown above, coupled with the following wording: "The Planning Board is authorized during the moratorium period to determine whether other proposed uses are substantially similar to this category so as to be governed by the moratorium."

I cannot speak for Justices Ward, Blackwood, and Davis (sponsors of the moratorium ordinance), but I would certainly welcome a motion to amend Item 26-I-45 accordingly. I hope we can get a good vote on that amendment, and then a good vote on the moratorium, as amended, at tonight's meeting of the Agenda Committee. To that end, I am copying the other members of the Quorum Court as well as Justin Blagg, Jim Cranor, Hamilton Kemp, and Judge Hyde.

Again, thanks for your thoughtful suggestions. Let me know if you see problems with what my suggested remedies.

Wendell Griffen
wendell.griffen@gmail.com
He/him/his

On Jun 8, 2026, at 8:42 PM, Patricia <patriciaforarkansas@gmail.com> wrote:

Wendell,

Thank you for taking the time to speak with me today and the considerable work that has gone into drafting Ordinance 26-I-45. I appreciate the effort to create a thoughtful framework for evaluating the impacts of large-scale digital infrastructure projects. As we discussed earlier and after reviewing the ordinance more closely, I had an additional question.

As currently written, the ordinance applies not only to High-Intensity Digital Infrastructure (HIDI) facilities such as data centers, AI computing facilities, and cryptocurrency mining operations, but also to any "High-Impact Industrial Use" meeting the electrical demand or water-use thresholds (5 MW or greater; or Water use of 100,000 gallons per day or greater).

My concern is that this could unintentionally impact existing employers and future economic development projects that are unrelated to digital infrastructure. Large manufacturing facilities, distribution centers, logistics hubs, food processing operations, healthcare campuses, and similar employers can often exceed the ordinance's 5 MW electrical threshold. As written, the moratorium could potentially delay expansions of existing businesses that have already invested in Pulaski County, employ local residents, and contribute significantly to our tax base and economy.

If the primary purpose of Ordinance 26-I-45 is to evaluate the unique impacts of data centers, AI computing facilities, cryptocurrency mining operations, and other digital infrastructure projects, then perhaps the ordinance should be limited to those uses. The inclusion of "High-Impact Industrial Uses" extends the moratorium far beyond digital infrastructure and risks delaying manufacturing expansions, distribution facilities, healthcare projects, and other economic development opportunities that were never the stated focus of the ordinance.

I wanted to ask whether you might consider one of the following alternatives:

- Remove references to and the definition of "High-Impact Industrial Use." This would result in a moratorium that applies only to High-Intensity Digital Infrastructure (HIDI) facilities. Such a revision would more closely align the ordinance with its stated purpose and eliminate concerns that traditional

industrial, manufacturing, distribution, logistics, or healthcare projects could be unintentionally affected.

- Exempt Existing Businesses and Expansions.

If there is a desire to retain the broader High-Impact Industrial Use language, perhaps existing businesses operating in Pulaski County before the effective date of the ordinance could be exempt, including expansions, modernization projects, facility upgrades, and infrastructure improvements associated with those operations. This approach would allow the County to study and develop a regulatory framework for future projects while ensuring that current employers are not prevented from growing, creating jobs, or making additional investments in Pulaski County.

- Go back to the 10 MW (megawatt) threshold.

My concern is that we do not inadvertently hinder economic development, business retention, healthcare expansion, or job creation while addressing the legitimate concerns surrounding large-scale digital infrastructure projects.

I would appreciate your thoughts on whether either of these approaches could help accomplish the ordinance's goals while avoiding unintended consequences for existing employers and future economic opportunities in Pulaski County.

Thanks again for all that you have done!

Patricia

Patricia Young-Baker
Justice of the Peace, District 10
501-749-8535

iMessage
Encrypted

Mon, Jul 20 at 5:45 AM

Wendell Griffen

Good morning.

I am not willing to give up on Item 26-I- 45A, the twelve month moratorium ordinance that was defeated last week in favor of 26-I-52 that Entergy put Dianne Curry to sponsor.

She needs 10 votes to enact it.

If the five of you vote against 26-I-52 we can mount another effort to pass a revised version of 26-I-45A. I'm willing to draft it for your review if you're willing to support that effort.

We shouldn't give up on protecting the residents of Sweet Home, Wrightsville, Higgins, and Woodson communities from the AVAIO/Entergy/Central Arkansas Water/Chamber of Commerce/Barry Hyde scheme to turn south Pulaski County into a de facto industrial zone.

If any of you object to my idea please let me know. I will respect your opinion.

Let's not give up. This is a defining moment not only for the future of south Pulaski County but for the entire unincorporated region of the County.

WG

Mon, Jul 20 at 9:23 AM

I'm with you Judge

ENCLOSURE

F

Text Message • SMS
Wed, Jun 17 at 3:58 PM

Wendell Griffen

WG

FYI.

**https://acrobat.adobe.com/id/urn:a...**
**- Wendell Griffen**
facebook.com

Tue, Aug 11 at 7:41 PM

Wendell Griffen

WG

CONGRATULATIONS!

+1 (501) 993-3747 Add

This QC isn't going to know how to function when they have a County Judge who knows what he is talking about and how to officiate this county!

+1 (501) 350-6948 Add

I could not be there in person. I have watched almost the entire thing. Thanks it's not a strong enough word for the work that Judge Wendell Griffen did tonight publicly on behalf of all the residents of Pulaski County. His comments were helpful, fact, based, delivered with concern... he did a brilliant job representing the county and the interest of the people. Thanks again.

Kristina Gulley

KG

**Judge**, I had to leave early Congratulations on getting your ordinance!

Thank you!

Kristy Eans

K

Congrats!

Thank you!

Kristina Gulley

ENCLOSURE
G

Thank you!

Kathy Lewison

I Appreciate Your Kind Remarks!🥳

Tue, Aug 11 at 10:03 PM

Kristy Eans

Props also to my JP Rebekah Davis.

Wendell Griffen

Our JPs did their homework. This is a very different land use from anything we've seen before in Pulaski County.

They read. Asked serious questions. Pondered. Received strong outpouring of concerns from their constituents.

They deserve our respect for making tonight's vote, and in not allowing themselves to be intimidated or overwhelmed by the amount of information they must party people.

Let's get those!

1 Reply

Kristy Eans

Yes 💯

Our JPs did their homework. This is a very different land use from anything we've seen before in Pulaski County.

+1 (501) 993-3747 Add

Agree!

Dianne Curry

Why are other people included in this text?

Much disrespect has already been Given over the last 3 months. To go alone to go alone is not what I do.



I had concerns.