**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**ADP LITTLE ROCK DATA HUB, LLC** **PLAINTIFF**

**vs.** **Case No. 4:26-cv-1196-LPR**

**PULASKI COUNTY, ARKANSAS;
BARRY HYDE, in his official capacity
as Pulaski County Judge;
JULIE BLACKWOOD, in her official capacity
as Pulaski County Justice of the Peace** **DEFENDANTS**

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff ADP Little Rock Data Hub, LLC ("ADP") is building a large load data center in Pulaski County, Arkansas. ADP is working with utilities, contractors, and vendors to undertake one of the largest capital investments in Arkansas history. Before October 27, 2026, ADP had satisfied all conditions set by Defendant Pulaski County, Arkansas ("the County") which had issued Final Site Plan Approval for ADP's project on August 11, 2026.

Opponents of ADP's project seek to undermine it through Pulaski County Ordinance 26-OR-19 ("the Ordinance"). Under color of state law, they launched a secretive campaign to "stop" ADP's project. On September 22, 2026, after impermissible polling and deliberation in violation of Arkansas's Open Meetings laws, the Pulaski County Quorum Court ("Quorum Court") passed the Ordinance. Three days later, Defendant Pulaski County Judge Barry Hyde vetoed the measure, citing its unlawfulness. But on October 27, 2026, the Quorum Court overrode Judge Hyde's veto.

ADP has no objection to lawful regulations of its project. But this Ordinance is unlawful. It regulates matters committed by Congress and the General Assembly to federal and state authorities with exclusive jurisdiction. The Ordinance regulates and discriminates against

interstate commerce. It targets ADP with arbitrary, burdensome, and discriminatory requirements, reviews, and assessments meant to forestall and impair ADP's ability to fully develop its site. And the Quorum Court enacted the Ordinance pursuant to concerted violations of Arkansas's Open Meetings laws.

The Court should enter a preliminary injunction restraining Defendants, their agents, employees, designees, and all persons acting in concert with them from enforcing the Ordinance against ADP for the pendency of this action. To ensure ADP can pursue complete relief, the Court should enter a preliminary injunction directing the County, Defendant Pulaski County Justice of the Peace Julie Blackwood ("Justice Blackwood"), and all other persons subject to Rule 65(d)(2) to achieve immediate and complete compliance with Plaintiff's request under the Arkansas Freedom of Information Act Defendants received October 19, 2026. Dkt. No. 1, Compl., Ex. 6.

**PRELIMINARY INJUNCTION STANDARD**

ADP has the burden of showing it is entitled to preliminary injunctive relief. To meet its burden, ADP must show (1) it is likely to succeed or has a fair chance of prevailing on the merits of its claim; (2) it is likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities favors ADP; and (4) an injunction would serve the public interest. *See Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc). "No single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006)). "However, '[i]n deciding whether to grant a preliminary injunction, likelihood of success on the merits is most significant.'" *Turtle Island*, 992 F.3d at 699 (quoting *Laclede Gas Co. v. St. Charles County, Mo.*, 713 F.3d 413, 420 (8th Cir. 2013) (citations omitted)).

In this posture, ADP must show it has at least "a fair chance of prevailing" on its claims. *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019).[1] Here, Defendants cannot show the Ordinance was enacted pursuant to "the full play of the democratic process." *D.M.*, 917 F.3d at 1000 (quoting *Rounds*, 530 F.3d at 732 n.6; also citing *Richland/Wilkin Joint Powers Authority v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)). Given the irregularities in the Ordinance's promulgation, the Court should find that ADP satisfies the likelihood-of-success prong even if ADP shows only a fair chance of prevailing on the merits.

**LIKELIHOOD OF SUCCESS ON THE MERITS**

The Court should find that ADP is likely to succeed or has a fair chance of prevailing on the merits of its claims that Ordinance 26-OR-19 is likely unlawful.

<u>Federal Preemption</u>

Ordinance 26-OR-19 intrudes on domains which Congress commits to federal authorities. "The Federal Power Act (FPA) […] vests in the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over wholesale sales of electricity in the interstate market." *Hughes v. Talen Energy Marketing, LLC*, 578 U.S. 150, 153 (2016) (citing 16 U.S.C. §§ 791a *et seq.*). "Under the FPA, FERC has exclusive authority to regulate 'the sale of electric energy at wholesale in interstate commerce.'" *Hughes*, 578 U.S. at 154 (quoting 16 U.S.C. § 824(b)); *New York v. FERC*, 535 U.S.

---

[1] To find likelihood of success on the merits "where a preliminary injunction is sought to enjoin the implementation of a duly enacted *state statute*" the district court must "make a threshold finding that a party is likely to prevail on the merits." *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732-33 (8th Cir. 2008) (emphasis added). But *Rounds* did not extend that requirement to "city ordinances or administrative actions by federal, state or local government agencies[.]" *Id.* at n.6. *Rounds* noted, "the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents 'the full play of the democratic process' and, thus, deserves the deference of the traditional test." *Id.* (quoting *Able v. United States*, 44 F.3d 128, at 131-32 (2d Cir. 1995)).

1, 6-7 (2002); *North Dakota v. Heydinger*, 825 F.3d 912, 914-916 (8th Cir. 2016) (discussing role of regional transmission organizations ("RTOs") such as Midcontinent Independent Transmission System Operator ("MISO")) (citing *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 267 (2016) ("*EPSA*") ("[A]lmost all electricity flows not through 'the local power networks of the past,' but instead through an interconnected 'grid' of near-nationwide scope.")).

Local governments "may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority[.]" *Hughes*, 578 U.S. at 164. "A state law is preempted where 'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law,' [...] as well as 'where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Id.* at 163 (quoting *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 509 (1989); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (cleaned up)).

"[T]ransmissions on the interconnected national grids constitute transmissions in interstate commerce." *New York*, 535 U.S. at 16 (citing *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 466-467 (1972)). "[E]nergy flowing onto a power network or grid *energizes the entire grid*, and consumers then draw undifferentiated energy from that grid." *New York*, 535 U.S. at n.5 (emphasis in original) (quotation omitted). Thus, "any activity on the interstate grid affects the rest of the grid." *Id.* RTOs like MISO now "control most of the nation's transmission grid." *Heydinger*, 825 F.3d at 914-915 (citations omitted). "FERC often forgoes the cost-based rate-setting traditionally used to prevent monopolistic pricing[,]" and "instead undertakes to ensure 'just and reasonable' wholesale rates by enhancing competition" by attempting "to break down regulatory and economic barriers that hinder a free market in wholesale electricity." *EPSA*, 577 U.S. at 267 (quoting *Morgan*

*Stanley Capital Group, Inc. v. Public Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 536 (2008) (noting FERC's efforts to "promote competition" in the generation market while "ensuring that the segment of the industry characterized by natural monopoly—namely, the transmission grid that conveys the generated electricity—cannot exert monopolistic influence over other areas.")).

*Heydinger* arose from Minnesota's attempts to regulate power generation in North Dakota, resulting in a split decision with three opinions to affirm the district court on overlapping grounds. Judge Loken applied the extraterritoriality doctrine under the dormant Commerce Clause. 825 F.3d at 922 (Minnesota may not "restrict[] use of the currently most cost-efficient sources of generating capacity" by "[o]ther States in the MISO region"). Judges Murphy and Colloton both found Minnesota's law preempted by the FPA. *See id.* at 927 ("Minnesota's ban on certain capacity contracts directly conflicts with FERC's jurisdiction"); *id.* at 928 ("Insofar as the Minnesota statute bans wholesale sales of electric energy in interstate commerce, I agree with Part II of Judge Murphy's opinion that the statute is preempted by the [FPA]. [FERC] has exclusive jurisdiction over the interstate wholesale market for electricity, including wholesale rates."). Judge Colloton also noted Minnesota could raise any "concerns with emissions from its neighbors" by "seek[ing] recourse through one of the [Clean Air] Act's several mechanisms by which affected States may challenge emissions from source States." *Id.* at 929 (citing 42 U.S.C. § 7426; *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 310-11 (4th Cir. 2010)).[2] *Heydinger* shows the substantial overlap between FPA preemption and facial invalidity under the dormant Commerce Clause.

---

[2] Defendants have not shown any effort to address concerns with ADP's electricity consumption in FERC or PSC proceedings. *See, e.g.*, 18 C.F.R. § 385.214(3) (authorizing "motion to intervene" in FERC docket); Rule 4.02(a) of PSC's Rules and Practice and Procedure (equivalent mechanism before PSC). Akin to Judge Colloton's reasoning in *Heydinger*, the County should submit requests for relief to FERC and PSC, not intrude on their statutory authorities.

FERC has determined "there is an urgent need for thoughtful reforms to ensure that large loads are able to connect to the transmission system in a timely, orderly, and non-discriminatory manner." 195 FERC ¶ 61,212, ¶ 7, and 9. ADP's data center project satisfies FERC's and MISO's definition of "large load" because it is (1) a new commercial or industrial customer; (2) located at a single site behind one or more points of interconnection; (3) has a peak load of 50 MW or greater; (4) interconnects to the transmission system at a voltage level of greater than 69 kV; and (5) is not part of a co-location arrangement." Ex. 1, Declaration of Kevin Murphy ("Murphy Declaration") at ¶¶ 11-15.

Through Ordinance 26-OR-19, the County claims a gatekeeping role for ADP's interconnection to the transmission grid. The Ordinance requires ADP to engage in costly, unpredictable, and discriminatory "electrical-load analysis, utility correspondence, proposed substations, transmission and distribution facilities, on-site generation, generators, fuel systems, and battery systems[.]" Section 6.2. The Ordinance requires ADP to submit feasibility and impact studies to the County. Based on those submissions, the County analyzes ADP's activity on the interstate grid, that activity's impacts on "[a]dequate electrical" infrastructure capacity, and whether ADP's electricity consumption will "impair safe, reliable, or efficient infrastructure service to surrounding properties." Article 7(a). Thus, interconnection of and transmission to ADP's data center project depend on the County's discretionary review of ADP's grid feasibility and impact submissions.

But the FPA and Supreme Court precedent make clear that large-load interconnection is FERC's field to occupy, not the County's. Decisions about the national power grid have national ramifications, which is why Congress commits those decisions to FERC, not local governments

like the County.[3] Authorizing the County to assess whether ADP's data center's electrical infrastructure is "adequate" and to cast judgment on ADP's data center's grid impacts would result in a patchwork regulatory quilt among the 75 counties in Arkansas and beyond.

While Ordinance 26-OR-19 disclaims an intent to engage in ratemaking, *see* Section 10.4, FPA preemption considers effects, not intent. The question is whether the Ordinance mandates "practices directly *affecting*" transmission services and rates. *See EPSA*, 577 U.S. at 278 (emphasis added) (finding "wholesale demand response programs" trigger FERC jurisdiction "with room to spare"). County-level power grid feasibility and reliability assessments affect both "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." *New York*, 535 U.S. at 6-7. Congress committed both fields to FERC's exclusive jurisdiction. *See id.*; 16 U.S.C. § 824(b)(1); *Heydinger*, 825 F.3d at 926 (Murphy, J., concurring).

In *Hughes*, Maryland created a state-level "capacity auction" intended "to encourage development of sufficient new in-state generation." 578 U.S. at 157-58. But that state-level capacity auction frustrated FERC's interstate-grid capacity auctions. Even though Maryland meant

[3] No presumption against preemption applies since the County has no tradition of regulating interstate transmission of electricity, wholesale sales of electricity, or even state-level regulations of electricity generation, siting, and retail sales. *Cf. Iowans for Alternatives to Smoking & Tobacco, Inc. v. Mosiman*, 183 F.4th 1040, 1051 (8th Cir. 2026) (contrasting public-health regulations with "areas that are uniquely federal or on interstate matters") (citing *Arizona v. United States*, 567 U.S. 387, 401-02 (2012)). Such a presumption does not apply in the context of local regulation in the absence of dual-sovereignty considerations. *Tarrant Regional Water Dist. v. Herrmann*, 569 U.S. 614, 631 n.10 (2013) (rejecting presumption against preemption in case involving regional water district since "the presumption against pre-emption is rooted in respect for the States as 'independent sovereigns in our federal system[.]'") (internal quotations omitted). Such considerations do not apply to the County. U.S. Const. amend. XI; 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 689-690 (1978) ("Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies.") (emphasis in original).

to encourage "in-state generation," a subject within Maryland's regulatory authority under the FPA, the Supreme Court held Maryland's program was preempted due to its conflict with FERC's federal auctions, ruling Maryland "may not seek to achieve ends, however legitimate, through regulatory means that intrude on FERC's authority[.]" *Hughes*, 578 U.S. at 164.

As with Maryland's capacity auctions in *Hughes*, here the County cannot substitute its own judgments and conduct its own assessments about grid reliability, interconnection feasibility, or transmission infrastructure in nexus with ADP's data center. The Ordinance frustrates FERC's goal to expedite and facilitate the interconnection and provision of transmission service to large loads, regardless of any land-use goals it may seek to effectuate. Therefore, the Ordinance is a "practice directly affecting" transmission service and rates which the FPA preempts. *EPSA*, 577 U.S. at 278.

Ordinance 26-OR-19 obstructs FERC's determinations about both (1) what sort of load is appropriate to interconnect to the national power grid; and (2) *how* large loads like ADP's data center should be interconnected. By requiring ADP to submit applications and await County-level assessments of "adequate" electrical infrastructure and load impacts and analysis, *see* Article 7(a), Section 6.2, the Ordinance obstructs FERC's accomplishment and execution of timely, orderly, and non-discriminatory interconnection of large loads like ADP's data center, rendering the Ordinance an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 377 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

In sum, Ordinance 26-OR-19 directly affects and obstructs the "timely, orderly, and non-discriminatory" interconnection of ADP's data center. 195 FERC ¶ 61,212, ¶ 7, and 9. The Ordinance intrudes in and frustrates the exercise of FERC's exclusive jurisdiction over large-load interconnection, transmission services, feasibility and capacity studies, and wholesale ratemaking in the interstate electricity market. 195 FERC ¶ 61,212, ¶ 7, at 9. Federal law preempts Article

7(a), Sections 6.2, 8.2(a), 8.3, 10.4, and 12.4 of Ordinance 26-OR-19. Therefore, they are without effect. To protect those federal interests, including FERC's policy determination that projects like ADP's data center should be connected to the transmission grid "in a timely, orderly, and non-discriminatory manner," 195 FERC ¶ 61,212, ¶ 7, and 9, the Court should declare the invalidity and enjoin enforcement of Ordinance 26-OR-19 as preempted by federal law.

<u>Commerce Clause</u>

For overlapping reasons, Ordinance 26-OR-19 regulates and discriminates against interstate commerce, rendering the Ordinance invalid. *See Heydinger,* 825 F.3d at 922.

"[A]ctions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 389 (1994) ("*C & A Carbone*") (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 31 (1937)). "[O]ur case law yields two lines of analysis: first, whether the ordinance discriminates against interstate commerce […] and second, whether the ordinance imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits.'" *C & A Carbone*, 511 U.S. at 390 (citing *Philadelphia v. New Jersey*, 437 U.S. 617 (1978); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Ordinance 26-OR-19 directly regulates instrumentalities of interstate commerce. *E.g.*, Article 7(a), Sections 6.2, 8.2(a), 8.3, 10.4, and 12.4. By interfering with the "timely, orderly, and non-discriminatory" interconnection of ADP's data center, the County's enforcement of the Ordinance will cause extraterritorial effects on the national power grid. *See Heydinger*, 825 F.3d at 921 ("In the MISO grid, electrons flow freely without regard to state borders, entirely under MISO's control"). The Ordinance thereby exceeds the County's regulatory authority and intrudes on Congress's power to regulate interstate commerce. U.S. Const. art. I, § 8, cl. 3.

Beyond its extraterritorial grid-level effects under *Heydinger*, Section 4.1 of Ordinance 26-OR-19 also discriminates arbitrarily against interstate commerce. It carves out "ordinary" uses of electricity and water for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Novartis Pharms. Corp. v. Griffin*, 833 F. Supp. 3d 956, 986 (E.D. Ark. 2026) (citing *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000)) (quoting *Oregon Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 99 (1994)). The Ordinance does not apply to food processing, metal ore and chemical processing, and other manufacturing facilities within Pulaski County which the Ordinance deems to be "ordinary." *See* Dkt. No. 1, Compl. at 213, Ex. 7, Encl. E (Justice Capps's circulation of the County's identification of "industrial uses beside data centers that use either more than 5 Megawatts/day or more than 100,000 gallons per day"). The Ordinance's regulatory burdens apply only to ADP's data center. Meanwhile, "ordinary" users conducting manufacturing or food processing need not satisfy its requirements. This disparate treatment evinces a pretextual and discriminatory purpose, aiming enforcement and restrictions only at ADP, an out-of-state data center company, while avoiding regulation of "ordinary" businesses, which are in-state or non-data-center facilities.

That discriminatory purpose is reinforced by the irregularities surrounding Ordinance 26-OR-19's enactment. By enacting the Ordinance, ADP's opponents meant to "stop" ADP, and subject ADP to "special treatment" under color of state law. *See, e.g.*, Dkt. No. 1 at ¶¶ 99-101 ("Judge Wendell[,] I think you could stop Avaio if you told them you wouldn't give them tax abatements they would leave."); *id.* at 211, Ex. 7, Encl. C ("Vote No on the amendment! NO! Special treatment for AVAIO."). The Ordinance targets ADP (and only ADP) for special regulatory burdens. These irregularities, including ongoing violations of the Arkansas Freedom of Information Act, underscore the discriminatory purposes motivating the Ordinance's enactment.

To avoid invalidation under the Commerce Clause, Defendants must "demonstrate, under rigorous scrutiny, that they have no other means to advance a legitimate local interest." *Novartis Pharms.* 833 F. Supp. 3d at 992 (quoting *South Dakota Farm Bureau v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003) (quoting *C & A Carbone*, 511 U.S. at 392)) (other citations omitted). Defendants are unlikely to do so. Judge Hyde's veto of the Ordinance negates such a showing. *See* Compl., Ex. 4, Hyde Veto. And the County rejected less-restrictive means that would not have intruded on the federal domain of regulating the interstate power grid. Ex. 2, Item 26-I-71.

ADP is also likely to prevail under *Pike* balancing. Ordinance 26-OR-19 imposes substantial burdens on interstate commerce. The FPA preempts state and local regulation of the national power grid, interstate transmission of electricity, and wholesale sales of electricity in interstate commerce. 16 U.S.C. §§ 824(b); 824e. Under Arkansas law, the County plays no role in deciding siting, generation, or rates for retail sales of electricity. And the County "has available to it other less burdensome means to achieve its stated purposes[,]" including Item 26-I-71, which the Quorum Court considered and rejected. *U & I Sanitation*, 205 F.3d at 1071. Item 26-I-71 avoids conflict with FERC's jurisdiction over ADP's power-grid impacts.[4] The Ordinance's burdens on interstate commerce outweigh any local interest Defendants can assert.

<u>State PSC Preemption</u>

Ordinance 26-OR-19 intrudes on domains which the General Assembly has committed to the exclusive jurisdiction of the Arkansas Public Service Commission ("PSC"). Ark. Code Ann. §§ 23-3-117; 23-4-201(a)(1), *et seq.*; 23-18-502(e); 23-18-503(7)(A); *Centerpoint Energy, Inc. v.*

---

[4] Item 26-I-71 would require submission of a "Will Serve Letter" from "the applicable electric utility" identifying "available electrical capacity," required transmission, substation, and generation upgrades, and "utility agreements or tariffs." Ex. 2, Section 2.02(c)(2). These less restrictive means satisfy the County's informational interests without intruding on federal and state decision-making authorities.

*Miller County Circuit Court*, 372 Ark. 343, 350, 276 S.W.3d 231, 327 (2008) ("*Centerpoint II*"); *Centerpoint Energy, Inc. v. Miller County Circuit Court, Second Div.*, 370 Ark. 190, 197, 258 S.W.3d 336, 341 (2007) ("*Centerpoint I*"); *General Telephone Co. of Southwest v. Lowe*, 263 Ark. 727, 730, 569 S.W.2d 71, 73 (1978). The Arkansas General Assembly narrowly restricts local regulatory authority in this specific field. Ark. Code Ann. §§ 23-18-526, 14-18-808(a); *see Hempstead County Hunting Club, Inc. v. Arkansas Public Service Com'n*, 2010 Ark. 221, at 10, 384 S.W.3d 477, 483 ("[T]he intent of section 23-18-502(e) was to confine jurisdiction over approval of major utility facility issues, with noted exceptions, to the Commission.").

The *Centerpoint* cases show that even common-law tort claims fall within the PSC's exclusive jurisdiction if they affect retail electricity rates. In *Centerpoint I*, the Arkansas Supreme Court issued a writ of prohibition to block trial-court proceedings in a class action against utilities alleging "fraud, unjust enrichment, and civil conspiracy concerning the cost of natural gas." 370 Ark. at 193, 258 S.W.3d at 338. The Arkansas Supreme Court noted, "the plaintiffs' core contention is that they paid too much for their natural gas service" which "is precisely a matter over which the APSC has sole and exclusive jurisdiction." *Id.* at 195, 258 S.W.3d at 339. "The jurisdiction of the APSC 'in such disputes is primary and shall be exhausted before a court of law or equity may assume jurisdiction.'" *Id.* at 203, 258 S.W.3d at 345 (quoting Ark. Code Ann. § 23-3-119(d)). In *Centerpoint II*, the Arkansas Supreme Court entered a second extraordinary writ: mandamus commanding dismissal of claims since "a court cannot retain jurisdiction over a proceeding for which it does not have jurisdiction in the first place." 372 Ark. at 350, 276 S.W.3d at 237.

In *General Telephone Co. of Southwest v. Lowe*, the Arkansas Supreme Court held "[a] court of equity does not have concurrent jurisdiction with the Public Service Commission in public utility litigation when there is a clear, adequate, and complete remedy by an application to the

Commission." 267 Ark. 727, 730, 569 S.W.2d 71, 73 (1978) (citations omitted). There, the Arkansas Supreme Court reasoned that since the Commission "unquestionably has jurisdiction to fix telephone rates in Texarkana, Arkansas" the Commission "may pass upon questions of law that are germane and incidental to its legislative act of rate-making." *Id.*

The County cannot exercise local authority "expressly prohibited by the Arkansas Constitution or by law for the affairs of the county." Ark. Code Ann. § 14-14-801. Because ADP's data center facility is "affirmatively subjected by law to state regulation or control," the County "is prohibited the exercise of any power in any manner inconsistent with state law or administrative rule or regulation." Ark. Code Ann. § 14-14-808(a). And the Quorum Court's enactment of Ordinance 26-OR-19 separately violated "laws which regulate planning or zoning" by bypassing "recommendations of the county planning board" without undertaking the procedure set by Ark. Code Ann. §§ 14-17-201, *et seq.*; 14-14-807(4).

Another source of conflict with the PSC's regulatory authority is the Ordinance's assertion of direct authority over the PSC in its provisions for appellate review and quasi-judicial administrative proceedings. The General Assembly, not local governments, exercises legislative authority over the PSC. By statute, the County must *participate* in PSC proceedings, not enshrine a competing adjudicatory process. Ark. Code Ann. § 23-18-502(e)(1) (empowering the PSC as "an exclusive forum with primary and final jurisdiction […] for the expeditious resolution of all matters concerning the location, financing, construction, and operation of a major utility facility in a single proceeding to which access will be open to […] *local governments*, and other public bodies to enable them to participate in these decisions.") (emphasis added); Ark. Code Ann. § 23-18-503(10) (defining "municipality" as "any county or municipality within the state"); *see Heydinger*, 825 F.3d at 929 (Colloton, J., concurring).

By its text, Ordinance 26-OR-19 purports to subject the PSC—which meets the Ordinance's definition of "Affected Public-Service Entity"—to regulations and the Planning Board's adjudicative process. Article 4; Article 7(i); Section 6.4, 6.5(d); 9.2(c). The Ordinance creates a parallel regulatory-adjudicative process by which the County's Planning Board would assess ADP's application and "approve, approve with conditions, or deny" it with "written findings identifying the evidence relied upon and the basis for each required criterion." Section 9.1. Section 9.2 confers a right to appeal the Planning Board's "Decision" to the Quorum Court to an array of persons.[5] Then, the Quorum Court "may affirm, reverse, remand, or modify conditions" and "shall issue written findings within thirty (30) calendar days after the appeal record closes." Section 9.4. A "timely appeal stays issuance and exercise of the CUP" and "[n]o construction, grading, land disturbance, or operation authorized solely by the appealed CUP shall occur while the appeal is pending unless ordered by a court." Section 9.5. The Ordinance provides for judicial review as "appealed directly to [the] circuit court" and pursuant to "Arkansas Code Annotated § 14-17-211." Section 9.6.

But the General Assembly vests appellate jurisdiction to review PSC orders in the Arkansas Court of Appeals. Ark. Code Ann. § 23-2-423(a)(1). And state courts lack jurisdiction to "[h]ear or determine an issue, case, or controversy concerning a matter that was or could have been

---

[5] Section 9.2 authorizes an appeal of the Planning Board's Decision by

(a) the Applicant or Permit Holder;
(b) an owner or lawful occupant of property that may be materially affected by the Planning Board decision;
(c) an Affected Public-Service Entity; or
(d) a person who submitted evidence or comments before the Planning Board and demonstrates a concrete and particularized effect upon the person's property, use and enjoyment of property, health, safety, legal rights, or other legally protected interest that is actual or reasonably probable and different in kind or degree from the effect on the public generally.

determined in a proceeding under this subchapter before the Arkansas Public Service Commission[.]" Ark. Code Ann. § 23-18-525(1). By creating a parallel judicial-review process that regulates generation, siting, and retail rates of electricity and water utility services, Ordinance 26-OR-19 conflicts with and is preempted by the exclusive jurisdiction granted to the PSC over electrical retail rates and service contracts, including but not limited to the binding Agreement for Electric Service ("AES") between ADP and Entergy Arkansas.[6] "The jurisdiction of the APSC 'in such disputes is primary and shall be exhausted before a court of law or equity may assume jurisdiction.'" *Centerpoint I*, 370 Ark. at 203, 258 S.W.3d at 345 (quoting Ark. Code Ann. § 23-3-119(d)).

The Ordinance's creation of a competing adjudicatory process obstructs and conflicts with the PSC's original regulatory jurisdiction and the Court of Appeals' appellate jurisdiction. Articles 7 and 9 of the Ordinance interfere with the PSC's jurisdiction. Thus, Articles 7 and 9 of the Ordinance are preempted under Arkansas law and without effect.

<u>Equal Protection</u>

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923) (claim for equal-protection violation stated where county required bridge company to pay taxes on 100% of the valuation of its property while all others paid only 55%); *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 352, 353

---

[6] The Complaint referred to this agreement as "ESA," *e.g.*, Compl. at ¶ 27, but the proper acronym is AES.

(1918) ("intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property")).

Other industrial and commercial operations within Pulaski County trigger the threshold amounts of water and electricity consumption identified in Section 4.1 of the Ordinance. But the Ordinance exempts those users as "ordinary" while subjecting ADP to burdensome regulations. Pulaski County does not attempt to regulate such other similarly situated industrial and commercial users of electricity, digital infrastructure, and water in the Ordinance. Pulaski County offers no reasons why, besides subjective ordinariness. There is no definition for what is "ordinary" about those uses, except perhaps that they are not data centers. This is intentional and arbitrary targeting, clarified by the fact that these carve-outs spring from otherwise objective quantifications of water and electricity consumption.

There is no rational basis for the County to target ADP's data center, but not "ordinary" businesses, for otherwise identical triggers of electricity and water use. Without considering the complexities of large-load interconnection, the Ordinance requires the County's Planning Board to assess a data center's electrical service agreement while determining whether to permit the project. Pulaski County does not attempt to regulate other equally situated users of electricity in this manner. The Hyde Veto shows the County lacks the capacity to undertake these assessments, *see* Dkt. No. 1-4, Hyde Veto at 3 ("26-OR-19 creates a regulatory system the County is not presently equipped to administer"), which require subject-matter expertise from large, specialized, coordinated teams like those at FERC, MISO, and PSC.

In *Olech*, the municipal government "first conditioned the connection" of the Olechs' property to the municipal water supply "on the Olechs granting the Village a 33-foot easement." 528 U.S. at 563. As the Olechs pointed out, the village required only a 15-foot easement from

others connecting to the water supply. But the village denied the Olechs access for "a 3-month delay" after which "the Village relented and agreed to provide water service with only a 15-foot easement." *Id.* Finding Olech had pleaded an equal-protection claim, the Supreme Court reasoned, "Olech's complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners" and that the Village's intentional demand "was 'irrational and wholly arbitrary.'" *Id.* at 565 (citation omitted). This was "sufficient to state a claim for relief under traditional equal protection analysis." *Id.*

Like the special 33-foot easement required in *Olech*, the Ordinance's "ordinariness" carve-out is subjective, irrational, and arbitrary. Olech alleged the village "was actually motivated by ill will resulting from the Olechs' previous filing of an unrelated, successful lawsuit against the Village[.]" *Id.* at 563. Likewise, the Ordinance was motivated by ill will to ADP, with proponents discussing how to "stop Avaio" and the merits of "special treatment." *See id.* at 566 (Breyer, J., concurring) (citing *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir. 1998) (noting the presence of "illegitimate animus" or "ill will" offers an "added factor" minimizing concern "about transforming run-of-the-mill zoning cases into cases of constitutional right.")).

This "ordinariness" regulation discriminates against ADP much like the "intentional systematic undervaluation" of properties in *Sunday Lake Iron*, 247 U.S. at 352-353, and the "intentional[] and arbitrary" disparate tax assessments in *Sioux City Bridge*, 260 U.S. at 445. This disparate treatment favoring comparably situated users of electricity and water while disfavoring ADP is intentional, irrational, and wholly arbitrary. *Olech*, 528 U.S. at 565.

<u>Facial Invalidity and Withholding of Public Records under FOIA</u>

Arkansas law imposes public-meetings and records-retention requirements on the County's Quorum Court related to its promulgation of ordinances. "[A]ll records and other written materials in the possession of a local government shall be available for inspection and copying by any person during normal office hours." Ark. Code Ann. § 14-14-110. "All petitions, certificates, notices, and other evidences of procedural steps taken in submitting any ordinance shall be filed and preserved for a period of three (3) years by the county clerk." Ark. Code Ann. § 14-14-918(c). "All meetings of a county government governing body, board, committee, or any other entity created by, or subordinate to, a county government shall be open to the public except as provided in subdivision (a)(2) of this section." Ark. Code Ann. § 14-14-109(a). "Appropriate minutes shall be kept of all public meetings and shall be made available to the public for inspection and copying." Ark. Code Ann. § 14-14-109(c).

As amended in 2025, the Arkansas Freedom of Information Act ("FOIA"), requires that all deliberation about a matter on which the Quorum Court make take official action take place in a public meeting. Ark. Code Ann. § 25-19-106(f)(2)(C). It violates FOIA for a Quorum Court member to participate in a communication, whether oral, written, or electronic, that occurs outside of a public meeting with another member of the Quorum Court "about a matter on which official action will foreseeably be taken." Ark. Code Ann. § 25-19-106(f)(2)(A). The Court may invalidate any action the Quorum Court took "that is the direct or indirect result of the prohibited communication or informal meeting." Ark. Code Ann. § 25-19-106(i)(2).

Before the 2025 amendment expanding the sweep of these requirements, the Arkansas Supreme Court had affirmed invalidation of a city board's decision made outside the public meetings process. *Harris v. City of Fort Smith*, 359 Ark. 355, 361, 197 S.W.3d 461, 464-465 (2004). In *Harris*, a sequence of one-on-one meetings that "were held to conduct Board business"

constituted a violation of the open-meetings requirements of the FOIA. *Id.* at 365, 197 S.W.3d at 467 ("Under the particular facts of the matter before us, we conclude that an informal meeting subject to the FOIA was held by way of the one-on-one meetings. The purpose of the one-on-one meetings was to obtain a decision of the Board as a whole on the purchase of the Fort Biscuit property."). The Arkansas Supreme Court found that "[t]he use of Harding as an intermediary between the Board members did not alter the actual character of the result of Harding's work, which was a decision of the Board. The FOIA may not be circumvented by delegation of duties to others." *Id.* (citing *City of Fayetteville v. Edmark*, 304 Ark. 179, 801 S.W.2d 275 (1990)).

The Arkansas Supreme Court's decision accorded with the intermediate appellate opinion in *Harris v. City of Fort Smith*, authored by then-Court of Appeals Judge Wendell Griffen. 86 Ark. App. 20, 158 S.W.3d 733 (2004). There, the Court of Appeals held, "the serial conversations between Harding and the individual directors about a matter that involved a recommendation that the City submit a bid on the land constituted a 'meeting' within the intent of the FOIA, for which the public was entitled to prior public notice." *Id.* at 23, 158 S.W.3d at 734. The opinion specified: "we reverse the decision by the trial court and remand the case for entry of a decree granting prospective injunctive relief and statutory attorney's fees pursuant to the FOIA." *Id.* at 23, 158 S.W.3d at 734-35. And it reasoned, "the legislature made it crystal clear that even informal meetings, *i.e.*, those lacking the outward appearance of formal meetings, are subject to the FOIA." *Id.* at 28, 158 S.W.3d at 737 (citing *Mayor & City Council of El Dorado v. El Dorado Broadcasting Co.*, 260 Ark. 821, 823-24 (1976)). Further, "[i]t is readily apparent to us that Harding's serial one-on-one conversations with each Board member to discuss the City's business were a subterfuge designed to circumvent the FOIA's public-disclosure requirements and that, through those

conversations with its straw man (Harding) the Board held a 'meeting' within the intent of the FOIA." *Id.* at 29, 158 S.W.3d at 738.

Turning to the present case, ADP has faced stiff resistance from Defendants when attempting to gather public records about the promulgation of Ordinance 26-OR-19. Defendants have failed to comply after multiple written requests and an extended deadline. Pulaski County, Justice Blackwood, and other records custodians have failed to allow examination or provide copies of all public records responsive to the written request submitted on October 19, 2026. Dkt. No. 1, Compl. Ex. 6. They failed to respond in writing in compliance with Ark. Code Ann. § 25-19-105(a)(3). They failed to immediately provide responsive records not in active use or storage in violation of Ark. Code Ann. § 25-19-105(a)(6), even as the veto-override vote loomed. And Pulaski County, Justice Blackwood, and other records custodians failed to preserve public records required to be retained under Ark. Code Ann. § 13-4-302(3)(A). Still, while Defendants' partial FOIA productions remain incomplete, they reveal a secret effort to engage in impermissible polling and deliberation by opponents of ADP's project, both among Quorum Court members and persons in active concert with them.

On May 26, 2026, amid an ongoing meeting of the Quorum Court to consider a data center ordinance, Pulaski County Judge Candidate Wendell Griffen texted Justices Blackwood, Lewison, Capps, and Davis urging them, "Vote NO on the amendment! NO! Special treatment for AVAIO." Ex. 3, Deliberation-Polling Text Messages, at 1. They did so.

On June 2, 2026, Griffen sent a text message to Justices Blackwood, Lewison, Capps, Massey, and Davis, but none of the other members of the Quorum Court. Dkt. No. 1, Complaint, Ex. 7, Encl. D at 212. Judge Griffen stated, "I am drafting a clear and legally defensible, ordinance with a companion resolution of legislative findings for a twelve (12) month countywide

moratorium on permitting high-intensity digital development in unincorporated areas of Pulaski County." *Id.* Griffen added, incorrectly, "Pulaski County is legally immune from liability for monetary damages, again on statutory and constitutional grounds." *Id.* He invited "any suggestions for the measures I am drafting." *Id.* Justice Blackwood replied, "Great! Can't wait to see it [] :-)". *Id.* Judge Griffen stated, "Check your email inboxes. Kathy, I sent yours to your Pulaski.net email address. Let me know if you need me to send it to another email address." *Id.* The Quorum Court held no public meeting on June 2, 2026.

Between June 3, 2026, and June 4, 2026, Griffen, Justice Blackwood and Pulaski County Parliamentarian Justin Blagg finalized a draft ordinance to target ADP's data center project with a moratorium. Ex. 4, Email Correspondence of June 3-4. Griffen stated Defendant Justice Blackwood "agreed to sponsor" the measure and requested that Parliamentarian Blagg "distribute it among the members of the Quorum Court, to County Attorney Kemp, County Clerk Hollingsworth, and to County Judge Hyde." *Id.* at 2.

Between June 8, 2026, and June 9, 2026, Griffen engaged members of the Quorum Court in non-public impermissible deliberations about data center measures via email correspondence outside any formal public meeting. Dkt. No. 1, Ex. 7, Encl. E at 213-219. On July 20, 2026, Griffen texted Justice Blackwood plus at least four other members of the Pulaski County Quorum Court in secret polling and deliberations about Items 26-I-45A and 26-I-52, which dealt with ADP's data center. Dkt. No. 1, Ex. 7, Encl. F at 220. Griffen invited specific legislative maneuvering: "[i]f the five of you vote against 26-I-52 we can mount another effort to pass a revised version of 26-I-45A," continuing, "[i]f any of you object to my idea please let me know." Justice Blackwood replied, "I'm with you Judge!" *Id.*

On August 5, 2026, Parliamentarian Blagg texted Justice Capps, "I was told you wanted to be a sponsor on the HIDUI Ordinance. Ex. 5, Capps-Blagg Text Messages at 8. Justice Capps replied, "I'm good to sponsor." *Id.* Thus, Parliamentarian Blagg was recruiting sponsors outside a meeting, presumably on behalf of the proponents of the measure.

On August 11, 2026, the day of an Agenda Committee meeting of the Quorum Court, Griffen wrote "CONGRATULATIONS!" to a subset of members of the Quorum Court, including Justice Blackwood, as well as non-members of the Quorum Court. Dkt. No. 1, Ex. 7, Encl. G at 221. That day, the Agenda Committee voted 13-1 to send Item 26-I-56 to the full Quorum Court with a do-pass recommendation. Referring to the presence of non-members of the Quorum Court on Griffen's text, Justice Curry asked, "Why are other people included in this text? Much disrespect has already been [g]iven over the last 3 months." *Id.* at 222-223.

At 9:39, 11:40, and 11:48 p.m. on August 12, 2026 and August 13, 2026, Justice Blackwood sent group texts to Judge Griffen and ten other Justices: Capps, Davis, Keith, Lewison, Massey, McCoy, Medlock, Person, Ward, and Young-Baker. Ex. 6. At 6:49 a.m. on August 13, she texted a different group. It left out Justice Keith and added nine unidentified numbers and an email address. *Id.* The thread Justice Blackwood produced from that group begins at 7:10 a.m. with a "Liked" reaction to a message that does not appear in the thread. *Compare* Ex. 6, *with* Dkt. No. 1, Compl., Ex. 7, Encl. B.

Before consideration of Item 26-I-56, now Ordinance 26-OR-19, persons in active concert with proponents of Item 26-I-56, including Griffen and a subset of members of the Quorum Court, contacted members of the Quorum Court to conduct impermissible polling outside of public meetings about how members of the Quorum Court would vote on the measure. And before final consideration of Item 26-I-56, Griffen and a subset of members of the Quorum Court knew or

should have known their impermissible polling and deliberations were violations of FOIA, yet they continued to engage in impermissible polling and deliberations.

At 10:06 a.m. on August 14, 2026, Griffen texted a subset of members of the Quorum Court that “Board members” “need accessible information about how 26-I-56 differs from earlier proposals (26-I-31 and 31A). Ex. 3 at 8. Later that day, at 4:27 p.m., Defendant Justice Blackwood addressed an email to Justices Davis, Capps, Lewison, Person, Massey, Keith, Ward, Young-Baker, Robinson, McCoy, Elliott, and Medlock. Ex. 7, Email Correspondence of August 14, 2026. Justice Blackwood’s email omitted Justice Curry. *Id.* The email’s subject line was “Side by side 31A – 56.” Defendant Justice Blackwood wrote, “I thought this might help anyone trying to compare the 2 ordinances.” Below was a five-page grid comparing Item 26-I-31A and 26-I56. For the category “Final County Approval,” the grid reads “Very important for Avaio” beside an emoji depicting a red flashing alarm. *Id.* at 6. This refers to Section 17.2, concerning Projects With Final County Approvals. *See* Compl., Ex. 3 at 32. As of August 14, 2026, the Ordinance’s effect on AVAIO was “very important” in deliberations about the Ordinance outside the public meeting process.

On August 22, 2026, and August 24, 2026, Justice Blackwood sent group texts to nine other Justices of the Peace, constituting 10 of 15 members of the Quorum Court, or a majority. Ex. 6. Justice Blackwood produced none of those three group text messages in response to the FOIA request of October 19, 2026. *See* Dkt. No. 1, Compl., Ex. 6.

On August 25, 2026, Item 26-I-56 came before the full Quorum Court at its 6:00 p.m. meeting with an emergency clause. That afternoon, Justice Blackwood texted Parliamentarian Blagg: “need to [talk to] you. I am in the meet[ing] […].” Ex. 8. Blagg replied, “Yeah come on back.” *Id.* Beginning at 4:29 p.m., about ninety minutes before the 6:00 p.m. meeting, Justice Blackwood called Justices Massey (10 billed minutes), Capps (6), McCoy (11), Davis (3),

Medlock (1), Ward, (1), and Keith (1), and twice called Justice Robinson (1 each). Ex. 6. In the same span, which ended at 5:42 p.m., she also called Judge Griffen (13 minutes) and received calls from Justices McCoy (7) and Medlock (10). *Id.*

At the meeting, the emergency clause was removed and Item 26-I-56 was placed on first reading. At 6:45 p.m., Justice Capps texted Parliamentarian Blagg: "Do we have to suspend the rules for resolutions?" Parliamentarian Blagg replied, "All late filings require it. The filing deadline is the week before the meeting." Ex. 5 at 9. Later, Parliamentarian Blagg texted Justice Blackwood: "Why'd you pull it?" She answered: "I pulled it because I was losing Luke and that left me with 9 votes." Ex. 8. Griffen called her later that night (7 min). Ex. 6. At the same meeting, Item 26-I-64A (the moratorium measure) was withdrawn.

On August 29, 2026, Griffen posted an Arkansas Times story about AVAIO's plans to a group text thread and wrote: "This news makes the case for 26-I-56 and its emergency clause unmistakably clear!" Justice Blackwood later replied to the group: "As we have thought! We must pass I-56!" Ex. 3 at 5.

On September 1, 2026, Pulaski County Justice of the Peace Natalie Capps rejected the impermissible polling and deliberations, stating, "I appreciate being included in this conversation but think it violates open meeting laws. I am going to kindly excuse myself. See you all next Tuesday—have a great rest of the week." Ex. 3 at 4. Justice Capps then removed herself from the polling-and-deliberation text-message thread. *Id.* But Griffen and the remaining subset of members of the Quorum Court continued to engage in impermissible polling and deliberations in communications which remain withheld unlawfully from Defendants' FOIA production.

On September 18, 2026, Griffen wrote to Justice Blackwood: "We need an updated emergency clause for Item 26-I-56." Ex. 9, Sept. 18, 2026 Email Correspondence, at 1. He

suggested that she “submit the following Amendment […] on Monday” and supplies the full text of Article 20. *Id.* The text identifies ADP’s project without naming it explicitly, stating “[t]he Quorum Court further finds that at least one publicly announced High-Intensity Digital Infrastructure project in Pulaski County has commenced construction and is planned for development in multiple phases, and that additional phases, facilities, increases in capacity, changes in configuration and other development activity may advance while the County lacks the comprehensive review standards established by this Ordinance.” *Id.* Griffen closed with “Please let me know if you disagree,” inviting a private response. On September 21, 2026, the day before the Quorum Court’s meeting, Justice Blackwood forwarded the emergency clause to Parliamentarian Blagg. *Id.* The source of this correspondence was Parliamentarian Blagg; Justice Blackwood produced none of her own emails in response to the FOIA.

At 8:36 a.m. on September 22, 2026, Parliamentarian Blagg told Justice Capps: “there will be an amendment on the table to add an emergency clause back into the item,” and walked Justice Capps through the vote math: 8 votes to adopt the amendment, then “a vote tonight (10 votes to adopt).” Ex. 5 at 10. This shows Ordinance 26-OR-19’s emergency clause reinstatement and vote count were planned before the public meeting. On September 22, 2026, the Quorum Court inserted a different emergency clause, without discussing the differences, and passed it in Item 26-I-56, now Ordinance 26-OR-19.

At 10:08 p.m. on September 22, 2026, Griffen returned Justice Capps to the earlier polling-and-deliberation text-message thread which Justice Capps had left on September 1, 2026, stating, “Good evening, I cannot end today without thanking each of you for co-sponsoring Item 26-I-56a. Thank you for the long tedious hours you spent studying this subject over the past months. Thank you for all you’ve done.” Ex. 3 at 4. Upon information and belief, that text-message thread included

the co-sponsors of Item 26-I-56, which the Quorum Court enacted as Ordinance 26-OR-19: Justices Blackwood, Capps, Davis, and Donna Massey.

Despite lawful request under FOIA, Justice Blackwood produced no call or text log for the billing cycle of September 4 through October 3, 2026, which includes the Quorum Court's vote on September 22, 2026. Yet she produced logs for the billing cycles of May 4 through June 3, June 4 through July 3, July 4 through August 3, August 4 through September 3, and October 4 through November 3, 2026. On information and belief, Justice Blackwood's September call logs would show evidence of her communications with other Justices of the Quorum Court to poll and deliberate about the Ordinance before the Quorum Court's vote at its September 22 public meeting.

Subsequent records show Justice Blackwood continued to coordinate with Quorum Court members outside of public meetings in violation of FOIA. On October 6, 2026, Justice Blackwood participated in a group text to 20 recipients, including Griffen and Justices Capps, Davis, and Massey. Ex. 10. Justice Blackwood produced none of its content. *Id.* Between 12:03 p.m. and 3:22 p.m. on October 13, 2026, Justice Blackwood had calls with Justices Lewison (twice), Massey, Davis, and Young-Baker. *Id.* At 5:32 p.m. that day Griffen emailed Quorum Court members urging an October 27 override.

All these secret communications and deliberations violated Ark. Code Ann. §§ 25-19-106(f)(2)(A), 25-19-106(f)(2)(C), and 25-19-106(g) ("An informal meeting that includes deliberation or that is for the purpose of exercising a responsibility, authority, power, or duty of a governing body is strictly prohibited."). The Court may invalidate any action the governing body took that is the direct or indirect result of the prohibited communication or informal meeting. Ark. Code Ann. § 25-19-106(i)(2). The requirement of the Open Meeting Law of the FOIA is to require members of the Quorum Court to deliberate in public, before their constituents and stakeholders,

so that the public servants may be accountable for their votes. The secret communications concerning the "special treatment" dished out for ADP deprived the public of their right to know how their representatives were addressing the issues. The Court should invalidate Ordinance 26-OR-19 because it is the direct or indirect result of the prohibited communications and informal meetings about Quorum Court matters. Ark. Code Ann. § 25-19-106(i)(1).

To support each of its claims in this case, ADP should receive full compliance from Defendants in response to the FOIA request Defendants received on October 19, 2026. Defendants withhold materials likely supportive of ADP's claims in this action. This Court should enforce the FOIA and order Defendants to produce all materials unlawfully withheld by Defendants in violation of FOIA. Ark. Code Ann. § 25-19-107(b).

The Court should order Defendants and all persons in active concert with them to produce all public records wrongfully withheld in response to the written request Defendants received October 19, 2026, within three business days of the order compelling production. Ark. Code Ann. § 25-19-105(a)(2)(A). And the Court should allow a reasonable time after full FOIA compliance for ADP to prepare for any evidentiary hearing needed to decide this motion, unless the Court determines that complete relief can be granted to ADP on the papers themselves.

<u>Due Process Clause, Contracts Clause, and Takings Clause Claims</u>

Ordinance 26-OR-19 also fails under the due process, contracts, and takings clauses.

The Ordinance contains undefined and standardless terms that are vague and ambiguous. "The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *Stephenson v. Davenport Cmty. Sch. Dist.*, 110 F.3d 1303, 1308 (8th Cir. 1997) (quoting *D.C. and M.S. v. City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986)). "A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness

'incorporates notions of fair notice or warning,' […] and a regulation 'violates the first essential of due process of law' by failing to provide adequate notice of prohibited conduct." *Stephenson*, 110 F.3d at 1308 (quoting *Smith v. Goguen*, 415 U.S. 566, 572 (1974); *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). "In short, a regulation is void-for-vagueness if it 'forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application[.]'" *Id.* "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

"Even when speech is not at issue, the void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *Grayned*, 408 U.S. at 108 ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *United States v. Davis*, 588 U.S. 445, 451 (2019).

Ordinance 26-OR-19 fails to define what is "required" "Electrical Infrastructure" or what makes such infrastructure "complete" or "available." Section 10.4. It does not define what amounts to "competent evidence," what degree of impairment is "material," or what sort of complaints received are "material" and which are not. Section 12.4. These standardless and undefined terms prevent ADP from predicting what standards or conduct will satisfy the Ordinance's requirements. As the Murphy Declaration attests, "ADP supports clear, lawful land use rules that protect the

communities where it builds." Ex. 1 at ¶ 19. But "[t]he Ordinance does not provide sufficient guidance for ADP to understand how to conduct itself or structure its project to satisfy the Ordinance's requirements." *Id.* at ¶ 21.

Additionally, the Ordinance confers excessively broad discretion to officials acting at the pleasure of the Pulaski County Judge, including personnel of the Pulaski County Planning Board, to award "discretionary County land use authorization" or "unresolved material discretionary conditions," Article 4, "unresolved discretionary review" or "further discretionary approval," Section 17.3(b), or "approval contingent upon unresolved discretionary action," Section 17.7. And the Ordinance offers neither precision nor guidance to public officials tasked with enforcing the Ordinance's terms. It does not restrict either the Planning Board's exercise of discretion or the Quorum Court's standard of review of that discretion. Instead, it invites protracted delays and long-running appeals, with automatic stays of construction activities as appeals continue.

"The presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994). "It is therefore not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution." *Id.* at 266 (citing *Ex Post Facto* clause, Contracts Clause, Takings Clause, prohibitions on bills of attainder, and the Due Process Clause). "The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976)). "The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its

responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf*, 511 U.S. at 266.

The Supreme Court and Eighth Circuit have repeatedly applied the presumption against retroactivity. *E.g.*, *Vartelas v. Holder*, 566 U.S. 257, 268 (2012) (citing *Chew Heong v. United States*, 112 U.S. 536 (1884) (applying presumption against retroactivity to statute barring reentry by Chinese laborers without a certificate issued on departure who had left the country prior to Act's passage and tried to return afterward); *Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939 (1997) ("[w]e apply this time-honored presumption unless Congress has clearly manifested its intent to the contrary."); *J-McDaniel Construction Co., Inc. v. Mid-Continent Cas. Co.*, 761 F.3d 916, 918 (8th Cir. 2014); *Zarcon, Inc. v. N.L.R.B.*, 578 F.3d 892, 895 (8th Cir. 2009) (quoting *Landgraf*, 511 U.S. at 280) ("[T]he court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."). So too under Arkansas law: "Unless it expressly states otherwise, we presume the legislature intends for its laws to apply only prospectively." *Bean v. Office of Child Support Enf't*, 340 Ark. 286, 296, 9 S.W.3d 520, 526 (2000). The Ordinance contains no express intent to defeat the strong presumption against retroactivity.

Beyond these due process problems, Ordinance 26-OR-19 also disrupts ADP's binding AES with Entergy. ADP has vested rights under the AES. Since the County lacks regulatory authority in these fields, the Ordinance lacks a significant and legitimate public purpose warranting its impairment of ADP's contractual rights. *See Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727 (8th Cir. 2019) (finding North Dakota's legislation "does not self-evidently further a significant and legitimate public purpose" and noting "the Contract Clause demands more than

incidental public benefits.”). In light of the alternative Item 26-I-71 as an alternative, *see* Ex. 2, the Ordinance is not reasonably tailored to avoid invalidation under the Contracts Clause. *Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir. 2022) (no reasonable tailoring where executive order “imposed broad restrictions” that “had nothing to do with” the avowed public purpose of addressing nonpayment of rent).

Section 12.6 of the Ordinance asserts a right to “lawful access” of ADP’s private property and the right to “obtain judicial process or pursue another lawful remedy” “if lawful access is denied” without defining “lawful access” or “another lawful remedy,” compounding the due process harms. The Ordinance threatens a per se physical taking with no provision for compensation, violating the Takings Clause. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (“The access regulation appropriates a right to invade the growers’ property and therefore constitutes a *per se* physical taking.”). “Government action that physically appropriates property is no less a physical taking because it arises from a regulation.” *Id.* Whenever a regulation results in a physical appropriation of property, a *per se* taking has occurred[.]” *Id.* The Ordinance’s assertion of a right to physically enter upon ADP’s property and hale ADP into court if “lawful access is denied” is a physical taking without any compensation, violating the Takings Clause.

These due process, contracts, and takings clause grounds independently suffice for ADP’s showing of a likelihood of success on the merits to warrant entry of preliminary injunctive relief.

**IRREPARABLE HARM**

ADP will suffer irreparable harm absent preliminary injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). “Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.” *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024). ADP need not “prove

with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) (quoting *Winter*, 555 U.S. at 22). Damage to business reputation and goodwill may suffice as irreparable harm. *See Rogers Grp., Inc. v. City of Fayetteville*, 629 F.3d 784, 789-90 (8th Cir. 2010) (citing *Med. Shoppe Int'l, Inc. v. S.B.S. Bill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003)).

Proponents of the Ordinance contend it will apply to ADP's data center project. In a call the day before the Ordinance passed, Justice Blackwood stated ADP's data center project would not be "grandfathered in." Instead, referring to the Ordinance's provisions, Justice Blackwood asserted ADP would "have to go through our regulations." Ex. 11, Cline, Elizabeth, "After months of turmoil, Pulaski County passes sweeping data center rules." *Arkansas Times*, Sept. 22, 2026, *available at* https://arktimes.com/arkansas-blog/2026/09/22/after-months-of-turmoil-pulaski-county-quorum-court-passes-sweeping-data-center-rules (accessed Nov. 2, 2026). Wendell Griffen, the Pulaski County Judge-elect taking office on January 1, 2027, has likewise made clear that these measures aim at ADP's project. In a post published on October 24, 2026, Griffen wrote that ADP's data center was "the development that created the need for regulation." Ex. 12, at 3. Advocating for the Quorum Court's veto-override, and criticizing the less-restrictive alternative, Griffen argued, "Item 26-I-71 may regulate future projects while leaving the proposed Wrightsville-area AVAIO-Leo development outside its protections." *Id.*

Kevin Murphy, the Vice President of ADP, submits in support of this motion a declaration that spells out ADP's risks of irreparable harm absent preliminary injunctive relief. Ex. 1, Murphy Decl. ADP has already spent tens of millions of dollars to undertake design, site plan approval, construction, financing, and agreements to undertake ADP's data center project in Pulaski County, Arkansas. Ex. 1, Murphy Decl. at ¶ 9. ADP is continuing to incur additional expenses as

construction begins, which must proceed immediately to meet the required start date in ADP's binding AES with Entergy Arkansas for the supply of up to 150 megawatts ("MW") of electricity to its data center at an annual cost of tens of millions of dollars. *Id.* at ¶ 17. ADP risks noncompliance with the Ordinance because it "does not provide sufficient guidance for ADP to understand how to conduct itself or structure its project to satisfy the Ordinance's requirements." *Id.* at ¶ 21. The Ordinance imposes costly, duplicative, and conflicting requirements, including feasibility and suitability studies pertaining to electricity transmissions and pricing. *Id.* at ¶ 22.

As the Murphy Declaration attests, "[i]f enforcement of the Ordinance is not enjoined by this Court, then its enforcement or threatened enforcement will cause ADP to sustain incalculable business injury, including the loss of goodwill, to an incalculable but substantial degree." *Id.* at ¶ 16. ADP's injuries would include at least "tens of millions of dollars of wasted past expenditures, plus the deprivation of ADP's specific and distinct investment-backed business expectancy, including foreseeable lost profits to be earned from ADP's business operations." *Id.* at ¶ 17. Given the project delays caused by the Ordinance, ADP's customers, investors, and vendors would foreseeably lose faith in ADP's ability to keep its promises and complete its project. *Id.* at 18.

**THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF**

ADP faces the threat of irreparable harm based on the cloud of uncertainty created by Ordinance 26-OR-19. This uncertainty impairs ADP's ability to coordinate with its utilities, vendors, contractors, and customers, all of whom have stakes in the protection of their own property and contractual interests by entry of a preliminary injunction.

Defendants will sustain little appreciable harm from a preliminary injunction. While Defendants may suffer harm from restraints on their enforcement of the Ordinance, precedent

presupposes those statutes are duly enacted. *See, e.g.*, *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) (citation omitted). Not so here.

Instead, the Ordinance's irregular promulgation does not represent "the full play of the democratic process." *Rounds*, 530 F.3d 724 at n.6 (quoting *Able*, 44 F.3d at 131-32). Enactment of Ordinance 26-OR-19 saw process irregularities, including unlawful polling and deliberation, vote-coordination mid-vote, FOIA violations in the run-up to the veto-override, and ongoing concealment of text messages, call logs, and email communications by Justice Blackwood and other custodians. Adding to this weighty evidence against the County's equitable interests, Defendant Justice Hyde's veto of the measure ("Hyde Veto") is an admission that the Ordinance exceeds the County's lawful authority. Fed. R. Evid. 801(d)(2).

The urgency of Defendants' interests is particularly low since the County already granted Final Site Plan Approval and 911 Address Verification for ADP's project. Any Defendants' interests are adequately protected by the requirement for ADP to show it is likely to succeed or has a fair chance of prevailing on the merits of its claims. *E.g.*, *Jones Eagle v. Ward*, 2024 WL 5112477, *21 (E.D. Ark. Dec. 9, 2024) (citing *Rounds*, 530 F.3d 724 at 732).

**THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF**

The public interest strongly favors entry of preliminary injunctive relief. The Arkansas Freedom of Information Act states:

> It is vital in a democratic society that public business be performed in an open and public manner so that the electors shall be advised of the performance of public officials and of the decisions that are reached in public activity and in making public policy. Toward this end, this chapter is adopted, making it possible for them or their representatives to learn and to report fully the activities of their public officials.

Ark. Code Ann. § 25-19-102. The public interest supports entry of preliminary injunctive relief to ensure that the public and electors learn the facts about the unlawful polling and deliberations by members of the Quorum Court.

Entry of preliminary injunctive relief will uphold the status quo during the pendency of this litigation by preserving "the relative positions of the parties." *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Declining to enter a preliminary injunction would upend the status quo by disrupting ADP's project, for which the County previously granted approvals. "In the end, 'it is always in the public interest to protect constitutional rights.'" *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (citations omitted).

## SECURITY

The Court should require no security as Defendants would not suffer financial harm if wrongfully enjoined. ADP requests that the Court require no injunction bond. Fed. R. Civ. P. 65(c).

## CONCLUSION

The Court should grant ADP's motion for a preliminary injunction. Fed. R. Civ. P. 65(a).

Dated: November 4, 2026.

**KUTAK ROCK LLP**

Jess Askew III, Ark. Bar No. 86005
Alexander T. Jones, Ark. Bar No. 2015246
Shayla I. Dawson, Ark. Bar No. 2023283
Adam P. Hagler, Ark. Bar No. 2026161
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
jess.askew@kutakrock.com
alex.jones@kutakrock.com
shayla.dawson@kutakrock.com
adam.hagler@kutakrock.com

*Attorneys for ADP Little Rock Data Hub, LLC*

**CERTIFICATE OF SERVICE**

Pursuant to Rule 5(d)(1)(B), I hereby certify that on November 4, 2026, I served the foregoing on all Defendants pursuant to Rule 5(b)(2)(C) of the Federal Rules of Civil Procedure and by email transmission to email addresses intended to give prompt notice to all Defendants.

Alexander T. Jones