**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ADP LITTLE ROCK DATA HUB, LLC** **PLAINTIFF**

vs. **Case No. 4:26-cv-01196-LPR**

**PULASKI COUNTY, ARKANSAS;**
**BARRY HYDE, in his official capacity**
**as Pulaski County Judge;**
**JULIE BLACKWOOD, in her official capacity**
**as Pulaski County Justice of the Peace** **DEFENDANTS**

**PROPOSED RESPONSE OF INTERVENOR WENDELL GRIFFEN TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW Intervenor Wendell Griffen (hereinafter, "Griffen"), Pulaski County Judge-elect, and for his Proposed Response to Plaintiff's Motion for Preliminary Injunction (Doc. 8) states:

## INTRODUCTION

Plaintiff ADP Little Rock Data Hub, LLC (hereinafter, "ADP") asks this Court to suspend enforcement of Pulaski County Ordinance No. 26-OR-19 before the County has taken any identified enforcement action against its proposed data center. ADP also asks the Court to compel compliance with a records request directed to County officials and custodians, none of whom is Griffen. Neither request warrants preliminary injunctive relief on the present record.

The Ordinance establishes land-use standards for high-intensity digital infrastructure in unincorporated Pulaski County. It addresses matters traditionally within local governmental authority, including infrastructure capacity, drainage, transportation, public safety, and the effects of proposed development on surrounding properties. Although certain provisions require consideration of electrical infrastructure, the Ordinance expressly disclaims authority over utility

EXHIBIT 2

rates, tariffs, service contracts, and matters within the jurisdiction of the Arkansas Public Service Commission.

ADP contends that any consideration of electrical infrastructure intrudes upon federal and state utility regulation. That argument confuses the regulation of electricity with the regulation of land uses that consume electricity. Federal and state jurisdiction over utility operations does not categorically preclude local governments from considering infrastructure impacts when exercising otherwise lawful land-use authority.

ADP also asserts that the Ordinance was enacted to prevent its development and that private communications concerning the legislation violated the Arkansas Freedom of Information Act. Those allegations present factual and legal questions that cannot be resolved merely by characterizing political advocacy as governmental action. Nor does an alleged FOIA violation automatically establish that every provision of a subsequently enacted ordinance is invalid.
Most importantly, ADP has not established that emergency relief is necessary. Its claimed expenditures and contractual commitments do not, standing alone, establish irreparable injury. ADP identifies no stop-work order, denial of an application under the Ordinance, or other specific enforcement action preventing construction. Its allegations concerning future delays, business relationships, and lost profits remain contingent upon events that have not been shown to have occurred.

Griffen does not ask the Court to resolve the ultimate validity of the Ordinance at this stage. He asks only that the Court deny extraordinary preliminary relief on the present record and preserve the parties' opportunity to develop the facts necessary for an informed decision.

Griffen was elected Pulaski County Judge on November 3, 2026, and will assume office on January 1, 2027. He currently holds no office in Pulaski County government. He cannot enforce the Ordinance, direct County employees, produce County records, or control the County's defense in this litigation. Griffen has moved to intervene because the requested injunction may directly affect the authority and responsibilities of the office he will assume. His participation is intended to protect those interests while allowing the Court to consider the preliminary-injunction motion on its existing schedule.

Griffen submits this response based on publicly available information and matters within his personal knowledge. He has not had access to the County's internal planning records, communications, or other records necessary to resolve several factual disputes raised by ADP.

## PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary remedy. The Court considers: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm absent an injunction; (3) the balance between that harm and the injury an injunction would inflict on other interested parties; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

A preliminary injunction may not issue based on a mere possibility of irreparable injury. The movant must establish that such injury is likely in the absence of relief. *Winter v. Natural Resources Defense Council, Inc.*, 129 S.Ct. 365, 172 L.Ed.2d 249, 555 U.S. 7, 20–22 (2008). Although the factors are considered together, a failure to establish irreparable harm ordinarily defeats a request for preliminary injunctive relief. *See Dataphase*, 640 F.2d at 114.

Citing *D.M. v. Minn. State High Sch. League,* 917 F.3d 994, 1000 (8th Cir. 2019), ADP argues that it must show it has at least "a fair chance of prevailing" on its claims rather than the more rigorous standard of "likely to prevail." The likely-to-prevail standard applies when "a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute." *Planned Parent. Mn, N. Dakota, S. Dakota v. Rounds,* 530 F.3d 724, 732 (8th Cir. 2008) (en banc). The heightened standard applies in such instances because the duly enacted state statute constitutes "government action based on presumptively reasoned democratic processes," and such action is "entitled to a higher degree of deference and should not be enjoined lightly." Id. at 732 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

Although *Rounds* involved a state statute, its reasoning supports application of the heightened standard here. The Eighth Circuit explained that legislative enactments resulting from presumptively reasoned democratic processes are entitled to greater judicial deference and should not be enjoined lightly. *Rounds*, 530 F.3d at 732. Ordinance 26-OR-19 was enacted by the Pulaski County Quorum Court, the County's elected legislative body exercising its lawmaking authority. Arkansas law expressly defines a county ordinance as an enactment of compulsory law. Ark. Code Ann. § 14-14-904(i). The Ordinance was considered and adopted by the Quorum Court, vetoed by the County Judge, and subsequently enacted over that veto. Unlike an administrative policy or individualized permitting decision, it represents the exercise of legislative authority through the democratic process. Accordingly, the Court should apply the heightened standard and require ADP to demonstrate that it is likely to prevail on the merits, rather than merely establishing a fair chance of success. *See Hause v. City of Fayetteville*, No. 5:24-cv-05143 (W.D. Ark. 2024); *Doe v. City of Apple Valley*, 487 F. Supp. 3d 761, 767–68 (D. Minn. 2020).

Whatever formulation governs ADP's likelihood-of-success showing, the other preliminary-injunction requirements remain applicable. ADP must establish a concrete basis for emergency relief rather than merely identify disputed questions concerning the Ordinance's validity.

**LIKELIHOOD OF SUCCESS ON THE MERITS**

ADP is not likely to succeed on the merits of its claims.

**Federal Preemption**

ADP's principal federal preemption argument rests on the proposition that any local review of electrical infrastructure associated with a large-load data center intrudes upon FERC's exclusive jurisdiction. That proposition is too broad.

The Federal Power Act assigns FERC jurisdiction over specified aspects of interstate electricity transmission and wholesale electricity sales. It does not follow that every land-use decision involving a facility that consumes electricity is exclusively federal. The Supreme Court has recognized the distinction between federal authority over wholesale electricity markets and authority retained by state and local governments over matters outside that field. See *Hughes v. Talen Energy Marketing, LLC*, 136 S.Ct. 1288, 194 L.Ed.2d 414, 578 U.S. 150, 164–65 (2016).

The Ordinance does not establish transmission rates, approve wholesale power sales, modify an interconnection agreement, or direct Entergy to provide or withhold electric service. Instead, it requires applicants for covered land uses to provide information concerning infrastructure capacity and potential impacts on surrounding properties. Section 10.4 of the Ordinance expressly disclaims regulation of utility rates, tariffs, service contracts, and matters within the Arkansas Public Service Commission's jurisdiction. ADP argues that the disclaimer is insufficient because the Ordinance's practical effects may reach the electrical grid. But the fact

that a local land-use decision may affect electricity demand does not, without more, establish that the County is regulating wholesale electricity sales or interstate transmission.

ADP relies on *Hughes* and *North Dakota v. Heydinger*, 825 F.3d 912 (8th Cir. 2016). Those cases involved governmental measures directly affecting interstate electricity transactions or generation arrangements. ADP has not demonstrated that the challenged land-use provisions operate in the same manner. The Ordinance must be examined according to what it actually requires and authorizes, not simply according to the technical characteristics of the proposed development.

ADP relies on FERC's June 18, 2026, order concerning large-load interconnections, Docket No. EL26-70-000. That order addresses federal concerns regarding the timely, orderly, and nondiscriminatory interconnection of large electrical loads. But the existence of federal interconnection oversight does not establish that local governments lose authority over the location, physical development, drainage, transportation impacts, and other land-use consequences of facilities requiring substantial electrical service.

Indeed, the FERC order recognizes a continuing role for state and local entities. See 195 FERC ¶ 61,212, ¶ 42 (June 18, 2026). ADP has not identified a specific federal directive requiring approval of its proposed land use notwithstanding otherwise applicable County regulations. Nor has ADP demonstrated that compliance with both the Ordinance and federal law is impossible. Accordingly, the record does not establish that the Ordinance is facially preempted by the Federal Power Act.

**<u>Commerce Clause</u>**

ADP contends that the Ordinance discriminates against interstate commerce because it regulates high-intensity digital infrastructure while exempting other commercial and industrial

uses. But a distinction among land uses is not necessarily discrimination against interstate commerce. The Ordinance's definitions apply according to the characteristics and principal uses of covered facilities. They do not distinguish between Arkansas and out-of-state owners.

ADP has not established that the Ordinance favors in-state economic interests over comparable out-of-state interests. Nor has ADP established that other commercial and industrial uses are similarly situated to facilities primarily devoted to high-intensity digital infrastructure. The fact that another facility consumes substantial electricity or water does not, standing alone, establish that it presents the same combination of land-use, infrastructure, operational, and decommissioning considerations.

ADP's reliance on the interstate character of the electrical grid likewise does not transform every local regulation affecting a large electricity consumer into unconstitutional regulation of interstate commerce. The Commerce Clause does not categorically prohibit neutral land-use regulations merely because regulated businesses participate in interstate commerce.

Even where a regulation does not discriminate against interstate commerce, it may be challenged if the burdens imposed on interstate commerce are clearly excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Ordinance addresses legitimate local concerns involving infrastructure capacity, transportation, drainage, public safety, and surrounding land uses. ADP has not demonstrated that the Ordinance imposes a substantial burden on interstate commerce, as distinguished from its alleged effects on ADP's particular development. Nor has ADP established that any incidental burden on interstate commerce is clearly excessive in relation to the County's legitimate regulatory interests.

**State PSC Preemption**

ADP also argues that the Ordinance intrudes upon the exclusive jurisdiction of the Arkansas Public Service Commission (hereinafter "PSC"). The PSC possesses extensive authority over public utilities, including matters involving rates and services. The County does not dispute that authority.

The question, however, is whether the Ordinance exercises powers reserved to the PSC or instead considers infrastructure impacts as part of local land-use review. The Ordinance expressly disclaims authority over utility rates, tariffs, and service contracts. ADP has not identified a provision authorizing the County to establish electricity rates, alter its ESA, direct Entergy's utility operations, or substitute County approval for a PSC determination.

To the extent any particular application of the Ordinance would intrude upon exclusive PSC jurisdiction, that question can be addressed when the relevant facts and administrative action are before the Court. Such a possibility does not establish that the entire Ordinance must be suspended before any identified enforcement action.

**Equal Protection**

ADP asserts that the Ordinance was designed specifically to prevent its development. The Ordinance, however, regulates a defined category of land use. It does not identify ADP as the only regulated entity. The Equal Protection Clause does not require local governments to regulate every business that uses substantial electricity or water in precisely the same manner.

Different land uses may present different operational and infrastructure concerns. Those distinctions may furnish a rational basis for different regulatory treatment. ADP relies on statements made during the political debate surrounding the Ordinance. Such statements may be relevant evidence, but they do not conclusively establish that the Quorum Court enacted the

Ordinance for an unconstitutional purpose. The Ordinance's text, legitimate governmental objectives, and actual operation must also be considered. On the present record, ADP has not established that the Ordinance lacks a rational relationship to legitimate County interests.

Because the Ordinance does not classify persons on the basis of a suspect characteristic or implicate a fundamental right, its distinctions among land uses are subject to rational-basis review. Under that standard, a legislative classification is presumed constitutional and must be upheld if there is any reasonably conceivable state of facts providing a rational basis for the distinction. *FCC v. Beach Communications, Inc.*, 113 S.Ct. 2096, 124 L.Ed.2d 211, 508 U.S. 307, 313–15 (1993). The Quorum Court was not constitutionally required to regulate every industry presenting some similar infrastructure concerns before addressing those associated with high-intensity digital infrastructure. Nor does the fact that ADP's proposed development was discussed during the legislative process establish that the resulting classification is irrational. The relevant inquiry is whether the distinction drawn by the Ordinance is reasonably related to legitimate governmental objectives, not whether its enactment was prompted in part by a particular proposed development.

**Facial Invalidity and Withholding of Public Records under FOIA**

ADP's FOIA allegations concern two distinct issues: communications surrounding enactment of the Ordinance and the alleged failure of County officials to produce requested records. Those issues should not be conflated.

ADP asserts two claims under the Arkansas Freedom of Information Act: Count VIII challenges the validity of Ordinance 26-OR-19 based upon alleged violations of the Act's open-meetings requirements, and Count IX seeks relief concerning the production of public records. Both claims arise exclusively under Arkansas law.

Under 28 U.S.C. § 1367(c)(1), a federal district court may decline to exercise supplemental jurisdiction over a state-law claim that raises novel or complex questions of state law. In exercising that discretion, the Court considers principles of comity, fairness, judicial economy, and convenience. *Hunter v. Page County*, 102 F.4th 863 (8th Cir. 2024).

ADP's claims implicate recently amended provisions of the Arkansas FOIA governing communications among members of public bodies and the circumstances under which governmental action may be invalidated. Ark. Code Ann. § 25-19-106. Resolution of those claims requires interpretation of Arkansas statutory requirements governing public meetings, communications among elected officials, and the remedies available for alleged violations.

The Arkansas General Assembly has established a specific judicial procedure for enforcement of the FOIA, including expedited consideration by Arkansas circuit courts. Ark. Code Ann. § 25-19-107. The statute also expressly addresses the authority of circuit courts to invalidate governmental action resulting directly or indirectly from prohibited communications. Ark. Code Ann. § 25-19-106(i).

Although ADP's FOIA allegations concern the legislative history of the challenged Ordinance, the statutory questions presented are distinct from its federal constitutional claims. Count IX additionally involves separate factual inquiries concerning the identities and responsibilities of records custodians, the existence and possession of responsive records, the adequacy of production, and applicable exemptions.

These questions concern the interpretation and enforcement of Arkansas law governing the conduct of Arkansas public officials. Principles of comity favor allowing Arkansas courts to address those questions, particularly where the General Assembly has recently amended the governing statutory provisions.

Accordingly, Griffen respectfully requests that the Court decline to exercise supplemental jurisdiction over Counts VIII and IX pursuant to 28 U.S.C. § 1367(c)(1), leaving those claims for resolution in the courts of Arkansas.

ADP's discussion of the Arkansas FOIA oversimplifies the statutory requirements governing communications concerning proposed governmental action. Although ADP quotes § 25-19-106(f)(2)(A) as prohibiting communications between members of a governing body outside a public meeting concerning matters on which official action is foreseeable, it omits subsection (f)(2)(B), which expressly permits communications conveying background and nondecisional information. Subsection (f)(2)(C) separately prohibits communications among members that constitute deliberation.

The statute also distinguishes prohibited polling from permissible administrative activity. Section 25-19-106(f)(1) expressly permits ministerial communications concerning scheduling and agendas, as well as the transmission of background and nondecisional information by public employees or agents. These distinctions are particularly relevant to ADP's exhibits involving the Quorum Court parliamentarian.

ADP's reliance on § 25-19-106(i)(2) is similarly incomplete. That provision authorizes, but does not mandate, invalidation by a circuit court of governmental action directly or indirectly resulting from prohibited communications or informal meetings. The Court must therefore consider both whether a statutory violation occurred and whether the circumstances justify invalidation of the challenged Ordinance.

ADP's reliance on *Harris v. City of Fort Smith*, 359 Ark. 355, 197 S.W.3d 461 (2004), is misplaced. In *Harris*, the city administrator conducted a series of individual conversations with every member of the city's board of directors and obtained their approval to submit a bid for the

purchase of real property. Through those communications, the board effectively reached a governmental decision outside a public meeting. The Arkansas Supreme Court held that the use of the administrator as an intermediary did not avoid the FOIA's open-meetings requirements.

The circumstances alleged here are materially different. Griffen was a private citizen advocating legislation, not a governmental administrator obtaining a decision on behalf of the governing body. The exhibits also include communications involving the Quorum Court parliamentarian concerning the preparation and processing of proposed legislation, activities expressly distinguished from prohibited conduct under the FOIA as amended in 2025. ADP has not demonstrated that these communications produced a governmental decision comparable to the board's action in *Harris*.

Moreover, *Harris* did not invalidate an ordinance or other governmental action. The Supreme Court reversed the determination that no FOIA violation had occurred and remanded for consideration of injunctive relief and attorney's fees. It therefore does not establish that invalidation of Ordinance 26-OR-19 is required or appropriate.

The Arkansas Supreme Court subsequently distinguished *Harris* in *McCutchen v. City of Fort Smith*, 2012 Ark. 452, 425 S.W.3d 671 (2012). In *McCutchen*, the city administrator distributed a memorandum and proposed ordinance to individual board members without soliciting their votes or obtaining a decision on the proposal. The Court held that those communications did not constitute an unlawful meeting under the FOIA. Although *McCutchen* preceded the 2025 statutory amendments, its distinction between distributing proposed legislation and obtaining governmental decisions through private communications remains consistent with the statute's express recognition of permissible ministerial and nondecisional

communications. The communications concerning preparation, sponsorship, and distribution of proposed legislation in ADP's Exhibits 4 and 5 are more analogous to *McCutchen* than to *Harris*.

ADP alleges that "[u]nder color of state law, [Defendants] launched a secretive campaign to 'stop' ADP's project" and that, following "impermissible polling and deliberation in violation of Arkansas's Open Meetings laws," the Quorum Court enacted Ordinance 26-OR-19 on September 22, 2026. ADP's own exhibits, however, undermine its characterization of the legislative process.

Far from documenting a secretive campaign, the exhibits provided by the Plaintiff reflect months of proposed legislation, public debate, and disagreement over the appropriate regulation of data centers. Indeed, Exhibit 11, a September 22, 2026 *Arkansas Times* article submitted by ADP, describes nearly five months of contentious debate, lengthy public meetings, and substantial citizen participation. The article reports disagreement among members of the Quorum Court, public opposition and support, and the vote adopting the Ordinance. The development of data-center regulations was plainly a matter of public knowledge and controversy.

ADP also conflates communications concerning several different legislative proposals. Exhibit 3 includes references to a proposed moratorium as early as May 26, 2026, and again in July. Exhibit 4 concerns Item 26-I-45, a proposed twelve-month moratorium. That proposal differs materially from Ordinance 26-OR-19, which establishes regulatory standards rather than a moratorium. Exhibit 8 further reflects the withdrawal of a proposed measure when sufficient votes were unavailable and a subsequent decision to pursue regulatory legislation instead. Communications concerning the development, revision, or withdrawal of earlier proposals do not, merely by their existence, establish unlawful deliberation resulting in enactment of the Ordinance challenged here.

Nor does every communication concerning proposed legislation constitute prohibited deliberation or polling. Exhibit 4 reflects communications with the Quorum Court parliamentarian concerning the formatting and distribution of proposed legislation. Exhibit 5 includes communications between the parliamentarian and an individual justice concerning legislative drafts, sponsorship, amendments, and procedural requirements. The parliamentarian's preparation of legislation, identification of sponsors, and coordination of the legislative process are administrative functions. Such communications do not, without more, establish prohibited deliberation among members of the Quorum Court. The exhibits also reference Planning Board consideration and public comment, further undermining the suggestion that the proponents sought to avoid public scrutiny.

The selective excerpts submitted by ADP, without the complete communications or surrounding context, do not establish that prohibited deliberation or polling occurred, much less that Ordinance 26-OR-19 resulted directly or indirectly from such conduct.

During the events alleged, Griffen was not the Pulaski County Judge or a member of the Quorum Court. He had no vote on the Ordinance, no authority to convene the Quorum Court, no authority to introduce legislation, and no power to enact legislation. As a private citizen, Griffen advocated for the adoption of legislation, proposed language, and communicated with elected officials. The right to petition government includes advocacy concerning proposed legislation, even when that advocacy is persistent, organized, or unpopular.

ADP seeks invalidation of the Ordinance based on alleged violations of the open-meetings provisions of the Arkansas FOIA. The statute authorizes judicial remedies for qualifying violations, including invalidation of governmental action in circumstances specified by law. But invalidation is not an automatic consequence of every alleged improper

communication. The Court must determine whether a statutory violation occurred and whether the challenged governmental action bears the legally required relationship to that violation. The Quorum Court considered and voted on the Ordinance in public proceedings. The County Judge vetoed the measure, and the Quorum Court subsequently voted to override the veto.

ADP also seeks an order compelling Pulaski County, Justice Blackwood, and persons acting in concert with them to produce records responsive to its October 19, 2026, FOIA request. Griffen was not a County official when that request was submitted. He had no authority over County records custodians and no ability to direct their response. The scope of the request, the records maintained by each custodian, the records actually produced, and any applicable exemptions remain disputed.

Should the Court decide to exercise supplemental jurisdiction of the FOIA claims, it should resolve any properly presented records-production claim under the governing statutory requirements and upon an adequate factual record.

**<u>Due Process Clause, Contracts Clause, and Takings Clause Claims</u>**

ADP contends that the Ordinance violates due process because certain terms are undefined and County officials possess excessive discretion in administering its requirements. The Due Process Clause requires fair notice of what the law demands and adequate standards to guard against arbitrary enforcement. It does not, however, require every term in a technical land-use ordinance to be defined with mathematical precision. *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).

ADP specifically challenges the terms "competent evidence," "required," "complete," and "available" in § 10.4, and the use of "material" in § 12.4. Those terms must be read in context. Section 10.4 requires evidence, before operations, that necessary electrical infrastructure

is complete or available. It limits County consideration of electrical infrastructure to lawful land-use impacts and expressly excludes utility rates, tariffs, service contracts, and matters within the Arkansas Public Service Commission's jurisdiction. Section 12.4 requires annual reporting concerning matters relevant to compliance with approved plans, permit conditions, and operational requirements. The use of terms requiring technical or factual judgment does not, standing alone, render these provisions constitutionally vague.

Nor does the Ordinance confer wholly standardless discretion. Article 7 establishes specific approval criteria and requires written findings supported by substantial evidence. Article 6 provides for notice, a public hearing, presentation of evidence, disclosure of conflicts, preservation of an administrative record, and a written decision. Article 9 establishes administrative appeal procedures and preserves judicial review as provided by Arkansas law. These provisions supply substantive standards and procedural safeguards against arbitrary decision-making.

ADP also challenges the possibility of construction delays during administrative appeals. The Ordinance does provide for stays of certain activities dependent upon disputed approvals. But it distinguishes such activities from work independently authorized by an undisputed approval. Sections 8.3, 9.5, and 17.6. The possibility that an administrative proceeding may delay development does not itself establish that the procedures violate due process. ADP has not identified an actual application of these provisions demonstrating that the County has exercised its discretion arbitrarily or denied ADP constitutionally adequate notice or review.

ADP also invokes the presumption against retroactive legislation, relying upon *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). But the Ordinance does not categorically revoke previously granted County approvals or extinguish vested development rights. Section 17.2

expressly exempts projects from obtaining a new Conditional Use Permit solely because of the Ordinance's adoption when they previously obtained all required Final County Approvals for the specific development authorized. Section 17.6 establishes a procedure for determining the existence and scope of those approvals. Section 17.7 expressly provides that nothing in Article 17 impairs vested rights established under Arkansas law.

The Ordinance distinguishes development previously authorized from new uses, expansions, and material modifications undertaken after its effective date. That distinction does not, by itself, constitute impermissible retroactive legislation. Although ADP maintains that it received final site plan approval, the scope of that approval and the development it authorized remain unresolved. The August 11, 2026 correspondence refers to five conditions associated with an earlier conditional approval, but the underlying application, approved plans, and original conditions have not been made available to Griffen. Without those records, the Court cannot determine whether the Ordinance would impair previously established rights or merely regulate development not covered by existing approvals.

Under Arkansas law, a property owner claiming vested development rights must establish good-faith reliance and substantial implementation of the intended use before the applicable restriction. *Blundell v. City of West Helena*, 258 Ark. 123, 522 S.W.2d 661 (1975). The inquiry is fact-specific and requires examination of the actual development undertaken, rather than merely the owner's plans or intentions.

In *Blundell*, the Arkansas Supreme Court recognized vested rights in the developed portion of a proposed mobile-home park but declined to extend that protection to portions that had not been substantially developed. Thus, even where vested rights exist, their scope depends

upon the particular use and development sufficiently undertaken before the restriction became effective.

The Arkansas Supreme Court reaffirmed these principles in *Potter v. City of Tontitown*, 371 Ark. 200, 264 S.W.3d 473 (2007). Despite approximately $968,000 in expenditures, the Court rejected the developers' vested-rights claim because they had not established good faith or sufficiently substantial development. The decision demonstrates that expenditures alone do not establish vesting; the nature and extent of the actual work, as well as the conditions governing governmental approval, are material.

Likewise, in *Smith v. City of Arkadelphia*, 336 Ark. 42, 984 S.W.2d 392 (1999), the Court held that previously issued permits and preparatory activities did not exempt proposed construction from subsequently adopted safety requirements. The existence of a governmental approval does not necessarily confer immunity from later lawful regulation. *See also Wilder v. Little Rock*, 150 Ark. 439, 234 S.W. 479 (1921).

Arkansas law also recognizes that governmental assurances and substantial good-faith reliance may support protection of a developer's interests. *Tankersley Bros. Industries, Inc. v. City of Fayetteville*, 227 Ark. 130, 296 S.W.2d 412 (1956). But the existence and scope of such protection depend upon the particular approvals, governmental conduct, reliance, and development established by the evidence.

Here, ADP relies upon its site-plan approval, property acquisition, substantial expenditures, and Electricity Service Agreement with Entergy Arkansas. Those circumstances are relevant, but they do not independently establish a vested right to complete every aspect of the proposed development free from subsequently enacted land-use requirements.

The August 11, 2026 correspondence from Pulaski County Planning and Development states that five conditions associated with a conditionally approved site plan dated December 19, 2024, had been satisfied. The original application, approved plans, and conditions are necessary to determine precisely what development the County authorized. Those records have not been made available to Griffen. Even assuming that ADP obtained final approval for some portion of its proposed development, it does not necessarily follow that the approval, or any vested rights arising from it, extends to the entire proposed data-center campus. Under *Blundell*, the scope of vested rights depends upon the particular development and use established by the evidence.

ADP acquired the property on August 20, 2026, after proposed data-center regulations had already been publicly considered by the Quorum Court. Although knowledge of possible regulatory changes does not itself establish bad faith, the timing is relevant to evaluating ADP's claimed reliance. The record must also establish when expenditures were incurred, what physical development occurred before the Ordinance became effective, and whether that development substantially implemented the particular use for which protection is claimed.

Moreover, Ordinance 26-OR-19 expressly preserves vested rights established under Arkansas law. Section 17.7 provides that nothing in Article 17 shall impair such rights. Section 17.6 establishes a process for determining the existence and scope of prior County approvals, including the specific uses, structures, facilities, phases, and development authorized. The Ordinance therefore does not, by its terms, categorically extinguish vested development rights.

The present record does not establish whether ADP substantially implemented the proposed development before the Ordinance became effective, whether its claimed reliance satisfies Arkansas law, or which portions of the project, if any, are protected. Under *Blundell* and

*Potter*, those questions cannot be resolved solely by reference to the amount of money spent or the existence of prior approvals.

Accordingly, ADP has not demonstrated a likelihood of success on its claim that Ordinance 26-OR-19 unlawfully impairs vested development rights.

ADP contends that Ordinance 26-OR-19 unconstitutionally impairs its Electricity Service Agreement ("ESA") with Entergy Arkansas. The Contracts Clause does not prohibit every regulation that affects an existing contractual relationship. The threshold inquiry is whether the challenged law substantially impairs contractual obligations. *Sveen v. Melin*, 584 U.S. 811, 819–20 (2018). If substantial impairment is established, the Court considers whether the law serves a significant and legitimate public purpose and whether the adjustment of contractual rights is reasonable and appropriate to that purpose. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–13 (1983).

This Court recently rejected a similar Contracts Clause challenge in *NewRays One, LLC*, No. 4:24-cv-00824-LPR, Order Denying Preliminary Injunction, at 7–9 (E.D. Ark. Oct. 6, 2024). There, a cryptocurrency mining facility claimed that enforcement of a Faulkner County noise ordinance substantially impaired its existing contracts. The Court identified three deficiencies in that claim: the ordinance served a significant and legitimate public purpose; it neither altered contractual terms nor prevented contractual performance; and the Contracts Clause addresses legislative impairment of contractual obligations, not executive enforcement standing alone. Citing *Ross v. Oregon*, 227 U.S. 150, 160–62 (1913), the Court emphasized that the Clause applies to legislative action rather than executive enforcement. The Court concluded that NewRays' likelihood of success on its Contracts Clause claim was "approaching zero." *Id.* at 9.

ADP's claim suffers from similar deficiencies. Ordinance 26-OR-19 regulates land use and the local impacts of high-intensity digital infrastructure. It does not purport to amend ADP's ESA, alter Entergy's contractual obligations, or regulate electricity rates, tariffs, or service contracts. See Ordinance § 10.4. ADP instead asserts that application of the Ordinance could delay its development and jeopardize performance under the ESA. But potential interference with a development schedule does not, without evidence of substantial contractual impairment attributable to the legislation itself, establish a Contracts Clause violation.

More fundamentally, ADP has not produced the ESA upon which its claim depends. The Complaint alleges that the agreement provides for up to 150 megawatts of electricity and requires construction and operation to begin by a specified date. Compl. ¶ 27. Yet ADP neither identifies that date nor provides the contractual provisions establishing its obligations. Although ADP has expressed willingness to submit the ESA under seal, it has not done so. Consequently, the record does not establish the agreement's operative deadlines, provisions addressing regulatory contingencies or extensions, or consequences of nonperformance. Without that evidence, the Court cannot determine whether the Ordinance substantially impairs ADP's contractual obligations or whether ADP merely anticipates difficulties meeting its development schedule. As this Court emphasized in *NewRays One*, allegations of threatened interference with existing contracts do not substitute for evidence connecting the challenged ordinance to an actual or threatened contractual impairment.

Nor has ADP established that the Ordinance necessarily prevents performance of the ESA. Sections 17.2, 17.6, and 17.7 preserve previously granted final approvals and independently established vested rights. The extent to which ADP's proposed development falls within those protections remains unresolved. ADP therefore has not demonstrated that the

Ordinance will prohibit its development, much less prevent fulfillment of particular contractual obligations.

Finally, ADP's assertion that the County lacks regulatory authority does not establish the absence of a legitimate public purpose. The Ordinance addresses land-use compatibility, infrastructure capacity, public safety, and impacts on surrounding properties. ADP's reliance on proposed Item 26-I-71 as a less restrictive alternative likewise does not establish that the enacted Ordinance is constitutionally unreasonable. The existence of another legislative approach does not, standing alone, demonstrate a Contracts Clause violation.

On this record, ADP has not established substantial impairment of its ESA attributable to Ordinance 26-OR-19 and therefore has not demonstrated a likelihood of success on its Contracts Clause claim.

ADP's physical-takings claim likewise fails to establish a likelihood of success. In *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), the Supreme Court distinguished governmental appropriation of a right of access from traditional inspections undertaken pursuant to lawful regulatory authority. The Court expressly recognized that governmental searches consistent with the Fourth Amendment and state law do not appropriate a property right and that ordinary health and safety inspection regimes generally do not constitute takings. Section 12.6 of the Ordinance provides for regulatory inspection and enforcement through lawful procedures, including judicial process when access is denied. It does not, on its face, establish an unconditional right of physical occupation comparable to the access entitlement invalidated in *Cedar Point*. ADP identifies no actual entry, appropriation of an access right beyond lawful inspection authority, or other physical invasion establishing a compensable taking.

The present record does not establish a taking requiring preliminary injunctive relief.

## IRREPARABLE HARM

ADP's request fails at the threshold because the record does not establish an imminent injury requiring preliminary injunctive relief.

ADP contends that the Ordinance threatens its project and creates uncertainty concerning future development. But the motion does not identify a stop-work order, a rejected application under the Ordinance, or a specific County directive requiring ADP to suspend construction. Indeed, ADP's supporting brief describes construction as beginning and states that the company continues to incur development expenses.

The distinction matters. A dispute concerning the validity of a land-use ordinance may be justiciable without establishing that immediate injunctive relief is necessary. ADP must show that enforcement or threatened enforcement will likely cause irreparable injury before the merits can be adjudicated. Its assertion that the Ordinance may delay construction does not identify when the alleged delay will occur, what County action will cause it, or why ordinary judicial relief would be inadequate.

ADP relies heavily on its alleged expenditures, contractual commitments, and anticipated losses. Its vice president, Kevin Murphy, states that ADP has spent tens of millions of dollars and may suffer additional losses if the Ordinance is enforced. Those expenditures may be relevant to the merits of certain claims, including any asserted vested rights. But expenditures already incurred do not themselves establish that an injunction is necessary to prevent future irreparable injury.

Likewise, anticipated construction costs, financing expenses, and lost profits are ordinarily economic injuries. ADP must explain why those injuries cannot be adequately

remedied through available legal relief or why their nature makes them incapable of reasonable calculation.

ADP also predicts injury to its reputation and business relationships. Such injury may support injunctive relief when adequately established, but it cannot rest solely on generalized predictions that customers, investors, or vendors may lose confidence in a project.

The Murphy Declaration describes potential consequences of enforcement. It does not establish that those consequences are presently occurring or are likely to occur before the Court can adjudicate the parties' rights.

ADP repeatedly characterizes the August 11, 2026, correspondence from Pulaski County Planning and Development as unconditional final site plan approval. The letter, however, refers to five conditions identified in a conditionally approved site plan dated December 19, 2024, and states that those conditions have been satisfied.

The original application, the conditionally approved site plan, and the correspondence establishing those conditions are material to determining precisely what the County approved. Griffen has not had access to those records. Nor has ADP established that site plan approval, whatever its scope, necessarily conferred a vested right to construct and operate the proposed development free from subsequently enacted land-use regulation.

The Court should not resolve that fact-intensive issue by accepting ADP's characterization of a single approval letter.

ADP also relies on its Electricity Service Agreement with Entergy Arkansas, asserting that construction must begin immediately to satisfy contractual deadlines.

The existence of a contractual deadline does not establish that the Ordinance will prevent compliance. The Court would need to determine, among other things, the applicable contractual

obligations, relevant deadlines, the actual status of construction, the effect of any County enforcement action, and the availability of contractual remedies. ADP has not submitted the ESA or identified the contractual deadlines upon which its claim of urgency depends. Without the agreement's operative provisions, the Court cannot evaluate whether regulatory delays would prevent performance, whether extensions are available, or what consequences would follow from any delay.

ADP has not established that the Ordinance has caused an existing default or that enforcement will necessarily prevent timely performance. Accordingly, the alleged contractual urgency does not independently establish irreparable injury.

**THE BALANCE OF HARMS DOES NOT FAVOR INJUNCTIVE RELIEF**

ADP contends that the County will suffer little harm if enforcement of the Ordinance is suspended. That contention overlooks the public interests the Ordinance was enacted to address. High-intensity digital infrastructure projects may present substantial questions concerning infrastructure capacity, transportation, drainage, public safety, surrounding land uses, and eventual decommissioning.

The Quorum Court enacted the Ordinance to establish a process for evaluating those matters before covered projects proceed. Suspending enforcement would prevent the County from applying those standards while this litigation remains pending.

ADP's asserted interests are also significant. The County has an interest in economic development, and unnecessary or unlawful restrictions on private property should not be sustained. But the balance of equities must rest on demonstrated injuries, not assumptions about future enforcement.

ADP has not shown that construction has been stopped or that the County has denied it permission to proceed under the Ordinance. The public interest favors lawful regulation, transparent government, and protection of constitutional rights. It also favors careful judicial consideration before suspending an ordinance enacted by the County's legislative body.
Those interests are best served by denying preliminary relief on the present record while permitting the parties to develop the facts necessary to determine the Ordinance's validity and application.

If the Court determines that some preliminary relief is warranted, that relief should be no broader than necessary to prevent the specific injury established.
An injunction should not categorically prohibit enforcement of every provision of Ordinance No. 26-OR-19 merely because ADP disputes certain provisions concerning electrical infrastructure. Nor should it extend to unidentified affiliates, privies, or other persons without a demonstrated basis for such relief.

Any order should identify the particular conduct restrained and comply with the specificity requirements of Rule 65(d). Likewise, any records-production order should identify the responsible custodian, the records subject to production, and any applicable statutory limitations.

Griffen further requests that the Court consider appropriate security under Rule 65(c) if an injunction is entered. ADP's assertion that the County would suffer no harm from an erroneous injunction does not establish that no security is appropriate.

## CONCLUSION

ADP has raised substantial questions concerning the Ordinance, its application, and the legislative process. Those questions deserve careful consideration. But the existence of disputed legal questions does not establish entitlement to a preliminary injunction.

ADP has not shown an imminent enforcement action preventing its development, established irreparable injury, or demonstrated that the balance of equities and public interest require suspension of the Ordinance before the merits can be adjudicated. Its separate FOIA claims likewise do not establish entitlement to the broad preliminary relief requested.

**WHEREFORE**, Intervenor Wendell Griffen respectfully requests that the Court deny Plaintiff's Motion for Preliminary Injunction (Doc. 8), or alternatively limit any relief to the specific conduct and injury established by the evidence.

Respectfully submitted,

Karla M. Burnett
Karla M. Burnett, Ark. Bar No. 94130

and

Danny R. Williams
Danny R. Williams, Ark. Bar No. 93148
323 Center Street, Suite 1205
Little Rock, AR 72201
Telephone: (501)580-5380
Telephone: (501)413-5714
karlamburnett@gmail.com
dwilliamslaw.pi@gmail.com
Attorneys for County Judge-elect Wendell Griffen

CERTIFICATE OF SERVICE

I, Danny R. Williams, counsel for the Intervenor, hereby certify on this 16th day of November, 2026, that the foregoing pleading was electronically filed through the CM/ECF system pursuant to Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure and by email transmission to email addresses intended to give prompt notice to all Parties.

Danny R. Williams
Danny R. Williams