**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**ADP LITTLE ROCK DATA HUB, LLC** **PLAINTIFF**

**vs.** **Case No. 4:26-cv-1196-LPR**

**PULASKI COUNTY, ARKANSAS;**
**BARRY HYDE, in his official capacity**
**as Pulaski County Judge;**
**JULIE BLACKWOOD, in her official capacity**
**as Pulaski County Justice of the Peace** **DEFENDANTS**

# REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff ADP Little Rock Data Hub, LLC ("ADP") has at least a fair chance of prevailing on the merits its claims. The Court should enter a preliminary injunction to protect ADP from irreparable harm likely to occur before trial. Testimony at Friday's hearing will show that the threat of enforcement of Ordinance 26-OR-19 ("the Ordinance") will irreparably harm ADP's business relationships. Meanwhile, County Judge-Elect Wendell Griffen's attempted intervention (Dkt. No. 23) adds to the cloud of uncertainty around the Ordinance and the threat posed by its enforcement.

The Court should weigh the FOIA-invalidation issues *first* in the likelihood-of-success analysis. Defendants Pulaski County, Arkansas and Pulaski County Judge Barry Hyde ("the County Defendants") have not shown the Ordinance was enacted pursuant to the full play of the democratic process. Since the opening brief, Justice Blackwood's newly disclosed September call logs show additional evidence of the Quorum Court's impermissible polling and deliberation. Ex. 13, at 1. Moreover, Justice Blackwood admits she failed to preserve electronically stored information ("ESI"); Justice Blackwood should have preserved that ESI since she anticipated this litigation. *Compare* Dkt. No. 22-1 at ¶ 9 *with* Dkt. No. 8-11 at 2 (Justice Blackwood: "[AVAIO]

will want to go ahead with their project, I'm sure, but *we will have to determine it in the courts* whether they can do that or not.") (emphasis added); Fed. R. Civ. P. 37(e). Justice Blackwood may intend to make further disclosures but has not yet done so at the deadline for this filing.

Because ADP has at least a fair chance of success on the merits and is likely to suffer irreparable harm before trial on the merits, the Court should enter a preliminary injunction restraining the County Defendants from enforcing the Ordinance against ADP during the pendency of this action.

**PRELIMINARY INJUNCTION STANDARD**

ADP must show it has at least "a fair chance of prevailing" on one or more of its claims. *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1000 (8th Cir. 2019). The County Defendants' response fails to show any evidence that the Ordinance was enacted pursuant to "the full play of the democratic process." *Id.* (quoting *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 n.6 (2008) (en banc); also citing *Richland/Wilkin Joint Powers Authority v. United States Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)). To the contrary, the Hyde Veto establishes as a binding admission that the Ordinance fails to follow procedures required under Arkansas law. *See* Dkt. No. 1-4 at 2 (citing Ark. Code Ann. § 14-17-203(g)) (vetoing the Ordinance as "an invitation to costly litigation over vested rights, due process, contractual interests, and constitutional property protections.")).

As the County Defendants admit, deciding which likelihood-of-success standard applies *first* requires "the Court to analyze the merits of the FOIA allegations." Dkt. No. 21 at 8, n.4.[1] This is the exact rubric prescribed by the Eighth Circuit: "the suggested course of action is to *first*

[1] The County Defendants' brief adopts different pagination than does the PACER docket. Here, page 4 versus page 7. This brief cites PACER pagination for consistency among different filings.

'evaluate whether 'the full play of the democratic process[]' was involved" and "*then* determine which standard would be more appropriate." *D.M.*, 917 F.3d at 1000 (emphasis added) (citing *Richland/Wilkin*, 826 F.3d at 1040 (quoting *Rounds*, 530 F.3d at 732 n.6)).

The County Defendants' brief incorrectly states that "county ordinances, like state statutes, are 'presumed' to be enacted through the 'reasoned democratic process.'" Dkt. No. 21 at 4.[2] *Rounds* gives the correct statement of law:

> Where preliminary injunctions are sought to enjoin city ordinances or administrative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents "the full play of the democratic process" and, thus, deserves the deference of the traditional test.

530 F.3d 724 at n.6 (quoting *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995)). If the County Defendants' statement is an attempt to distinguish between "city ordinances" and county ordinances like Ordinance 26-OR-19, they offer no rationale for such a distinction, which is invalid under Arkansas law. Ark. Code Ann. § 14-1-503(3) ("'Local government'" means a municipality, county, or other political subdivision of this state[.]").

**LIKELIHOOD OF SUCCESS ON THE MERITS**

The Court should find that ADP has at least a fair chance of prevailing on the merits of its claims that Ordinance 26-OR-19 is likely unlawful.

<u>Federal Preemption</u>

The County Defendants' response fails to engage with ADP's cited authorities concerning the Federal Power Act's ("FPA") preemption of Ordinance 26-OR-19. *See* Dkt. No. 21 at 15-18.

---

[2] In *D.M.*, cited by the County Defendants, the Eighth Circuit affirmed based on the fair-chance-of-prevailing standard, though the Eighth Circuit noted, "[g]iven the lack of justification for the policy, we have no doubt that the boys could even satisfy the heightened likely-to-prevail standard if it were applicable." 917 F.3d at 1003, n.4. So too here.

*New York v. FERC* establishes that "transmissions on the interconnected national grids constitute transmission in interstate commerce." 535 U.S. 1, 16 (2002). *New York* details the history of the FPA, which Congress enacted in 1935 to fix "the *Attleboro* gap" created by the Supreme Court's holding that states could *not* regulate the resale of electricity from a Rhode Island electric plant which sold electricity to a Massachusetts company which then resold *that* electricity to the city of Attleboro, Massachusetts. *Id.* at 5. (citing *Public Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927) ("*Attleboro*") *abrogated by Arkansas Elec. Co-op. Corp. v. Arkansas Public Service Com'n*, 461 U.S. 375, 393 (1983)). Through the FPA, "Congress authorized federal regulation of electricity in areas beyond the reach of state power" and "also extended federal coverage to some areas that previously had been state regulated" in order "to provide effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *New York*, 535 U.S. at 6 (quoting *Gulf States Util. Co. v. FPC*, 411 U.S. 747, 758 (1973) (also citing 16 U.S.C. § 824(b)).

At specific issue in *New York* was an order adopted by the Federal Energy Regulatory Commission ("FERC") that required "public utilities owning and/or controlling facilities used for the transmission of electric energy in interstate commerce have on file tariffs providing for nondiscriminatory open-access transmission services." 535 U.S. at 10 (citing 60 Fed. Reg. 17662). Here, ADP submitted in support of its complaint FERC's order setting forth the "urgent need for thoughtful reforms that large loads are able to connect to the transmission system in a timely, orderly, and non-discriminatory manner." Dkt. No. 1-5 (195 FERC 61,212, ¶ 7, and 9). By creating obstacles to the timely, orderly, and non-discriminatory interconnection of ADP's project to the interstate transmission grid, the Ordinance trammels on FERC's regulatory authority as conferred by the FPA; therefore, those conflicting provisions of the Ordinance are without effect because

they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 377 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The County Defendants did not address *New York* in their response.

In *FERC v. Elec. Power Supply Ass'n*, the Supreme Court confirmed FERC's regulatory authority over wholesale electricity sales through "wholesale demand response programs" since those programs "directly affect[] wholesale rates[.]" 577 U.S. 260, 278-279 (2016) ("*EPSA*") ("In general (and as earlier described), wholesale market operators employ demand response bids in competitive auctions that balance wholesale supply and demand and thereby set wholesale prices."). "Wholesale demand response, in short, is all about reducing wholesale rates; so too, then, the rules and practices that determine how those programs operate." *Id.* at 279. FERC employs wholesale demand response to mitigate the harms of "sky-high demand in peak periods" that "threaten[] network breakdowns, compel[] purchases from inefficient generators" and create avoidable price increases in the wholesale market. *Id.* at 287.

It is in this specific context that ADP entered into its Agreement for Electric Service ("AES") with Entergy Arkansas, LLC ("Entergy"). Under the AES, which ADP seeks to introduce into evidence in a manner that protects its confidentiality, ADP participates in the wholesale demand response program in coordination with Entergy, including ADP's reselling electricity to the interstate power grid in connection with demand-response orders from the grid operator, Midcontinent Independent System Operator ("MISO"). The AES shows the County Defendants were incorrect to state, "Avaio is a retail purchaser of electricity and does not interact with the wholesale market that is under FERC's jurisdiction." Dkt. No. 21 at 16. Similarly, the County Defendants were incorrect to state that, "to be sure, Avaio intends to *use* rather than *sell* the

electricity they are purchasing from Entergy Arkansas." Dkt. No. 21 at 18 (emphasis in original). Indeed, ADP will participate both in wholesale demand response and retail electricity markets through the AES. And it will do so as a "large load" as defined by FERC,[3] which FERC has determined should be timely, orderly, and non-discriminatorily interconnected to the transmission grid.[4]

By creating obstacles to ADP's participation in the wholesale demand response marketplace, the Ordinance obstructs FERC's regulatory authority as conferred by the FPA; therefore, those conflicting provisions are "without effect" because they "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 377 (quoting *Hines* 312 U.S. at 67). Applying the County Defendants' own logic, the Ordinance *does* affect wholesale electricity transactions and is thus *inside* "FERC's domain." *See* Dkt. No. 21 at 16-17 (citing *Hughes*, 578 U.S. at 154 (quoting *EPSA*, 577 U.S. at 265)).

While the County Defendants do address *Hughes v. Talen Energy Marketing, LLC*, they take the wrong lessons from the case. 578 U.S. 150 (2016). Same for *North Dakota v. Heydinger*, 825 F.3d 912, 914 (8th Cir. 2016). The County Defendants say, "the State retains authority over

---

[3] *See* Dkt. No. 9 at 6 (ADP meets FERC's and MISO's definition of "large load" as (1) a new commercial or industrial customer; (2) located at a single site behind an interconnection point; (3) with peak load of 50 MW or greater; (4) interconnecting at a voltage level greater than 9 kV; and (5) not part of a co-location arrangement") (citing Dkt. No. 8-1, Murphy Declaration, at ¶¶ 11-15).

[4] The County Defendants say, "FERC appears to have defined [large load] without any analysis or explanation in a single order." Dkt. No. 21 at 16 (citing 195 FERC 61,212, ¶ 58). The County Defendants do not explain why FERC would assert separate definitions in multiple orders. In any case, on November 16, 2026, MISO responded to FERC's show-cause order by substantially affirming FERC's definition. Ex. 14, MISO Transmittal Letter of Nov. 16, 2026, at 2, n.7 ("As proposed in MISO's IRR filing, a Large Load is defined as "Load with Demand of 50 MW or more associated with any facility or aggregation of facilities located at a single substation behind one or more Point(s) of Withdrawal from the Transmission System that is owned, operated, or controlled by: (a) a single entity, or (b) a group of entities that will coordinate with respect to the profile of the Load. Large Load does not include Load used exclusively for charging an Electric Storage Resource."). To the extent MISO's definition differs from FERC's, ADP meets both definitions.

'most matters they had traditionally regulated, including local electric utility rates and the siting of power plants" so "even state laws that 'incidentally affect areas within FERC's domain" are not preempted." Dkt. No. 21 at 16 (quoting *Hughes*, 578 U.S. at 164). But the County is not "the State." The County Defendants identify no tradition of local governments regulating local electric utility rates or the siting of power plants. The County Defendants identify no lawful authority to borrow regulatory authorities that belong to Arkansas; nor do they identify any law by which Arkansas authorizes the County Defendants to regulate in these fields.

The County Defendants invoke "the presumption against preemption" but cite no case applying that presumption to local regulations like this Ordinance. They cite *Iowans for Alternatives to Smoking & Tobacco, Inc. v. Mosiman*, 183 F.4th 1040, 1051. But *Mosiman* itself acknowledges the limited application of the doctrine "on areas that are uniquely federal or on interstate matters." *Id.* Interstate transmission and wholesale sales are clearly established to be both "uniquely federal" and "interstate matters" under Supreme Court precedent that the County Defendants' response does not meaningfully address. Moreover, the County Defendants' response also does not address *Tarrant Regional Water Dist. v. Herrmann*, which rejected the presumption in a case about a regional water district. 569 U.S. 614, 631 n.10 (2013).

Finally, the County Defendants claim that ADP lacks any cause of action to pursue its preemption claims. *See* Dkt. No. 21 at 14-15. The County Defendants are wrong.

*First*, by its text, Congress has created a right of action against the County for a "suit in equity." 42 U.S.C. § 1983. The County Defendants' response fails to address *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 689-690 (1978), which establishes the County is subject to suit under 42 U.S.C. § 1983. *Monell* resolves the point against the County: "Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did*

intend municipalities and other local government units to be included among those persons to whom § 1983 applies." 436 U.S. at 690. "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, *ordinance*, regulation or decision officially adopted and promulgated by that body's officers." *Id.* (emphasis added). Ordinance 26-OR-19 is an ordinance adopted and promulgated by officers of the County; and ADP may bring a "suit in equity" to enjoin its enforcement under 42 U.S.C. § 1983.

*Second*, the County Defendants misread *Armstrong v. Exceptional Child Ctr., Inc.*, which squarely forecloses their argument by its own text. 575 U.S. 320, 326 (2015). As Justice Scalia noted, "as we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 155-156 (1908)). Indeed, "the Supremacy Clause need not be (and in light of our textual analysis above, cannot be) the explanation. What our cases demonstrate is that, 'in a proper case, relief may be given in a court of equity […] to prevent an injurious act by a public officer.'" *Armstrong*, 575 U.S. at 327 (quoting *Carroll v. Safford*, 3 How. 441, 463 (1845)). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* (citation omitted). "It is a judge-made remedy, and we have never held or even suggested that, in its application to state officers, it rests upon an implied right of action contained in the Supremacy Clause." *Id.*

Against the plain language of 42 U.S.C. § 1983, *Monell*, *Armstrong*, and *Ex parte Young*, the County Defendants say, "Avaio must identify a federal right and then 'the Supremacy Clause

'creates a rule of decision' to adjudicate the allegedly conflicting state and federal provisions." Dkt. No. 21 at 15 (citing *Ark. United v. Thurston*, 146 F.4th 673, 678 (8th Cir. 2025)).

The County Defendants are in the wrong line of cases.[5] Each of the cases they cite was a statutory-construction case that asked whether a particular federal statute created a "private right of action" to enforce an aggregate, *i.e.* non-personalized, Congressional mandate. *Ark. United*, 146 F.4th at 678 (noting no statutory "mention of private plaintiffs or private remedies" in § 208 of the Voting Rights Act, 52 U.S.C. § 10508) (citing *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, 86 F.4th 1204 (8th Cir. 2023), *reh'g denied*, 91 F.4th 967 (8th Cir. 2024)); *Does v. Gillespie*, 867 F.3d 1034, 1039 (8th Cir. 2017) ("statutes with an 'aggregate' focus do not give rise to individual rights") (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)). *Gonzaga* was a damages case, 536 U.S. at 276, which concluded, "FERPA's nondisclosure provisions contain no rights-creating language" that they "have an aggregate, not individual, focus" and that "they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions." *Id.* at 290.

Here, by contrast, ADP brings a "suit in equity" to declare and defend its property rights which are entitled to equitable protection from impairment by "illegal executive action" under *Ex parte Young*. *Armstrong*, 575 U.S. at 327. Unlike aggregate or generalized interests, ADP's property interests are its own "rights, privileges, or immunities secured by the Constitution and laws[.]" 42 U.S.C. § 1983. As *Monell* holds, the County Defendants are directly liable to ADP's

---

[5] *E.g.*, *Doe v. Gillespie*, 867 F.3d 1034, 1039 (8th Cir. 2017) (concerning "enforceable federal rights in spending statutes" where courts should examine "whether Congress intended to confer individual rights upon a class of beneficiaries"); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)).

suit "for monetary, declaratory, or injunctive relief" because the threatened execution or implementation of Ordinance 26-OR-19 as applied to ADP is unconstitutional.[6]

In short, the County Defendants' response fails to engage with Supreme Court caselaw; it mistakes the marketplaces in which ADP's large load project participates; it incorrectly invokes the sovereign powers of State governments in lieu of the more circumscribed authorities held by localities; it presents the wrong standard of review when deciding questions of preemption; and it misunderstands the long-standing historical tradition of equity jurisprudence to prevent illegal executive action "tracing back to England."

ADP has shown a fair chance of prevailing on the merits of its federal preemption claims against the County Defendants. Therefore, the "most important" of the four-factor test has been met, and the Court should preliminarily enjoin the enforcement of these provisions as this action proceeds.

<u>Commerce Clause</u>

ADP has standing to bring its Commerce Clause claims since Ordinance 26-OR-19 "has a direct negative effect on [ADP's] borrowing power, financial strength, and fiscal planning." *North Dakota v. Heydinger*, 825 F.3d 912, 917 (8th Cir. 2016) (quoting *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006) (quoting *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003)). As the County Defendants cite, earlier this year this Court entered a preliminary injunction based on violation of the Commerce Clause. *Novartis Pharms. Corp. v. Griffin*, 833 F. Supp. 3d 956 (E.D. Ark. 2026). "According to binding precedent, a state law violates the Constitution if the law '(1) clearly discriminates against interstate commerce in favor of in-state commerce, (2)

[6] Congress has additionally conferred this Court powers to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

imposes a burden on interstate commerce that outweighs any benefits received, or (3) has the practical effect of extraterritorial control on interstate commerce.'" *Id.* (quoting *Styczinski v. Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (quoting *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019)). ADP has a fair chance of prevailing on all three points.

To begin with extraterritorial control on interstate commerce, Ordinance 26-OR-19 directly affects wholesale electricity sales in interstate commerce undertaken via the interstate power grid. Under ADP's AES with Entergy, ADP and Entergy coordinate their participation as wholesale market participants in the MISO-led demand-response program. By interfering with the MISO-led demand-response program in which ADP and Entergy are coordinating participants, Ordinance 26-OR-19 directly affects wholesale ratemaking in interstate commerce. On this point *Heydinger* is instructive, since the "practical effect" of the Ordinance regulates activities taking place outside Arkansas by directly interfering with interconnection on MISO's grid. 825 F.3d at 921 (citing *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 793 (8th Cir. 1995)).

As Judge Loken noted in *Heydinger*, the inherently interstate nature of the electrical grid makes it "unlike cases where the regulated out-of-state entities had the physical ability to segregate products bound for the regulating State from products bound for other States." 825 F.3d at 921, n.6 (citations omitted). There, the Minnesota prohibitions "regulate[d] activity and transactions taking place *wholly outside* of Minnesota" since "a person who 'imports' electricity does not know the origin of the electrons it receives, whether or not the transaction is pursuant to a long-term purchase agreement with an out-of-state generator." *Id.* In *Heydinger*, Minnesota's statute attempted to "prevent[] MISO members from adding capacity from prohibited sources anywhere in the grid, absent Minnesota regulatory approval or the dismantling of the federally encouraged

and approved MISO transmission system. This Minnesota may not do without the approval of Congress." *Id.* at 921.

The analogy is straightforward. Without Congressional approval, the County may not prevent MISO members like Entergy from adding large loads like ADP's by withholding its local-governmental regulatory approval, particularly given FERC's directives for timely, orderly, and non-discriminatory interconnection of large loads like ADP's. The County Defendants identify no Congressional approval for the sort of grid-affecting regulations mandated by the Ordinance. Given ADP's large-load participation in the transmission system and its role as a demand-response participant under the AES, the County's Ordinance obstructs "the federally encouraged and approved MISO transmission system." *Heydinger*, 825 F.3d at 922. ADP easily meets the fair-chance-of-prevailing standard on its commerce clause claim based on the Ordinance's effects on the interstate power grid.

Additionally, the Ordinance clearly discriminates against interstate commerce in favor of in-state commerce. "If the law in question overly discriminates against interstate commerce, then we will strike the law unless the state or locality can demonstrate, 'under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1067 (8th Cir. 2000) (quoting *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392 (1994)). "The law may be discriminatory on its face or, even if it is facially neutral, the law may have a discriminatory purpose or a discriminatory effect." *U & I Sanitation*, 205 F.3d at 1067 (citing *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (8th Cir. 1995)). The question is whether the Ordinance effectuates "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys. Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994). "If a restriction on commerce is discriminatory, it is virtually *per*

*se* invalid." *Id.* Additionally, "even if a law does not overtly discriminate against interstate commerce, the law will nonetheless be stricken if the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *U & I Sanitation*, 205 F.3d at 1067 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Here, the differential treatment concerns "ordinary" and "unordinary" users of electricity and water, like the "differential treatment between *pharmacies (or other dispensers)* inside and outside of Arkansas" in *Novartis*. 833 F.Supp.3d at 989. The County Defendants identify no other plausible regulatory target besides ADP to which Ordinance 26-OR-19 could apply. Any facial neutrality is pretextual; the differential treatment of "ordinary" industrial and commercial operators compared to ADP is intended to single-out ADP. Thus, the *intent* of Ordinance 26-OR-19 is to target an out-of-state data center developer for special treatment, while protecting all other industrial and commercial operators from the Ordinance's regulatory scope. Accordingly, the Ordinance, both by intent and effect, effectuates differential treatment that favors "ordinary" industrial and commercial users of electricity and water (all such users except ADP) while burdening ADP and only ADP with its restrictions, regulations, approvals, automatic stays of construction, and other regulatory burdens.

While the *current* County Defendants claim ADP is not subject to the Ordinance, in his attempted intervention papers Pulaski County Judge-Elect Wendell Griffen repeatedly argued that "the scope" and "the development" authorized by ADP's final site plan approval "remain unresolved." Dkt. No. 23-2 at 17; *id.* at 21 ("The extent to which ADP's proposed development falls within those protections remains unresolved."). Thus, the current County Defendant's admissions concerning the Ordinance's non-applicability to ADP—while critical—do not fully prevent impact to ADP's project from the Ordinance's clouds of uncertainty.

Finally, ADP is likely to prevail under *Pike* balancing. There is significant overlap between the FPA preemption and Commerce Clause issues in *Heydinger*. As ADP intends to show at Friday's hearing, the AES resolves the point against the County Defendants. Because the Ordinance threatens to obstruct ADP's grid-interconnection, it directly affects "transmissions on the interconnected national grids" that "constitute transmission in interstate commerce." *New York*, 535 U.S. at 16.

The Ordinance subjects ADP's grid-interconnection to indeterminate and automatic delay while the County conducts discretionary regulatory review it admittedly lacks the capacity to administer. Dkt. No. 1-4, Hyde Veto at 3 ("26-OR-19 creates a regulatory system the County is not presently equipped to administer."). Compared to FERC's directives for "timely, orderly, and non-discriminatory interconnection of ADP's, the Ordinance burdens interstate commerce by indeterminately preventing ADP's interconnection on MISO's power grid, which is a direct impairment of interstate commerce. Those burdens are substantial, compounded by the County's admitted inability to administer the Ordinance.

Resisting a finding of substantial burden under *Pike* balancing, the County Defendants say ADP provided "little analysis" but proceed to offer little of their own. Dkt. No. 21 at 20. The County Defendants say, "there is no burden, and certainly no burden that outweighs the local benefits," citing research articles about data center externalities. But they do not account in any respect for the obvious burdens on the interstate power grid posed by the Ordinance. And the County Defendants' response does not address the point that the Quorum Court rejected a readily available alternative that would have satisfied the County's informational interests without intruding on federal and state decision-making authorities. *See* Dkt. No. 8-2, Item 26-I-71.

Ultimately, the question under *Pike* balancing is straightforward: do the Ordinance's burdens on interstate commerce substantially outweigh local benefits? The answer is yes, at least with respect to the Ordinance's interference with the interconnection of ADP's project to the national power grid:

- Article 2(d) (requiring "project-specific disclosure and review of electrical demand […], on-site generation, battery energy storage, and decommissioning *before* approval, permitting, construction, or material modification of High-Intensity Digital Infrasturcture (HIDI) land use projects") (emphasis added);
- Article 3(a) (legislative findings regarding "electrical loads," "substations, generators, battery systems, telecommunications systems");
- Article 3(b) (noting "[a]vailable electrical […] capacity" may "vary substantially by location, existing commitments, system configuration, load profile, facility design, cooling technology, and project scale" making "necessary" "site-specific review");
- Article 4 (defining "Affected Public-Service Entity" as including "electric utility," "telecommunications provider" and "other governmental or public service entity whose facilities or services may be materially affected by an application."); *id.* (defining "Battery Energy Storage System"; *id.* (noting "Binding Utility Agreement" "does not constitute a County land-use approval or establish a right to a Conditional Use Permit under this Ordinance"); *id.* (defining "Continuous Electrical Demand" in terms of "reasonably foreseeable phased buildout, measured or estimated based on competent utility, engineering, equipment, and operational evidence.");
- Section 4.1 (defining "HIDIU Thresholds" as "primary-purpose test" where "Continuous Electrical Demand of ten (10) megawatts or greater" or "three (3) megawatts or more of aggregate dedicated on-site generation or Battery Energy Storage System" but excluding "ordinary" users, listing "office buildings, hospitals, educational institutions, research laboratories, manufacturing facilities, distribution centers, telecommunications facilities, governmental facilities, public utility infrastructure, and other commercial or industrial users[.]");
- Section 6.2 (requiring permit application to contain "electrical-load analysis, utility correspondence, proposed substations, transmission and distribution facilities, on-site generation, generators, fuel systems, and battery systems");
- Article 7(a) (approval hinges on the County's "written findings, supported by substantial evidence" that "the Applicant has established" "adequate electrical" "infrastructure capacity" and that "the use will not materially impair safe, reliable, or efficient infrastructure service to surrounding properties.";

- Section 8.2 (triggering "material modification" based on "increase in approved Continuous Electrical Demand");
- Section 10.4 (requiring "[b]efore operations, the Permit Holder shall provide competent evidence that required electrical infrastructure is complete or available.");
- Section 11.8 (tying "Annual Monitoring Fee and Monitoring Escrow" to "approved Continuous Electrical Demand"; and
- Section 12.4 (requiring "Annual Report" "sufficient to verify compliance with this Ordinance and the CUP" to include "actual peak, average, and maximum coincident electrical demand during the reporting period, together with the approved Continuous Electrical Demand and any material change in electrical-load assumptions, equipment, or phased buildout").

All these provisions directly intrude on both federal and state regulatory authorities by obstructing ADP's timely, orderly, and non-discriminatory interconnection to the interstate grid and by interfering with ADP's participation in the interstate market of wholesale electricity sales. The County Defendants have not articulated why Item 26-I-71 fails to satisfy their local interests without imposing the substantial burdens on interstate commerce caused by Ordinance 26-OR-19. In sum, ADP has at least a fair chance of prevailing on its Commerce Clause claim.

<u>State PSC Preemption</u>

ADP has at least a fair chance of prevailing on its claims that the Ordinance's electrical regulations are preempted under Arkansas law.[7] Arkansas law commits regulation of generation

[7] Each of the provisions preempted under FPA are also preempted under Arkansas law. Moreover, the Ordinance's Appellate Review site-approval and appellate-review provisions separately violate the PSC's exclusive-jurisdiction to regulate these matters. *See* Article 4 (defining "Applicant," "Conditional Use Permit or CUP," "County Final Administrative Decision," Section 8.3 (defining "Determination and Appeal" of a "Material Modification"; Section 8.4 (defining "Review"); Article 9 ("Administrative Appeals and Judicial Review"); Section 11.9 (authorizing "recovery of extraordinary investigation and enforcement costs" subject to Article 13); Section 11.10 (authorizing "charge and replenishment duties" set by a "fiscal officer's determination" to be heard by "a neutral hearing officer appointed by the County Judge"); Section 11.11 (noting "timely administrative appeal" of escrow funds including those "subject to a pending dispute or appeal under Section 11.10"); Section 13.10 (providing that "final Planning Board enforcement decision, other than a revocation recommendation, may be appealed to the Quorum Court within thirty (30) calendar days under Article 9."); Section 17.6 (mandating "no construction or activity […] shall begin or continue while a timely administrative appeal is pending" and providing that "[a]

and retail sales of electricity to the Arkansas Public Service Commission ("PSC"), not the County. Ark. Code Ann. §§ 23-1-103 (requiring "every public utility and every person or corporation" to "obey and comply with every requirement of this act and of every order, decision, direction, or rule made or prescribed by the [PSC] in the matters specified or any other matter in any way relating to or affecting the business of any public utility."); 23-18-106(a) (authorizing PSC rulemaking by which electric utilities "engage in comprehensive resource planning"; "acquire electric energy, capacity, and generation assets"; and "utilize alternative methods to meet their obligations to serve Arkansas retail electrical customers.").

The Ordinance is inconsistent with the PSC's exclusive jurisdiction over generation and retail ratemaking of electricity. Ark. Code Ann. §§ 14-14-808(a) (prohibiting the County's "exercise of any power in any manner inconsistent with state law or administrative rule or regulation in any area affirmatively subjected to state regulation or control"; 14-14-808(c) (defining an "area" as "affirmatively subjected to state control if a state agency or officer is directed to establish administrative rules governing the matter or if enforcement of standards or requirements established by statute is vested in a state officer or agency.").

The County Defendants say it is "confusing" that "the General Assembly narrowly restricts local regulatory authority in this specific field." Dkt. No. 21 at 33. But the General Assembly expressly displaces local legislative power in areas "affirmatively subjected to state regulation or control" which includes the fields of "comprehensive resource planning" and acquisition of "electric energy, capacity, and generation assets" and "utilization of alternative methods" to deliver

---

determination under this Section may be appealed under Article 9, except where applicable Arkansas law requires *a direct appeal to circuit court*.") (emphasis added).

electricity to "Arkansas retail electrical customers." Ark. Code Ann. §§ 23-18-106(a); 14-14-808(c).

The County Defendants misread Ark. Code Ann. § 14-14-808(b), which does provide affirmative inconsistency where local "standards or requirements" are "lower or less stringent than those imposed by state law, rule or regulation." But that subsection applies in every context, *i.e.*, even areas which are not "affirmatively subjected by law to state regulation or control." Here, the Ordinance imposes "standards or requirements" in areas "affirmatively subjected by law to state regulation or control" as the General Assembly directed the PSC to "establish administrative rules governing the matter" and vested in the PSC the task of "enforcement of standards or requirements" for the generation and retail sales of electricity. *See* Ark. Code Ann. §§ 23-18-101, *et seq.*

The County Defendants say local governments are authorized to "provide various services" such as "[p]lanning" and "zoning," and "water, sewer, and other utility services" under Ark. Code Ann. § 14-14-802. *See* Dkt. No. 21 at 32-33. But they identify no historical precedent in Arkansas for county or municipal regulation of electricity. And they fail to engage with the extensive precedent supporting the PSC's exclusive jurisdiction.[8] The County Defendants point to no affirmative legislative grant of such authority. In any case, the Ordinance is not the provision of a "service" under the plain-language meaning of that term, such as water treatment, garbage

---

[8] *See* Dkt. No. 9 at 11-12 (citing *Centerpoint Energy, Inc. v. Miller County Circuit Court*, 372 Ark. 343, 350, 276 S.W.3d 231, 237 (2008) ("*Centerpoint II*"); *Centerpoint Energy, Inc. v. Miller County Circuit Court, Second Div.*, 370 Ark. 190, 197, 258 S.W.3d 336, 341 (2007) ("*Centerpoint I*"); *General Telephone Co. of Southwest v. Lowe*, 263 Ark. 727, 730, 569 S.W.2d 71, 73 (1978); *Hempstead County Hunting Club, Inc. v. Arkansas Public Service Com'n*, 2010 Ark. 221, at 10, 384 S.W.3d 477, 483; Ark. Code Ann. §§ 23-3-117; 23-4-201(a)(1); 23-18-502(e); 23-18-503(7)(A); 23-18-526; 14-18-808(a)).

collection, or the like. Instead, it subjects ADP to "special treatment" through regulatory burdens intended to impair its project.

Through this action, ADP does *not* contend the County lacks all authority to regulate "dangerous or noxious activities." ADP does not challenge the Ordinance's sound-level requirements or physical setback requirements. At the same time, the County cannot regulate where it lacks regulatory authority merely by reclassifying its regulations as targeting "dangerous or noxious activities." Any concerns the County Defendants may have with ADP's electrical use must be channeled through the PSC's process; the General Assembly has expressly conferred that review process to the PSC's exclusive jurisdiction with respect to municipalities. *See* Ark. Code Ann. § 23-3-119(a)(1) (authorizing a "municipality" to "complain to the commission in writing"). The County Defendants' response identifies no statutory authority to establish a competing adjudicatory regime displacing the PSC.

The County Defendants misread the Ordinance's conflicts with the appellate jurisdiction over PSC matters conferred to the Arkansas Court of Appeals by the General Assembly. *See* Dkt. No. 9 at 14-15. ADP does not assert that the Ordinance "allow[s] the County to hear appeals from the PSC;" instead, the Ordinance is an attempt to bypass the PSC's exclusive jurisdiction by initiating discretionary reviews outside the PSC's jurisdiction. The Ordinance arrogates oversight authority over generation, siting, and retail rates of electricity, subjects the PSC to participate in the County's regulatory-adjudicative process as an "Affected Public-Service Entity," and then channels appellate review through circuit court, contradicting the process of judicial review created by the General Assembly. Ark. Code Ann. § 23-2-423(a)(1). Again, the proper pathway for the County Defendants to assert any concerns they have with electrical use of ADP's project is through the process committed to the PSC's jurisdiction. *See* Ark. Code Ann. § 23-3-119(a)(1).

Equal Protection

ADP has at least a fair chance of prevailing on its class-of-one claim. The County Defendants' response does not address *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). There, the local government imposed heightened requirements on the Olechs which it did not impose on other property owners, requiring a 33-foot easement to access municipal water rather than the 18-foot easement required of all others. The Olechs had previously successfully litigated against the city, and they pleaded the true reason for the differential treatment as a "class-of-one" was motivated at least in part by "ill will" toward them, stemming from that prior litigation.

The record evidence already shows that County Judge-Elect Griffen, working in tandem with at least four Quorum Court members, meant to target ADP for "special treatment" and to "stop" ADP's project. This Ordinance is the culmination of direct targeting of ADP as a class-of-one. By its text, the Ordinance takes pains to subject ADP—and only ADP—to its burdensome requirements. It excludes non-ADP industrial and commercial users of electricity and water, which it styles as "ordinary."

While the County Defendants now correctly concede that the Ordinance does not apply to ADP, that begs the question: to whom could it apply? Judge-Elect Wendell Griffen argues "the scope" and "the development" authorized by ADP's final site plan approval "remain unresolved." Dkt. No. 23-2 at 17; *id.* at 21 ("The extent to which ADP's proposed development falls within those protections remains unresolved."). Defendant Justice Blackwood says ADP is not "grandfathered in," and that ADP would "have to go through our regulations." Dkt. No. 9-11. To repeat, the current County Defendants' admissions concerning the Ordinance's non-applicability to ADP—while critical—do not fully prevent impact to ADP's project from the Ordinance's clouds of uncertainty.

The County Defendants say ADP "tries to paint the Ordinance's passage as an attack on Avaio itself" but then claim, "that should be no surprise" and that "[if] Avaio could use that fact to mount an equal-protection claim, then almost every new industry could avoid regulation." Dkt. No. 21 at 21-22. That fails to address any of the extensive targeting evidence ADP has already presented to the Court even in advance of the preliminary evidentiary hearing or future civil discovery:

- Dkt. No. 8-3 at 1 ("Vote NO on the amendment! NO! Special treatment for AVAIO"); *id.* at 2 ("If we could get some regulatory ordinances passed prior to final approval for AVAIO would it apply to them?" and "since the PSC has not yet signed off on the approvals for Avaio they could be included in the moratorium. We need to be able to include Avaio."); *id.* at 5 ("Judge Wendell… I think you could stop Avaio if you told them you wouldn't give them tax abatements they would leave");
- Dkt. No. 8-4 at 9-10 ("The Quorum Court finds that active and anticipated proposals for high-impact industrial and high-intensity digital infrastructure facilities may proceed before Pulaski County has completed development of an adequate regulatory framework.");
- Dkt. No. 8-7 at 6 ("**Very important for AVAIO**") (emphasis in original);
- Dkt. No. 8-9 at 1 ("The Quorum Court finds that at least one publicly announced High-Intensity Digital Infrastructure project in Pulaski County has commenced construction and is planned for development in multiple phases[.]");
- Dkt. No. 8-11 at 1 ("AVAIO would not, JP Julie Blackwood told the *Arkansas Times* in an earlier call on Monday, be 'grandfathered in.' 'They have to go through our regulations,' she said.");
- Dkt. No. 8-12 at 3 ("If AVAIO already possesses the necessary site-plan approval, Item 26-I-71 may regulate future projects while leaving the proposed Wrightsville-area AVAIO-Leo development outside its protections.").

ADP has shown a fair chance of prevailing on its equal protection claim.

<u>Facial Invalidity and Withholding of Public Records under FOIA</u>

The first reading of the Ordinance was at the Quorum Court meeting on August 25, 2026. The FOI records reflect the Justices of the Peace communicated by phone and text about the

Ordinance and conducted pre-meeting polling for the Ordinance before that public meeting. *See generally* Dkt. Nos. 8-3, 8-4, 8-5, 8-6, 8-8, 8-9, 8-10, 8-10.

In the 90 minutes before the August 25 meeting began at 6:00 p.m., Justice Blackwood called the nine other members of the Quorum Court who voted in favor of the Ordinance that evening: Justices Massey (10 billed minutes), Capps (6), McCoy (11), Person (7), Davis (3), Medlock (1), Ward, (1), and Keith (1), and twice called Justice Robinson (1 each). Dkt. No. 8-6. In the same span, which ended at 5:42 p.m., she also called Judge Griffen (13 minutes) and received calls from Justices McCoy (7) and Medlock (10). *Id.* Justice Blackwood spent 72 minutes of those 90 on these calls. *Id.*

This group of Justices had been working together on the Ordinance since August 11, when it was placed on the agenda for the August 25 meeting. At 10:06 a.m. on August 14, 2026, Griffen texted four members of the Quorum Court, including Justice Blackwood, that "Board members" "need accessible information about how 26-I-56 differs from earlier proposals (26-I-31 and 31A)." Dkt. No. 8-3 at 8. Later that day, at 4:27 p.m., Justice Blackwood emailed Justices Davis, Capps, Lewison, Person, Massey, Keith, Ward, Young-Baker, Robinson, McCoy, Elliott, and Medlock. Dkt. No. 8-7. Justice Blackwood's email omitted Justice Curry. *Id.* The email's subject line was "Side by side 31A – 56." Defendant Justice Blackwood wrote, "I thought this might help anyone trying to compare the 2 ordinances." Below was a five-page grid comparing Item 26-I-31A and 26-I56. For the category "Final County Approval," the grid reads "**Very important for Avaio**" beside an emoji depicting a red flashing alarm. *Id.* at 6 (emphasis in original). This refers to Section 17.2, concerning Projects With Final County Approvals. *See* Dkt. No. 1, Compl., Ex. 3 at 32. As of August 14, 2026, the Ordinance's effect on AVAIO was "very important" in deliberations about the Ordinance outside the public meeting process.

The majority who voted in favor of the Ordinance on August 25 all received this side-by-side analysis of the Ordinance from Justice Blackwood on August 14.

On August 22, 2026, and August 24, 2026, Justice Blackwood sent group texts to nine other Justices of the Peace, constituting 10 of 15 members of the Quorum Court, or a majority. Dkt. No. 8-6. Justice Blackwood produced none of those three group text messages in response to the FOIA request of October 19, 2026. *See* Dkt. No. 1, Compl., Ex. 6. They remain unproduced.

When the Ordinance came for consideration at the August 25, 2026 Quorum Court meeting, there was no public deliberation about its substance. The Court simply voted to amend the Ordinance on a voice vote to remove its emergency clause and then placed it on first reading. With respect to the emergency clause, after the meeting Parliamentarian Blagg texted Justice Blackwood: "Why'd you pull it?" She answered: "I pulled it because I was losing Luke and that left me with 9 votes." Dkt. No. 8-8.

After the pro-Ordinance group had voted for the Ordinance without an emergency clause on August 25, 2026, the same group of Justices voted for the Ordinance with the emergency clause added back on September 22, 2026. The same group voted to override the veto on October 27, 2026. The group of Justices that had considered the Ordinance in private correspondence and discussion before the August 25 vote held firm throughout the three public meetings that resulted in approval of the Ordinance. The only public discussion that took place during those meetings was the impact of the emergency clause on the Ordinance and its impact on an assignment to the County Planning Department that the emergency clause rendered moot.

FOIA's Open Meetings provisions prohibit the private deliberations that resulted in this Ordinance. "A member of a governing body shall not participate in a communication, whether oral, written, electronic, or otherwise" that "she knows or reasonably should know is a poll," or

"[o]ccurs outside of a public meeting with another member of the governing body about a matter on which official action will foreseeably be taken by the governing body." Ark. Code Ann. § 25-19-105(f)(1)(A), (2)(A). The group communications among the Justices after it was placed on the Quorum Court's agenda on August 11 violated these prohibitions. They also violated the purpose of public meetings, which must be "conducted in a manner that allows the public to attend and hear all of the public body's meaningful discussion and deliberation, if any, on official business as provided under subsections (f) and (g) of this section." Ark. Code Ann. § 25-19-105(a)(5).

The group of ten Justices who communicated about the Ordinance between August 11 and August 25 did not have meaningful discussions or deliberations in public. The group of ten approved the Ordinance without an emergency clause and without public deliberation on August 25, and they approved the Ordinance with the emergency clause and overrode the veto at the September and October public meetings with no public deliberation. The people who elected these representatives do not know why their Justice voted for the Ordinance because what substantive deliberation did occur took place out of public view.

On September 1, 2026, Justice Natalie Capps noted this precise violation in a group text thread concerning the Ordinance: "I appreciate being included in this conversation but think it violates open meeting laws. I am going to kindly excuse myself. See you all next Tuesday—have a great rest of the week." Dkt. No. 8-3 at 4. Justice Capps then removed herself from the polling-and-deliberation text-message thread. *Id.*

Justice Blackwood's newly disclosed September call logs show additional evidence of the Quorum Court's impermissible polling and deliberation. Ex. 13, at 1. Justice Blackwood admits she failed to preserve electronically stored information ("ESI") despite having publicly spoken about her knowledge of the likelihood of litigation. *Compare* Dkt. No. 22-1 at ¶ 9 *with* Dkt. No.

8-11 at 2 (Justice Blackwood: "[AVAIO] will want to go ahead with their project, I'm sure, but *we will have to determine it in the courts* whether they can do that or not.") (emphasis added); Fed. R. Civ. P. 37(e).

Resisting her duties under the FOIA, Justice Blackwood says the FOIA request "took an impermissible shortcut by addressing itself only to the County Judge via the County Attorney." Dkt. No. 22 at 4. As Justice Blackwood appropriately concedes, Dkt. No. 22 at 5, n.2, Judge Hyde is the official who has "custody of county property." Ark. Code Ann. § 14-14-1101(a)(5). Justice Blackwood's shortcut assertion might have been a satisfactory explanation had she been unaware of the request. But Justice Blackwood's Declaration shows she had actual knowledge of and directly participated in the County's compliance with the FOIA Request. And her contemporaneous statements show she knew litigation would likely ensue from enactment of the Ordinance which triggers independent retention obligations. *E.g.*, Fed. R. Civ. P. 37(e). Neither Justice Blackwood nor the County identify any objection made under Ark. Code Ann. § 25-19-105(a)(3)(C).

Relatedly, the County Defendants say that the FOIA claims are invalid because ADP "failed to timely bring its FOIA appeal." Dkt. No. 21 at 12. In doing so, the County Defendants misstate the chronology. They correctly state that the request was made October 19, 2026. *See* Dkt. No. 1, Ex. 6 at 1. But the County Defendants ignore that ADP agreed to an extension of the County's compliance deadline from October 22, 2026, to October 26, 2026. Dkt. No. 1, Ex. 7, at 1. Based on the County's response deficiencies, ADP sent a demand letter for FOIA compliance on October 27, 2026. Dkt. No. 1, Ex. 7, at 1. Ordinance 26-OR-19 was enacted later that day. ADP has still received no response to that demand letter. On October 29, 2026, two days after its demand letter

and three days after the County's FOIA response, ADP commenced this action seeking an appeal of the denial of its FOIA rights. That timeline satisfies any reasonable definition of "immediate."

But the County Defendants argue for an unreasonable definition of "immediate" based on a case about timeliness of service of process related to a bond forfeiture when a criminal defendant failed to appear in court as promised as a condition of pretrial release. *First Ark. Bail Bonds, Inc. v. State*, 373 Ark. 463, 284 S.W.3d 525, 529 (Ark. 2008). In that case, the criminal defendant failed to appear in court on April 6, 2006, and the circuit court entered an order to show cause the next day, April 7, 2006. *Id.* at 463, 284 S.W.3d at 526. That order was served on the bail-bond company on April 10, 2006. Almost seven months passed, then on November 3, 2006, the circuit court entered a Bond Forfeiture Summons, directing the bail-bond company to appear and show cause why they should not forfeit the bond to Sebastian County. *Id.* As the Arkansas Supreme Court reasoned, "service of valid process is necessary to give a court jurisdiction over a defendant." *Id.* at 467, 284 S.W.3d at 528. It held that the "nearly seven months" between the show-cause order and the issuance of summons "was not issued immediately as required by the statute."

This case is different. Here, ADP initiated suit two days after its demand letter, not seven months. The County Defendants' position would penalize ADP's efforts to confer and seek FOIA compliance without having to resort to judicial process. And this matter does not implicate the jurisdictional considerations underpinning the requirement for "service of valid process[.]" *First Arkansas Bail Bonds*, 373 Ark. at 467, 284 S.W.3d at 528.

Finally, these are simply not the sort of questions that raise "a novel legal issue" that counsels in favor of declination of supplemental jurisdiction. *Hunter v. Page County*, cited by the County Defendants, resolves the point conclusively in favor of exercise of federal jurisdiction. 102 F.4th 853, 870 (8th Cir. 2024). There, the Eighth Circuit affirmed the trial court's exercise of

supplemental jurisdiction over state-law claims under Iowa's Open Meetings Act, *after* dismissing federal-question claims. The Eighth Circuit affirmed the district court's conclusion that the case raised "no novel or complex state issues[.]" *Id.* at 870. The Eighth Circuit reasoned, "plaintiffs' state claims are neither novel nor complex" and noted the "established body of case law on the Open Meetings Act" which "provided sufficiently clear guidance for the district court to address plaintiffs' state claims." *Id.* at 871. So too here, as detailed in ADP's opening brief. Dkt. No. 9 at 17-20.

ADP has shown at least a fair chance of prevailing on its FOIA records claim against the County and Justice Blackwood. And ADP has shown at least a fair chance of prevailing on its Open Meetings claim relating to invalidation of Ordinance 26-OR-19. These claims are key to the likelihood-of-success analysis as the Court weighs preliminary injunctive relief. Across two separate responses, Defendants have not shown the Ordinance was enacted pursuant to the full play of the democratic process, to warrant heightened deference. Therefore, the Court should analyze *all* claims based on the lower-scrutiny fair-chance-of-prevailing standard, given the procedural irregularities surrounding the Quorum Court's adoption of the Ordinance.

<u>Due Process Clause, Contract Clause, and Takings Clause Claims</u>

The County Defendants do not challenge the basic tenets of ADP's Due Process Clause claims. The Ordinance fails to give adequate notice of prohibited conduct that could trigger indeterminate delays, and the Murphy Declaration explains that ADP does not know how to comport its conduct based on the vague and ambiguous directives mandated by the Ordinance.

As the Hyde Veto shows, the County presently lacks the capacity to administer the Ordinance's requirements, suggesting that even the County is confused about key terms and the scope of obligations the Ordinance purports to require. *See* Dkt. No. 1-4 at 2 ("Article 17 itself

recognizes the difficulty: the Planning Director is permitted to determine the existence and scope of County approvals but is specifically prohibited from deciding whether a constitutional vested right exists. That leaves the County in a difficult position. A substantially advanced project could become subject to new restrictions while the central question—whether the owner already possesses legally protected rights—remains unresolved.”). The County Defendants are bound by the Hyde Veto's description of the County's “difficult position[,]” not by litigation-driven assurances that “undefined terms” have only “common and ordinary meanings,” *see* Dkt. No. 21 at 22. Particularly since Judge-Elect Griffen claims “the scope” and “the development” authorized by ADP's final site plan approval “remain unresolved.” Dkt. No. 23-2 at 17; *id.* at 21.

To the extent any of these matters either do or may “remain unresolved,” then the Ordinance threatens to subject ADP to indeterminate delay of its project, even if wholly invalid, as the appellate process unfolds. *See* Section 9.5 (“A timely appeal stays issuance and exercise of the CUP. No construction, grading, land disturbance, or operation authorized solely by the appealed CUP shall occur while the appeal is pending unless ordered by a court. Work independently authorized by an *undisputed* and *otherwise valid* County approval is not stayed solely by an appeal under this Article *unless the County* or a court determines that the work depends upon the appealed decision.”) (emphasis added).

No text limits the County's determination that work “depends upon the appealed decision” or anything else. Nor does the Ordinance explain what sort of “Electrical Infrastructure” is “Required,” presenting an obvious ambiguity: does this mean physically required to operate or required *by the Ordinance* for the County to permit operation? Arguing the Court should ignore the Murphy Declaration, the County Defendants say, “vagueness is a question of law for the Court.” Dkt. No. 21 at 21 (citing *United States v. Frison*, 825 F.3d 437, 441 (8th Cir. 2016)). But

this oversimplifies the question. As *Frison* makes clear: "We consider whether a statute is vague *as applied to the particular facts at issue*[.]" 825 F.3d at 442 (quoting *United States v. Cook*, 782 F.3d 983, 987 (8th Cir. 2015) (emphasis added) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010)). Thus, the Murphy Declaration, the Hyde Veto, and forthcoming evidence at Friday's hearing are all factors "relevant to [the] analysis." *Frison*, 825 F.3d at 442 (citations omitted). These factors show ADP has at least a fair chance of prevailing on its void-for-vagueness claims.

The County Defendants' response appropriately concedes the Ordinance "is not retroactive[.]" Dkt. No. 21 at 24. The County Defendants are bound by this concession. However, uncertainty lingers, as evidenced by the attempted intervention by Judge-Elect Griffen, who claims "the scope" of and "the development" authorized by ADP's final site plan approval "remain unresolved." Dkt. No. 23-2 at 17; *id.* at 21. From that assertion, in addition to the other evidence of targeting already before the Court, the County is likely to attempt to wield the Ordinance against ADP's project in the immediate future, despite its admitted nonretroactivity. At present, the County Defendants say only, "retroactivity alone does not make a statute unconstitutional." Dkt. No. 21 at 25 (citing *United States v. Darusmont*, 449 U.S. 292, 298-99 (1981). But "retroactive legislation" may be used "as a means of retribution against unpopular groups or individuals." *Landgraf v. USI Film Products*, 511 U.S. 244, 266 (1994). ADP has presented ample targeting evidence to show it has at least a fair chance of prevailing on its Due Process Clause claims.

The County Defendants say ADP has no "cause of action" to bring a Contract Clause claim. As with the preemption analysis, the County Defendants again fail to address *Ex parte Young* and *Monell*. They again cite a case involving state-level officials, not a local government directly liable as a "person" under 42 U.S.C. 1983. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720 (8th Cir.

2022). In *Walz* the Eighth Circuit *reversed dismissal* of the plaintiff's claims under the Contract Clause and Takings Claims brought under 42 U.S.C. § 1983. In doing so, the Eighth Circuit stated, there have been cases in this circuit in which" "a cause of action has been asserted" "under § 1983 for a Contract Clause violation." 30 F.4th at 727 (citing *Justice Network Inc. v. Craighead Cnty.*, 931 F.3d 753, 758 (8th Cir. 2019); *Int'l Ass'n of Fire Fighters, Local 2665 v. City of Clayton*, 320 F.3d 849, 850 (8th Cir. 2003) (also citing *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017) (addressing qualified immunity in official-capacity suit); *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) (affirming dismissal of claim "seek[ing] a judicial determination under § 1983 that the City unconstitutionally deprived the plaintiff of their right to receive supplemental pension payments" directly from the city); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (affirming summary judgment on Contracts Clause claim against city government).

Even *Kominski* concedes the Contract Clause applies once a party has initiated a "judicial proceeding […] to vindicate his rights under a contract[,]" distinguishing that sort of equitable or declaratory relief from "a private cause of action against the state official responsible for the contractual impairment." 865 F.3d at 346. In both *Kaminski* and *Crosby*, the essential question was whether the governmental entity breached *its own contract* with the plaintiff. Their essential holdings were that the Contract Clause does not somehow constitutionalize breach of contract claims for purposes of 42 U.S.C. § 1983. So too for *Hayes v. Graves*, where this Court considered "the rights of prisoners to receive and keep COVID-19 stimulus payments sent to them by the federal government." 2022 WL 822881, *1 (E.D. Ark. Mar. 16, 2022). *Hayes* considered whether the Contract Clause applied to property rights *between* the prisoner and state officials.

None of the contracts involved here are between ADP and the County. ADP has contracted with Entergy and others to build and operate its data center. Instead, this case is like *Walz*, which

arose from private contracts between landowners and tenants displaced by "an executive order mandating a statewide residential eviction moratorium." 30 F.4th at 723. The Eighth Circuit rejected the interpretation of *Carter v. Greenhow* adopted by *Kaminski* and *City of Gastonia*, reasoning that "the Court has since clarified that *Carter* was a question about pleading and not about whether the plaintiff could bring a claim under the Contract Clause." *Walz*, 30 F.4th at 727 (citing *Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991) ("noting the Court has since given the *Carter* decision 'a narrow reading' and holding that the petitioner could bring a Commerce Clause claim under 42 U.S.C. § 1983); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 n.29 (1979) (parenthetical omitted)).

This case is also like *Association of Equipment Manufacturers v. Burgum*, as cited in ADP's opening brief. Dkt. No. 9 at 30 (citing 932 F.3d 727 (8th Cir. 2019)). In *Burgum*, the contracts in question were "between manufacturers and dealers" not between the plaintiff and North Dakota. *Carter* confirms the point. There, the plaintiff essentially complained of "rights the plaintiff derives from the contract with the state," *not* a separate, private contract impaired by actions taken under color of state law. 114 U.S. at 321-322. *Carter* itself confirmed that the Contract Clause was available to a plaintiff "[i]n any judicial proceeding necessary to vindicate his rights under a contract *affected* by such legislation" where "the individual has a right to have a judicial determination declaring the nullity of the attempt to impair its obligation." *Id.* (emphasis added). While *Carter* reasons that may be "the only right to secured" by the Contract Clause, this right forms the basis for ADP's Contracts Clause claim in this case.

Turning to the elements, ADP must first show that the Ordinance substantially impairs at least one of its contractual relationships. *Burgum*, 932 F.3d at 730 (quoting *Sveen v. Melin*, 584 U.S. 811, 819 (2018)). The Ordinance impairs ADP's performance under its AES with Entergy and

creates new regulatory burdens exceeding those set by FERC and PSC. It also impairs ADP's other contractual relationships. These impairments are substantial. While the County Defendants complain that ADP "hasn't even presented the allegedly impaired contract to the Court for analysis," Dkt. No. 21 at 29, ADP intends to present further evidence subject to reasonable confidentiality protections at Friday's evidentiary hearing.

After that first step, "the inquiry turns to the means and ends of the legislation" to decide "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Sveen*, 584 U.S. at 819 (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983)). The County Defendants say that courts should "defer to legislative judgment as to necessity and reasonableness." Dkt. No. 21 (quoting *Burgum*, 932 F.3d at 734). And the County Defendants state, incorrectly, that "the analysis is all but indistinguishable from how rational-basis review evaluates means-ends fit." Dkt. No. 21 at 28.

This misstates the law, as *Burgum* clarifies in its very next sentence: "Yet the Court also made clear that the Contract Clause *provides greater protection for contractual rights* than the 'less searching' rational basis standard applied under the Due Process Clauses." 932 F.3d at 734 (citing *Pension Benefit Guar. Co. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984)). Indeed, "[t]o avoid collapsing the specific prohibition of the Contract Clause into the more general Due Process Clause, a reviewing court must require the State to demonstrate more than a conceivable or incidental public purpose for impairing the obligation of contracts." *Id.* At minimum, this demands that the regulatory body show it "is properly exercising its police power[,]" which the County cannot do here since its authorities are preempted under both federal and state law. *Id.* at n.2 (citing *Energy Reserves Grp.*, 459 U.S. at 412; *City of El Paso v. Simmons*, 379 U.S. 497, 508-09 (1965) ("*Once we are in this domain of the reserve power of a State* we must respect the 'wide discretion

on the part of the legislature in determining what is and what is not necessary.'") (as emphasized in *Burgum*).

ADP has at least a fair chance of prevailing on its claim that the Ordinance substantially impairs its contractual relationships.

Finally, the County Defendants do not rebut ADP's likelihood-of-success showing on its Takings Clause claims. The Ordinance's assertion of a right to demand "immediate consensual access" is confined to an "imminent threat context." Section 12.2. That "immediate consensual access" is separate and apart from the "reasonable County inspections" compelled for "areas, records, equipment, and conditions relevant to land use compliance" for "County employees and County-directed professionals" as required under Section 12.1. Section 12.6 does not restrict its demand for "lawful access" only to Section 12.2's "immediate consensual access." Instead, the requirement of allowing "County employees and County-directed professionals" for "County inspections" provides for "reasonable advance notice" "when practicable." Section 12.1.

The "inspection" "access" required under Ordinance 12.1 is a *per se* physical taking under *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 145 (2021). It "appropriates a right to invade [ADP's] property[.]" *Id.* at 149. Moreover, "[r]efusal to provide access" "may constitute a violation" of the Ordinance, triggering its penalty provisions. Section 12.6. As the Supreme Court reasoned in *Hassid*, this Ordinance "appropriates a right to physically invade [ADP's] property," and as in *Hassid*, any noncompliance can "result in sanctions." 594 U.S. at 144. The County Defendants do not claim they have given ADP any compensation for this *per se* physical taking. Therefore, ADP has at least a fair chance of prevailing on its Takings Claim as applied to Article 12 of the Ordinance.

**STANDING**

The County Defendants' standing arguments are not well-taken. As recounted above, the Ordinance was formulated with ADP as the specific and apparently solitary regulatory target. The Ordinance claims a discretionary gatekeeping role for ADP's interconnection to the transmission grid, which actively impairs ADP's AES with Entergy. The Ordinance prescribes an indeterminate appeals process with automatic delays of ADP's connection to the power grid. *See* Article 9.[9] *Any* timely appeal, regardless of apparent merit, "stays issuance and exercise of the CUP" and "[n]o construction, grading, land disturbance, or operation authorized solely by the appealed CUP shall occur while the appeal is pending unless ordered by a court." Section 9.5. Only work "independently authorized by an *undisputed* and otherwise valid County approval" is not stayed solely by an appeal under this Article[.]" *Id.* But even that safety valve does not apply if "the County or a court determines that the work depends upon the appealed decision." *Id.*

As outlined above, the County Defendants have correctly admitted the Ordinance does *not* apply to ADP. However, the attempted intervention by Pulaski County Judge-Elect Griffen shows that this appropriate concession does not end the inquiry before this Court. Judge-Elect Griffen takes office on January 1, 2027. In this very action Judge-Elect Wendell Griffen has asserted "the scope" of and "the development" authorized by ADP's final site plan approval "remain

[9] The Ordinance purports to authorize appeals by "an owner or lawful occupant of property that *may* be materially affected," an "Affected Public-Service Entity" like MISO, PSC, or Entergy, or "a person who submitted evidence or comments before the Planning Board and demonstrates a concrete and particularized affect" on their "property, health, safety, legal rights, or other legally protected interest that is actual or reasonably probable and different in kind or degree from the effect on the public generally." Section 9.2 (emphasis added). In that appeal world, "the Applicant retains the burden of establishing compliance with the applicable approval criteria." Section 9.4. But the Ordinance identifies no standard for "compliance" for "the Applicant." But in an "enforcement appeal" the County "bears the burden of proving the violation by a preponderance of the evidence." *Id.*

unresolved." Dkt. No. 23-2 at 17; *id.* at 21 ("The extent to which ADP's proposed development falls within those protections remains unresolved."). Thus, the current County Defendant's admissions concerning the Ordinance's non-applicability to ADP—while critical—do not fully ameliorate the harmful impacts the Ordinance is causing ADP's project.

ADP seeks a conclusive judicial declaration of its rights and responsibilities with respect to its property and contractual rights in nexus with Pulaski County Ordinance 26-OR-19. 28 U.S.C. § 2201(a). ADP is entitled to a declaration of its rights "with the force and effect of a final judgment or decree." *Id.* And ADP seeks all necessary and proper relief based on that judicial declaration, to include a preliminary injunction to protect it from likely irreparable harm before this action can proceed to final judgment. 28 U.S.C. § 2202.

**IRREPARABLE HARM**

ADP will prove it will suffer irreparable harm absent preliminary injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). *See* Dkt. No. 9 at 31-32.

Griffen and Justice Blackwood argue the Ordinance applies to ADP's data center project. In a call the day before the Ordinance passed, Justice Blackwood stated ADP's data center project would not be "grandfathered in" and ADP would "have to go through our regulations." Dkt. No. 8-11. On October 24, 2026, Griffen wrote that ADP's data center was "the development that created the need for regulation." Dkt. No. 8-12 at 3. Griffen opposed an alternative regulation because it would leave "the proposed Wrightsville-area AVAIO-Leo development outside its protections." *Id.* And since the original brief, Judge-Elect Griffen has asserted in this action that the Ordinance's application to ADP's project "remains unresolved." Dkt. No. 23-2 at 17; *id.* at 21.

The County Defendants, meanwhile, agree the Ordinance does not apply.

Amid this uncertainty, which has arisen since ADP obtained unconditional approval of its site plan for the project on August 11, 2026, Kevin Murphy, the Vice President of ADP, will testify that ADP has already spent and committed to spend tens of millions of dollars to undertake design, site plan approval, construction, financing, and agreements to undertake ADP's data center project in Pulaski County. Dkt. 8-1, Murphy Decl. at ¶ 9. Due to the confidential and sensitive nature of the existing agreements and ongoing discussions, ADP will request to present detailed evidence of its commitments under seal.

ADP is proceeding with construction under a contract with a large local construction company. ADP already has a seven-figure contract with that company and is negotiating a far larger contract for the complete project. A representative of that company will appear and testify at the hearing. ADP will request that this confidential, sensitive commercial testimony and evidence be taken under seal.

ADP will present evidence about its binding AES with Entergy Arkansas for the supply of up to 150 megawatts ("MW") of electricity to its data center at an annual cost of tens of millions of dollars. *Id.* at ¶ 17. ADP will request to submit the contract and testimony about its specifics under seal.

Aside from the cloud of uncertainty about whether the Ordinance applies to ADP, ADP risks noncompliance because the Ordinance "does not provide sufficient guidance for ADP to understand how to conduct itself or structure its project to satisfy the Ordinance's requirements." *Id.* at ¶ 21. The Ordinance imposes costly, duplicative, and conflicting requirements, including feasibility and suitability studies pertaining to electricity transmissions and pricing. *Id.* at ¶ 22.

The County Defendants say the Murphy Declaration "provides no explanation or evidence to support" ADP's irreparable harm. Dkt. No. 21 at 39. But in two days' time, Murphy will present

additional specific testimony concerning the irreparable harm and risks ADP faces due to the uncertainties surrounding the Ordinance. ADP will seek to provide that testimony, including negotiations with potential tenants, under seal to protect this commercially sensitive and confidential information.

ADP will show, as Murphy's Declaration attests, "[i]f enforcement of the Ordinance is not enjoined by this Court, then its enforcement or threatened enforcement will cause ADP to sustain incalculable business injury, including the loss of goodwill, to an incalculable but substantial degree." *Id.* at ¶ 16. ADP's harms would run to "tens of millions of dollars of wasted past expenditures, plus the deprivation of ADP's specific and distinct investment-backed business expectancy, including foreseeable lost profits to be earned from ADP's business operations." *Id.* at ¶ 17. If the Ordinance applies to ADP, ADP's customers, investors, and contractors could foreseeably lose faith in ADP's ability to keep its promises and complete this project. *Id.* at 18.

**THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF**

The Defendants have not rebutted the likely threat of irreparable harm to ADP caused by Ordinance 26-OR-19. ADP intends to introduce evidence, both through business records and testimony, to demonstrate the harms the Ordinance has triggered. In response, the County Defendants say "the Ordinance doesn't apply to" ADP, but even if it does, "Avaio has not shown that it is likely to succeed on any of the merits." Dkt. No. 39 at 39. But this argument restates the likelihood-of-success factor as if it governs the balance-of-harms.

If, as the County Defendants now assert, the Ordinance does not apply to AVAIO, then they cannot identify any harm that would result from an as-applied injunction of its enforcement against AVAIO. Thus, in balancing the harms, ADP risks irreparable harm while the County Defendants risk only limited restraint on authorities they claim not to have.

Separately, Justice Blackwood's FOIA-compliance duties exist separate and apart from this action. Ordering full compliance with the FOIA does not impose new burdens on Justice Blackwood; it simply protects ADP's rights to obtain public records under the FOIA.

**THE PUBLIC INTEREST FAVORS INJUNCTIVE RELIEF**

The County Defendants say that "the balance of the harms and public interest factors merge" when "a county official opposes a preliminary injunction." Dkt. No. 39 at n. 16. But as they concede, no authority extends that merger doctrine to the context of "a county official[.]" Distinctions between State and county officials course through the doctrines before the Court. These distinctions reflect the fundamental point that States and local governments are different under the Constitution. The most fundamental difference arises from the dual-sovereignty structure under our Constitution, which underpins many of the doctrines governing and managing federal-state relations in federal courts.

By their very nature, federal and state preemption claims demand a thorough inquiry about the public interest above and beyond whether "a county official opposes a preliminary injunction." Measuring the public interest requires the Court to weigh FERC's interest in the "timely, orderly, and nondiscriminatory" interconnection of ADP's project; the General Assembly's regulatory interest in committing public-utility regulation to the PSC; the people's interest in safeguarding public access to public records under the Arkansas Freedom of Information Act; and the people's rights to ensure that Open Meetings laws be followed, including those laws forbidding unlawful polling and deliberation outside public meetings.

Finally, the County Defendants fail to rebut that "[i]n the end, it is always in the public interest to protect constitutional rights." *Carson v. Simon*, 978 F.3d 1051, 1061 (8th Cir. 2020) (citations omitted).

## SECURITY

The County Defendants' response contains no request for any security under Fed. R. Civ. P. 65(c). The County Defendants identify no financial harm if they are wrongfully enjoined. The Court should require no injunction bond. Fed. R. Civ. P. 65(c).

## CONCLUSION

The Court should grant ADP's motion for a preliminary injunction. Fed. R. Civ. P. 65(a).

Dated: November 18, 2026.

**KUTAK ROCK LLP**

Jess Askew III, Ark. Bar No. 86005
Alexander T. Jones, Ark. Bar No. 2015246
Shayla I. Dawson, Ark. Bar No. 2023283
Adam P. Hagler, Ark. Bar No. 2026161
124 West Capitol Ave., Suite 2000
Little Rock, AR 72201-3740
Telephone: (501) 975-3000
Facsimile: (501) 975-3001
jess.askew@kutakrock.com
alex.jones@kutakrock.com
shayla.dawson@kutakrock.com
adam.hagler@kutakrock.com

*Attorneys for ADP Little Rock Data Hub, LLC*