**Michael Kessler**
Managing Assistant General Counsel
Direct Dial: 317-753-9434
Email: mkessler@misoenergy.org

November 16, 2026

**VIA ELECTRONIC FILING**

The Honorable Debbie-Anne Reese
Secretary
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

**Re: Midcontinent Independent System Operator, Inc.'s Large Load Review, Cost Recovery and Transmission Services Filing Docket No. ER27-___-000**

Dear Secretary Reese:

The Midcontinent Independent System Operator, Inc. ("MISO"), and the MISO Transmission Owners[1] through this filing,[2] submit proposed revisions to its Open Access Transmission, Energy and Operating Reserve Markets Tariff ("Tariff"),[3] concerning the integration of Large Loads.[4] This omnibus filing describes the proposals MISO has already

---

[1] The MISO Transmission Owners for this filing consist of: AEP Indiana Michigan Transmission Company; Ameren Services Company, as agent for Union Electric Company d/b/a Ameren Missouri, Ameren Illinois Company d/b/a Ameren Illinois and Ameren Transmission Company of Illinois; Arkansas Electric Cooperative Corporation; Big Rivers Electric Corporation; Central Minnesota Municipal Power Agency; Citizens Electric Corporation; City Water, Light & Power (Springfield, IL); Cleco Power LLC; Cooperative Energy; Dairyland Power Cooperative; Duke Energy Business Services, LLC for Duke Energy Indiana, LLC; East Texas Electric Cooperative, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Great River Energy; GridLiance Heartland LLC; Hoosier Energy Rural Electric Cooperative, Inc.; Indiana Municipal Power Agency; International Transmission Company d/b/a ITC *Transmission*; ITC Midwest LLC; Lafayette Utilities System; Michigan Electric Transmission Company, LLC; MidAmerican Energy Company; Montana-Dakota Utilities Co.; Northern Indiana Public Service Company LLC; Prairie Power, Inc.; Republic Transmission, LLC; Southern Illinois Power Cooperative; Southern Indiana Gas & Electric Company (d/b/a CenterPoint Energy Indiana South); Southern Minnesota Municipal Power Agency; Wabash Valley Power Association, Inc.; and Wolverine Power Supply Cooperative, Inc.

[2] This filing is made pursuant to section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d, and Part 35 of the regulations of the Federal Energy Regulatory Commission ("FERC" or "Commission"), 18 C.F.R. § 35.1, *et seq*.

[3] Unless otherwise indicated by the text or context of this transmittal letter, all terms used herein have the definitions set forth in Module A of the Tariff.

[4] The MISO Transmission Owners join this filing for the purpose of exercising their filing rights and supporting the filing of the Large Load Cost Recovery Agreement and the Large Load Impacted Transmission Owner Cost Recovery Agreement. Consistent with the MISO Transmission Owners Agreement, a majority of the MISO Transmission Owners voted in favor of filing the Large Load Cost Recovery Agreement and the Large Load



EXHIBIT
14

submitted in response to the Federal Energy Regulatory Commission's ("Commission") June 18, 2026, Show Cause Order[5] and presents additional proposals in response to that order that have been developed as MISO obtained the information and completed the design work necessary to bring those components forward.[6]

MISO's response has proceeded through a series of related filings addressing different aspects of Large Load integration.[7] The Zero Injection Generator Interconnection Agreement ("ZGIA"), Interconnection Reliability Requirements for Large Loads ("IRR"), and Large Load Addition Resource Study ("LARS") proposals addressed components that were ready for Commission review while work continued on the application, transmission service, and financial provisions needed to address the remaining issues. This filing explains how those proposals fit together with the further revisions described below.[8]

The additional revisions addressed here[9] establish the Large Load Project Review ("LLPR") process and provide transmission service options reflecting a Large Load's intended use of the Transmission System, including a Firm Service Step Up ("FSSU") process to evaluate the availability of Network Integration Transmission Service ("NITS"), and Interim Network Integration Transmission Service ("Interim NITS"). In addition, and as part of the LLPR process, MISO and its Transmission Owners propose Tariff revisions and two *pro forma* cost recovery agreements (the Large Load Cost Recovery Agreement and Large Load Impacted Transmission Owner Cost Recovery Agreement), which are designed to mitigate the risk of cost shifting among

---

Impacted Transmission Owner Cost Recovery Agreement. *See* Agreement of Transmission Facilities Owners To Organize The Midcontinent Independent System Operator, Inc., A Delaware Non-Stock Corporation, Rate Schedule FERC No. 1, Appendix K § II.

5 *Midcontinent Indep. Sys. Operator, Inc.*, 196 FERC ¶ 61,123 (2026) ("Show Cause Order") (identifying the issues concerning large and co-located loads that are the subject of the section 206 proceeding).

6 16 U.S.C. § 824d; 18 C.F.R. §§ 35.3, 35.13 (2026).

7 As proposed in MISO's IRR filing, a Large Load is defined as "Load with Demand of 50 MW or more associated with any facility or aggregation of facilities located at a single substation behind one or more Point(s) of Withdrawal from the Transmission System that is owned, operated, or controlled by: (a) a single entity, or (b) a group of entities that will coordinate with respect to the profile of the Load. Large Load does not include Load used exclusively for charging an Electric Storage Resource."

8 MISO, Transmittal Letter, *Zero Injection Generator Interconnection Agreement*, Docket No. ER26-3552-000, at 1–2, 5–7 (Aug. 18, 2026) ("ZGIA Transmittal") (reserving transmission service and electrically proximate load issues for later proposals); MISO, Transmittal Letter, *Interconnection Reliability Requirements for Large Loads*, Docket No. ER26-3650-000, at 1, 4 (Aug. 28, 2026) ("IRR Transmittal") (identifying additional study, service, and cost protection work); MISO, Transmittal Letter, *Large Load Addition Resource Study*, Docket No. ER27-25-000, at 14–15, 20–21 (Oct. 2, 2026) ("LARS Transmittal") (anticipating further transmission service and cost protection provisions).

9 This transmittal letter frequently quotes proposed Tariff revisions to facilitate its explanation. In the event of a conflict between the Tariff language as discussed in this letter and that reflected in the attached Tariff sheets, MISO intends that the language in the attached Tariff sheets control.

Transmission Customers resulting from a Transmission Customer's taking of Transmission Service on behalf of a Large Load.[10]

MISO requests that the Commission accept the proposed revisions effective 90 days from the date of this filing (*i.e.,* February 14, 2027). MISO recognizes this filing includes significant Tariff revisions and introduces new processes and cost recovery mechanisms that impact the broader stakeholder community. In response to OMS and other stakeholder requests for MISO to support an extended comment period, MISO proposes a 30-day comment period to allow stakeholders sufficient time to evaluate and comment on the proposals being presented in this filing. This extended comment period reasonably balances the need for additional time for stakeholder review while maintaining the urgency presented by the Show Cause Order and works well within MISO's requested 90-day effective date request.

## I. EXECUTIVE SUMMARY

MISO to date has been able to successfully manage the integration of large loads leveraging existing MISO tools and quickly recognized the need for additional frameworks and processes to support reliable, efficient, and cost-effective integration given projected trends for f faster and dramatic demand growth across the region. To this end, MISO, its Transmission Owners, state regulatory authorities, and broad stakeholder community have been working collaboratively to support the reliable, cost-effective, and efficient integration of large loads. Over the past two years MISO has been developing new processes and tools to provide additional transparency, efficient reliability standardization, integrated solutions for generation and new transmission service offerings with stakeholders to meet the challenge. The MISO Large Load Working Group has been an effective clearing house for such efforts and is providing a constructive, collaborative forum to develop these solutions. This group met over thirteen times in the last eight months with an average of 400 people and a peak of 1000 people participating in each session. This process included over 100 MISO presentations to stakeholders and over 400 feedback responses from stakeholders.

MISO recognizes the need for balanced solutions to support the diverse interests of stakeholders and state policies across the MISO region. While these differing perspectives can make unanimity- difficult to achieve, they contribute to a robust stakeholder process and better-informed outcomes that ultimately drive the enormous value that MISO membership brings to customers in terms of reliability, cost-effectiveness and policy enablement.

The Commission's Show Cause Order provided important support for MISO's ongoing efforts to develop solutions for responsible and reliable integration of large loads. By identifying specific priorities and encouraging incremental filings as solutions matured, the Commission established a framework that enabled stakeholders and MISO to advance improvements without waiting for a single comprehensive package.

---

[10] Proposed MISO Tariff, Attachment LLL (Form of Agreement for Large Load Cost Recovery Agreement) and Attachment MMM (Form of Agreement for Large Load Impacted Transmission Owner Cost Recovery Agreement).

In response, MISO has already filed several proposals responsive to the Show Cause Order that are currently pending before the Commission, including Zero Injection-GIA, Large Load Interconnection Reliability Requirements, and the Load Additions Resource Study. Collectively these filings represent meaningful progress toward more timely, transparent, reliable, and cost-effective large load integration, which appropriately mitigates cost shifts to other Transmission Customers.

The additional package of solutions in this filing and the companion filing[11] complement MISO's pending Large Load filings and directly address the remaining concerns identified in the Show Cause Order. MISO's filings, in the aggregate, reflect its compliance with the timelines and scope of the Show Cause Order. At the same time, MISO recognizes that Large Load integration will continue to evolve. These filings represent an important milestone, not an endpoint. MISO remains committed to further enhancing its planning, operational, and market frameworks as experience is gained and system needs grow. The Large Load Working Group will continue to serve as the primary stakeholder forum for evaluating, developing and refining additional solutions to support ongoing integration of Large Loads across the MISO region.

The filings before the Commission are the product of an extremely robust, albeit expedited, stakeholder process conducted within the timelines established by the Show Cause Order. MISO advanced solutions that incorporated substantial stakeholder feedback while remaining consistent with MISO's filing rights and jurisdictional responsibilities. MISO worked closely with its Transmission Owners to develop this joint filing and appropriately recognize their respective roles, rights, and responsibilities. MISO also engaged the Organization of MISO states through regular discussions throughout the development of this package of filings.

While full alignment was not achieved on every aspect of the proposals, stakeholder and state regulator input materially informed the resulting framework. MISO is confident that the collective set of filings before the Commission provides state regulators with additional transparency, information and tools to help fulfill their responsibilities to retail electricity customers, consistent with the objectives outlined in the Show Cause Order. The solutions also preserve flexibility for states to advance their individual policy objectives, including the use of detailed information and analyses provided through MISO's planning and operational processes.

The proposals included in the filing provide a robust foundation for integrating Large Loads in a manner that supports reliability, protects Transmission Customers from cost shifts related to new Large Loads, and provides additional transmission service options consistent with the Commission's objectives for co-located loads, behind the meter generation arrangements and flexible Large Loads. Specifically, this filing addresses the following elements identified in the Show Cause Order:

---

[11] MISO is contemporaneously submitting its Grid Responsive Integration Transmission Services ("GRITS") proposal as a separate FPA Section 205 filing. The GRITS filing addresses the Show Cause Order requirement that MISO evaluate the need for both firm and non-firm contract demand transmission service.

- Large Load Project Review (LLPR) – The LLPR establishes a comprehensive application and evaluation process to assess the grid impacts associated with Transmission Service needed to serve proposed Large Loads, including required Network Upgrades and associated costs. The LLPR also includes deposits, project milestones, and other safeguards designed to discourage speculative Large Load requests.
- Large Load Transparency Dashboard – The results of the LLPR periodically will be published to provide transparency into the location and estimated costs associated with Large Load facilities in the MISO region, while protecting confidential information.
- Cost Shifting Risk Among Transmission Customers – MISO and the MISO Transmission Owners have developed new Tariff language and *pro forma* cost recovery agreements designed to ensure that the costs incurred to provide Transmission Service to Large Load Transmission Customers, including the costs of Large Load Upgrades (defined herein), are born by such customers and thereby avoid unfair cost shifts among Transmission Customers. The agreements leave retail regulatory authorities able to further disaggregate costs as warranted.
- Additional Transmission Services – The new Transmission Services available to Large Loads include Firm Service Step Up and Interim Non-Firm NITS service. These offerings build off existing NITS service and support the timely integration of Large Loads by aligning Transmission Service with a Transmission Customer's projected buildout and operational needs, while providing flexibility in how Transmission Service is obtained during different stages of development.

MISO appreciates the guidance provided by the Commission in the Show Cause Order and believes this filing, together with the companion GRITS filing, and MISO's other pending Large Load filings fully addresses the concerns identified by the Commission. Taken together, these proposals represent a significant advancement in framework supporting Large Load integration, building on processes and tools that MISO has already implemented.

At the same time, MISO recognizes that the rapid growth of Large Loads will continue to present new challenges and opportunities. As a result, these filings should be viewed as an important milestone rather than an endpoint. MISO remains committed to working collaboratively with stakeholders, Transmission Owners, states and the Commission to evaluate and develop additional tools, processes, and solutions to support the reliable, efficient, transparent and cost-effective integration and operation of Large Loads in the MISO region.

## II. BACKGROUND

This omnibus filing brings together the history and substance of MISO's response to the Commission's Show Cause Order. MISO has pursued that response through a series of related filings, submitting individual proposals as the necessary information, stakeholder consideration, and proposed Tariff provisions became sufficiently developed. The earlier submissions addressed components that were ready to proceed while work continued on other elements of the response. This filing explains that progression, describes the relationship among the proposals already

submitted, and presents the additional provisions that have since been developed. The background below traces how that coordinated effort led to the present submission.

**A. The changing nature of load growth in the MISO region.**

The MISO region is experiencing a change in the scale, concentration, and pace of new electricity demand. Large Load additions, including data centers and advanced manufacturing facilities, can introduce substantial demand at a single location and seek service on schedules that are shorter than those traditionally required to develop supporting generation and transmission infrastructure. These developments require MISO, the Transmission Owners, and the entities serving those Loads to coordinate planning, investment, and operational requirements early in the development process to address the unique needs associated with such Large Load additions to the grid. As MISO explained in its July 20, 2026, Informational Report, conventional forecasting methods were developed for more gradual and geographically dispersed growth; Large Load projects present additional uncertainty concerning location, timing, and the demand that ultimately materializes.[12]

The resulting challenge extends beyond identifying a physical point of connection. MISO must assess the transmission facilities needed to serve new demand, understand how the Load will behave during normal operations and system disturbances, and coordinate the addition of resources needed to support resource adequacy. At the same time, the uncertainty surrounding Large Load development makes it necessary to distinguish committed projects from speculative requests and to address the risk that investments made to serve a particular load may remain unrecovered if that Load is delayed, reduced, or does not materialize. MISO's Large Load initiatives were developed to address these related planning, reliability, and cost recovery concerns.[13]

MISO has also recognized that certain Large Loads may be willing and able to limit their withdrawals from the Transmission System. That flexibility can support service before all facilities needed for full firm service have been completed, or an ongoing arrangement under which only a portion of the Load receives firm service. Accommodating those different needs requires clear service rights, enforceable operating limits, and appropriate treatment of the customer's planning and financial obligations. The development of additional Transmission Service options therefore became a component of MISO's broader Large Load work.

**B. MISO's existing processes and the development of a dedicated stakeholder forum.**

MISO's efforts to address these challenges began before the Commission issued its Show Cause Order. MISO had improved the Expedited Project Review ("EPR") process within the

[12] MISO, Informational Report, Docket No. EL26-70-000, at 1-2 (July 20, 2026) ("Informational Report"); MISO, Transmittal Letter, Interconnection Reliability Requirements for Large Loads, Docket No. ER26-3650-000, at 2-3 (Aug. 28, 2026) ("IRR Transmittal").

[13] Informational Report at 1-3; Motion of MISO to Hold Proceeding in Abeyance and Request for Shortened Comment Period and Expedited Treatment, Docket No. EL26-70-000, at 2-5, 8-9 (Aug. 3, 2026) ("Abeyance Motion").

MISO Transmission Expansion Plan ("MTEP") to facilitate timely study and approval of transmission upgrades needed for large load additions.[14] On the generation side, MISO developed the temporary Expedited Resource Addition Study ("ERAS") process to accelerate the interconnection of resources addressing identified near-term resource adequacy and reliability needs.[15] These initiatives provided a foundation for additional tools tailored to the pace and characteristics of large load development.[16] Those expedited processes addressed important near-term needs, but MISO recognized that additional provisions were necessary to address the broader relationship among load additions, generation development, transmission service, and system operations.

MISO also began consolidating stakeholder consideration of large load issues. Following a January 2026 Large Load Additions Workshop, MISO's Steering Committee approved creation of the Large Load Working Group ("LLWG") in March 2026. The LLWG held its first meeting on April 20, 2026, providing a dedicated forum for issues spanning markets, reliable operations, planning, and resource adequacy. Its early work included Interconnection Reliability Requirements, Firm Service Step Up arrangements, and the Zero-Injection Generation Interconnection proposal. This work brought previously related but separately considered issues into a coordinated large load work plan.[17]

**C. The Show Cause Order and the opportunity to develop regional solutions.**

On June 18, 2026, the Commission instituted a proceeding under section 206 of the Federal Power Act ("FPA") to examine whether MISO's Tariff remained just and reasonable in light of various concerns related to large and co-located load development. The Commission identified concerns regarding application and study procedures, operational requirements, network upgrade cost transparency and recovery, service for flexible and co-located loads, and generation serving associated Loads. It directed MISO and the Transmission Owners to respond to its preliminary findings and address potential Tariff changes.[18]

The Commission's action reinforced work already underway while identifying additional matters for stakeholder consideration. The Show Cause Order also contemplated development of regional solutions through FPA section 205 filings and allowed requests for an abeyance of up to

---

[14] Furnish Testimony at 17-18.

[15] MISO, Transmittal Letter, *Expedited Resource Addition Study*, Docket No. ER25-2454-000 (June 6, 2025) ("ERAS Transmittal").

[16] Abeyance Motion at 3-4; Informational Report at 6-7; MISO, Transmittal Letter, *Zero Injection Generator Interconnection Agreement*, Docket No. ER26-3552-000, at 4-6 (Aug. 18, 2026) ("ZGIA Transmittal").

[17] Abeyance Motion at 3-4 & n.6; MISO, Transmittal Letter, *Large Load Addition Resource Study*, Docket No. ER27-25-000, at 49-50 & nn.102-108 (Oct. 2, 2026) ("LARS Transmittal").

[18] *Midcontinent Indep. Sys. Operator, Inc.*, 195 FERC ¶ 61,212, PP 1-3, 33-39 (2026), *errata notice*, 196 FERC ¶ 61,123 (2026) ("Show Cause Order"); *Midcontinent Indep. Sys. Operator, Inc.*, 196 FERC ¶ 61,133, P 1 (2026) ("Abeyance Order").

90 days for that purpose. MISO pursued that opportunity to coordinate the existing initiatives with additional proposals responsive to the Commission's concerns.[19]

On July 20, 2026, MISO submitted the Informational Report addressing resource adequacy and initiatives to accelerate the addition of generation to serve emerging demand. The Report explained the respective roles of states, load serving entities, and MISO in supporting resource adequacy and described both existing reforms and additional proposals under development. It identified a zero injection interconnection process and a parallel study framework for associated load and generation as complementary approaches to facilitating timely service while accounting for system needs.[20]

On August 3, 2026, MISO requested that the proceeding be held in abeyance for 90 days. The Abeyance Motion described a series of anticipated section 205 filings covering Zero-Injection Interconnection Service, a Large Load definition and Interconnection Reliability Requirements, coordinated Load and generation studies, Firm Service Step Up arrangements, and additional service options for flexible Loads. It also identified further work on application and study procedures and Upgrades cost transparency. MISO explained that the proposals needed to operate together and fit within MISO's existing planning, interconnection, and service processes.[21]

The Commission granted the requested abeyance on August 14, 2026. It found that the described stakeholder process would provide an opportunity to consider region-specific solutions and held the proceeding, including the responses and briefing questions, in abeyance for 90 days.[22] The Commission established November 16, 2026 as the revised response deadline and explained that a timely FPA section 205 filing addressing its preliminary findings would suspend the filing respondents' obligation to respond and continue the abeyance pending further Commission direction. The Commission further explained that any issues not addressed by the FPA section 205 filings would remain subject to the FPA section 206 proceeding instituted under the Show Cause Order and encouraged respondents seeking termination to identify specifically which proposed revisions resolved which concerns.[23]

### D. The earlier filings and the matters reserved for further development.

During the abeyance period, MISO submitted proposals addressing those elements of its response that were sufficiently developed for Commission review. Those submissions did not purport to resolve every issue in a single filing. Instead, they advanced particular components while expressly identifying related matters for further development and subsequent submission. The resulting sequence provides important context for this omnibus filing: the present submission

---

[19] Show Cause Order P 37; Abeyance Motion at 4-5, 7-9; Abeyance Order PP 3-5.

[20] Informational Report at 1-4, 10-11. The Report responded to the informational reporting requirement in Show Cause Order P 122.

[21] Abeyance Motion at 3-5, 8-13.

[22] Abeyance Order at PP 8-9.

[23] *Id.* at PP 8-11. The Order established December 16, 2026, as the deadline for answers to responses. *Id.* P 9.

both accounts for the proposals already filed and advances additional portions of the response that were not ready for submission at those earlier stages.[24]

First, on August 18, 2026, MISO submitted its Zero Injection Generator Interconnection Agreement ("ZGIA") proposal in Docket No. ER26-3552-000. The filing proposed a form of Generator Interconnection Agreement, a study process, and an agreement for generation serving Load at the same substation without broader injections onto the Transmission System. MISO had begun developing the concept before the Show Cause Order and refined it through stakeholder discussion. MISO limited the initial proposal to same-substation arrangements so that the zero injection option could proceed while the separate questions presented by generation serving electrically proximate Load were addressed through further work.[25] The ZGIA proposal was deliberately limited in scope. This distinction is relevant to the present filing because a generator interconnection pathway alone does not supply the complete Transmission Service and cost recovery framework for the Load it serves.[26]

Second, on August 28, 2026, MISO submitted its Interconnection Reliability Requirements ("IRR") for Large Loads proposal in Docket No. ER26-3650-000. That proposal included a Tariff definition of Large Load and requirements addressing data, models, telemetry, forecasting, and operational visibility, together with phasor measurement, ramp, and ride-through requirements for Computational Loads. MISO proposed to place the applicable obligations on the Transmission Customer taking service on behalf of the Large Load, reflecting that customer's direct relationship with MISO. The proposal was intended to improve MISO's ability to assess, observe, and manage Large Load behavior.[27] The IRR filing also distinguished requirements applicable to the Transmission Customer taking Transmission Service on behalf of the Large Load from the study procedures used to identify system-level impacts and necessary transmission solutions. MISO explained that it already performed stability assessments through MTEP and EPR but would address enhancements to the broader Load addition and Transmission Service study processes in a later FPA section 205 filing. The IRR proposal thus supplied the proposed operational requirements to be incorporated into, and assessed through, the developing study framework.[28]

Third, on October 2, 2026, MISO submitted its Large Load Addition Resource Study ("LARS") proposal in Docket No. ER27-25-000. LARS proposed a coordinated process for studying qualifying Load additions of at least 200 MW and associated new generation. The proposal built upon experience with expedited load-side planning and coordinated the Load and generation studies through a common application framework. It complemented ZGIA by

---

[24] ZGIA Transmittal at 1-2, 5-7; IRR Transmittal at 1, 4; LARS Transmittal at 3-4, 15, 20-21.

[25] ZGIA Transmittal at 1-2, 6-7. MISO requested an October 18, 2026, effective date. *Id.* at 2. This paragraph describes the submitted proposal; it does not state that the Commission accepted the proposal or its requested effective date.

[26] ZGIA Transmittal at 2, 7; LARS Transmittal at 3-4.

[27] IRR Transmittal at 1-4. MISO requested a December 4, 2026 effective date. *Id.* at 2. This paragraph describes the proposal as submitted.

[28] IRR Transmittal at 4.

addressing qualifying Load and generation arrangements beyond the narrower same-substation, zero injection configuration.[29] LARS also reflected the iterative nature of the stakeholder process. MISO introduced the coordinated study concept at the July 16, 2026 LLWG meeting and sought feedback on eligibility, readiness, and protections against speculative requests. The proposal evolved from an initial 250 MW eligibility concept to the 200 MW threshold submitted to the Commission. MISO's LARS transmittal further anticipated a subsequent filing addressing the Load study process, Transmission Service, and cost recovery provisions needed to complete other elements of the Large Load framework.[30]

### E. The additional provisions now presented in this omnibus filing.

While the ZGIA, IRR, and LARS proposals proceeded through separate filings, MISO continued developing the remaining application, study, service, and financial provisions. Those matters required additional information and coordination concerning how customers would request service, how the necessary upgrades would be identified, what obligations would support the resulting investment, and what service could be provided under differing operating conditions. The present filing brings forward those additional proposals and explains how they relate to the components previously submitted. The proposed LLPR process builds on the load-specific functions of EPR to establish a dedicated Tariff framework for a Transmission Customer taking service on behalf of a Large Load to obtain Transmission Service. The LLPR includes standardized applications, recurring study cycles, identification of necessary Upgrades, and the integration of the proposed interconnection reliability requirements.[31] While only Transmission Owners were eligible to submit requests to the EPR process, MISO is proposing that only Large Load Transmission Customers (in collaboration with the Transmission Owner) may submit an application to the LLPR process.

The cost recovery and transparency provisions ensure the Large Load Transmission Customer pays the cost of the Large Load Upgrades required to provide Transmission Service, including if the expected Load does not arrive as anticipated or remain in service. The proposed cost recovery agreements, related security, and cost transparency measures are intended to connect the requested Transmission Service and necessary supporting investment with enforceable financial obligations. The proposed framework includes Tariff revisions and a *pro forma* Large Load Cost Recovery Agreement, and a *pro forma* Large Load Impacted Transmission Owner Cost Recovery Agreement, together with a publicly accessible dashboard providing high-level information about upgrades and estimated costs while protecting confidential information.[32]

---

[29] LARS Transmittal at 1-6; see also Combined Notice of Filings No. 1, 91 Fed. Reg. 64,362 (Oct. 8, 2026) (Docket No. ER27-25-000; Oct. 2, 2026 filing; requested Dec. 2, 2026 effective date).

[30] LARS Transmittal at 3-4, 15, 20-21, 49-52.

[31] Furnish Testimony at 3; *see* Section D.1.c.ii-iii.

[32] Furnish Testimony at 21-23; Abeyance Motion at 12-13. Detailed recovery, security, and accounting provisions remain subject to confirmation against the final *pro forma* agreements and supporting testimony.

The service proposals address the separate question of how a customer may use the Transmission System once the relevant studies and prerequisites have been satisfied. The proposed Interim Network Integration Transmission Service ("Interim NITS") provides a non-firm Transmission Service option for participation of a Load progressing toward full firm Network Integration Transmission Service ("NITS") prior to the completion of required Upgrades. The proposal also includes an optional Firm Service Step Up for loads progressing toward full firm service. These alternatives are intended to recognize different operating capabilities and development schedules while specifying the associated withdrawal limits, curtailment conditions, and customer obligations.

Accordingly, this omnibus filing should be considered in the context of the full sequence of MISO's submissions in response to the Show Cause Order. The earlier filings addressed components that could be brought forward first; the proposals submitted here reflect the further development of the application, study, cost recovery, transparency, and service provisions described above. Together, that history explains both the timing and the scope of the present filing. The sections that follow identify the relief sought, describe the additional Tariff revisions proposed here, and explain how this submission and the previously filed proposals comprehensively address the Commission's concerns identified in the Show Cause Order.

## III. LARGE LOAD APPLICATION AND STUDY PROCESS

In the Show Cause Order, the Commission directed MISO develop an "application process, study procedures, and ongoing operational requirements that apply to Eligible Customers seeking transmission service on behalf of large loads."[33] The Commission recognized that MISO and the MISO Transmission Owners may have existing Load integration processes that included studies for Transmission Service to Large Loads but sought documentation of clear and consistent procedures in MISO's Tariff that address the characteristics and challenges associated with interconnecting Large Loads in order to avoid disputes about how studies will be conducted, deter speculative or duplicative requests for Transmission Service to serve Large Loads, and help avoid excessive and unnecessary Upgrades.[34] MISO has worked with the Transmission Owners, developers of Large Loads, and other stakeholders to develop the Large Load Project Review ("LLPR") process proposed herein. LLPR provides a clear and consistent study process that will be required for evaluating all requests for Transmission Service to serve Large Loads.[35] The LLPR process addresses the goals of the Show Cause Order by providing a clear and consistent study process that is tailored to the needs and challenges associated with Large Load integrations and which provides the necessary framework for implementing the other Large Load reforms sought by the Show Cause Order.[36] The LLPR is also a uniform process that provides increased speed and certainty to Large Load Transmission Customers in identifying the Network Upgrades needed

---

[33] Show Cause Order at P 3.

[34] *Id.* at PP 49, 55-57.

[35] Furnish Testimony at 3-4.

[36] *Id.* at 20-21.

to provide Transmission Service to Large Load Transmission Customers.[37] LLPR also promotes accountability, deters speculative or duplicative requests for Large Load-driven requests for Transmission Service, and provides transparency regarding the Large Load-driven Network Upgrades and their associated costs.

In response to concerns raised by the Commission, MISO and the MISO Transmission Owners propose Tariff revisions and two *pro forma* cost recovery agreements that together require the Transmission Customer seeking to take Transmission Service on behalf of a Large Load ("Large Load Transmission Customer") to make a minimum financial contribution toward the revenue requirement of the Transmission Owners responsible for constructing the Upgrades identified by MISO in the LLPR, including financial security sufficient to secure such contribution.[38] These proposed Tariff changes and agreements, which are a condition precedent to MTEP approval, impose cost responsibility and accountability on Large Load Transmission Customers consistent with the Commission's direction in the Show Cause Order and provide transparent identification of the Network Upgrades made necessary by Large Loads, including their estimated costs.[39] LLPR is an expedited process designed to be completed in approximately five months. To simplify the explanation of the LLPR process, MISO describes the key definitions, the Large Load Application, and the required steps in the LLPR study process in the sections below.

### A. New Definitions for the LLPR Process

MISO includes several new definitions in Attachment FF to its Tariff, which are needed to provide a working vocabulary for implementing the LLPR process.[40] These terms are summarized below:

- **Large Load Network Upgrades** are the additions, modifications, and upgrades to be made to the Transmission System that are located *inside* the Transmission Pricing Zone containing the POW for the Large Load that are necessary for MISO and the Transmission Owner to operate and maintain the Transmission System in a safe and reliable manner.
- **Impacted Transmission Owner Large Load Network Upgrades** are the additions, modifications, and upgrades to be made to the Transmission System that are located *outside* the Transmission Pricing Zone containing the POW for the Large Load that are necessary for MISO and the Transmission Owner to operate and maintain the Transmission System in a safe and reliable manner.

---

37 MISO is proposing to add a new definition to Module A to define Large Load Transmission Customer as the Transmission Customer that is taking Transmission Service on behalf of a Large Load.

38 *See* Tab E Testimony and Exhibits of Greg M. Gudeman ("Gudeman Testimony) (describing the *pro forma* cost recovery agreements).

39 Furnish Testimony at 5.

40 In the transmittal letter, MISO paraphrases the LLPR process definitions, but the full definitions of each of these terms may be found in Section D.1.c.i of Attachment FF.

- The **Large Load Cost Recover Agreement ("LL-CRA")** is the primary agreement that establishes the Large Load Transmission Customer's cost responsibility for Large Load Network Upgrade(s), which are located in the Transmission Pricing Zone containing the POW for the Large Load.
- The **Large Load Impacted Transmission Owner Cost Recovery Agreement ("LLITO-CRA")** is the agreement that establishes the Large Load Transmission Customer's cost responsibility for the Impacted Transmission Owner Large Load Network Upgrades, which are located outside of the Transmission Pricing Zone containing the POW for the Large Load.

The two different kinds of upgrades are distinguished by whether they are located inside the Transmission Pricing Zone ("TPZ") or outside of the TPZ containing the POW for the Large Load.[41] Similarly, the LL-CRA and LLITO-CRA establish cost recovery terms based on the location of the Upgrades, inside or outside the TPZ. As discussed in more detail later, this agreement framework is necessary for costs to be properly assigned throughout MISO's Transmission System.

Together, these terms enable the creation of processes and requirements that recognize the location on the Transmission System of Large Load Upgrades identified through the LLPR process, identify their connection to Large Loads, and establish the applicable parties to the proposed agreements under MISO's Tariff.[42]

**B. Applicability and Participant Responsibilities.**

MISO's existing study processes require supplementation and enhancement in order to efficiently and effectively address the growth in Large Load development over the past couple of years. LLPR builds from and adapts MISO's existing Expedited Project Review ("EPR") process and will be the required core study process for all requests for Transmission Service made on behalf of or in order to serve Large Loads. Specifically, the LLPR process will apply to all requests for Transmission Service for Large Loads, as defined in MISO's Interconnection Reliability Requirements ("IRR") filing, including the load components of LARS which is an aligned transmission and interconnections service requests for very large loads (200 MW or greater) paired with the generation that will serve it.[43]

---

[41] To facilitate efficient explanation, MISO uses the term "Large Load Upgrades" to embrace both "Large Load Network Upgrades" and "Impacted Transmission Owner Large Load Network Upgrades," reserving use of the specific defined term for where context requires it.

[42] MISO notes that nothing in LLPR interferes with the ability of states and other retail regulators to impose additional conditions, further allocate cost responsibility and risk among and between retail customers and Load Serving Entities, or require further agreements involving parties not directly taking service under MISO's Tariff (e.g., data centers and other owners of Large Loads).

[43] MISO's LARS proposal, currently pending in Commission Docket ER27-25-000, provides a specialized process designed to study very large (≥200 MW) Large Loads accompanied by the generation that will serve it on a coordinated timeline. MISO has committed to updating the load study portion of LARS to Incorporate the LLPR process and requirements proposed herein once these are accepted.

MISO envisions different parties playing diverse roles in the LLPR process. First, the Large Load Transmission Customer, commonly the LSE, plays a key role in the LLPR process as it is the party that can request Transmission Service through LLPR from MISO. The Transmission Owner has an integral role in working with the parties on studies. The entity that owns the Large Load, while usually not directly subject to MISO's Tariff, will play an essential role in providing the information needed to support the LLPR Application and working with the Transmission Customer to determine the type of Transmission Service to request.[44] Finally, MISO, as the Transmission Provider, acts as coordinator, performing the required LLPR studies, administering the LLPR process and, ultimately, approving transmission projects and granting Transmission Service.

Transmission Customers seeking to participate in LLPR must submit a Large Load Application to MISO as well as a non-refundable application fee of $250,000.[45] Due to the role of the Transmission Customer in obtaining Transmission Service for Loads, the Show Cause Order's direction that the Transmission Customer seeking Transmission Service to serve a Large Load bear responsibility for requesting the Transmission Service and executing cost recovery agreements. The Large Load Transmission Customer is the only party that may request Transmission Service on behalf of a Large Load from MISO and thus, is the only party that may submit a Large Load Application.[46] MISO's current processes similarly limit the types of entities that can submit EPR Requests.[47] MISO's current EPR process similarly only allows Transmission Owners to submit EPR requests. The Transmission Customer must select from a list of Transmission Service options which service it is applying for and must identify the amount of requested firm or non-firm service options.[48] LLPR is designed to facilitate several different types of requests for Transmission Service, including Network Resource Integration Service ("NITS"), Firm Service Step Up ("FSSU"), Interim ("Interim NITS"), and Transmission Service requested through LARS.[49] Notably, the requested Transmission Service option and the identified MW amount may not be changed after the Large Load Application is submitted to MISO.[50] This, together with the required application, discourages speculative or unready Large Load

---

44 A Large Load may assume other responsibilities or obligations pursuant to agreements with the Transmission Customer or in accordance with rules and regulations adopted by states commissions or other retail regulators. MISO's LLPR does not prohibit this.

45 Furnish Testimony at 5.

46 *Id.*

47 Under current processes, only a Transmission Owner may submit an EPR request into MTEP because they are the entity that identifies the urgent need on their facilities. Thus, LLPR does not introduce any new restriction against other types of entities submitting requests for Transmission Service (*e.g.*, Generator Interconnection Customers, Market Participants). Rather, LLPR simply shifts this role from the Transmission Owner to the Large Load Transmission Customer to facilitate the accountability goals of the Show Cause Order.

48 *Id.* at 5-6.

49 *Id.*

50 *Id.* at 5. Large Loads may be completed in phases, but the total expected MW load amount must be identified in the Large Load Application at time of submission. Any additional load amounts must be submitted as a new request for Transmission Service.

Applications and provides the needed certainty about what is being studied that is necessary to perform an accelerated study without creating undue restudy risk.

The specific Transmission Service requested, the size of the Load, and whether the Large Load has partnered with generation will determine the next steps for the applicant and the load. For example, if the applicants are looking to co-locate the Load with the generation, then they will need to ensure that an appropriate Interconnection Agreement e.g. "ZGIA" has already been executed for the generator.[51] If the Large Load is greater than or equal to 200 MW and has formally partnered with a generator for a minimum of fifteen years, then the applicants will go through the LARS study process.[52] Other Transmission Services or processes such as FSSU and Interim NITS can be selected at the start of LLPR or after the LLPR study process is completed. Any Large Load going through the LLPR process will be subject to the Interconnection Reliability Requirements proposed by MISO in Docket No. ER26-3650-000.[53]

MISO will complete the LLPR study process three times in each 365-day period based on any Large Load Applications received by the deadline.[54] MISO will post the application deadline on its website at least 90 calendar days prior to each deadline.[55] The Large Load Transmission Customers may submit Large Load Applications at any time and MISO will maintain a list of all Applications leading up to each study process.[56] Any applications that are submitted after the deadline will be automatically included in the next LLPR study cycle.[57] In order for MISO to complete these studies in an expedient manner, the applicants must abide by these deadlines and additional review periods, which will be addressed in the next sections.

### C. LLPR Study Cadence, Timing, and Application Requirements—Attachment FF Sections I.D.1.c.iii.a—I.D.1.c.iii.c.

MISO is proposing to complete the LLPR study process three times in a 365-day period.[58] The timing of this process is reasonable and dictated by how long it is expected for MISO and the other participants in an LLPR process to complete the required steps. This study cadence is necessary and appropriate in order to allow the base case of each LLPR study cycle to incorporate the

---

51 *See generally*, ZGIA Filing, Docket No. ER26-3552.

52 *See* LARS Filing, Docket No. ER27-25-000.

53 *See* IRR Filing, Docket No. ER26-3650-000.

54 Furnish Testimony at 10.

55 *Id.* As explained in testimony, the first Large Load Application deadline will be on March 1, 2027, and due to the timing of this filing, MISO will not be able to provide 90-day notice for the first LLPR study cycle.

56 Furnish Testimony at 4, 10.

57 *Id.* at 10.

58 MISO considers each LLPR study cycle to commence on the date of the Large Load Application deadline and ends once the project receives MTEP approval, which takes place once the stakeholder process has been completed and the cost recovery agreements are executed or filed unexecuted with the Commission.

Transmission System changes from the prior LLPR Study cycle.[59] To avoid unnecessary restudy risks, it is appropriate to begin each study cycle after the prior one is completed and the applicable cost recovery agreements have been executed or submitted to the Commission for acceptance.

While the Large Load Application may only be submitted by the Transmission Customer, other parties including the Transmission Owner and the Large Load customer must all provide required information as part of the application. The LLPR Applicant must submit the non-refundable application fee of $250,000 and any relevant study deposits at the time of application submission.[60] The parties must also submit a significant amount of information with the Application to ensure that they have completed any necessary pre-planning steps and have reached agreement on key portions of the project including the identification of any necessary Large Load Upgrades by the Transmission Owner(s).[61]

The required technical information for a completed LLPR Application is set forth in proposed Section I.D.1.c.iii.b of Attachment FF. This information includes the geographic location and Point of Withdrawal ("POW") for the Large Load, the MW amount of the Large Load, the type of Transmission Service requested, data regarding the characteristics of the Large Load and equipment in order to enable MISO to assess how it will operate, the MTEP and model on demand information for associated load and transmission upgrades, the requested In-Service Date, and any requisite contact information.[62]

Proposed Section I.D.1.c.iii.b.2 requires study files to include various items. Specifically, such files should include models, one line diagrams, the Transmission Owner's Interconnection Study Report, including consideration of Alternative Transmission Technologies ("ATTs")/Grid-Enhancing Technologies ("GETs"), and information about any Large Load Upgrades identified by the applicable Transmission Owner, with specific requirements to provide an estimate of the total costs of the required Large Load Upgrades, the costs that the Large Load Transmission Customer will be obligated to pay, and, if this is less than 100% of the capital costs of the Large Load Upgrade, a narrative explaining how their portion of the costs was determined. This information will enable MISO to verify any analyses performed by the Transmission Owner and provide the cost transparency sought by the Show Cause Order. The Large Load Application is designed to be flexible so that it can be used to initiate the study process for several different types of Transmission Service and integrate with other MISO processes.[63]

Proposed Section I.D.1.c.iii.b.3 requires an attestation by the Transmission Customer attesting that it acknowledges MISO's ability to review reliability impacts and additional

---

[59] Furnish Testimony at 12.

[60] *Id.* at 5.

[61] *See id.* at 6-8.

[62] *See id.*

[63] LARS, for example, will require an Interconnection Request for a Generating Facility and additional information about the commercial relationship and electrical connection between the Interconnection Customer/Generating Facility and the LARS Associated Transmission Customer and LARS Associated Large Load.

mitigations through applicable study processes, that the Transmission Customer will comply with Tariff terms and requirements applicable to Large Loads that are set forth in Module B of the Tariff, that the Transmission Customer has a commercial agreement with the Large Load providing for it to request Transmission Service in order to serve that Large Load, and that the Transmission Customer does not have other requests pending with MISO for duplicative Transmission Service. These latter two requirements provide safeguards against unnecessary, speculative, or duplicative requests for Transmission Service by demonstrating that the Transmission Customer submitting the LLPR Application is the correct Transmission Customer that will serve the Large Load and that there are not multiple requests for the same Transmission Service being submitted as speculative alternatives on different parts of the MISO Transmission System.[64] If the Large Load was proposed in multiple places then that would artificially inflate the total cost of Large Load Network Upgrades, jeopardize the finality and commercial certainty of LLPR studies, and create restudy or cost shift risks for other Transmission Customer or participants in other MISO processes.[65]

MISO also proposes to require submission of valid models for electromagnetic transient ("EMT") studies.[66] The EMT work must be completed in the pre-application phase in order to capture the complete list of Upgrades and to ensure that the Large Load Transmission Customer has taken into consideration the necessary mitigation to meet the Interconnection Reliability Requirements.[67] Finally, applicants must submit the LLPR System Impact Study Agreement and sign any relevant non-disclosure agreements required by MISO in order to ensure funding for the LLPR study and appropriately provide for the handling of confidential information.[68] The LLPR System Impact Study Agreement is based on and largely follows the interconnection study agreement required for Generation Interconnection Customers with adjustments to reflect the different types of studies that may be performed under LLPR.[69] The required CEII NDA to be included as Attachment FF-10 to the Tariff is substantively identical to the *pro forma* CEII NDA required of Generator Interconnection Customers with their Interconnection Requests,[70] and the required Confidential Information NDA is MISO's *pro forma* Universal Nondisclosure Agreement, which is set forth in Attachment Z to the MISO Tariff.[71]

---

64 Furnish Testimony at 9.

65 *Id.* at 9; MISO has carefully worded the language of Attachment FF Section I.D.1.c.iii.b.3 so as not to prevent the submission of applications for incremental transmission service needed in addition to that requested in a previous application. This is appropriate because such requests are not speculative alternatives.

66 MISO is requiring all Large Load Applications to include EMT models, but EMT studies will only be required for specific Large Load projects based on information MISO will provide and the level of detail will be described in the BPM.

67 Furnish Testimony at 8-9.

68 *Id.* at 26-27.

69 *See,* Attachment X, Appendix 1, Attachment B

70 *See,* Attachment X, Attachment C to Appendix 1: Universal Non-Disclosure and Confidentiality Agreement.

71 The LLPR System Impact Study Agreement is provided in the form of Attachment FF-10 to Attachment FF. The confidentiality agreements may include MISO's Universal Non-Disclosure Agreement or non-disclosure agreements related to CEII.

LLPR Applicants are required to submit a $250,000 non-refundable application fee and a $100,000 study deposit upon application submission.[72] The $250,000 both provides funding for LLPR administration and studies while also acting as a deterrent to speculative or uncertain Large Load Applications.[73] The $100,000 study deposit provides needed funding for the LLPR System Impact Study and any related studies that may be required, such as an FSSU or Interim NITS study. In the event that a Large Load Transmission Customer chooses to have MISO complete its EMT study, then an additional $100,000 study deposit must be provided.[74]

The objective of including all these requirements at time of application is to ensure that the Upgrades that are needed to reliably serve the Large Load are identified at the outset.[75] It is also critical that the parties collaborate prior to submitting the Large Load Application to MISO so that MISO may complete the LLPR study process on its accelerated timeline.[76] The streamlined deficiency cure period for applicants is another piece of the LLPR proposal. MISO will review each Large Load Application and notify the applicants of any identified deficiencies within fifteen (15) business days of receipt. After receiving that deficiency notification from MISO, the Transmission Customer will have ten (10) business days to cure the identified deficiencies.[77] The Transmission Customer will also have five (5) business days to address any errors that may be identified later in the LLPR study process.[78] If the Transmission Customer is unable to cure the deficiencies in any of the required timelines, then the Large Load Application will be deemed withdrawn from the LLPR process.[79] While the non-refundable application fee will be lost, the parties may submit the project in a future LLPR study cycle but must identify what information changed from the previous application.[80] There will be only one Application review period and one cure period for each Large Load Application.[81] This is necessary to ensure that the LLPR process remains streamlined and that MISO is able to complete these studies on an expedited timeline. MISO's proposed Tariff language captures all requirements that will be included in the LLPR Application. MISO will develop a form of application that captures proposed Tariff requirements, as may be adjusted by any compliance directives received from the Commission, and will post this form on MISO's website prior to the application deadline for the first LLPR study cycle.

---

[72] Furnish Testimony at 5.

[73] This is in alignment with the Commission's Show Cause Order and its concern with speculative transmission requests on behalf of Large Loads. *See* Show Cause Order PP 68, 73, 80.

[74] Furnish Testimony at 8-9.

[75] *Id.*

[76] *Id.* at 5, 12.

[77] *Id.* at 10-11.

[78] *Id.*

[79] *Id.*

[80] *Id.* at 15-16.

[81] Furnish Testimony at 10-11.

**D. Model Building and Coordination with MTEP and Existing Processes—Attachment FF Section I.D.1.c.iii.d**

Pursuant to proposed Section I.D.1.c.iii.d, MISO will commence developing models for all LLPR studies no later than five (5) business days after the conclusion of cure period.[82] MISO will use reasonable efforts to complete the model review process within thirty (30) Calendar Days after the conclusion of the Large Load Application cure process.[83] MISO will develop models for the LLPR studies in the applicable cycle based on the latest MTEP case and reflect all MTEP approvals that have occurred as of the end of the cure period.[84] This ensures that LLPR models are based on the latest available information. The process includes the circulation of draft models to the applicable Transmission Owners and Large Load Transmission Customers, subject to the required nondisclosure agreements, and provides a five (5) business day window for the applicable Transmission Owners and Large Load Transmission Customers to submit comments for MISO's consideration, after which MISO will finalize the models and circulate the final models to them.[85] The model build period ends when the Transmission Provider provides the final models to the appliable Transmission Owners and Transmission Customers.[86] Taken together, this language establishes a just and reasonable model review process for Large Loads that balances an opportunity for participation and comments with a schedule consistent with the expedited nature of the LLPR process so as not to disturb or delay subsequent MISO processes that build from the completed LLPR Study Cycle.

**E. The LLPR System Impact Study—Attachment FF Section I.D.1.c.iii.e.**

Proposed Sections I.D.1.c.iii.e and I.D.1c.iii.f establish both a LLPR System Impact Study process by describing the substantive analyses that will be performed as part of LLPR and details the tender and processing of the Final LLPR Study Report. First, proposed Section I.D.1.c.iii.e provides that MISO will commence the LLPR System Impact Study within two business days after conclusion of the model review period and explains that the LLPR study will consist of an analysis of the impacts of the Large Load on MISO's Transmission System containing those elements described in Attachment FF-10. The proposed language further provides that the analysis will be based on any applicable planning criteria.[87] This language necessarily balances specificity about what is being studied with sufficient flexibility to accommodate rules currently being developed by NERC, Regional Entities, Transmission Owners, and regulators. While completing the LLPR System Impact Study, MISO may consider alternative solutions including those suggested by stakeholders and the MTEP aggregate system analyses against applicable planning criteria.[88]

---

82 *Id.* at 13.

83 *Id.*

84 *Id.* at 12-13.

85 *Id.* at 13.

86 *Id.*

87 Furnish Testimony at 13-14.

88 *Id.*

MISO will post all the Large Load Applications that will be included in the upcoming LLPR System Impact Study to its MTEP webpage on its public website, thus facilitating the transparency requirements identified in the Show Cause Order.[89]

In the event that any Transmission Issues are identified in the LLPR System Impact Study, MISO will send the initial Transmission Issues to the applicable Transmission Owner and collaborate with them on the development of possible solutions.[90] This will include considering ATTs/ GETs and selecting the preferred solution to the identified Transmission Issues.[91] At this point in the LLPR study process, there are additional strict deadlines that must be followed. The Transmission Owners will have fifteen business days to respond to the identified Transmission Issues with possible solutions and, within ten business days after receipt of the proposed solutions, MISO will review and test the mitigation.[92] If MISO identifies more Transmission Issues, then it will notify the Transmission Owner, who will then have an additional ten business days to develop new possible solutions.[93] MISO will then review and test the newly proposed mitigations within five business days.[94] If the Transmission Issues are not resolved in the required timeframe, then the Large Load Application will be withdrawn, and the project will be removed from the LLPR study.[95]

Once the LLPR analysis/mitigation portion of the study is concluded, MISO will provide a draft LLPR Study Report to the Transmission Customer and each applicable Transmission Owner. The Transmission Customer and Transmission Owner(s) will have five business days to review and provide comments on the study report.[96] After reconciling any comments, MISO will provide the final LLPR Study Report and any applicable cost recovery agreements to the Transmission Customer and applicable Transmission Owner(s).[97] MISO will not process any Large Load Application for MTEP approval until all applicable cost recovery agreements are executed by all parties or an unexecuted or non-conforming filing is submitted to the Commission.[98] This is necessary to prevent circumvention of cost recovery agreement obligations and is consistent with their place in the LPPR framework as a required pre-condition of MTEP approval and obtaining Transmission Service for Large Loads.

---

89 *Id.*

90 *Id.*

91 *Id.*

92 *Id.*; *see also,* Section I.D.1.c.iii.e-f.

93 Furnish Testimony at 14-15.

94 *Id.*

95 *Id.*

96 *Id.*

97 *Id.*

98 *See Id.* at 15-16.

### F. Tender and Processing of the Cost Recovery Agreements—Attachment FF Section I.D.1.c.iii.f.[99]

When MISO shares the final LLPR Study Report with the Large Load Transmission Customer and any applicable Transmission Owners, MISO will also tender the Large Load Cost Recovery Agreement and/or the Large Load Impacted Transmission Owner Agreement(s). The Large Load Transmission Customer and Transmission Owner(s) have fifteen business days to execute the cost recovery agreements and return them to MISO, or request that the non-conforming or unexecuted cost recovery agreements be filed with the Commission.[100] Failure to do so will result in the Large Load Application being withdrawn and the project being removed from the LLPR process.[101] The Large Load Upgrades associated with these projects will be considered approved for MTEP purposes either at the completion of the stakeholder review process, as of the date that the last party executes a conforming cost recovery agreement, or as of the date of filing an unexecuted or non-conforming cost recovery agreement with the Commission, whichever is later.[102] This approach is structurally consistent with how MISO processes other service agreements, such as MISO's *pro forma* GIA and preserves the rights of Large Loads Transmission Customers to bring disputes before the Commission through unexecuted filings while maintaining the accelerated LLPR completion timeframe needed to allow subsequent LLPR cycles to commence with models that account for prior LLPR cycles with sufficient certainty.[103]

To address stakeholder desires for a date certain when the LLPR Application is deemed granted and the required Large Load Upgrades approved for inclusion in MTEP, MISO's proposed language uses either the date of the completion of the stakeholder review process, the date the last party executes a conforming cost recovery agreement, or the filing date of a non-conforming or unexecuted cost recovery agreement, whichever is later, as the point in time at which MTEP approval occurs. This approach is just and reasonable because an executed conforming agreement may be included in MISO's Electronic Quarterly reports and need not wait for a Commission order to be deemed accepted.[104] Thus, the certainty that the project will be developed significantly increases at this point. For nonconforming and/or unexecuted agreements, MISO considered using the date of a Commission order accepting such agreement as the trigger for MTEP inclusion. However, MISO ultimately rejected this approach as impractical. Given the need to build the base

---

[99] Section I.D.1.c.iii.f also addresses the tender of the final LLPR Study Report, but that timing was addressed in the previous section.

[100] Gudeman Testimony at 5.

[101] *Id.*

[102] Furnish Testimony at 17.

[103] *See*, Tariff Attachment X, Section 11.3 (Execution and Filing) (implementing a similar procedure, including a deemed withdrawal for failure to proceed and different timeframes based on the requirements and timing of the underlying process).

[104] Under MISO's EPR process, projects are deemed approved for inclusion in MTEP once the study is complete and MISO adds them to the list of approved projects. With the introduction of agreements that memorialize commitments associated with the LLPR process, using later of the stakeholder review process completion date, the execution date, or filing date of unexecuted or non-conforming agreements provides an appropriate equivalent reference date for approval.

models used in subsequent LLPR cycles using a system topography that reflects what was changed by prior LLPR cycles in order to accurately study impacts, it would not be possible to wait several months for a Commission order before building the models used in the next LLPR cycle while maintaining a triannual LLPR study cadence. MISO proposes the date of filing of an unexecuted or nonconforming filing as point where the application should be deemed approved for inclusion in MTEP as reasonable compromise between providing certainty in modeling for the next LLPR study cycle and maintain the accelerated study cadence necessary to accommodate the integration schedules of Large Loads.[105]

Notably, no Transmission Service shall commence under an unexecuted or non-conforming cost recovery agreement until it has been accepted by the Commission. While it is reasonable to include the needed transmission upgrades in models upon submission of an unexecuted or nonconforming filing in order to commence subsequent study cycles on schedule, allowing Transmission Service to commence prior to Commission acceptance of the cost recovery agreements risks decoupling the requirements for the Large Load Transmission Customer contained in the agreements from the Transmission Service granted. This risk is not needed to prevent delays to all other Large Load Transmission Customers and MISO expects that in most instances, a Commission order would likely be issued before the Large Load's need-by date.[106]

MISO's proposed language is reasonable and necessary to establish the prescribed timeline for executing the cost recovery agreements, enable stakeholder review and feedback, identify when Large Load projects are considered approved for MTEP purposes, and allow model building for subsequent cycles. These strict timelines are necessary to ensure that the LLPR process can be completed in a 365-day period and to ensure that MISO has sufficient certainty in the Large Load Upgrades completed by applicants in the LLPR process. These requirements make clear that even if a project is withdrawn and removed from the MTEP models, the Large Load Transmission Customer is still responsible for paying for any identified Large Load Upgrade costs. This approach avoids reserving system capability for projects that ultimately do not proceed.

### G. Resubmission of Withdrawn Applications—Attachment FF Sections I.D.1.c.iii.g

Proposed section I.D.1.c.iii.g provides that any withdrawal of the application will result in the removal of the project from the LLPR study process. The Large Load Transmission Customer may submit a new Large Load Application to MISO but must identify what information has

---

105 While this date does not provide as much certainty as the date of Commission acceptance, a project is still more likely to be developed after a service agreement is filed than before that point. In MISO's experience, most unexecuted filings will still result in the agreement being accepted by the Commission, either with or without the requested changes to *pro forma* agreement terms, and non-conforming agreements are fairly uncommon. MISO acknowledges that rejection is possible and projects that have unexecuted agreements can be included in subsequent models only subject to the outcome of the Commission proceeding. However, the risks of diminished certainty are, on balance, preferable to guaranteed study delays.

106 This could result in an actual delay only in the highly unlikely scenario where a Large Load is projected to be built and require Transmission Service obtained through LLPR in a shorter timeframe than the Commission can act on a filing.

changed since the previous submission.[107] This language provides clear withdrawal rules and is both reasonable and needed to allow for the uniform administration of the LLPR process on an accelerated timeframe.

**H. Stakeholder Forums—Attachment FF Sections I.D.1.c.iii.h.**

Consistent with its current process, MISO will host a stakeholder forum at the end of each LLPR study process or as otherwise provided in the Transmission Planning Business Practices Manual ("TPBPM") basis to review the identified transmission needs, solutions, and any alternatives identified in the completed LLPR studies.[108] The purpose of these stakeholder forums is to review with stakeholders the transmission needs, solution(s), and any identified alternatives identified in the completed LLPR System Impact Studies. Following each stakeholder forum, stakeholders will have a defined comment period outlined in the TPBPM.[109] This stakeholder review process happens in parallel to the tender and execution of any relevant cost recovery agreements, thus allowing MISO to schedule stakeholder discussions and comment periods on an actionable timeframe. As explained earlier in this letter, a LLPR Application is considered approved by MISO at the completion of the stakeholder review process, execution of a conforming cost recovery agreement for such Large Load Upgrade, or upon the filing of an unexecuted or non-conforming cost recovery agreement with the Commission, whichever is later.[110] For example, if a cost recovery agreement was executed within two days, MISO would not consider the project approved until it completed the stakeholder review process. This is necessary to allow action on stakeholder comments where appropriate.

These proposed Tariff additions align with MISO's commitment to working with stakeholders in addressing the integration of Large Loads and providing transparency in the projects studied in the LLPR process. MISO regularly hosts these stakeholder forums as part of the EPR process and will continue to do so on a regular basis for projects going through the LLPR process.

**I. Cost Recovery Agreements—Attachment FF Section I.D.1.c.iii.i.**

As part of the proposed LLPR process and to mitigate the risk of cost shifting among Transmission Customers, MISO is proposing two cost recovery agreements to ensure that a Large Load Transmission Customer bears the risk and is ultimately responsible for the costs incurred to provide the requested Transmission Service.[111] The relevant cost recovery agreements will include

---

[107] Furnish Testimony at 16.

[108] *Id.* at 17. Any meetings involving CEII or confidential materials will be handled under Section I.C.23 of Attachment FF.

[109] *Id.*

[110] *Id.*

[111] Proposed MISO Tariff, Attachment LLL (Form of Agreement for Large Load Cost Recovery Agreement) and Attachment MMM (Form of Agreement for Large Load Impacted Transmission Owner Cost Recovery Agreement).

an exhibit listing the Large Load Upgrade(s) and/or Impacted Transmission Owner Large Load Upgrade(s) that are required for the Large Load Transmission Customer.

The LLPR process ends with MTEP approval and after the issuance of such approval, the Transmission Customer remains responsible for the Large Load Upgrade costs identified through the LLPR.[112] Thus, if a project is assigned Large Load Upgrades through the LLPR process and the Large Load is subsequently not built, or its service is terminated, then the Large Load Transmission Customer will remain responsible for any associated costs assigned to their project under the proposed cost recovery agreements. This provides the necessary certainty for later projects studied in the LLPR process and will allow MISO to complete the studies efficiently without disrupting future LLPR study cycles.[113]

The details and requirements of the proposed cost recovery agreements are further described in Section IV of this transmittal letter.

**J. LLPR Operations Agreement and Confidentiality—Attachment FF Sections I.D.1.c.iii.j—I.D.1.c.iii.k.**

Once a Large Load project has received MTEP approval, the Transmission Customer must submit an updated Large Load forecast along with an operations agreement for the new Large Load.[114] This operations agreement, which is Exhibit 2 to Attachment F, is an application for Network Integration Transmission Service (NITS) in accordance with Module B Section 29.2 of the Tariff prior to the Service Commencement Date. As part of the operations agreement process, the Transmission Owner will develop a CPNode for each Large Load. This is necessary for MISO settlement, operational visibility, and forecasting purposes.[115] These *pro forma* service agreements are executed, reported in the EQR, and posted publicly on MISO's website. Service to the Large Load will not commence prior to MISO's review and execution of the operations agreement.

Proposed Section I.D.1.c.iii.k provides for the designation and protection of confidential and Critical Energy Infrastructure Information by participants in the LLPR process with access to non-public information subject to MISO's established Nondisclosure Agreement and CEII rules. As explained further by Ms. Furnish, the form of non-disclosure agreement will be the universal NDA, as accepted by the Commission for inclusion in MISO's Tariff as Attachment Z. The CEII NDA is directly drawn from the form of nondisclosure agreement included with MISO's Interconnection Request form required for Interconnection Customers, thus promoting rules alignment across processes. Allowing participants in studies to request confidential and/or CEII treatment of appropriate information is a necessary and routine feature of MISO study processes and will protect the more sensitive information (e.g., detailed models, diagrams and other sensitive technical information) required as part of the LLPR process. MISO notes that these confidentiality

---

[112] Furnish Testimony at 15-16.

[113] *Id.*

[114] Furnish Testimony at 16-17.

[115] Furnish Testimony at 16-17.

safeguards will not conflict with the transparency requirements proposed in this filing, including the public Large Load dashboard, because the required information is set forth in the Tariff and both MISO's proposed Tariff language and existing confidentiality rules prohibit designation as confidential of information that a Tariff or other legal requirement specifies be made public.

At the conclusion of the LLPR process, the cost recovery agreements associated with Large Load Upgrades will be submitted to the Commission for approval. Any executed cost recovery agreements will be included in MISO's EQR reports on a quarterly basis and all the agreements included in those EQR reports are publicly posted on MISO's public website in accordance with the same procedures applicable to other types of service agreements. The EQR reports will also be accessible through MISO's website.[116] Unexecuted or non-conforming cost recovery agreements will be filed separately with the Commission and publicly available subject to the Commission's regulations.

**K. The Proposed Tariff Revisions are Just and Reasonable.**

Under section 205 of the Federal Power Act, MISO must show that its proposed Tariff revisions are just and reasonable, and not unduly discriminatory or preferential. "For filings made under FPA section 205, the Commission evaluates whether the proposal in the filing is just and reasonable, and not whether alternative proposals are more or less reasonable than the filing party's proposal."[117] In the Show Cause Order, the Commission preliminarily found that MISO's Tariff lacked clear and consistent provisions addressing large load integration. The Commission noted that MISO's role in load additions has been largely supplemental and the Transmission Owners' study processes are not set in the Tariff and some have used ad hoc, stand-alone study agreements. The proposed LLPR revisions directly address these concerns.

MISO developed a dedicated framework for Large Loads and proposes to add the LLPR process to Attachment FF of the Tariff as well as new *pro forma* Attachments LLL and MMM. With these additions, every Transmission Customer seeking Transmission Service for a Large Load must submit a Large Load Application and provide the requisite information to MISO. This not only creates a single path for Large Load Transmission Customers to take when seeking Transmission Service, it provides MISO with the ability to expedite the study timelines and, in some cases, optimize the transmission solutions. Each Large Load Application must elect one of several defined options (LLPR, Interim NITS, LARS, etc.), which replaces the historic and potentially inconsistent practices with a single, Tariff-based process that applies equally to all Large Load Transmission Customers. Together, these provisions create a transparent and predictable path for identifying the Large Load Network Upgrades needed to serve Large Load Transmission Customers, while balancing speed, reliability, and stakeholder engagement.

MISO's proposed Large Load framework provides alternative pathways depending on size of the load, which strikes a just and reasonable balance between capturing the larger loads for

---

116 *See* MISO, *Notifications Overview*, *Market Settlements*, available at: https://www.misoenergy.org/markets-and-operations/notifications/.

117 *See PJM Interconnection, LLC*, 197 FERC ¶ 61,019, at P 29 (2026).

which MISO needs visibility to ensure system reliability and directing the smaller loads that do not raise the same reliability concerns into the existing EPR process.[118] The Large Load Application is just and reasonable and not unduly discriminatory or preferential because it requires the applicants to provide significant information about the Large Loads, which in turn will provide MISO with the information necessary to address the operational impacts of Large Loads looking to interconnect to MISO's Transmission System.

The LLPR application process also contains the elements identified by the Commission in the Show Cause Order. The Large Load Applications are accepted on a rolling basis and require a non-refundable application fee of $250,000. The applications must include detailed information about the Large Load and provide planning models for MISO to utilize when completing its own independent studies. MISO is also requiring that the Large Load Transmission Customer attest that it has no other pending requests for service to the same Large Load, which will improve load forecasting clarity and certainty. The Commission has noted in other contexts that non-refundable fees, study deposits, and readiness requirements deter speculative requests, which is critical for MISO to be able to study these loads on an expedited basis. The proposed Tariff revisions and *pro forma* cost recovery agreements also require financial security equal to the Large Load Network Upgrade capital costs once the LL-CRA is executed, which will further reduce the possibility of speculative requests clogging the study processes, distorting load forecasting, or further risking any kind of cost shifting.

The LLPR System Impact Study is just and reasonable because it incorporates enhanced study requirements to enable MISO independently to analyze the impacts of each Large Load on the Transmission System. MISO will conduct this analysis based on MTEP models, and in collaboration with the Transmission Owner and Transmission Customer. Moreover, to participate in the LLPR process, MISO requires that EMT studies be completed before the application is submitted so that the full set of Network Upgrades needed to reliably serve the Large Load can be identified.[119] The study also requires the evaluation of alternative transmission technologies and grid-enhancing technologies by the Transmission Owners and MISO will review the consideration of any relevant ATTs/GETs, which was another Commission concern.[120]

The LLPR provides the clarity and consistency sought in the Show Cause Order by stating the information required to enter the process, the study sequence, the roles of MISO and the Transmission Owners, and the relationship of the results to planning and service. The readiness and attestation requirements address the Commission's concern with speculative or duplicative requests, while the cumulative assessment and reliability information support consistent treatment

---

[118] *See PJM Interconnection, LLC*, 197 FERC ¶ 61,019, at P 27 (2026); *see also Sw. Power Pool, Inc.*, 194 FERC ¶ 61,031, at PP 10, 61 (2026) (accepting a proposed definition of a high impact large load that included a 50 MW threshold for new or increased load at a single site connected to the transmission system at a voltage level greater than 69 kV); *Tri-State Generation & Transmission Ass'n, Inc.*, 196 FERC ¶ 61,127, at P 76 (2026) (*Tri-State*) (accepting a proposal to define a high impact load as load exceeding or forecasted to exceed 45 MW within four years).

[119] Furnish Testimony at 8.

[120] *Id.* at 13-14.

of system impacts. The recurring cycles provide an accelerated path grounded in MISO's existing planning framework.[121] Finally, the proposed revisions were developed through MISO's Large Load Working Group where the process was presented, reviewed, and discussed by stakeholders.[122] The Commission recognized and encouraged this effort in the Show Cause Order.

For these reasons, the proposed Tariff revisions are just and reasonable, and not unduly discriminatory or preferential, and the Commission should accept them under section 205 of the Federal Power Act.

**L. Separate Proposal to Apply Cost Recovery Agreements to LARS Projects.**

Separately from all other proposals contained in this filing, MISO proposes to include the following language as a separate paragraph in Attachment FF, Section I.D.1.c.iii.f in order to facilitate the use of the LL-CRA and LLITO-CRA as part of the LARS process:

> Subject to Commission acceptance of the revisions to Attachment FF of the Tariff pending before the Commission in Docket No. ER27-25, all LARS Associated Transmission Customers that submit LARS Applications for inclusion in a LARS cycle with a kickoff date on or after February 14, 2027, shall execute or request the unexecuted and/or non-conforming filing of the LL-CRA and/or LLITO-CRA, as applicable, for all Network Upgrades identified in a LARS study for which Attachment FF I.D.1.b.ii.g. assigns cost responsibility to the LARS Associated Transmission Customer. The LARS Application and Network Upgrades identified in a LARS study for which Attachment FF I.D.1.b.ii.g. assigns cost responsibility to the LARS Associated Transmission Customer shall be deemed approved for MTEP purposes as of the later of: (1) the date the last party executes the applicable conforming LL-CRA and, if required, LLITO-CRA(s); (2) the date of filing with the Commission of an unexecuted and/or nonconforming LL-CRA and/or LLITO-CRA; or (3) the conclusion of the stakeholder comment period required by Section III.D.1.c.iii.h of this Attachment FF. A LARS Associated Transmission Customer shall not commence Transmission Service under an unexecuted or non-conforming LL-CRA or LLITO-CRA until such agreement(s) have been accepted by the Commission.

If the Commission ultimately approves MISO's LARS proposal, all LARS Associated Transmission Customers that submit LARS Applications on or after the effective date of this filing (February 14, 2027), shall execute or request the unexecuted filing of a cost recovery agreement, as applicable, for all Large Load Upgrades identified in a LARS study. The Large Load Upgrades associated with these LARS projects will be considered approved for MTEP purposes as of the date that the last party executes a conforming cost recovery agreement or as of the date of filing an unexecuted or non-conforming cost recovery agreement with the Commission.

---

[121] Show Cause Order at PP 39, 56–65 (identifying concerns regarding timely studies, readiness, operational impacts, and clear Tariff provisions); Furnish Testimony at 3.

[122] *See* Furnish Testimony at 28-33.

In the LARS Answer, MISO also stated that it would submit another filing to reconcile the LARS and LLPR processes to ensure their full alignment.[123] Notably though, MISO has proposed standalone Tariff language in this docket to make the proposed cost recovery agreements applicable to new LARS studies. While acceptance of the Tariff language discussed above will not obviate the need to make a subsequent reconciliation filing to harmonize other aspects of the LARS and LLPR filings, it will allow for the cost recovery agreements, which are a valuable transparency and accountability mechanism, to apply to LARS studies earlier than would be possible if MISO waited until acceptance of the instant filing and a subsequent reconciliation filing, to apply the cost recovery agreements to the LARS process.[124] To the extent that the Commission accepts the cost recovery agreements in the instant docket, it may then separately consider whether to make them applicable to the next LARS cycle, assuming MISO's LARS filing also is accepted.

Thus, this proposed Tariff language represents a standalone proposal, which MISO includes in this filing purely for Tariff administration reasons.[125] While it builds on the LLPR process and Cost Recovery Agreements proposed in this filing, it is not a component of any other proposal contained in this filing, not a part of any compromise or agreement with stakeholders regarding other elements of this filing. MISO urges acceptance of this language for the reasons described above, MISO

## IV. COST RECOVERY AGREEMENT AND COST TRANSPARENCY

The Show Cause Order preliminarily found that MISO's Tariff appeared to be unjust and unreasonable because it lacked adequate mechanisms to mitigate the risk of cost shifting among transmission customers, which may result in unjust and unreasonable rates for transmission service.[126] Specifically, the Commission was concerned about the apparent lack of: (1) transparency regarding the assignment of network upgrades, and their associated costs, that are needed to provide transmission service to transmission customers on behalf of large loads; and (2) a *pro forma* cost recovery agreement between MISO, the transmission owner, and the

---

[123] Furnish Testimony at 19; *see* MISO's November 9 Answer filed in Docket No. ER27-25-000 ("LARS Answer") at 15.

[124] This proposed language is severable from LARS because acceptance LARS was designed to work even with existing processes and then be integrated with the reforms contained in this filing once accepted by the Commission.. The standalone proposal contained in this filing is an enhancement to LARS, but not necessary for its function. The proposed language is severable from this filing because it is contained in its own paragraph that replicates language proposed elsewhere and its application is limited to LARS.

[125] As explained in the LARS Answer, MISO filed its LARS proposal before LLPR, the LL-CRA and LLITO-CRA were developed given the immediate need for such a process and lead time for implementation. LARS Answer at 3, 18. In that docket, MISO committed to updating LARS to incorporate the processes changes included in this filing once this filing is accepted. LARS Answer at 15. While MISO could make a separate contemporaneous filing from this one to make the LL-CRA and LLITO-CRA applicable to Large Load Transmission Customers participating in LARS, this would create version control concerns with pending language built upon pending language, as each filing would create a new version of Attachment FF.

[126] Show Cause Order at P 66.

transmission customer taking transmission service on behalf of Large Loads that ensures that the transmission customer bears the risk and is ultimately responsible for costs incurred to provide transmission service, including the cost of network upgrades.[127] Below is a summary of the proposed Tariff revisions that address the Commission's concerns.

**A. Cost Recovery Agreements**

In the Show Cause Order, the Commission preliminarily found that MISO's Tariff appeared to be unjust and unreasonable because it lacked "adequate mechanisms to mitigate the risk of cost shifting among transmission customers, which may result in unjust and unreasonable rates for transmission service."[128] To prevent unjust and unreasonable cost shifting among transmission customers, the Commission stated that it appeared necessary for MISO, the relevant transmission owner, and the transmission customer taking transmission service on behalf of a large load to enter into a cost recovery agreement with a specified minimum financial contribution and financial security sufficient to secure such contribution to mitigate cost shifting if the transmission customer ultimately takes less transmission service than anticipated because the large load does not materialize as planned or is not developed at all.[129]

In response to concerns raised by the Commission, MISO and the MISO Transmission Owners propose Tariff revisions and two *pro forma* cost recovery agreements that together require the Large Load Transmission Customer to make a minimum contribution toward the revenue requirement of the Transmission Owner(s) responsible for constructing the Large Load Upgrades identified by MISO in the LLPR.[130] To ensure the minimum contribution, Large Load Transmission Customers are required to provide security to cover the capital cost of the Large Load Upgrades. As briefly described in the previous section, prior to receiving MTEP approval for any such Large Load Upgrades, Large Load Transmission Customers are required to execute the *pro forma* LL-CRA and/or LLITO-CRA, as applicable, or request that the cost recovery agreements be filed unexecuted or as non-conforming with the Commission within 15 business days of being tendered the agreements by MISO. Failure to do so by the conclusion of the 15-day period will result in the Large Load Application being withdrawn, and the project being removed from the LLPR process. The customer is required to provide security within 45 days of the execution of the LL-CRA and/or LLITO-CRA. If the LL-CRA or LLITO-CRA is filed unexecuted or as non-conforming, separate terms apply depending on the nature of the dispute and when the Commission approves such agreement. Importantly, a Large Load Transmission Customer cannot

---

[127] *Id.*

[128] Show Cause Order at P 78.

[129] *Id.* at P 82, 84.

[130] Proposed MISO Tariff, Attachment LLL (Form of Agreement for Large Load Cost Recovery Agreement) and Attachment MMM (Form of Agreement for Large Load Impacted Transmission Owner Cost Recovery Agreement).

commence Transmission Service under an unexecuted and/or non-conforming LL-CRA or LLITO-CRA until the applicable cost recovery agreements have been approved by the Commission.[131]

The above framework, including the embedded rate mechanisms, which are discussed in more detail below, reflect a balanced approach to mitigating the cost shift concerns identified by the Commission while respecting state laws (in particular state retail ratemaking authority), Transmission Owner diversity, including their varied business models, the reality that Transmission Customers are often not the Large Load entities actually interconnecting to the Transmission System but merely a pass through, and the region's economic development ambitions. Importantly, nothing in LLPR, including the proposed cost recovery framework interferes, limits the ability of states and other retail regulators to impose additional conditions, further allocate cost responsibility and risk among and between retail customers and Load Serving Entities, or require further agreements involving parties not directly taking service under MISO's Tariff (*e.g.*, data centers and other owners of Large Loads). Although a difficult needle to thread, the proposed framework, consistent with the direction given by the Commission in the Show Cause Order, and in recognition of MISO's regional differences and state authority, is a just and reasonable approach to addressing the risk of cost shifting among Transmission Customers in MISO and potentially unjust and unreasonable rates.

Below is a summary of each agreement and the rate mechanisms therein.

**1. Scope and allocation of responsibilities.**

MISO proposes two complementary *pro forma* cost recovery agreements to establish the Large Load Transmission Customer's financial responsibility for the Large Load Upgrades identified through the LLPR study process. The Large Load Cost Recovery Agreement ("LL-CRA") addresses upgrades within the Transmission Pricing Zone containing the Large Load's Point of Withdrawal. The Large Load Impacted Transmission Owner Cost Recovery Agreement ("LLITO-CRA") addresses upgrades outside that zone. MISO, the Large Load Transmission Customer, and the applicable Transmission Owner(s) are required parties to the agreements. For purposes of the agreements, LLPR includes LARS. The agreements therefore link the LLPR study results to the entities responsible for service, investment, and payment.

In addition to any Transmission Service charges incurred by the Large Load Transmission Customer under the Tariff, a Large Load Transmission Customer is responsible for the costs of the Large Load Upgrades ("Minimum Contribution") pursuant to the cost recovery rate mechanisms in the LL-CRA and LLITO-CRA.[132] This Minimum Contribution is necessary to ensure that the Large Load Transmission Customer is responsible for paying for the costs of transmission driven by the Large Load (*i.e.*, the cost incurred to provide the requested Transmission Service, including the costs of any Large Load Network Upgrades).

---

[131] Proposed MISO Tariff, Attachment FF, I.D.1.c.iii.f.

[132] Gudeman Testimony at 7, 22.

To accommodate the diversity of regulatory approaches and business models among Transmission Owners, the *pro forma* agreements provide the Transmission Owner responsible to construct a Large Load Upgrade the flexibility to roll into its rates for Transmission Service the capital costs of the Large Load Upgrade or to directly assign the costs of the Large Load Network Upgrade(s) to the Large Load Transmission Customer, and such election will be recorded in the agreement.[133] The MISO Transmission Owners are a diverse group of investor-owned transmission owners, municipal utilities, and cooperatives, including both vertically integrated and independent transmission companies, that own transmission facilities over which MISO provides Transmission Service. For example, some Transmission Owners, in addition to service Transmission Customers, serve retail load. Some do not—they only serve MISO Transmission Customers. The rate mechanisms in the cost recovery agreements ensure that cost recovery does not unnecessarily conflict with these various Transmission Owner business models in existence within the MISO footprint. Importantly, however, as discussed below, whether Large Load Upgrade costs are rolled in or directly assigned, the Large Load Transmission Customer is always responsible for the costs of the Large Load Upgrades, thus, mitigating cost shifts to other Transmission Customers, consistent with the Show Cause Order.[134]

**2. Recovery of costs for upgrades within the TPZ.**

Where the capital costs of the Large Load Network Upgrade are rolled in the Transmission Owner's transmission rates, the Large Load Transmission Customer is responsible for its Total Required Revenue Commitment, which amount is set forth in the agreement and payable on a yearly basis consistent with the Yearly Required Revenue Commitment.[135] If the Transmission Service revenue attributable to a Large Load Transmission Customer on behalf of the Large Load during a calendar year is less than the customer's Yearly Required Revenue Commitment, the customer is required to make a Supplemental Payment to the Transmission Provider.[136] The formulas for calculating such amounts are set forth in Exhibit C of the LL-CRA. Below is a more detailed description of these items.

The Total Required Revenue Commitment reflects the return on and of the Large Load Network Upgrade investments over twenty years, including capital cost, return, depreciation, operations and maintenance, and taxes.[137] The commitment is initially based on the estimated upgrade costs and then adjusted as actual capital costs are determined.[138]

Following each calendar year, the Transmission Owner, in coordination with MISO, will determine whether the Large Load Transmission Customer has satisfied its Yearly Required

[133] Proposed MISO Tariff, Attachment LLL, §§ 3.1–3.4 and signature page; Proposed MISO Tariff, Attachment MMM, §§ III–V and signature page.

[134] Gudeman Testimony at 8.

[135] *Id.*

[136] *Id.* at 12.

[137] *Id.* at 8-10.

[138] Proposed MISO Tariff, Attachment LLL, § 3.3.3.

Revenue Commitment or whether a Supplemental Payment is owed.[139] If the Transmission Service revenue attributable to Large Load Transmission Customer during a calendar year is less than the Large Load Transmission Customer's Yearly Required Revenue Commitment, the Large Load Transmission Customer is required to make a Supplemental Payment to MISO, the formula for which is set forth in Exhibit D to the LL-CRA. If the attributable revenue equals or exceeds the yearly commitment, no Supplemental Payment is required. Mr. Gudeman, in his testimony, details and provides examples for calculating the Total Required Revenue Commitment, the Yearly Required Revenue Commitment and Supplemental Payment.[140]

This annual comparison gives effect to the Large Load Transmission Customer's actual contribution to transmission revenues while preserving a minimum payment obligation when load is below the level needed to mitigate a cost shift. For example, a $10 million Yearly Required Revenue Commitment and $7 million in attributable annual transmission-service revenue would necessitate a $3 million Supplemental Payment; attributable revenue of $10 million or more would produce no Supplemental Payment for that year. In his testimony, Mr. Gudeman, based on assumptions provided in his testimony, provides an illustrative example of how the Supplemental Payment is determined.[141] If required, MISO will issue the supplemental invoice within ninety days after the end of every calendar year during the term of the cost recovery agreement, with billing and payment governed by Tariff Section 7 and the applicable Business Practice Manuals.[142]

MISO will allocate any Supplemental Payments among the Transmission Owners that are a party to the LL-CRA in proportion to their respective Annual Incremental Revenue Requirement (defined in the agreement) included in the Yearly Required Revenue Commitment.[143] Any Supplemental Payment allocated to a Transmission Owner will be treated as a revenue credit against the recipient Transmission Owner's annual transmission revenue requirement, and each applicable Transmission Owner must provide a workpaper in its annual informational filing, which is generally filed in March of a calendar year, detailing that credit.[144] While the need for a Supplemental Payment and the amount thereof will not be known until after a calendar year has ended, there does not necessarily need to be a large lag in reflecting significant Supplemental Payments in rates paid by Transmission Customers. As Mr. Gudeman explains, any lag associated with a Supplemental Payment could be addressed by the Transmission Owner when developing its projected revenue requirement.[145] In short, the cost recovery mechanism explained above is specifically designed to offset in rates the costs of the Large Load Network Upgrades so that the end result is that those costs are not shifted to other Transmission Customers.[146] As shown in

---

139 Proposed MISO Tariff, Attachment LLL, § 3.3.5.

140 Gudeman at 8-17; *see also* Proposed MISO Tariff, Attachment LLL, § 3.3 and Ex. C, D.

141 Gudeman Testimony at 12-13; Gudeman Testimony Exhibit MTO-0004 (Calculation of Supplemental Payment).

142 Proposed MISO Tariff, Attachment LLL, §§ 3.3.5.6 and 3.3.5.7.

143 Gudeman Testimony at 13.

144 Gudeman Testimony at 17.

145 *Id.* at 13-16.

146 *Id.* at 16-17.

Exhibit MTO-0006 to Mr. Gudeman's , with all else being equal assuming no other changes to load or revenue requirements, the Large Load Transmission Customer pays at least the incremental revenue requirement for the Large Load Network Upgrades and the zonal rate charged to other customers will not increase as a result of the Large Load Network Upgrades.[147]

Where the capital costs of the Large Load Network Upgrades are directly assigned to the Large Load Transmission Customer, payments will be due from the customer as specified in a separate agreement between Transmission Owner and Large Load Transmission Customer to be filed with the Commission.[148] Under such circumstances, the Transmission Owner agrees that it will not recover the costs of the directly assigned upgrade from other Transmission Customers and commits to providing an annual workpaper showing that treatment.[149]

The LL-CRA continues until the earlier of twenty years after the final Large Load Network Upgrade enters service or satisfaction in full of the Total Required Revenue Commitment and the direct-assignment payment obligations, as applicable.[150]

### 3. Recovery of costs for upgrades outside the TPZ.

The LLITO-CRA establishes a separate rate mechanism for upgrades outside the TPZ. Where the capital costs of ITO-Large Load Network Upgrades are rolled into a Transmission Owner's rates, the Large Load Transmission Customer is responsible for the ITO Large Load Network Upgrade(s)' Monthly Revenue Requirement beginning in the month following the Transmission Owner's notification that the upgrade has entered service.[151] The formula to calculate the Monthly Revenue Requirement is set forth in Exhibit II to the LLITO-CRA and is identical to the "Incremental Revenue Requirement for Large Load Network Upgrades Calculation" formula in Exhibit C to the LL-CRA.[152] As described above, the formula multiplies the capital invested in the ITO-Large Load Network Upgrade(s) by a levelized fixed charge rate determined from the term of the LLITO-CRA and data from the Transmission Owner's MISO Tariff Attachment O Formula Rate, including taxes, interest on long term debt, return on equity, depreciation expense, total operations and maintenance expense, general and common depreciation expense; taxes other than income taxes; and total gross transmission plant. The default recovery term is 240 months of payments for each upgrade, unless the parties mutually agree to a different term or the applicable obligations are otherwise satisfied.[153]

---

[147] *Id.* at 16-17; Gudeman Testimony Exhibit MTO-0006 (Zonal Rate Impact).

[148] Proposed MISO Tariff, Attachment LLL, § 3.4.1.

[149] Proposed MISO Tariff, Attachment LLL, § 3.4.2.

[150] Proposed MISO Tariff, Attachment LLL, §§ 2.2–2.3, 3.3.

[151] Proposed MISO Tariff, Attachment MMM, § IV.

[152] Gudeman Testimony at 24.

[153] Proposed MISO Tariff, Attachment MMM, § II.

The Transmission Owner recalculates the payment annually using updated inputs from the Transmission Owner's Tariff Attachment O Formula Rate using data from the previous calendar year.[154] Any payments from the customer under the LLITO-CRA are treated as revenue credits against the Transmission Owner's annual transmission revenue requirement, documented in the Transmission Owner's annual informational filing.[155]

If the impacted Transmission Owner directly assigns ITO-Large Load Network Upgrade costs under proposed Section V of the LLITO-CRA, payments are due as specified in a separate agreement between Transmission Owner and Large Load Transmission Customer to be filed with the Commission.[156] As with the LL-CRA, the Transmission Owner may not recover the directly assigned costs from other Transmission Customers and must document the foregoing in its annual informational filing.[157]

#### 4. Financial security and construction coordination

To secure the Large Load Transmission Customer's obligations, the agreements require irrevocable security reasonably acceptable to each Transmission Owner (for example, a letter of credit, surety bond, or parent guaranty) in an amount equal to the capital cost of the covered upgrades.[158] The agreements allow the customer to request a reduction in security, subject to the specified timing, documentation, and floor based on the remaining Minimum Contribution, and the Transmission Owner may not unreasonably deny a request consistent with those provisions. Under such terms, where the Large Load Transmission Customer and Transmission Owner are the same legal entity, the Transmission Owner is not required to demand security of itself but it is still subject to the requirement to protect against cost shifts. The security provisions in the agreements exist to protect the Transmission Owner from financial risk associated with the capital costs of the Large Load Network Upgrade(s) and Transmission Customers from related cost shifts, and in analogous circumstances, the Commission has found it would be impractical and unnecessary to require security.[159]

The Large Load Transmission Customer is required to provide security within 45 days of the parties' execution of the agreements.[160] If the agreements are filed unexecuted or as non-conforming, however, separate terms apply, depending on when the Commission approves such agreement, as well as the nature of the parties' dispute. Failure to provide security within the applicable period results in immediate withdrawal of the Large Load Application.[161]

---

[154] Gudeman Testimony at 24.

[155] Proposed MISO Tariff, Attachment MMM, §§ IV.i—j.

[156] Gudeman Testimony at 24-25; Proposed MISO Tariff, Attachment MMM, § V.

[157] Gudeman Testimony at 25.

[158] Proposed MISO Tariff, Attachment LLL, § 4.1; Proposed MISO Tariff, Attachment MMM, § VI.

[159] *See Midcontinent Indep. Sys. Operator, Inc.*, 156 FERC ¶ 61,166, at P 12 (2016); Gudeman Testimony at 19, 26.

[160] Gudeman Testimony at 19, 25.

[161] Proposed MISO Tariff, Attachment LLL, § 4.2; Proposed MISO Tariff, Attachment MMM, § VI.

Upon the Transmission Owner's request, the Transmission Owner and Large Load Transmission Customer will enter into a separate agreement regarding construction of the covered upgrades.[162] Such separate agreements do not displace the customer's obligation to enter into a cost recovery agreement. Where the security's form, terms, and provider permit, security posted under a cost recovery agreement may satisfy the construction agreement's security requirement. Similarly, if the Large Load Transmission Customer provides security under a construction agreement prior to providing the required security under the cost recovery agreement, the security required under the construction agreement may be applied as the required security under the cost recovery agreement if the forms, terms, and provider of the security under the construction agreement allow it. Both *pro forma* agreements prohibit a lapse between the two arrangements and prohibit requiring the customer to concurrently maintain the full security amount under both. The *pro formas* also separately preserve applicable Tariff security and collateral requirements for Transmission Service. The coordination provisions therefore address overlapping construction security while retaining the payment obligations secured by the cost recovery agreement.

**B. MISO Large Load Dashboard—Attachment FF, Section I.D.1.c.iv**

To ensure that MISO addresses the transparency requirements identified in the Show Cause Order, MISO is proposing Tariff language describing its commitment to sharing information related to large load integration through a public dashboard. The Commission explained that it was "concerned about the apparent lack of (1) transparency regarding the assignment of Network Upgrades, and their associated costs, that are needed to provide transmission service to Eligible Customers on behalf of large loads . . ."[163] The proposed Tariff changes address the Commission's goals for transparency and information sharing.

MISO's proposed Large Load dashboard will identify the Large Load Upgrades that are needed and the costs associated with those upgrades. Transmission Owners must provide MISO with information that may be publicly posted on its website including: 1) the aggregate amount of proposed Large Load additions by Large Load Transmission Customers, including in each Transmission Pricing Zone; 2) the planned Large Load Upgrades needed to provide the Large Load Transmission Customer Transmission Service, identified by type of equipment and Large Load Upgrade for each Large Load; and 3) cost estimates for those Large Load Upgrades.[164] MISO's proposed Tariff language closely follows the requirements of the Show Cause Order to ensure alignment with the Commission's transparency requirements.[165]

In accordance with the requirements of the Show Cause Order, MISO will provide data received from its Transmission Owners related to Large Load Upgrades on its public website and

---

162 Proposed MISO Tariff, Attachment LLL, § 4.2.1; Proposed MISO Tariff, Attachment MMM, § VI.b.

163 Show Cause Order at P 66.

164 *Id.* at P 77.

165 *Compare* Show Cause Order at P 77 *with* proposed Attachment FF, Section I.D.1.c.iv.

in a format that is searchable and allows users to filter the data.[166] These proposed Tariff additions directly respond to the Commission's request for "(1) robust, accurate, and systematic provision of data on MISO's website in a single location, and in an easily accessible format that is searchable and allows users to filter the data, regarding the cost for Network Upgrades needed to provide transmission service to Eligible Customers on behalf of large loads."[167] As MISO presented to stakeholders in the LLWG, it is in the process of developing a Large Load Dashboard, which will depict a map of MISO's footprint and the location of the Large Loads along with their associated Large Load Upgrades.[168] The information displayed in the dashboard will be easily accessible on MISO's website and searchable by users looking to learn more information about large load development in MISO's footprint. The proposed Tariff requirements obligate Transmission Owners to provide MISO with updated information regularly, with the specific timeframes to be set forth in MISO's BPM for Large Load.[169]

The dashboard, along with the cost recovery agreements and associated materials, will provide a fuller picture of the costs associated with integrating Large Load in MISO's footprint for the public, and will provide a useful input to state and other retail regulatory authorities in developing their own Large Load policies, rules, and regulations.

**C. Just and Reasonable Treatment.**

MISO and the MISO Transmission Owners submit that the proposed agreements address the concerns identified in the Show Cause Order and support just and reasonable rates by connecting each Large Load Upgrade to an enforceable minimum contribution from the Large Load Transmission Customer. Put plainly, under the proposed framework, the Large Load Transmission Customer is always responsible for the costs of the Large Load Network Upgrade(s), thus, mitigating cost shifts to other Transmission Customers, consistent with the Show Cause Order.[170]

---

[166] Furnish Testimony at 25-26.

[167] Show Cause Order at P 67.

[168] MISO, *Cost Shifting Risk Among Transmission Customers* (LLWG-2026-8), Sept. 23, 2026, available at: 20260923 LLWG Item 05 Cost Shifting Risk Among Transmission Customers (LLWG-2026-8)783359.pdf.

[169] This approach is consistent with the Rule of Reason given that the obligation is to update regularly and the specific reporting cadence is an implementation detail best address through BPMs and adjusted based on experience and the requirements of stakeholder. . *See, e.g., Midcontinent Indep. Sys. Operator, Inc., 169 FERC ¶ 61,221, at P 67 2019 (2019) (citing Energy Storage Ass'n v. PJM Interconnection, L.L.C.*, 162 FERC ¶ 61,296, at P 103 (2018)) (describing the rule of reason).

[170] Proposed MISO Tariff, Attachment LLL, §§ 3–5, 7.3; Proposed MISO Tariff, Attachment MMM, §§ III–VII; *Midcontinent Indep. Sys. Operator, Inc.*, 195 FERC ¶ 61,212, PP 78–85 (2026), errata notice, 196 FERC ¶ 61,123 (2026) (identifying the cost recovery, security, and revenue-credit concerns).

## V. TRANSMISSION SERVICE OFFERINGS

### A. Overview and service selection.

MISO proposes transmission service options that distinguish a customer seeking temporary non-firm transmission service while progressing toward full NITS from a customer electing an ongoing permanent firm and non-firm service mix. Firm Service Step Up ("FSSU") permits NITS service to increase as the required capability becomes available. Interim NITS permits transmission service within approved non-firm limits while the remaining upgrades needed for full NITS are completed.

The transmission service election determines the customer's rights and obligations. Firmness addresses the availability and priority of Transmission Service; Resource Adequacy addresses the capacity needed to support demand. The proposal treats those questions separately. Interim NITS remains in the capacity construct because it is a transition to full NITS service. Neither election authorizes withdrawals beyond the quantities and operating conditions established for that service.

### B. Firm Service Step Up.

The FSSU process is designed to allow a Transmission Customer to obtain NITS in increments before all upgrades supporting its ultimate NITS requirement have been completed. As the relevant capability becomes available, a portion of the customer's Interim NITS, described further below, may convert to NITS while the remaining portion continues under the applicable interim restrictions. The customer therefore can use available firm capability without assuming a firm entitlement to the full quantity before the system can support that service.

The FSSU process is optional and allows NITS to be combined with Interim NITS. At each step, the applicable firm NITS quantity remains tied to the capability supporting that step; any remaining interim quantity continues to be subject to its non-firm, Interim NITS, limits. This distinction preserves the integrity of the service actually available while accommodating a customer's phased development toward full NITS.[171]

FSSU provides speed to power because it enables faster integration of incremental amounts of Large Load using firm service or Interim NITS. Ms. Xie explains that an FSSU request may include a firm service component and Interim NITS component, allowing a portion of the customer's non-firm service to convert to firm service before all required Upgrades are complete, with the remaining non-firm service continuing under the applicable Interim NITS operating limits.[172] The FSSU proposal thus provides an expeditious option to obtain firm service, at least in part.

---

[171] Xie at 21.

[172] *Id.* at 20.

**C. Interim NITS.**

The interim service developed through the Flexible Large-Load Interconnections and Transmission Service ("FLITS") stakeholder work is referred to here as Interim NITS. It allows a Transmission Customer taking NITS on behalf of a Large Load to begin receiving an approved quantity of non-firm service while the Network Upgrades required for full NITS are completed. The service is part of the NITS framework and uses the Attachment F NITS Service Agreement with a new exhibit for the Large Load, together with a corresponding Attachment G exhibit setting out the additional operating criteria.[173]

The customer remains on a path to full NITS rather than selecting a permanent substitute for NITS. When the required upgrades are completed and the conditions for full NITS are satisfied, full NITS begins. Where FSSU is used, the interim agreement continues to govern the portion that has not yet converted to firm service.

Charges for Interim NITS are determined under Schedule 9, and Interim NITS load is treated as Network Load in almost all cases under the proposed design. An increase in the interim load quantity is reflected in the applicable Attachment F exhibit, but updating the exhibit does not establish additional system capability or authorize operation beyond the approved limit. Cumulative load growth of at least 25 MW requires the applicable LLPR study.[174]

Interim NITS is subject to non-emergency operating restrictions and curtailment when required by transmission conditions. During a Transmission Emergency, Interim NITS is curtailed after non-firm Point-to-Point service but before NITS and Firm Point-to-Point Transmission Service, and Firm GRITS. Interim NITS is not curtailed solely to mitigate economic congestion. Its non-firm limits are tied to the transmission capability available before completion of the Upgrades supporting full NITS.[175]

For Resource Adequacy, Interim NITS remains in the Coincident Peak Demand forecast and subject to the existing capacity requirements. It consequently has the same priority as other Load with Firm Transmission Service during a Capacity Emergency, subject to its separate transmission limitations. This treatment preserves capacity demand and investment signals for load progressing toward NITS and prevents interim non-firm transmission status from operating as a capacity exemption.[176]

The non-firm portion does not receive Auction Revenue Rights ("ARR") Entitlements and is excluded from the applicable Peak Usage calculation. Firm load under the associated NITS

---

[173] Xie at 7. *See also* MISO, LLWG, *Flexible Large-Load Interconnections and Transmission Service—Interim NITS Option*, LLWG-2026-5 (Sept. 23, 2026), stakeholder feedback request (identifying the FLITS work as addressing the Interim NITS option).

[174] Xie at 10.

[175] *Id.* at 19.

[176] *Id.* at 24.

arrangement remains eligible under the existing rules. Interim NITS may register as a Load Modifying Resource ("LMR"), subject to the applicable requirements, while its non-firm portions are restricted from Demand Response Resource ("DRR") and Emergency Demand Response ("EDR") participation. These distinctions preserve the relationship between the service quantity and the market and congestion benefits associated with firm service.[177]

Interim NITS directly responds to the Commission's preliminary finding that MISO's Tariff lacks transmission services reflecting Eligible Customers taking service on behalf of flexible Large Loads willing and able to limit their use of the transmission system under certain conditions;[178] it aligns the Interim NITS customer's charges, curtailment priority, Resource Adequacy obligations, and market participation rights with its actual, interim non-firm use of the transmission system. In addition, Interim NITS protects existing transmission customers from undue cost shifting by requiring Interim NITS Load to be billed under Schedule 9 and to remain subject to existing Resource Adequacy requirements, and it is time-limited and structurally integrated into the existing NITS framework so that it functions as a genuine bridge to full firm service rather than a permanent alternative. Interim NITS is not unduly discriminatory or preferential because it is available on comparable terms.

### D. Reliability and rate treatment.

The service options rely on enforceable withdrawal limits. Metering, telemetry, model representation, communications, and operating controls provide the information and capability needed to administer those limits. The Transmission Owner determines additional control technologies or protection systems needed for the particular arrangement and for which the Large Load Transmission Customer will be responsible, while MISO establishes the applicable service requirements and communicates directives through the relevant parties. A commercial agreement identifying a limit does not eliminate the need to make that limit observable and enforceable in operations.[179]

The proposed operating framework provides for remote-disconnection procedures, applicable unreserved-use consequences, and potential service termination when the customer does not comply with a required restriction. Interim NITS participation as an LMR also remains subject to the applicable LMR requirements and penalties. These provisions support the different curtailment priorities and protect the reliability expectations associated with firm service. The customer's ability to obtain non-firm service depends on accepting the limitations that define that service.

The resulting differences are grounded in the rights provided. Interim NITS remains associated with full NITS and its capacity obligation while accepting transmission limits during the transition. Limiting ARR benefits to firm quantities likewise preserves the existing connection

---

[177] *Id.* at 25.

[178] *See* Show Cause Order at PP 102, 104.

[179] Xie Testimony at 11.

between firm Transmission Service and the congestion entitlement associated with it. MISO submits that these distinctions support just and reasonable treatment of the different service arrangements.

## VI. LEGAL SHOWING AND RESPONSE TO THE SHOW CAUSE ORDER

Section 205 requires jurisdictional rates, charges, and the practices affecting them to be just and reasonable and prohibits undue preferences and unreasonable differences in service. (16 U.S.C. § 824d(a)–(b)). MISO submits the proposed revisions under that standard. The proposals respond to the Commission's preliminary findings through the section 205 pathway expressly contemplated in the Show Cause Order and the Abeyance Order. That procedural framework permits MISO to bring forward developed proposals while the Commission retains authority to address issues that the resulting filings do not resolve.[180]

The application and study concerns are addressed by the combination of LLPR and the separately submitted IRR proposal. LLPR identifies what the customer must submit and how the requested service is studied. IRR supplies the proposed Large Load definition and requirements concerning visibility and operating performance. Their interaction connects the information used in planning with the load behavior required after service begins. The agreement and operating provisions then memorialize the obligations applicable to the resulting service.[181]

The transmission service concerns are addressed by the additional service choices described in Section V. Interim NITS supplies a temporary non-firm path while the upgrades needed for full NITS are completed. FSSU allows incremental conversion where firm capability is available. The applicable operating limits, capacity treatment, and charges reflect the particular rights accepted by the customer. This approach implements the Commission's recognition that service can account for a load's willingness and ability to limit its use of the system.[182]

The initial availability of the new service options is directed to Large Loads within the scope of this filing. MISO's proposal focuses the service, study, modeling, and operational changes on the category of load identified in the Show Cause Order. Customers electing the same service are subject to its corresponding requirements. The focused implementation also permits MISO to evaluate the consequences of broader eligibility before proposing that extension.[183]

The generator interconnection and associated load issues are addressed through the complementary ZGIA and LARS pathways, read with the load's applicable Transmission Service.

---

[180] Show Cause Order PP 33–38 (describing the response framework and the opportunity to develop section 205 filings); Abeyance Order PP 8–11 (allowing the staged filings and preserving unresolved issues).

[181] Show Cause Order PP 39, 48–65 (addressing application, study, operational, and agreement provisions); IRR Transmittal at 1–4 (describing the proposed definition and operational requirements); Furnish Testimony at 16-17, 22-23.

[182] Show Cause Order PP 100–105 (addressing interim NITS, contract-demand service, and flexible load).

[183] Xie Testimony at 21.

ZGIA addresses qualifying same-substation zero injection arrangements, while LARS coordinates the study of qualifying load and associated generation. Neither form of Interconnection Service eliminates the separate need to identify the transmission and operating obligations of the load. The proposed transmission service arrangements supply that additional part of the framework.[184]

The proposed framework also respects the allocation of responsibilities between federal and state regulators. The filing addresses jurisdictional Transmission Service, generator interconnection, and the associated planning and operating requirements. It does not displace state authority over retail service or resource procurement and does not authorize retail arrangements prohibited by applicable law. This distinction permits the transmission and interconnection provisions to operate within the existing regional regulatory framework.[185]

MISO also submitted the July 20, 2026 Informational Report addressing resource adequacy and initiatives to accelerate generation additions. That report described the roles of the states, load serving entities, and MISO and identified both existing reforms and proposals under development. The current filing complements those efforts by connecting the service election to the applicable planning assumptions and capacity treatment; it does not equate transmission firmness with a determination that capacity has been procured for the load.[186]

MISO requests that the Commission consider this submission together with the related filings in evaluating the response to the Show Cause Order. The Abeyance Order provides that timely section 205 filings addressing the preliminary findings suspend the filing respondents' obligation to respond and continue the abeyance pending further direction. It also preserves further consideration of issues not addressed by the filings.[187]

**A. Existing commercial arrangements and transition.**

Paragraph 123 of the Show Cause Order asks how implementation should account for existing agreements and agreements nearing execution. The IRR filing addressed transition for the reliability requirements proposed there.[188] The present application and service provisions account for existing agreements and agreements nearing execution in several ways. First, the LLPR process and requirements apply prospectively, with the first application deadline and LLPR cycle targeted for implementation date of Q1 of 2027. Requests for transmission service to

---

[184] ZGIA Transmittal at 1–2, 6–7 (describing the proposal's scope and the matters reserved for further work); LARS Transmittal at 3–6, 14–15 (describing coordinated load and generation studies and anticipated service provisions).

[185] Show Cause Order PP 42–47, 68–70 (discussing the respective federal and state responsibilities); ZGIA Transmittal at 22–23 (explaining that the associated-load provisions respect state restrictions on retail wheeling).

[186] Informational Report at 1–4, 6–11 (responding to the informational requirement and describing resource adequacy initiatives); Show Cause Order P 122 (requiring the report).

[187] Abeyance Order PP 9–11 (describing continued abeyance and the specificity expected for a request to terminate the proceeding in whole or in part).

[188] Show Cause Order P 123 (requesting briefing on implementation and protection of existing commercial arrangements); *See* MISO IRR filing, Docket No. ER26-3650, IRR *Trans. Ltr.* at 1 (identifying transition provisions for the IRR proposal).

accommodate Large Loads / study the Network Upgrades that have already commenced an EPR study will remain subject to that process and the proposed Tariff revisions neither require not allow projects that have already been processed through EPR or are in such process to transfer to the LLPR process. This respects existing commercial arrangements. To the extent that a project has not already been studied for its impacts to the Transmission System, the costs of its impacts are not established and requiring such project to proceed through LLPR cannot disrupt established expectations. Moreover, the LLPR study process is sufficiently similar to the EPR process in terms of timing and scope that requiring nascent projects (*i.e.*, those that have not been submitted for study and costs established) will not introduce significant new delays or unfamiliar study practices. Finally, with respect to the cost recovery agreements required for projects that complete LLPR, MISO notes that such agreements, while imposing responsibilities on the Large Load Transmission Customer, do not purport to invalidate or override any agreements that may exist between the entity that owns the Large Load and the Large Load Transmission Customer, or prevent more granular assignment of costs by a retail regulator.[189] Thus, the process appropriately prevents disruption to existing commercial arrangements and those nearing completion, while still ensuring that Commission goals are met prospectively.

**B. Effects on regional and local planning.**

Paragraph 124 asks how the new services affect planning, including uncertainty concerning the type, location, and quantity of flexible load. LLPR evaluates the service requested through cumulative models coordinated with MTEP. Interim NITS remains associated with completion of the facilities needed for full NITS. These distinctions allow planning to reflect the service obligation rather than treat every maximum load quantity as an identical firm delivery requirement.[190]

The separate firm and non-firm representation also makes the operational consequence of the planning assumption identifiable. A customer receiving non-firm service remains bound by its applicable reservation and withdrawal limits; a conversion to firm service depends on the capability and approval supporting that conversion. The study and operating arrangements therefore give effect to the same service election. The separate withdrawal review for committed load further allows MISO to assess changes in the planning assumptions when a project does not proceed.[191]

---

[189] While MISO's Tariff would make the Large Load Transmission Customer responsible for costs at the level of the MISO Tariff, it does not purport to prevent a Large Load Transmission Customer from recovering funds through commercial agreements with the Large Load.

[190] Show Cause Order P 124 (identifying the planning questions); Furnish Testimony at 4-5, 12-14 (describing cumulative models and MTEP coordination).

[191] Furnish Testimony at 15-16.

**C. Cost recovery and financial security.**

In response to Show Cause Order's concern regarding cost shifting among transmission customers related to large loads, MISO and the MISO Transmission Owners propose the Tariff revisions and *pro forma* LL-CRA and ITO-CRA described in Section IV.A of this transmittal. As explained above, consistent with the concerns identified by the Commission in the Show Cause Order the proposed cost recovery agreements require "a specified minimum financial contribution and financial security sufficient to secure such contribution," thus mitigating cost shifting if the Large Load Transmission Customer ultimately takes less Transmission Service than anticipated because the Large Load does not materialize as planned or is not developed at all.[192] Moreover, as explained above and in Mr. Gudeman's testimony, the Tariff and *pro forma* agreements ensure that payments made by a Large Load Transmission Customer to the Transmission Provider under the agreements will be appropriately credited toward Transmission Owners' annual transmission revenue requirements in the event such costs are rolled into the Transmission Owner's rates consistent with the Commission's cost-of-service regulations.[193] Lastly, the agreements provide that Transmission Owner will provide a workpaper in the annual informational filing detailing how any payments made pursuant to a cost recovery agreement are reflected in the Transmission Owner's transmission formula rate, or not recovered from Transmission Customers, as applicable.[194]

In response to paragraph 125, MISO proposes the LL-CRA and ITO-CRA described in Section IV.A as the contractual structures governing minimum cost contributions for the covered upgrades. For rolled-in in-zone costs, the minimum is the Yearly Required Revenue Commitment supported by the twenty-year incremental revenue calculation, with attributable transmission revenues applied through the annual shortfall comparison. For rolled-in impacted-owner costs, the minimum is the specified upgrade revenue-requirement payment over the applicable term. Each agreement also permits direct assignment. The amount follows the upgrades identified for the requested service and the documented customer responsibility, rather than a uniform dollar charge applied to every Large Load.

The financial security provisions initially use upgrade capital cost, permit specified adjustments and reductions, and provide draw and replenishment remedies. The construction-security coordination provisions avoid concurrently requiring full security under both a CRA and the corresponding construction agreement when compatible security can serve both.

The pro formas do not establish a general substitution right for a retail-level agreement with the end-use Large Load. Their express coordination provisions address the separate construction agreement's security.

---

[192] Show Cause Order at P 84.

[193] *See id.* P 85.

[194] *Id.*

**D. Alternative transmission technologies.**

Paragraphs 62 and 126 address evaluation of alternative transmission technologies and the explanation furnished when traditional upgrades are selected. The LLPR application includes the Transmission Owner's evaluation of alternative technologies and grid-enhancing technologies, and MISO reviews that information together with any further needs identified in the cumulative study. When transmission issues arise, MISO and the Transmission Owners evaluate possible solutions in the mitigation process. The resulting study report identifies the selected transmission solutions and the basis for the requested service.[195]

The proposed consideration of alternatives is directed to whether a solution will satisfy the applicable planning criteria and provide a more efficient means of accommodating the request. MISO has specifically incorporated consideration of alternative transmission technologies ("ATTs") and Grid Enhancing Technologies ("GETs") as part of the LLPR. Proposed Attachment FF Section I.D.1.c.iii.b.2 requires Large Load Transmission Customers to include with their LLLPR Application the applicable Transmission Owner's Interconnection Study Report, specifically identifying what ATTs and GETs were considered and what the outcome of that determination. Proposed Attachment FF, Section I.D.1.c.iii.e, which establishes the LLPR System Impact Study, specifically provides that MISO may consider alternative solutions, including those submitted by stakeholders. These solutions will include any ATTs or GETs identified by stakeholders. Attachment FF, Section I.D.1.c.iii.e further provides that, in the event MISO identifies any Tranmission Issues during the study, MISO will collaborate with the Transmission Owners on the development of solutions, specifically including ATTs and GETS.

Together, these proposed Tariff revisions embed a requirement to consider ATTs and GETS in the LLPR Study process and provide opportunities for stakeholders to suggest additional GETS or ATTs not initially identified in the study. Because this consideration is a part of the LLPR study, the basis for the proposed solution and alternatives considered will be included in the final LLPR Study report.[196] Because LLPR will be the required core process for evaluation of all requests for Transmission Service to serve Large Loads, these requirements will apply uniformly to new Large Loads.

MISO's requested acceptance of those provisions is based on the evaluation and reporting requirements, rather than a customer's ability to request consideration of an alternative outside the defined study process.[197]

---

195 Show Cause Order PP 62, 126; Furnish Testimony at 13-14, 31.

196 Furnish Testimony at 31 (explaining further that MISO will develop a standardized LLPR Study Report with sections that specifically address ATT/GETs considerations).

197 Show Cause Order P 126 (addressing evaluation without a customer request, appropriate modeling, and the explanation of feasibility, cost, and timing when traditional upgrades are selected).

### E. Generation participation and Resource Adequacy

Paragraph 127 addresses market participation and Resource Adequacy treatment of generation serving co-located or electrically proximate load. The ZGIA filing proposed participation as a Generation Resource, Dispatchable Intermittent Resource, Electric Storage Resource, or Behind the Meter Generation resource, subject to the limitation associated with serving the ZG Associated Load. It also proposed registration and operating-limit provisions that provide visibility into gross load and generation and constrain the resource's participation to the applicable configuration.[198]

For capacity, the ZGIA proposal bases accreditation on participation type and limits it by reference to the identified associated load, with the specified adjustment for avoided losses. It provides for use of ZG Resource credits through a Fixed Resource Adequacy Plan or Reliability Based Demand Curve Opt Out and restricts the use of uncleared and self-scheduled credits. Those provisions reflect the limited reach of ZG Interconnection Service and avoid treating the resource as though it could serve unrelated regional load.[199]

LARS follows a different interconnection pathway. The filing requests Network Resource Interconnection Service, limits the requested interconnection service to 150 percent of the paired load's peak demand, and requires the load and generation to be located in the same Local Resource Zone. MISO explained that these criteria connect the generation to the associated need while allowing different fuel types and accreditation outcomes. The study evaluates the pair's full system impacts using the criteria applicable to other NRIS requests.[200]

## VII. DESCRIPTION OF PROPOSED TARIFF REVISIONS

The proposed revisions implement the application and service framework across the relevant definitions, planning procedures, Transmission Service provisions, and agreements. LLPR establishes the application requirements, study sequence, model review, study report, and interfaces with MTEP and related study processes. The corresponding defined terms and agreement provisions identify the request being studied, the responsible Transmission Customer, and the requirements applicable when the resulting service is provided.[201]

The Transmission Service revisions establish the rights and conditions associated with Interim NITS and FSSU. Interim NITS uses the existing Attachment F framework with the additional service exhibit and corresponding Attachment G operating criteria. The related

---

198 Show Cause Order P 127(a)–(b) (identifying the generator participation and accreditation questions); ZGIA Transmittal at 17–19, 22–23 (describing market registration, operating limits, and the proposed ZG Resource definition).

199 ZGIA Transmittal at 18–20 (describing the proposed Module E-1 accreditation, forecast identification, FRAP, Opt Out, and credit-use provisions).

200 LARS Transmittal at 10–11, 13 (describing the service, pairing, and study criteria and their relationship to Resource Adequacy).

201 Furnish Testimony at 4, 11 (describing codification of the LLPR process).

modeling, Resource Adequacy, and ARR provisions distinguish the firm and non-firm components so that the same service election is reflected consistently in planning, operations, and settlements.

The marked and clean Tariff records submitted as Tab A and B respectively, set out the revisions. The following table of Tariff revisions is provided for reference and informational purposes only. The language filed in the proposed Tariff revisions shall control in the event of any discrepancies between the information provided in this table and the proposed Tariff revisions.

| **Tariff Section** | **Tariff Section Title** | **Brief Description of Changes** |
|---|---|---|
| **Module A** | | |
| | 1.B – Definitions - B | Update Baseload Usage to include Firm Transmission Service. Update Behind the Meter Generation to add Interim NITS as a service. |
| | 1.D – Definitions - D | Update Demand Response Resource, Types I and II, to include Firm Transmission Service as an eligibility. |
| | 1.F – Definitions - F | Update Firm Service Step Up to establish a process for evaluating the reliability impact of planned incremental Load additions before full integration of a Large Load whose planning study has been approved through MTEP. Update Firm Transmission Service to cover Load served under Firm Point-to-Point Transmission Service or NITS and exclude Load service on a non-firm basis under Interim NITs. |
| | 1.I – Definitions - I | Updates to Impacted Transmission Owner Large Load Network Upgrade(s) to cover upgrades outside the Transmission Pricing Zone containing the Large Load's Point(s) of Withdrawal that MISO identifies through Large Load Project Review as necessary for reliable service. Update to Interim NITS to provide for NITS reserved and |

| | | |
|---|---|---|
| | | scheduled on an as-available basis and subject to curtailment or interruption under Section 33.5. Updates to Interruptible Load, which now deems the portion of a Large Load served under Interim NITS to be Interruptible Load. |
| | 1.L – Definitions - L | Update to Large Load Network Upgrade to cover upgrades within the Transmission Pricing Zone containing the Large Load's Point(s) of Withdrawal that MISO identifies through Large Load Project Review as necessary for reliable service. Update to Large Load Transmission Customer to include a Transmission Customer taking or requesting Transmission Service on behalf of a Large Load. Update to Load Zone to clarify that a Large Load receiving Interim NITS must represent its firm and non-firm portions as separate Load Zones and that neither zone may be combined with other Loads. |
| | 1.N – Definitions - N | Update to Network Integration Transmission Service to now include Interim NITS under Exhibit 4 of Attachment F unless the Tariff expressly provides otherwise. Update to Network Load to now include all portions of a Large Load taking Interim NITS under Exhibit 4 of Attachment F unless the Tariff expressly provides otherwise. Update to Non-Firm Transmission Service to cover Load served under Non-Firm Point-To-Point Transmission Service or Interim NITS under Exhibit 4 of Attachment F. |

| | | |
|---|---|---|
| | 1.P – Definitions - P | Update to Peak Usage to exclude the Interim NITS portion of a Large Load from the forecast NITS peak used to calculate Peak Usage for ARR allocation. Load associated with a Firm Service Step Up request enters the calculation only after all associated upgrades are complete. |
| | 1.T – Definitions - T | Update to Total Forecast Peak Load to excludes Load served through Interim NITS from the forecast NITS peak. It also excludes Load associated with a Large Load's Firm Service Step Up request until all associated upgrades are complete. |
| | 2.2 – Reservation Priority For Existing Firm Transmission Service | Section 2.2 replaces references to "firm service" customers with references to customers taking the newly defined "Firm Transmission Service." This ties rollover priority and the right of first refusal to qualifying firm service and excludes the non-firm portion of Interim NITS. |
| **Module B** | | |
| | I. Introduction | Provides that a Large Load Transmission Customer must submit an application for LLPR review for Transmission Service to serve a Large Load as described in Attachment FF. |
| | III. Network Integration Transmission Service | Provides that the rates, terms, and conditions governing Network Integration Transmission Service will generally apply to Interim NITS. |
| | 28.1 – Scope of Service | Provides that the Large Load Transmission Customer taking Interim NITS must coordinate with the applicable Transmission Owner to establish a Commercial Pricing Node associated with the |

| | | |
|---|---|---|
| | | NITS service and a Commercial Pricing Node associated with Interim NITS service. |
| | 28.3 – Network Integration Transmission Service | Proposes revisions to clarify that the Transmission Provider and, as applicable, ITC will provide Network Integration Transmission Service, rather than Firm Transmission Service. |
| | 29.1 – Condition Precedent for Receiving Service | Proposes a new framework for a Large Load Transmission Customer to take Interim NITs and requiring that customer to identify the Load that will qualify for Firm Transmission Service and the amount of Load qualifying for Non-Firm Transmission Service. |
| | 29.3 – Arrangements to be Completed Prior to Service | Proposes revisions to clarify when Firm Network Integration Transmission Service and Interim NITS will commence. |
| | 30.8 – Use of Interface Capacity by the Network Customer | Adds a provision such that the use of Interface capacity to service the portion of a Network Customer's Network Load served under Interim NITS shall be on an as-available basis and subject to all limitations, Curtailment, and Interruption provisions, and that inclusion of such Load in the Load-based usage limit does not confer a right to firm use of Interface capacity to serve that portion of Load. |
| | 31.1 – Network Load | Provides that Network Load will include all portions of a Large Load served on a non-firm basis, unless provided otherwise. |
| | 31.5 – Changes in Service Requests | Provides that a Large Load Transmission Customer is limited to one request to defer the start of the Network Integration Transmission Service up to a |

| | | |
|---|---|---|
| | | period of 90 days. Further provides that, if the Large Load does not commence operations or fails to operate at the approved level within 90 days of the requested Service Commencement Date, the Transmission Provider may revoke the approval for the amount of Network Integration Transmission Service that failed to begin operation. Further provides that the Large Load Transmission Customer is not relieved of its obligation to pay the costs of the transmission facilities caused to be constructed. |
| | 31.7 – Deferral of Service to Large Loads | New section proposing the deferral of service to Large Loads until the construction of new transmission facilities is completed. Provides that the Large Load Transmission Customer may request Interim NITS for the portion of any deferred service, which the Transmission Provider may defer if it determines that providing service would impair existing Firm Transmission Service. |
| | 31.8 – Excess Withdrawal | New section proposing that the Large Load Transmission Customer may not schedule the delivery of Energy to a Large Load in excess of the Firm Transmission Service that has been approved for the Load additions in the intervening step-up period, and that any withdrawal in excess of the approved limit will be subject to charges and penalties. Further provides that a Large Load Transmission Customer taking |

| | | |
|---|---|---|
| | | Interim NITS may not schedule delivery of Energy to a Large Load in excess of the aggregate level of Firm Transmission Service and Non-Firm Transmission Service. |
| | 33.5 – Allocation of Curtailments | Proposes that Interim NITS will have a lower priority than (i) Firm Transmission Service and (ii) Transmission Service from Resources other than designated Network Resources for Network Customers not served under Interim NITS. Among transactions under Interim NITS, Curtailments or Interruptions will begin with the Large Load with the most recent Service Commencement Date. |
| | 33.7 – System Reliability | Proposes that the Transmission Provider will be able to curtail Interim NITS service for reliability reasons and implements penalties if the Large Load Transmission Customers fails to cease or reduce service in response to such a directive. If the Large Load Customer fails to cease or reduce service on two separate occasions within a 365-day period, Interim NITS shall be permanently terminated. |
| **Module C** | | |
| | 38.5 – Load Aggregation | Provides for limits on Load aggregation and clarifies each Large Load must be represented by a single Commercial Pricing Node and may not be aggregated or included in a Load Zone with other Commercial Pricing Nodes. Further provides that a Large Load taking both Firm and Non-Firm Transmission Service will have separate Commercial Pricing Nodes for each service, |

| | | |
|---|---|---|
| | | with Actual Energy Withdrawal first associated with the Commercial Pricing Node for Firm Transmission Service. Further provides that the Transmission Provider will maintain a list of defined Elemental Pricing Nodes that comprise a Large Load. |
| | 38.6 – Aggregators of Retail Customers | Provides that ARC registration will require an attestation by the ARC that no part of the DRR, LMR, or EDU is served through Interim NITS. Further provides that for each Large Load registered by an ARC, the Large Load Transmission Customer must certify that the DRR, LMR, or EDR is being registered at a maximum Demand that is less than or equal to the total amount of Firm Transmission Service provided to the Large Load. Provides that a Large Load being registered by an ARC may not be included in an aggregation of other Loads. |
| | 38.7.2 – Demand Response Resource Procedures | Provides that only the portion of a Large Load served by Firm Transmission Service may register as a Demand Response Resource, and that the Market Participant must demonstrate that the portion of any Large Load being registered as a Demand Response Resource has Firm Transmission Service. |
| | 42.6 – Partial-Year FTR Allocation Process for New ARR Zone(s) | Proposes revisions to exclude the portion of a Large Load taking Interim NITS from Partial-Year FTR Allocation processes. |
| | 43.2.4 – Nomination and Allocation of ARRs and MTPS ARRs | Proposes revisions throughout the section to exclude the portion of a Large Load taking Interim NITS from the nomination and |

| | | |
|---|---|---|
| | | allocation stages for Network Integration Transmission Service. |
| **Attachments** | | |
| Attachment F | Form of Service Agreement For Network Service | New Exhibit 2 adds transaction specification sheet for Large Load NITS that records the requested service, start date, and required upgrades. It also confirms that any local Transmission Owner operating requirements apply in addition to the applicable Tariff requirements, including Section 37A.<br><br>New Exhibit 3 adds a transaction specification sheet for Firm Service Step Up that records the firm service level, start date, and required upgrades for each increment. Exhibit 4 adds a separate sheet for Interim NITS that records firm and non-firm service levels and the start and end dates for each transaction. |
| Attachment G | Form of Network Operating Agreement for Network Service | Sections 3.0–5.0 set separate commencement rules for firm NITS and Interim NITS. Firm NITS commencement is tied to completion of the facilities and upgrades required for the applicable service, while Interim NITS requires MISO approval under new Exhibit F. The agreement also provides for service to end on a mutually agreed date or the transaction termination date.<br><br>New Exhibit F allows non-firm Large Load identified in the Firm Service Step Up study to operate under Interim NITS before required upgrades are complete, |

| | | |
|---|---|---|
| | | subject to Section 37A. MISO may curtail that service for reliability or operational reasons under Module B. |
| Attachment FF | Transmission Expansion Planning Protocol | Section I.D.1.c establishes the LLPR process for new loads of 50 MW or more and existing loads increasing by at least 25 MW in the aggregate. It provides for three study cycles per year and sets out application requirements, deficiency and cure procedures, model development, system impact studies, and stakeholder review.<br><br>Section I.D.1.c also establishes how MISO tenders the final study report and applicable cost recovery agreements under Attachments LLL and MMM. It specifies when upgrades are deemed approved for MTEP purposes, requires customer security for in-zone and out-of-zone upgrades, and requires MISO to post proposed load additions, planned upgrades, and estimated costs in a searchable, filterable format.<br><br>Section I.D.3 establishes the Firm Service Step Up study process for incremental service before full Large Load integration. It limits commencement to one incremental block per year and sets separate eligibility timing for firm NITS and Interim NITS. Both forms of incremental service end when service for the full Load begins. |

| | | |
|---|---|---|
| | | Attachments FF-9, FF-10, and FF-11 add the Large Load Transmission Customer attestation, the LLPR System Impact Study Agreement, and the Critical Energy Infrastructure Information nondisclosure agreement, respectively. |
| | I.D.1.c – Large Load Transmission Service | Proposes a new framework for Transmission Service to Large Loads including the Large Load Project Review (LLPR) process. |
| | I.D.1.c.i – Definitions | Adds definitions for Large Load Network Upgrade(s), Impacted Transmission Owner Large Load Network Upgrade(s), the Large Load Cost Recovery Agreement (LL-CRA, Attachment LLL), and the Large Load Impacted Transmission Owner Cost Recovery Agreement (LLITO-CRA, Attachment MMM). |
| | I.D.1.c.ii – Large Load Project Review Process Scope and Application | Establishes a Large Load Application where different service options may be selected (LLPR, FSSU, Interim NITS, or LARS). |
| | I.D.1.c.iii – Large Load Project Review | Provides for MISO to independently review the reliability impacts of Large Loads that require upgrades, in collaboration with the Transmission Owner(s) and Large Load Transmission Customer, with any system modifications presented through MTEP. |
| | Triannual Studies | Requires LLPR studies three times in a 365-day period with application deadlines posted at least 90 calendar days in advance. Late applications will be reviewed in the next cycle. |
| | Requirements for LLPR Processing | Identifies the application requirements including: data, |

| | | |
|---|---|---|
| | | study files, reports, an attestation, non-refundable application fee, relevant study deposits, and confidentiality agreements. |
| | Review and Cure of Application Deficiencies | Sets out the period of time that MISO has to review and identify deficiencies in the Large Load Application and defines the period of time the Large Load Transmission Customer has to cure any deficiencies. |
| | Model Build Period | Requires LLPR models to be built from the latest MTEP cases, with specific comment windows and a target of completing within 30 calendar days after the cure period. |
| | The LLPR System Impact Study | Defines the scope of the study, the posting of applications, and deadlines for Transmission Owners to propose solutions (including ATTs/GETs); applications are withdrawn if issues remain unresolved. Also provides for the draft and final LLPR Study Reports and tender of the LL-CRA/LLITO-CRA. |
| | Resubmission of Large Load Applications and Removed Projects | Allows a Large Load Transmission Customer whose application was removed to resubmit in a future LLPR study cycle after identifying what has changed. |
| | Stakeholder Forums | Requires MISO to host stakeholder forums at least three times per year, followed by comment periods. Projects are deemed approved once the LL-CRA and/or LLITO-CRA is executed or if unexecuted or non-conforming, filed with the Commission, and the Transmission Owner must make a good faith effort to implement them. |

| | | |
|---|---|---|
| | *Pro Forma* LL-CRA and LLITO-CRA | Requires a Large Load Transmission Customer to enter into a LL-CRA and/or LLITO-CRA listing the required Large Load Network Upgrades, to limit cost shifting, and reduce speculative requests. The customer remains responsible for all applicable Transmission Service charges. |
| | Large Load Cost Recovery Agreement | Imposes Minimum Contribution for the Large Load Network Upgrades. Also requires security equal to the estimated upgrade costs. |
| | Large Load Impacted Transmission Owner Cost Recovery Agreement | Requires a separate LLITO-CRA with each affected Transmission Owner, under which the Large Load Transmission Customer is responsible for a Minimum Contribution for ITO-Large Load Network Upgrades and security to cover those upgrades. |
| | Tender and Execution of the Cost Agreement | Gives the parties 15 business days to execute the tendered LL-CRA/LLITO-CRA or request an unexecuted or non-conforming filing with the Commission; if they do neither, then the Large Load Application is deemed withdrawn and the project is removed from the LLPR process. |
| | I.D.1.c.iv – Operations Agreement and Confidentiality of LLPR Information | Requires an updated load forecast and a NITS application under Module B, Section 29.2 before service begins. Also requires the parties to keep non-public LLPR information confidential under MISO's universal NDAs. |
| Attachment FF-9 | Large Load Project Review Attestation Form | New Tariff attachment |
| Attachment FF-10 | LLPR System Impact Study Agreement | New Tariff attachment |

| | | |
|---|---|---|
| Attachment FF-11 | LLPR Critical Energy Infrastructure Information NDA | New Tariff attachment |
| Attachment LLL | Form of Agreement for Large Load Cost Recovery Agreement | New Tariff attachment |
| Attachment MMM | Large Load Impacted TO Cost Recovery Agreement | New Tariff attachment |

## VIII. STAKEHOLDER ENGAGEMENT

MISO developed the Large Load proposals described herein through an iterative stakeholder process that began before issuance of the Show Cause Order. EPR improvements and coordination of load and generator studies were discussed through the Planning Advisory Committee and Planning Subcommittee during 2024 and 2025. ZGIA was introduced in December 2025 and developed through a subsequent planning committee and LLWG discussions. The LLWG then provided a dedicated forum for the planning, operations, markets, and Resource Adequacy questions implicated by Large Load integration.[202]

The process included presentation of concepts, circulation of draft Tariff language, written feedback, and further revisions. For example, the LARS proposal evolved from an initial 250 MW threshold to the 200 MW threshold filed with the Commission following stakeholder feedback. MISO also revised the proposed treatment of multiple generating facilities and contractual arrangements and clarified the representation of the load-generation pair. These changes illustrate the relationship between the stakeholder process and the proposals brought forward in the staged filings.[203]

The LLPR application and transmission service proposals continued and were developed through that process. At the September 23, 2026, LLWG meeting, MISO reviewed the LLPR and identified the posted draft Tariff language, inviting feedback on the process and the proposed provisions. MISO also presented the Interim NITS (initially presented as "FLITS") option and sought feedback on its design. Stakeholder comments addressed study readiness and timing, planning coordination, service limits, curtailment, and the transition to firm service. These issues informed the continuing work on the relationship among the application, study, and operating provisions.[204]

---

[202] ZGIA Transmittal at 45–46 (describing EPR, coordinated study, and ZGIA discussions); LARS Transmittal at 49–50 (describing the LLWG's role and early work plan).

[203] LARS Transmittal at 50–52 (describing the July, August, and September discussions and the resulting changes to the proposal).

[204] MISO, LLWG, *Application and Study Process Tariff and Process Design*, LLWG-2026-7 (Sept. 23, 2026), feedback request and comments posted Oct. 7–8, 2026 (identifying the draft LLPR review and stakeholder issues); MISO, LLWG, *Flexible Large-Load Interconnections and Transmission Service—Interim NITS Option*, LLWG-2026-5 (Sept. 23, 2026), feedback request and comments posted Oct. 2, 2026 (addressing the interim service design).

MISO's development of the present filing also reflects the need to coordinate the proposals with the earlier submissions. The same load information and reliability assumptions must support the study process, the service election, and the operating agreement. Stakeholder consideration of those interfaces has therefore proceeded alongside development of the individual service and study provisions.[205]

Throughout the stakeholder process, MISO solicited feedback on what approach should be applied to developing processes and ensuring stakeholder protections. MISO proposed, accepted feedback from stakeholders, and significantly modified many aspects of the Large Load effort. As discussed below, some of the stakeholder process may be summarized in three categories: (1) cost transparency and recovery; (2) LLPR; and (3) Interim NITS.

Our 2026 Journey with the Large Load Working Group




**A. Cost Transparency and Recovery**

In the initial LLWG meeting, MISO identified cost efficiency as one of twelve considerations governing large-load integration.[206] Stakeholder feedback proposed including cost allocation within cost efficiency or treating it as an additional consideration.[207] MISO agreed to work with stakeholders to define solutions that fit within MISO's scope.

As previously discussed, throughout January and May of 2026, stakeholders raised cost transparency concerns while MISO concentrated on reliability requirements and expedited

205 Abeyance Motion at 8–13 (explaining the need to align individual solutions with one another and existing MISO procedures); Abeyance Order P 8 (recognizing the opportunity for region-specific stakeholder solutions).

206 Available at: https://cdn.misoenergy.org/20260130%20Large%20Load%20Workshop%20Presentation738349.pdf at 12.

207 Available at: https://cdn.misoenergy.org/MISO%20Response%20to%20Large%20Load%20Workshop%20Considerations%20and%20Outcomes%20of%20Large%20Load%20Additions746069.pdf at 4, 13.

interconnection processes.[208] In June, the Show Cause Order identified deficiencies in MISO's Tariff concerning cost transparency and protections against cost shifting, but the Show Cause Order was clear that it was not intended to disturb existing regional cost-allocation methods.[209]

In response to early stakeholder feedback and the Show Cause Order, MISO presented LLWG-2026-8 during the August 27, 2026 LLWG meeting to address an approach to address issues related to cost efficiency, transparency, and allocation.[210] The issue covered a mechanism to mitigate the risk of cost shifting among transmission customers, Tariff updates to create a public data platform that provides transparency to state and local stakeholders regarding the assignment of Network Upgrades and their associated costs. Stakeholder feedback requested more information that estimated project costs. MISO committed to developing a dashboard and pro forma recovery agreement while continuing to work to develop the minimum contribution formula.[211]

At the September 9, 2026, LLWG meeting, MISO previewed the public dashboard intended to identify network upgrades associated with large load transmission service.[212] Stakeholders generally supported the dashboard but some suggested additional measures were needed to prevent cost shifting.[213]

At the September 23, 2026, LLWG meeting, MISO introduced a conceptual pro forma cost recovery agreement.[214] MISO also illustrated how additional large load transmission revenue could offset upgrade costs and how a supplemental payment might protect existing customers if revenue were insufficient.

At the October 8, 2026, LLWG meeting, MISO provided additional details regarding the proposed *pro forma* cost recovery agreement, including the calculation of minimum. MISO also addressed the role of financial security and the treatment of payments through Transmission Owner annual informational filings. Stakeholder feedback sought additional clarification regarding the

---

208 Available at: https://cdn.misoenergy.org/20260420%20LLWG%20Item%2001b%20Agenda750857.pdf; https://cdn.misoenergy.org/20260514%20LLWG%20Item%2001b%20Agenda756827.pdf.

209 Show Cause Order at P 82.

210 Available at : https://cdn.misoenergy.org/New%20Issue%20-%20Cost%20Shifting%20Risk%20Among%20Transmission%20Customers776496.pdf.

211 Available at: https://cdn.misoenergy.org/LLWG%20Cost%20Transparency%20and%20Cost%20Shifting%20Response%20(LLWG-2026-8)%20(20260827)786923.pdf.

212 Available at: https://cdn.misoenergy.org/20260909%20LLWG%20Item%2005%20Cost%20Shifting%20Risk%20Among%20Tx%20Customers%20Cost%20Transparency%20(LLWG-2026-8)779833.pdf.

213 Available at: https://cdn.misoenergy.org/LLWG%20Cost%20Shifting%20Risk%20Among%20Transmission%20Customers-Cost%20Transparency%20Response%20(LLWG-2026-8)%20(20260909)789797.pdf.

214 Available at: https://cdn.misoenergy.org/20260923%20LLWG%20Item%2005%20Cost%20Shifting%20Risk%20Among%20Transmission%20Customers%20(LLWG-2026-8)783359.pdf at 5-10.

calculation of the minimum contribution, the treatment of network upgrade costs, financial security requirements, and the interaction between the proposed agreement and existing transmission rates.[215]

At the October 29, 2026 LLWG, meeting, specifically, in response to earlier feedback, MISO and the Transmission Owners clarified that the Large Load Transmission Customer is always responsible for the costs of the Large Load Upgrade(s) to mitigate the cost shifts to other Transmission Customers and changed the amount of financial security to be the capital cost of the Large Load Upgrade(s). MISO also described how it will provide transparency through a combination of the outputs from the Large Load Project Review, the pro forma cost recovery agreement, Transmission Owner annual informational filings, and a transparency dashboard.[216] MISO revised payments to be prorated for staggered upgrade in service dates and addressed separated agreements for impacted Transmission Owners outside the relevant transmission pricing zone. Additionally, the revised dashboard added Project Description and Cost Shared Status fields. Other updates in response to stakeholder feedback include the financial security holder, security amounts, security forms, and cost updates. Feedback is now complete but suggests that the revisions addressed some stakeholder concerns.[217]

**B. LLPR**

At the August 27, 2026, LLWG meeting, MISO proposed a new Large Load Project Review ("LLPR") process to integrate requirements from the Show Cause Order, incorporate enhancements from broader large-load efforts, and preserve the core functions of reliable integration.[218] The initial design called for quarterly study cycles, cumulative MTEP studies, and continued monthly stakeholder meetings. Stakeholder feedback expressed concerns about commercial confidentiality and premature contract commitments.[219]

At the September 23, 2026, LLWG meeting, MISO proposed a refined approach after receiving stakeholder feedback, including replacing the Electric Service Agreement with an

---

215 Available at: https://cdn.misoenergy.org/20261008%20LLWG%20Item%2004%20Cost%20Shifting%20Show%20Cause%20%28LLWG-2026-8%29786862.pdf at 4–8; https://www.misoenergy.org/engage/stakeholder-feedback/2026/llwg-cost-shifting-risk-pro-forma-cost-recovery-agreement-llwg-2026-8-20261008/.

216 Available at: https://cdn.misoenergy.org/20261029%20LLWG%20Item%2004%20Cost%20Shifting%20Risk%20Among%20Transmission%20Customers%20(LLWG-2026-8)791917.pdf at 2.

217 Available at: https://www.misoenergy.org/engage/stakeholder-feedback/2026/llwg-cost-shifting-risk-among-transmission-customers-llwg-2026-8-20261029/.

218 Available at: https://cdn.misoenergy.org/20260827%20LLWG%20Item%2005%20Large%20Load%20Application%20and%20Study%20Process%20(LLWG-2026-7)777233.pdf.

219 Available at: https://cdn.misoenergy.org/LLWG%20Large%20Load%20Application%20and%20Study%20Process%20Response%20(LLWG-2026-7)%20(20260827)786659.pdf.

attestation, tailoring studies to the type of transmission service requested, preserving the EPR for other projects, and proposed Tariff language.[220] MISO also committed to a standardized report covering assumptions, upgrades, costs, schedules, and Advanced Transmission Technologies and Grid-Enhancing Technologies.[221]

At the October 29, 2026, LLWG meeting, MISO presented a final LLPR process with application. The LLPR included application, study, mitigation, reporting, and approval frameworks, as well as three annual study cycles, expanded readiness requirements and draft Tariff revisions.[222]

### C. Interim NITS

MISO's development of Firm Service Step-Up ("FSSU") and Flexible Large-Load Interim Transmission Service, which was initially referred to as FLITS but is herein referred to as Interim NITS, reflects two related efforts to allow large loads to receive power which can be reliably transmitted before all transmission upgrades needed for full firm service are completed. The two proposals developed separately but became interconnected as MISO responded to stakeholder feedback and the Show Cause Order.

In April 2026, MISO recommended the Firm Service Step-Up initiative for consideration by the LLWG.[223] At the April 20, 2026, LLWG meeting, MISO proposed a process to evaluate and grant firm service for partial load interconnection.[224] The initial proposal was for a phased firm-service. Feedback indicated that stakeholders generally supported a process to assess and grant firm service to facilitate the timely interconnection in large loads, but some pointed to a need for flexibility in how service level was granted.[225] Other feedback opposed annual only studies, and some raised the possibility of non-firm service for a facility that might want some flexible load indefinitely. The feedback established a need for multiple incremental steps and more flexible

---

220 Available at: https://cdn.misoenergy.org/20260923%20LLWG%20Item%2004%20Tariff%20Defined%20Application%20and%20Study%20Process%20(LLWG-2026-7)782743.pdf.

221 Available at: https://cdn.misoenergy.org/LLWG%20Application%20and%20Study%20Process%20Tariff%20and%20Process%20Design%20Response%20(LLWG-2026-7)%20(20260923)791576.pdf.

222 Available at: https://cdn.misoenergy.org/20261029%20LLWG%20Item%2006%20Large%20Load%20Application%20and%20Study%20Process%20(LLWG-2026-7)791445.pdf.

223 Available at: https://www.misoenergy.org/engage/MISO-Dashboard/firm-service-step-up-for-large-load-interconnections/.

224 Available at: https://cdn.misoenergy.org/20260420%20LLWG%20Item%2008%20Firm%20Service%20Step%20Up%20Overview751418.pdf.

225 Available at: https://cdn.misoenergy.org/MISO%20Feedback%20Response%20Firm%20Service%20Step%20Up%20(LLWG-2026-1)%20(20260420)760062.pdf.

service timing, and MISO committed to developing further details in the process to provide clarity at the June LLWG.

At the June 10, 2026, LLWG meeting MISO presented further details on the Firm Service Step Up process.[226] MISO proposed quarterly study opportunities to identify how much firm load could be served reliability before all necessary upgrades were complete.[227] MISO's proposed process was more defined. It now allowed requests through Transmission Owner and Load Serving Entity coordination following MTEP approval, the ability to request several incremental load blocks, and a 36-month horizon. Feedback also indicated that MISO had largely responded to the need for more frequent studies and multiple steps but was adapting the proposal for upcoming stakeholder meetings. Some stakeholders expressed concern whether requested in-service dates could distort priority.

At the July 16, 2026, LLWG meeting, MISO presented a refined FSSU process and initial Tariff language.[228] A Bridge Interim Transmission Service Proposal was also presented by a stakeholder.[229] MISO proposed to update the FSSU process and proposed to clarify terminology, define the step-up period, and adopt additional requirements. The proposed Tariff language restricted requested load blocks to a minimum 25 MW step, limited to the number of network upgrade projects associated with the original full load integration study. MISO proposed a 36-month request horizon, and limits on additional upgrades and restudies. Stakeholder feedback focused on provisions to correct terminology, a timing requirement for transmission service requests, and limiting incremental load blocks on an annual basis.

At the August 12, 2026, LLWG meeting, MISO reviewed the initial proposal for a framework for Non-Firm Transmission Service for Large Loads called Flexible Large-load Interconnection and Transmission Service (FLITS).[230] FLITS was proposed as a non-firm transmission service option for large loads, usable either temporarily while upgrades were completed or on a more permanent basis. The proposal contemplated separate interim and permanent non-firm transmission service and worked alongside existing NITS and FSSU arrangements. MISO received a variety of feedback, though most stakeholders desired to see non-

---

[226] Available at: https://cdn.misoenergy.org/20260610%20LLWG%20Item%2007%20Firm%20Service%20Step%20Up%20Study%20Process763098.pdf.

[227] Available at: https://cdn.misoenergy.org/LLWG%20Large%20Load%20Firm%20Service%20Step%20Up%20Approach%20Response%20(LLWG-2026-1)%20(20260610)769664.pdf.

[228] Available at: https://cdn.misoenergy.org/20260716%20LLWG%20Item%2008%20Firm%20Service%20Step%20Up%20Study%20Process768776.pdf.

[229] Available at: https://cdn.misoenergy.org/20260716%20LLWG%20Item%2007c%20BITS%20Proposal_Alliant%20Energy768542.pdf.

[230] Available at: https://cdn.misoenergy.org/20260812%20LLWG%20Item%2006%20Conditional%20Non-Firm%20Transmission%20Service%20(LLWG-2026-5)774185.pdf.

firm large load included in the Coincident Peak Demand forecast. Others raised concerns over congestion prices, cost shifting, curtailment priority and other issues.

At the August 27, 2026, LLWG meeting, MISO proposed revised Tariff language for the FSSU process. In response to stakeholder feedback, MISO included terminology corrections, clarifications of requirements, limiting number of steps on an annual basis, and new requirements for submitting transmission service and load forecasts.

On September 9, 2026, LLWG meeting, MISO posted a summary of stakeholder feedback taken into consideration to improve the design for non-firm Transmission Service.[231] MISO reported that 12 respondents, including the OMS, supported including non-firm load in capacity-demand forecasts, compared with two favoring exclusion and four requesting further discussion. MISO also corrected an error in its August presentation regarding settlement modeling. MISO reported receiving 23 submissions and made several other identifiable changes.

Incorporating this feedback, MISO also presented at the September 9, 2026, LLWG meeting, where MISO proposed changes to FLITS in response to stakeholder feedback.[232] In response to feedback, MISO split the concept into interim FLITS and permanent Contract Demand, included all load in the Coincident Peak Demand forecast, removed the fixed ramp rate and required curtailment in a time specified by MISO.

At the September 23, 2026, LLWG meeting, MISO presented changes to the FLITS proposal.[233] MISO revised ARR entitlements to no longer be granted to the non-firm portion of the load and did not propose special rules for large loads in the Resource Adequacy construct. MISO also announced that it continued to develop a permanent non-firm Transmission Service option.

MISO responded to stakeholder feedback by revising Attachment FF provisions for clarity, correcting redundant sections, and reorganizing provisions related to transmission service.[234] MISO also stated that BPM language was being developed to describe the study process and criteria details at the implementation level.

---

[231] Available at: https://cdn.misoenergy.org/Flexible%20Large-Load%20Interconnection%20and%20Transmission%20Service%20(FLITS)%20Response%20(LLWG-2026-5)780398.pdf.

[232] Available at: https://cdn.misoenergy.org/20260909%20LLWG%20Item%2006%20Non%20Firm%20Large%20Load%20(LLWG-2026-5)780125.pdf.

[233] Available at: https://cdn.misoenergy.org/20260923%20LLWG%20Item%2007%20Conditional%20Non-Firm%20Transmission%20Service%20(LLWG-2026-5)783425.pdf.

[234] Available at: https://cdn.misoenergy.org/LLWG%20Firm%20Service%20Step%20Up%20for%20Large%20Load%20Interconnections%20Tariff%20Response%20(LLWG-2026-1)%20(20260923)792368.pdf.

At the October 29, 2026, LLWG meeting, MISO presented proposed revisions to BPM-020 addressing the FSSU study process, including study parameters, evaluation criteria, Interim Network Integration Transmission Service, and Qualified Changes. MISO also presented revisions to the LLPR framework, including application requirements, study timelines, reliability assessments, identification of Network Upgrades, and coordination with Transmission Owners. MISO requested additional stakeholder feedback on both proposals to further refine the processes and implementation procedures.

## IX. DOCUMENTS SUBMITTED IN THIS FILING

In addition to this Transmittal Letter, this submission includes the following materials, with the final tab and exhibit designations identified in the filing index:

Tab A – Redline Tariff[235]

Tab B – Clean Tariff

Tab C – Testimony of Jeanna Furnish

Tab D – Testimony of Zhaoxia Xie

Tab E – Testimony and Exhibits of Greg M. Gudeman

Tab F – Show Cause Order Briefing Questions and Answers

## X. EFFECTIVE DATE AND REQUEST FOR WAIVER

MISO requests that the proposed revisions become effective 90-days from the date of filing (*i.e.*, February 14, 2027).

MISO also requests waiver of Section 35.13 of the Commission's regulations, 18 C.F.R. § 35.13 (2026), to the extent applicable to this filing, and requests waiver of any other applicable requirement of 18 C.F.R. Part 35 for which waiver is not specifically requested, if necessary, in order to permit Commission acceptance of this filing.

---

235 Language currently pending before the Commission in the following, unrelated dockets is highlighted in yellow: ER26-3552-000; ER26-3650-000; and ER27-25-000. MISO requests that the Commission treat such highlighted language as subject to the outcome of those pending proceedings. If needed, MISO commits to file any revisions to this highlighted language as necessary to comply with any Commission orders in the proceeding.

In addition, MISO has not included language that has future effective dates of 6/1/2027, 9/1/2027, and 6/1/2029, under Docket Nos. ER26-1882-001, ER25-1886-000, and ER22-1640-003;-006, respectively. MISO has also removed language that has a future effective date of 6/12/2028 and is pending in Docket No. ER26-2825-000. If needed, MISO commits to file any revisions to comply with any Commission orders in these proceedings and MISO commits to make subsequent filings with the Commission to reflect the most up-to-date version of the then-current Tariff provisions prior to the effective dates of the language.

## XI. COMMUNICATIONS

MISO respectfully requests waiver of Rule 203(b)(3) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.203(b)(3) (2026), to the extent necessary to permit the designation of more than two persons for service on behalf of MISO in this proceeding and requests all communications related to this filing be directed to:

For MISO:

Michael Kessler
Managing Assistant General Counsel
Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent System Operator, Inc.
720 City Center Drive
Carmel, Indiana 46032
Telephone: (317) 249-5400
mkessler@misoenergy.org
csupino@misoenergy.org

For MISO:

James C. Holsclaw
Lauren A. Stenger
Calfee, Halter & Griswold LLP
3900 Salesforce Tower
111 Monument Circle
Indianapolis, Indiana 46204
Telephone: (317) 308-4266
jholsclaw@calfee.com
lastenger@calfee.com

**For MISO Transmission Owners:**

Wendy N. Reed
Anna Fernandez
Wright & Talisman, P.C.
1200 G Street, N.W
Suite 600
Washington, D.C. 20005
Telephone: (202) 393-1200
reed@wrightlaw.com
fernandez@wrightlaw.com

## XII. NOTICE AND SERVICE

MISO has served a copy of this filing electronically, including attachments, upon all Tariff customers, MISO Members, Member representatives of Transmission Owners and non-Transmission Owners, as well as all state commissions within the MISO Region and the Organization of MISO States. The filing has been posted electronically on MISO's website at https://www.misoenergy.org/legal/ferc-filings/ for other parties interested in this matter.

MISO also requests waiver of Section 35.13 of the Commission's regulations, 18 C.F.R. § 35.13 (2026), to the extent applicable to this filing, and requests waiver of any other applicable requirement of 18 C.F.R. Part 35 for which waiver is not specifically requested, if necessary, in order to permit Commission acceptance of this filing.

## XIII. CONCLUSION

For all of the foregoing reasons, MISO respectfully requests that the Commission accept this filing and grant waiver of any Commission regulations the Commission deems in order for the Commission to accept it as proposed.

Respectfully submitted,

/s/ Michael Kessler
Michael Kessler
Managing Assistant General Counsel
Christopher D. Supino
Managing Senior Corporate Counsel
Midcontinent Independent System
Operator, Inc.
720 City Center Drive
Carmel, Indiana 46032
Telephone: (317) 249-5400
mkessler@misoenergy.org
csupino@misoenergy.org

James C. Holsclaw
Lauren A. Stenger
Calfee, Halter & Griswold LLP
3900 Salesforce Tower
111 Monument Circle
Indianapolis, Indiana 46204
Telephone: (317) 308-4266
jholsclaw@calfee.com
lastenger@calfee.com

*Attorneys for the Midcontinent Independent System Operator, Inc.*

Wendy N. Reed
Anna Fernandez
Wright & Talisman, P.C.
1200 G Street, N.W
Suite 600
Washington, D.C. 20005
Telephone: (202) 393-1200
reed@wrightlaw.com
fernandez@wrightlaw.com

*Attorneys for the MISO Transmission Owners*